CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
VENABLE LLP
William M. Sloan (SBN 203583)
Tyler B. Welti (SBN 231697)

TELEPHONE NO: 415.653.3750   FAX NO: 415.653.3755
ATTORNEY FOR *(Name):* Athletics Investment Group, LLC

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: René C. Davidson Courthouse

CASE NAME:
Athletics Investment Group, LLC v. BAAQMD, et al.

> To keep other people from seeing what you entered on your form, please press the Clear This Form button at the end of the form when finished.

**ELECTRONICALLY FILED**
Superior Court of California
County of Alameda
05/06/2022
Chad Finke, Executive Officer / Clerk of the Court
By: X. Bowie   Deputy

CASE NUMBER: 22CV010930
JUDGE:
DEPT:

| CIVIL CASE COVER SHEET | Complex Case Designation | |
|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☑ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☐ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action *(specify):* Two
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 05/02/2022
William Sloan
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

EXHIBIT A

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
    or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-
    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Page 2 of 2

| Print This Form | For your protection and privacy, please press the Clear This Form button after you have printed the form. | Clear This Form |

7

F. ADDENDUM TO CIVIL CASE COVER SHEET

*Unified Rules of the Superior Court of California, County of Alameda*

| Short Title: | Case Number: |
|---|---|
| Athletics Investment Group, LLC v. Bay Area Air Quality Management District | |

## CIVIL CASE COVER SHEET ADDENDUM

### THIS FORM IS REQUIRED IN ALL NEW UNLIMITED CIVIL CASE FILINGS IN THE
### SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

[X] Oakland, Rene C. Davidson Alameda County Courthouse (446)

[ ] Hayward Hall of Justice (447)

[ ] Pleasanton, Gale-Schenone Hall of Justice (448)

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) | | |
|---|---|---|---|---|
| Auto Tort | Auto tort (22) | [ ] | 34 | Auto tort (G) |
| | | **Is this an uninsured motorist case?  [ ] yes  [ ] no** | | |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] | 75 | Asbestos (D) |
| | Product liability (24) | [ ] | 89 | Product liability (not asbestos or toxic tort/environmental) (G) |
| | Medical malpractice (45) | [ ] | 97 | Medical malpractice (G) |
| | Other PI/PD/WD tort (23) | [ ] | 33 | Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ ] | 79 | Bus tort / unfair bus. practice (G) |
| | Civil rights (08) | [ ] | 80 | Civil rights (G) |
| | Defamation (13) | [ ] | 84 | Defamation (G) |
| | Fraud (16) | [ ] | 24 | Fraud (G) |
| | Intellectual property (19) | [ ] | 87 | Intellectual property (G) |
| | Professional negligence (25) | [ ] | 59 | Professional negligence - non-medical (G) |
| | Other non-PI/PD/WD tort (35) | [ ] | 03 | Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [ ] | 38 | Wrongful termination (G) |
| | Other employment (15) | [ ] | 85 | Other employment (G) |
| | | [ ] | 53 | Labor comm award confirmation |
| | | [ ] | 54 | Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [ ] | 04 | Breach contract / Wrnty (G) |
| | Collections (09) | [ ] | 81 | Collections (G) |
| | Insurance coverage (18) | [ ] | 86 | Ins. coverage - non-complex (G) |
| | Other contract (37) | [ ] | 98 | Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] | 18 | Eminent domain / Inv Cdm (G) |
| | Wrongful eviction (33) | [ ] | 17 | Wrongful eviction (G) |
| | Other real property (26) | [ ] | 36 | Other real property (G) |
| Unlawful Detainer | Commercial (31) | [ ] | 94 | Unlawful Detainer - commercial  **Is the deft. in possession** |
| | Residential (32) | [ ] | 47 | Unlawful Detainer - residential  **of the property?** |
| | Drugs (38) | [ ] | 21 | Unlawful detainer - drugs  **[ ] Yes   [ ] No** |
| Judicial Review | Asset forfeiture (05) | [ ] | 41 | Asset forfeiture |
| | Petition re: arbitration award (11) | [ ] | 62 | Pet. re: arbitration award |
| | Writ of Mandate (02) | [X] | 49 | Writ of mandate |
| | | **Is this a CEQA action (Publ.Res.Code section 21000 et seq)  [ ] Yes  [X] No** | | |
| | Other judicial review (39) | [ ] | 64 | Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [ ] | 77 | Antitrust / Trade regulation |
| | Construction defect (10) | [ ] | 82 | Construction defect |
| | Claims involving mass tort (40) | [ ] | 78 | Claims involving mass tort |
| | Securities litigation (28) | [ ] | 91 | Securities litigation |
| | Toxic tort / Environmental (30) | [ ] | 93 | Toxic tort / Environmental |
| | Ins covrg from cmplx case type (41) | [ ] | 95 | Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] | 19 | Enforcement of judgment |
| | | [ ] | 08 | Confession of judgment |
| Misc Complaint | RICO (27) | [ ] | 90 | RICO (G) |
| | Partnership / Corp. governance (21) | [ ] | 88 | Partnership / Corp. governance (G) |
| | Other complaint (42) | [ ] | 68 | All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] | 06 | Change of name |
| | | [ ] | 69 | Other petition |

202-19 (5/1/00)

A-13

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**
**Branch Name:** Rene C. Davidson Courthouse
**Mailing Address:** 1225 Fallon Street
**City, State and Zip Code:** Oakland CA 94612

**SHORT TITLE:** THE ATHLETICS INVESTMENT GROUP, LLC, vs THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT, AND, et al.

**CASE NUMBER:**
22CV010930

**NOTICE OF CONFIRMATION OF ELECTRONIC FILING**

The Electronic Filing described by the below summary data was reviewed and accepted by the Superior Court of California, County of ALAMEDA. In order to process the filing, the fee shown was assessed.

**Electronic Filing Summary Data**

Electronically Submitted By:  jti efsp
Reference Number: EF-e39f55f5a49f
Submission Number: 22AA00058510
Court Received Date: 05/06/2022
Court Received Time: 1:27 pm
Case Number: 22CV010930
Case Title: THE ATHLETICS INVESTMENT GROUP, LLC, vs THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT, AND, et al.
Location: Rene C. Davidson Courthouse
Case Type: Civil Unlimited
Case Category: Writ - Administrative Mandamus
Jurisdictional Amount: Over $25,000
Notice Generated Date: 05/06/2022
Notice Generated Time: 1:43 pm

| **Documents Electronically Filed/Received** | **Status** |
| --- | --- |
| Petition for Writ of Mandate | Accepted |
| Civil Case Cover Sheet | Accepted |
| Summons | Accepted |

**Comments**
Submitter's Comments: Can our document to be stamped with the original date of submission (05/02/2022) as

**NOTICE OF CONFIRMATION OF FILING**

EXHIBIT A
9

the court did take some time to look over our documents before we received a notice of rejection.   Also (SCHNITZER STEEL INDUSTRIES, INC.,)  is Real Party in Interest,

Clerk's Comments:

**Electronic Filing Service Provider Information**
Service Provider: jti efsp
Contact: jti efsp
Phone:

RECEIVED MAY 0 9 2022

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT, and ALEXANDER
CROCKETT, in his official capacity as Interim Executive Officer of the BAAQMD,
Respondents. And SCHNITZER STEEL INDUSTRIES, INC., Real Party in Interest.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

THE ATHLETICS INVESTMENT GROUP, LLC,
Petitioner

> To keep other people from
> seeing what you entered on
> your form, please press the
> Clear This Form button at the
> end of the form when finished.

**ELECTRONICALLY FILED**
Superior Court of California
County of Alameda
05/06/2022
Chad Finke, Executive Officer / Clerk of the Court
By: _____ X. Bowie _____ Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Rene C. Davidson Courthouse
1225 Fallon Street
Oakland, CA 94612

CASE NUMBER:
*(Número del Caso):*
**22CV010930**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
William M. Sloan. Venable LLP, 101 California St Suite 3800, San Francisco, CA 94111; (415) 653 3570

DATE:
*(Fecha)* 05/06/2022
Chad Finke, Executive Officer / Clerk of the Court

Clerk, by
*(Secretario)* _____ X. Bowie _____ , Deputy
*(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT

under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)        ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☒ other *(specify):* CCP 416.50 Public Entity

4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

For your protection and privacy, please press the Clear This Form button after you have printed the form.

Save This Form | Print This Form | Clear This Form

EXHIBIT B

11

1   VENABLE LLP
    William M. Sloan (SBN 203583)
2   wmsloan@venable.com
    Tyler G. Welti (SBN 231697)
3   tgwelti@venable.com
    101 California Street, Suite 3800
4   San Francisco, CA 94111
    Telephone:   415 653 3750
5   Facsimile:   415 653 3755

6   KEKER, VAN NEST & PETERS LLP
    R. James Slaughter  (SBN 192813)
7   rslaughter@keker.com
    Eric H. MacMichael (SBN 231697)
8   emacmichael@keker.com
    633 Battery Street
9   San Francisco, CA 94111-1809
    Telephone:   415 391 5400
10  Facsimile:   415 397 7188

11
    Attorneys for *Petitioner*
12  *The Athletics Investment Group, LLC*

13

14          SUPERIOR COURT OF THE STATE OF CALIFORNIA

15              IN AND FOR THE COUNTY OF ALAMEDA

16

17  THE ATHLETICS INVESTMENT GROUP,       Case No. **22CV010930**
    LLC,
18                                         **VERIFIED PETITION FOR WRIT
                    Petitioner,            OF MANDATE AND COMPLAINT
19                                         FOR DECLARATORY RELIEF**

20        v.                               **(Code Civ. Proc. §§ 1085, 1060)**

21  THE BAY AREA AIR QUALITY
    MANAGEMENT DISTRICT, and
    ALEXANDER CROCKETT, in his official
22  capacity as Interim Executive Officer of
    the BAAQMD,
23
                    Respondents.
24  ─────────────────────────────────
    SCHNITZER STEEL INDUSTRIES, INC.,
25
                    Real Party in Interest,
26

27

28

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
05/06/2022 at 01:27:07 PM
By: Xian-xii Bowie, Deputy Clerk

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT B
12

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

# INTRODUCTION

1.      This case is about Respondent Bay Area Air Quality Management District's (BAAQMD) longstanding failure to regulate Real Party in Interest Schnitzer Steel Industries, Inc.'s (Schnitzer) air pollution in West Oakland, an environmental justice community that suffers one of the heaviest pollution burdens in California.

2.      BAAQMD administers the federal and California Clean Air Acts (each, a CAA; collectively, the CAAs) for the nine-county San Francisco Bay Area.  Under federal and state law, BAAQMD must apply the CAAs and BAAQMD's rules (Rules) to certain emitters of air contaminants that operate within BAAQMD's jurisdiction, such as Schnitzer.

3.      Schnitzer operates a metal-shredding operation (Facility) in West Oakland.  It is an emitter of air contaminants that operates within BAAQMD's jurisdiction.  It is unlawful for Schnitzer to emit air contaminants from the Facility without authorization, including a permit (Permit to Operate, or PTO) issued by BAAQMD.

4.      For many years, BAAQMD has failed to fulfill its non-discretionary regulatory obligations, imposed by both federal and state law, with respect to Schnitzer's Facility.  To start, the law specifies that where a facility's emissions exceed certain regulatory thresholds, it is a "Major Facility" and must obtain a "Major Facility Review" / Title V Permit.  It is clear that the Facility meets the requirements for being a Major Facility, because emissions data for the mega-shredder, which shreds automobiles and other metal-containing waste, show unequivocally that Schnitzer's high emissions of volatile organic compounds (VOCs)[1] and hazardous air pollutants (HAPs) exceed the regulatory thresholds.  BAAQMD has actual knowledge of these facts.  But BAAQMD has not required Schnitzer to obtain a Major Facility Review Permit.

5.      Furthermore, Schnitzer emits air contaminants in amounts exceeding various thresholds set by law, including the conditions of its PTO. Federal and state law require the local air regulator—here, BAAQMD—not to permit an emitter to operate if it is not in compliance with

---

[1] VOCs include precursor organic compounds (POCs), which are "[a]ny compound of carbon, excluding methane, carbon monoxide, carbon dioxide, carbonic acid, metallic carbides or carbonates and ammonium carbonate."  BAAQMD Rules 1-235, 1-233.  POCs participate in atmospheric photochemical reactions to create ozone pollution.

2

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT B

13

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

1  applicable emissions limits or other CAA requirements. But BAAQMD has issued and re-issued

2  Schnitzer's PTO many times even though BAAQMD officials have actual knowledge that

3  Schnitzer's emissions violate the CAA, BAAQMD Rules, and its permit conditions. Indeed,

4  BAAQMD has known for many years that Schnitzer's Facility emits excessive levels of several

5  air pollutants that cause substantial health risks for the West Oakland community. BAAQMD's

6  own findings also clearly show the alarming health impacts of this air pollution. BAAQMD

7  prepared a community-wide emissions inventory and health risk assessment as part of the West

8  Oakland Community Action Plan, which aims to improve air quality in the West Oakland

9  environmental justice community. The inventory shows that Schnitzer's emissions cause a public

10  health risk in West Oakland that is impermissible under BAAQMD's Rules. In fact, the

11  emissions and health risk data show that Schnitzer emits substantially more of every inventoried

12  pollutant (PM2.5, diesel particulate matter (PM), and TACs) and causes more cancer risk than

13  any other permitted source in West Oakland.

14        6.    Compounding the problem, the PTO that Schnitzer does possess does not include

15  various sources at the Facility. The Facility contains stockpiles of metal shredder aggregate that

16  emit air contaminants. Schnitzer also engages in "torch-cutting," which is the process of breaking

17  apart large objects with the use of heat and flame; this practice emits air contaminants. These

18  activities emit air contaminants and cannot occur without a permit. Schnitzer has not obtained a

19  permit for its stockpiles or to engage in torch-cutting. BAAQMD has actual knowledge of this

20  deficiency and, correspondingly, a legal obligation to not renew Schnitzer's PTO. BAAQMD has

21  failed to do so.

22        7.    Despite knowing that Schnitzer is violating several air quality laws and emissions

23  limits set by BAAQMD, BAAQMD has continued to renew Schnitzer's PTO. In doing so,

24  BAAQMD has violated its legal duty to not issue or renew a permit for a facility that is violating

25  emission limitations, BAAQMD Rules, or federal or California laws. Underscoring this fact,

26  PTO renewals issued by BAAQMD in 2020 and 2021 set limits on emissions of pollutants that

27  tables in the permits themselves show Schnitzer is exceeding.

28        8.    The brunt of BAAQMD's failure to regulate Schnitzer's Facility as required by

law falls on West Oakland, a low-income community of color with a long history of suffering disproportionately high environmental pollution. Within this community, Schnitzer's Facility is located closer to nearly every class of sensitive receptor— including hospitals, schools, and daycare centers—than any other metal shredder in California. Indeed, the Facility is less than a mile away from schools, hospitals, senior living centers, parks, and about 23,000 residents. The Facility adjoins the Oakland Inner Harbor of the San Francisco Bay, which is impaired by multiple pollutants. This area is already designated under the federal CAA as a nonattainment area for the 2015 8-hour ozone and the 2006 PM2.5 national ambient air quality standards (NAAQS). In this sensitive location, Schnitzer shreds more material, generates more hazardous waste, and emits more air pollutants than any other metal shredding facility in the State.

9.     Petitioner the Athletics Investment Group LLC (the Athletics) maintains its business operations near the Facility and has proposed to build a ballpark for Major League Baseball games and other events close to the Facility. The Athletics bring this lawsuit to compel BAAQMD to perform its duties under state air quality law with respect to regulating the Schnitzer Facility and thereby fulfill BAAQMD's responsibility to protect the West Oakland community. Specifically, BAAQMD must deny Schnitzer's permit to operate because Schnitzer is in violation of emission limitations, BAAQMD Rules, and applicable federal and California air quality laws.

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

4
VERIFIED PETITION FOR WRIT OF MANDATE

VENABLE LLP
101 CALIFORNIA STREET  SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

1

**JURISDICTION AND VENUE**

2    10.    This Court has jurisdiction over this petition for a writ of mandate under section

3   1085 of the California Code of Civil Procedure and Article VI, Section 10 of the California

4   Constitution. The Court has jurisdiction over the complaint for declaratory relief under California

5   Code of Civil Procedure § 1060.

6    11.    Venue is proper in this Court under section 401 of the Code of Civil Procedure

7   because this is an action against the State or a department, officer, or other agency of the State,

8   which may be commenced in any county in which the California Attorney General has an office.

9   The California Attorney General has an office in Alameda County. Venue is also proper under

10   section 395 because the relevant operations of Real Party in Interest Schnitzer Steel Industries,

11   Inc. occur in Alameda County.

12

**PARTIES**

13    12.    Petitioner Athletics Investment Group LLC is a limited liability corporation

14   organized under California law and having a principal place of business at 55 Harrison Street,

15   Oakland, California 94607.

16    13.    Respondent BAAQMD is a California state public agency, organized and existing

17   under and under California Health & Safety Code section 40200, *et seq.*

18    14.    Respondent Alexander Crockett is the Interim Executive Officer of BAAQMD. He

19   is sued in his official capacity only.

20    15.    Real Party in Interest Schnitzer is a corporation organized under Oregon law. It

21   operates a metal shredding facility located at 1101 Embarcadero West, Oakland, California,

22   94607.

23

**LEGAL OVERVIEW**

24    16.    In California, local and regional authorities have the primary authority and

25   responsibility to control air pollution from all sources other than motor vehicles. (Health & Saf.

26   Code, § 39002.) BAAQMD is tasked with regulating stationary sources of air pollution in the

27   nine counties that surround the San Francisco Bay, including Alameda County. (Health & Saf.

28   Code, § 40200.)

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

17.     In particular, California law directs BAAQMD to "adopt and enforce rules and regulations to achieve and maintain the state and federal ambient air quality standards in all areas affected by emission sources under [its] jurisdiction, and ... enforce all applicable provisions of state and federal law." (Health & Saf. Code, § 40001(a).) This includes the federal and California CAAs.

18.     BAAQMD must also implement a permit system that requires parties to obtain a permit to operate "any article, machine, equipment, or other contrivance which may cause the issuance of air contaminants." (Health & Saf. Code, § 42300(a).) Among other things, BAAQMD's permit system must:

> Prohibit the issuance of a permit unless the air pollution control officer is satisfied, on the basis of criteria adopted by the district board, that the article, machine, equipment, or contrivance will comply with all of the following:
> (1) All applicable orders, rules, and regulations of the district and of the state board.
> (2) All applicable provisions of [the California CAA]....

(Health and Saf. Code § 42301(b).)

19.     This is an ongoing obligation on BAAQMD in regulating the facilities within its jurisdiction. The law requires that BAAQMD's permitting system must:

> Require, upon annual renewal, that each permit be reviewed to determine that the permit conditions are adequate to ensure compliance with, and the enforceability of, district rules and regulations applicable to the article, machine, equipment, or contrivance for which the permit was issued which were in effect at the time the permit was issued or modified, or which have subsequently been adopted and made retroactively applicable to an existing article, machine, equipment, or contrivance, by the district board and, if the permit conditions are not consistent, require that the permit be revised to specify the permit conditions in accordance with all applicable rules and regulations.

(Health and Saf. Code § 42301(e).)

20.     BAAQMD Rule 2-1-302 requires a facility to obtain an authority to construct and PTO for any equipment that may cause the emission of air contaminants. The steps to obtain a permit, and the conditions imposed on a given facility, vary depending on the amount and type of air contaminants the facility emits. BAAQMD must regulate any facility that emits District Best Available Control Technology (BACT) Pollutants or TACs above certain levels. District BACT

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT B

Pollutants include "[p]recursor organic compounds (POCs), non-precursor organic compounds (NPOCs), oxides of nitrogen (NOx), sulfur dioxide (SO2). PM10, PM2.5, and carbon monoxide (CO)." (BAAQMD Rule 2-2-210.) A TAC is "an air pollutant that may cause or contribute to an increase in mortality or in serious illness or that may pose a present or potential hazard to human health." (BAAQMD Rule 2-5-222.)

21.     BAAQMD's Regulation 2, Rule 2, implements the New Source Review (NSR) provisions of the federal and California Clean Air Acts. Under these provisions, a permit to construct or operate a new or modified source must require BACT to "control emissions of District BACT pollutants" if the source "will have the potential to emit [a District BACT pollutant] in an amount of 10.0 or more pounds on any day." (Rule 2-2-301.) BACT requires "the most effective emission control" or "the most stringent emission limitation" to be installed for a new or modified source.[2] (Rule 2-2-202.) BAAQMD's NSR regulations also require offsets for any source with the potential to emit more than specified levels of pollutants, which are 10 tons per year for POCs and Nitrous Oxide. (Rule 2-2-302.)

22.     BAAQMD's Regulation 2, Rule 5 creates additional toxic new source review requirements for sources of TACs. BAAQMD must require Toxic BACT (TBACT) for any permitted source of TACs where the source presents a cancer risk greater than 1.0 in one million (10-6 or 1.0E-6) at the "Maximally Exposed Individual" location[3] or a chronic hazard index greater than 0.20. (Rule 2-3-301.) A facility's health risk is determined by completing a Health Risk Assessment (HRA).[4]

---

[2] Under BAAQMD's rules, "BACT" is equivalent to the stringent Lowest Achievable Emission Rate (LAER) standard used in the federal non-attainment NSR Program. See BAAQMD Rule 2-2-202; 42 U.S.C. § 7503; 40 C.F.R. §§ 51.165(i), 51.161.

[3] BAAQMD Rule 2-5-212 defines "Maximally Exposed Individual" as "A person that may be located at the receptor location where the highest exposure to toxic air contaminants emitted from a given source or project is predicted, as shown by an APCO-approved HRA. MEI locations are typically determined for maximum cancer risk, chronic hazard index and acute hazard index based on exposure to residential, worker, and student receptors." See also CalEPA Office of Environmental Health Hazard Assessment, Air Toxics Hot Spots Program Risk Assessment Guidelines (Feb. 2015).

[4] An HRA, which is also known as a Health Risk Screening Analysis (HRSA), is "[a]n analysis that estimates the increased likelihood of health risk for individuals in the affected population that may be exposed to emissions of one or more toxic air contaminants." (BAAQMD Rule 2-5-211.)

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

23.     In addition, BAAQMD must deny a permit for a source of TACs "if the project risk exceeds any of the following project risk limits: [(1)] a cancer risk of 10.0 in one million (10-5 or 1.0E-5); [(2)] a chronic hazard index of 1.0; [(3)] an acute hazard index of 1.0." (BAAQMD Rule 2-2-301.)

24.     If a facility has the potential to emit in excess of applicable major source thresholds,[5] it must go through Major Facility Review and obtain a Major Facility Review Permit (also known as a Title V Permit) before operating. A facility is subject to Major Facility Review if it "has the potential to emit 100 tons per year or more of any regulated air pollutant" or "has the potential to emit 10 tons per year or more of a single hazardous air pollutant, 25 tons per year or more of a combination of hazardous air pollutants, or such lesser quantity as the EPA Administrator may establish by rule." (BAAQMD Rule 2-1-2 17 (defining PTE); BAAQMD Rule 2-6-222 (defining regulated air pollutants).) The Major Facility Review process requires large emitters to obtain a single, comprehensive operating permit that shows all federal, state, and local air quality requirements, and includes a public notice and EPA review period. (BAAQMD Rule 2-6-411.)

25.     Under BAAQMD's regulations and the California Health and Safety Code, these obligations continue to apply after a source is constructed. For example, Health and Safety Code § 42301(e) requires BAAQMD, before renewing a permit, "to determine that the permit conditions are adequate to ensure compliance with, and the enforceability of, [applicable] district rules and regulations" that were in effect when the permit was issued. BAAQMD Rule 2-6-424 requires BAAQMD to "evaluate the applicability of [the Major Facility Review] rule to each facility as part of the District's annual permit renewal process required by Health & Safety Code Section 42301(e)." And BAAQMD Rule 2-1-304 states that BAAQMD "shall deny an authority to construct or a permit to operate if the APCO finds that the subject of the application would not

---

[5] *See* BAAQMD Rule 2-6-212 (defining "Major Facility"); BAAQMD Rule 2-1-302 (requiring any major facility to comply with BAAQMD Rule 2-6); *see also* 42 U.S.C. § 7661(a) (making it unlawful to operate a major source except in compliance with a Title V permit); 40 C.F.R. § 70.7(b) (requiring a major source to submit a timely and complete application under an approved permit program).

8

VERIFIED PETITION FOR WRIT OF MANDATE

1   or does not comply with any emission limitations or other regulations of the District ... or with

2   applicable permit conditions or federal or California laws or regulations."

3       26.     In other words, BAAQMD has a clear, present, mandatory duty to deny a facility

4   permission to operate if the source violates or would violate applicable laws, regulations, or

5   permit conditions.

6   **FACTUAL ALLEGATIONS**

7   **A.    Schnitzer's Metal-Shredding Operations in West Oakland**

8       27.     Schnitzer operates the largest metal shredder in California. The Facility is located

9   within the West Oakland environmental justice community. Schnitzer is a large, profitable

10  company able to implement best management practices necessary for protecting public health and

11  the environment. Schnitzer is a multinational company with operations that include both

12  acquiring, processing, and selling scrap metals, and manufacturing and selling finished steel

13  products. Over the last three years, Schnitzer has generated an average of over $2.2 billion in

14  total revenue, with cashflow from operations averaging approximately $153 million.

15      28.     Schnitzer's Facility receives and stockpiles junked products containing metal, such

16  as vehicles, appliances, construction, and demolition materials, and manufacturing waste. Junk

17  vehicles and other metal-containing "feedstock" regularly contain hazardous materials, including

18  gasoline, oil, antifreeze, lead-acid batteries, vehicle air bags, compressed gas cylinders (e.g.,

19  propane tanks, compressed gas tanks, and fire extinguishers), refrigerants in air conditioning or

20  heat transfer systems, capacitors containing polychlorinated biphenyls (PCBs), light ballasts,

21  transformers, and items containing elemental mercury (e.g., tilt-switches or thermostats).

22      29.     Schnitzer loads this stockpiled feedstock into the "mega shredder," which grinds

23  the feedstock to small pieces and releases emissions into the air. From there, magnets remove

24  ferrous metals from the shredded feedstock. The remaining material, called "metal shredder

25  aggregate," is dropped off a conveyor belt and stored in large stockpiles. This aggregate typically

26  contains non-ferrous metal and a mixture of material often called "metal shredder residue," which

27  consists of metals, plastics, rubber, glass, foam, fabrics, carpet, wood, residual automobile fluids,

28  road dirt, and other debris.

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

9

VERIFIED PETITION FOR WRIT OF MANDATE

30.     Schnitzer eventually moves stockpiled aggregate to the Facility's "joint product plant," where non-ferrous metals such as aluminum, copper, lead, and zinc are removed.  The remaining metal shredder residue is stockpiled, eventually "treated" (sprayed with a sodium or potassium silicate solution and an alkaline activator such as cement), and then again stockpiled outside the joint products plant.

31.     Every year, Schnitzer also uses torches and other equipment to process about 100,000 tons of larger metal-containing materials that are too large to go through the shredder.

32.     Each of these steps of the shredding process (including the stockpiling of material and torch-cutting) emits air pollutants, including VOCs, particulate matter, and many TACs/HAPs, as explained further below.

**B.     Schnitzer's Operations Emit Numerous Pollutants and Cause Substantial Health Risk.**

33.     Schnitzer's Facility has polluted West Oakland for decades, including by emitting hundreds of tons a year of hazardous pollutants into the atmosphere in violation of state and federal air quality standards.  The Facility's shredder stack, along with associated conveyors, is a "source" that emits large amounts of pollutants into the air.  (BAAQMD Rule 2-6-228 [Defining "source" as "[a]ny article, machine, equipment, operation, contrivance or related groupings of such that may produce and/or emit any regulated air pollutant or hazardous air pollutant."])  On multiple occasions, source testing conducted at the Facility revealed that the shredder emits volatile organic compounds (VOCs), lead, and numerous other TACs, such as benzene, cadmium, hexavalent chromium, polychlorinated biphenyls (PCBs), and trichloroethylene.  Schnitzer's PTO also covers an infeed conveyor, cement silo, auto body component screener, drum magnet line with enclosure, and related abatement equipment.

34.     Schnitzer's torch cutting is another source subject to BAAQMD's regulation and permitting.  Schnitzer uses torch cutting to break apart large metal pieces of heavy melting steel.  Torch cutting vaporizes metal, resulting in emissions of fine particulate matter (PM2.5) and metals, including nickel, cadmium, hexavalent chromium, copper, lead, and other TACs.  Torch cutting occurs at a part of the facility that is specifically designated for torch cutting operations.

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

10
VERIFIED PETITION FOR WRIT OF MANDATE

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653-3750

BAAQMD has not permitted Schnitzer's torch cutting and does not appear to have evaluated associated emissions in reviewing and permitting the Facility.

35.    The Facility's large, uncovered stockpiles of hazardous materials are also a



"source" of pollutants that could be controlled by enclosing them. Schnitzer's stockpiles emit PM, POCs, TACs, and other pollutants as a result of wind erosion and materials handling, on top of emissions from regular fires. Schnitzer stores this hazardous material in large, multistory stockpiles outside and uncovered, where contaminants can blow offsite into surrounding communities and the Bay, and, as has occurred many times and is depicted here, catch fire.[6]

36.    Air pollution emissions from Schnitzer's mega-shredder, stockpiles, and other sources raise heightened health concerns because the materials handled consist of "aggregate" and "shredder residue" that exceed toxicity thresholds for hazardous waste under California law due to high concentrations of lead, copper, and zinc. Available data show that emissions from

---

[6] KTVU Fox 2, Crews responding to blaze at Schnitzer Steel in Oakland (June 17, 2020), https://www.ktvu.com/news/crews-responding-to-blaze-at-schnitzer-steel-in-oakland; *see also* Laura Anthony, ABC Channel 7 News, West Oakland fire is recycling plant's fifth in eight years, (June 4, 2018), http://abc7news.com/oakland-fire-is-recycling-plants-fifth-in-eight-years/3561037/ [quoting a BAAQMD official describing the smoke from a June 2, 2018 fire as a "toxic brew"].

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

1   stockpiles exceed trigger levels and that a health risk assessment of stockpile emissions is

2   required. As summarized in the attached table (attached as Exhibit 1), wind erosion of the

3   shredded ferrous metal and aggregate stockpiles alone results in emission of TACs—such as

4   arsenic, hexavalent chromium, lead, and nickel—at rates higher than their corresponding chronic

5   trigger levels. TAC emission rates associated with storage piles are even higher when emissions

6   from off-gassing, material handling, stockpiles of shredder residue and harvested non-ferrous

7   metal, and processing of heavy melt steel are accounted for. As Table 1 also shows, the

8   stockpiles emit POCs at rates higher than the 10 pound/day trigger for BACT under Rule 2-2-301.

9   Schnitzer's operations have also caused a significant amount of light fibrous material (LFM)—

10  which, like aggregate and metal shredder residue, is hazardous waste under California law—and

11  contaminated dust to be emitted and deposited across a large area of West Oakland and into the

12  San Francisco Bay.[7] Accordingly, available data show TAC emissions from the stockpiles are

13  likely to result in greater than a one in a million cancer risk ($10^{-6}$) for the maximally exposed

14  individual.[8] If the risk is greater than $10^{-6}$, the Facility must apply TBACT.[9]

15          37.     On June 28-29, 2017, October 12-13, 2017, January 20-21, 2018, October 29-31,

16  2018, and January 21-23, 2019, Schnitzer conducted testing at the shredder stack, including

17  testing for VOCs, particulate matter, and TAC emissions. The tests show that the shredder has a

18  potential to emit many TACs—including benzene, cadmium, hexavalent chromium, lead, PCBs,

19  and trichloroethylene—at levels that are many times greater than applicable chronic trigger

20

21

22  [7] *See, e.g.*, Department of Toxic Substances Control, Enforcement Order for Corrective Action,
23  Docket No. HWCA-FY20/21-006 (Feb. 23, 2021); *see also* Alameda County District Attorney's
    Office, California Attorney General's Office, Department of Toxic Substances Control,
24  Community Meeting concerning Schnitzer Steel Industries, Inc. (Nov. 20, 2014).

25  [8] BAAQMD Rule 2-5-401 ("An application for an Authority to Construct or Permit to Operate for
    any project subject to this rule shall contain an HRA conducted in accordance with Section 2-5-603
26  or the information necessary for the APCO to conduct an HRA. The APCO shall prepare an HRA
    where the applicant submits none.").

27  [9] BAAQMD Rule 2-3-301 ("The applicant shall apply TBACT to any new or modified source of
    TACs where the source risk is a cancer risk greater than 1.0 in one million ($10^{-6}$ or 1.0E-6), and/or
28  a chronic hazard index greater than 0.20.").

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

1    levels.[10]

2         38.    The October 2017, January 2018, October 2018, and January 2019 test results also

3    show that the Facility is a Major Facility under BAAQMD's rules and the shredder is a Major

4    Source under the federal CAA due to the shredder's potential to emit VOCs in excess of

5    applicable major source thresholds.[11]   Schnitzer does not have a Major Facility Permit, as

6    required by BAAQMD's Rules and the federal CAA, and did not timely apply for such a permit

7    when it became subject to BAAQMD Regulation 6, Rule 2 and Title V of the CAA.  As further

8    explained below, the test results also confirm that Schnitzer's Facility is a significant source of

9    TACs that are causing an unacceptably high health risk in West Oakland.

10        39.    Health risk data released by BAAQMD demonstrates the serious health and safety

11   risks associated with Schnitzer's air emissions.  BAAQMD compiled and released health risk data

12   about Schnitzer's emissions as part of the community-wide emissions inventory prepared in

13   connection with the West Oakland Community Action Plan (WOCAP).[12]  The WOCAP was

14   prepared by the West Oakland community and several agencies, including BAAQMD, under the

15   Community Air Protection Program, also known as Assembly Bill 617.  AB 617 provides for

16   community-based emissions reductions in neighborhoods most disproportionately impacted by air

17   pollution.  West Oakland was selected as a first priority environmental justice community and

18   was the first community in the State to issue an action plan under AB 617.  The WOCAP

19   identifies existing sources of air pollution in West Oakland and sets forth strategies to improve air

20
21   [10] The Facility's potential to emit these pollutants is shown by emission rates derived from these
     source test results and the Facility's authorized throughput capacity of 720,000 tons/year.
     BAAQMD chronic trigger levels are specified in BAAQMD Regulation 2, Rule 5.

22   [11] See BAAQMD Rule 2-6-212 (defining "Major Facility"); BAAQMD Rule 2-1-302 (requiring
     any major facility to comply with BAAQMD Rule 2-6); 42 U.S.C. § 7661(a) (making it unlawful
23   to operate a major source except in compliance with a Title V permit); 40 C.F.R. § 70.7(b)
     (requires a major source to submit a timely and complete application under an approved permit
24   program).

25   [12] See BAAQMD, Owning Our Air: The West Oakland Community Action Plan, Vol. 1 (Oct.
     2019),   available   at   https://www.baaqmd.gov/~/media/files/ab617-community-health/west-
26   oakland/100219-files/final-plan-vol-1-100219-pdf.pdf?la=en;   id.   at   Vol.   2,
     https://www.baaqmd.gov/~/media/files/ab617-community-health/west-oakland/100219-
27   files/final-plan-vol-2-100219-pdf.pdf?la=en; see also "2017 West Oakland-CANCRISK-hex_map"
     contained in Supporting Data Package (v1.0), available at https://www.baaqmd.gov/community-
28   health/community-health-protection-program/west-oakland-community-action-plan.

                                         13
                    VERIFIED PETITION FOR WRIT OF MANDATE

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

1   quality across the community, such as relocating significant stationary sources of pollution and

2   increasing monitoring and enforcement.

3         40.    The WOCAP shows that Schnitzer emits substantially more of every inventoried

4   pollutant (PM2.5, diesel particulate matter, and TACs) and causes more cancer risk than any other

5   permitted source in West Oakland.[13]  The WOCAP and underlying health risk data released by

6   BAAQMD also confirm that the cancer risk caused by Schnitzer's stationary sources exceeds

7   Rule 2-5-302's limit of 10 cases per million people at the maximally exposed receptor.  For

8   instance, cancer risk mapping data provided by BAAQMD shows that Schnitzer's permitted

9   source emissions cause an excess cancer risk of well over 10 in one million at the location of a

10  residential receptor (Phoenix Lofts) located near the Facility.  The WOCAP also shows that the

11  excess cancer risk caused by the Facility approaches 10 cases per million across the entirety of

12  residential zone 2, with 7 cases per million caused by its permitted stationary sources (the mega-

13  shredder) and over 3 more cases per million caused by its ship and truck emissions.[14]

14        41.    Notwithstanding all this, Schnitzer has continued to operate in violation of the

15  Clean Air Act, BAAQMD's rules, and its permit conditions.  And BAAQMD has continued to

16  renew Schnitzer's PTO despite Schnitzer's failure to comply with BAAQMD, state, and federal

17  air quality requirements and the PTO's emissions limits and other conditions.

18  **C.    Air Permitting History of Schnitzer's Facility**

19

20  [13] WOCAP, Vol. 1 at 5-7, 5-8, 5-25, 6-12, 6-15, 6-16, 6-19; WOCAP, Vol. 2 at A.I-16, A.I-105,

21  A.II 8-10, A.II-32-34, A.II-36-37; *see also* "2017 WestOakland-CANCRISK-hex_map" contained
    in Supporting Data Package (v1.0), https://www.baaqmd.gov/community-health/community-

22  health-protection-program/west-oakland-community-action-plan. The WOCAP and underlying
    data do not appear to apply directly to assessing compliance with BAAQMD's rules. The WOCAP

23  emissions inventory and health risk assessment appear to be based on estimated actual emissions
    rather than potential to emit, which is the metric used to determine compliance with BAAQMD's

24  rules. Additionally, it is unclear if the emissions inventory for Schnitzer was based on all recent
    source tests (the data file is labeled *2017 cancer risk*) or accounted for all TACs that Schnitzer

25  emits. The "stationary source" emissions and health risk attributed to Schnitzer appear to be based
    only on the shredder, not other sources and equipment like the stockpiles and joint products plant.

26  WOCAP, Vol. 2 at A.I-19 (describing the "source" as "shredder"). Schnitzer's truck and vessel
    emissions are listed separately.

27  [14] WOCAP, Vol. 2 at A.I-105, A.II 8-10, A.II-32-34, A.II-36-37. These numbers are lower than
    would be shown by an HSRA based on more recent source tests and accounting for emissions from

28  torch cutting, stockpiles, and other sources.

---

14

VERIFIED PETITION FOR WRIT OF MANDATE

**EXHIBIT B**

42.     In 2006, Schnitzer applied for permits to construct and operate a new "mega-shredder" at the Facility and began operating the mega-shredder on or about November 1, 2006.

43.     BAAQMD determined Schnitzer's application was incomplete, in part because emission factors for several TACs emitted by the shredder were not provided.  BAAQMD identified the TACs lead, asbestos, cadmium, hexavalent chromium, mercury, nickel, and zinc. (Letter from BAAQMD to Schnitzer Steel Products Company, Feb. 16, 2006.)

44.     In response, Schnitzer relied on academic literature to estimate emission levels for some but not all of the TACs associated with automobile shredding, rather than by measuring the actual levels of emissions coming from the Facility.  BAAQMD accepted the abbreviated list of TACs even though BAAQMD was then aware that testing conducted by another state agency, the Department of Toxic Substances Control, showed that other TACs were present in Schnitzer's shredder residue.  (Internal BAAQMD Email from Carol Allen to Dharam Singh, April 27, 2006, noting that DTSC had found "cadmium, total chromium, copper, lead, mercury, nickel, zinc, and PCBs" in auto shredder residue (attached hereto as Exhibit 2).)

45.     Based on emission factors reported in academic literature for the incomplete list of TACs, and with the actual emission levels obscured, BAAQMD completed an HRA for the shredder replacement in 2006 that indicated a maximum cancer risk of $22 \times 10^{-6}$.  The cancer risk was primarily due to polychlorinated biphenyls (PCBs) and hexavalent chromium emissions.  In the HRA, BAAQMD concluded the maximum risk was unacceptable because it was greater than the risk threshold of $10 \times 10^{-6}$ specified in BAAQMD Rule 2-5-302.

46.     Schnitzer responded that the HRA (and the academic literature it relied on) overstated actual emissions from the new shredder.  Schnitzer committed to performing a source test to measure emission factors for PCBs, hexavalent chromium, benzene, total organic compounds, and particulate matter (PM) from the shredder.  BAAQMD incorporated this requirement to undertake source tests to confirm whether applicable requirements are met based on the Facility's emissions into the authority to construct it issued for the new shredder.

47.     Schnitzer conducted the source test in March 2007. The results showed emission factors for PCBs, hexavalent chromium, benzene, total organic compounds, and PM from the

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

15

VERIFIED PETITION FOR WRIT OF MANDATE

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

1   shredder to be about 80 to 99.7 percent lower than the values used by BAAQMD in its 2006

2   HRA.  But the source test did not conform to BAAQMD procedures because the shredder was not

3   enclosed, resulting in a large percentage of the shredder's emissions escaping undetected and

4   Schnitzer significantly underreporting its actual emissions.

5       48.     On or about April 26, 2007, BAAQMD issued Schnitzer a PTO (2007 PTO). The

6   PTO included a throughput limit (the amount of material that may pass through the shredder) of

7   431,471 tons per year.  The 2007 PTO did not contain emission limits for many pollutants emitted

8   by the shredder, including TACs.

9       49.     Although BAAQMD had originally found that the Facility did not comply with

10  cancer risk thresholds, in 2008, BAAQMD completed a partial Health Risk Screening Analysis

11  ("HRSA"), in reliance on the incomplete information Schnitzer had provided, and found that the

12  project was below risk limits.  However, BAAQMD based the 2008 HRSA on Schnitzer's

13  inaccurate source test results that Schnitzer reported in March 2007.  The 2008 HRSA also did

14  not include many pollutants that: (1) BAAQMD had already identified as potential health

15  concerns caused by Schnitzer;[15] (2) Schnitzer later acknowledged are emitted from the mega-

16  shredder;[16] and/or (3) are otherwise known to be associated with metal shredding emissions.[17]

17      50.     BAAQMD has since acknowledged these errors—including that the 2008 HRSA

18  did not account for emissions from the shredder and associated operations that did not pass

19

20

21

22  _____

23  [15] The 2008 HRSA omitted asbestos, mercury, and nickel even though BAAQMD identified those
    toxic pollutants in a February 16, 2006 letter to Schnitzer.

24  [16] The 2008 HRSA did not consider many HAPs that Schnitzer's consultant has acknowledged
    that the Facility emits.  *See* Trinity Consultants, Synthetic Minor Operation Permit Application,

25  Schnitzer Steel, Industries (July 2019) at 3-3 (listing HAPs).

26  [17] The 2008 HRSA also did not include polychlorinated dibenzo-p-dioxins and polychlorinated
    dibenzofurans, which are known to exist in automobile shredder residue.  *See, e.g.*, Sakai, S., et

27  al., An International Comparative Study of End-of-Life Vehicle (ELV) Recycling Systems, The
    Journal of Material Cycles and Waste Management, Vol. 16 (2014) at 8; Zevenhoven, R. and L.
    Saeed, Automotive Shredder Residue (ASR) and Compact Disc (CD) Waste: Options for

28  Recovery of Materials and Energy, Helsinki University of Technology (Apr. 2003) at 13.

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

through the stack, which public records indicate are significant.[18]  BAAQMD acknowledged that the HRSA was conducted for TAC emissions only, and that it did not account for fugitive emissions when it permitted the shredder replacement and increased throughput. (BAAQMD Engineering Evaluation Report, Schnitzer Steel Products Company, Plant No. 208, App. No. 16721 (Mar. 2009), (2009 Engineering Evaluation Report, attached as Exhibit 3), at 6; BAAQMD Engineering Evaluation Report, Schnitzer Steel Products Company, Plant Number 208, Application Number 27762 (Nov. 11, 2016) (2016 Engineering Evaluation Report, attached as Exhibit 4), at 2.

51.     In permitting the Facility in 2008, BAAQMD also found NSR to be required due to the Facility's PM10 emissions.  But BAAQMD did not impose BACT or offsets for POCs or other pollutants that the shredder and associated operations, such as stockpiles of hazardous shredded materials and torch-cutting, emit in significant quantities.

52.     In 2016, Schnitzer applied for a permit to construct an upgraded abatement system at the mega-shredder designed to improve the capture rate for shredder emissions of particulate pollution.  In considering this permit, BAAQMD acknowledged concerns about Schnitzer's emissions and compliance with applicable requirements under BAAQMD Rules and the federal CAA.  In an Engineering Report, BAAQMD conceded that emissions from Schnitzer's shredder and associated operations "were not properly accounted for when the shredder was initially

---

[18] For example, BAAQMD records attribute most of Schnitzer's particulate emissions to emissions that did not pass through the stack. *See* BAAQMD Staff Report on Proposed Rules 12-13 & 6-4 (Feb. 2013) at 42, *available at* https://www.baaqmd.gov/~/media/files/planning-and-research/public-hearings/2013/1213_0604_sr_030713.pdf (estimating before enclosure of the shredder that Schnitzer's annual fugitive emissions of particulate matter (PM) to be almost 90x greater than its process emissions of PM, at 11.5 tons and 0.13 tons, respectively).  While the term "fugitive emissions" is used to describe emissions from the shredder and associated operations that do not pass through a stack, these emissions may reasonably be made to pass through a stack with the use of control measures (e.g., enclosure) and thus are not "fugitive" emissions under BAAQMD or federal rules. *See* 40 C.F.R. § 70.2 ("Fugitive emissions are those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally-equivalent opening."); BAAQMD Rule 2-1-203; U.S. EPA, Mem. re Interpretation of Definition of Fugitive Emissions in Parts 70 and 71 (Feb. 10, 1999) at 2 ("EPA Fugitive Emissions Interpretation Memo"), https://www.epa.gov/sites/production/files/2015-08/documents/fug-def.pdf (explaining that "[i]n determining whether emissions could reasonably be collected (or if any emissions source could reasonably pass through a stack, etc.), 'reasonableness' should be construed broadly").

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT B

1    permitted" in 2007 or when BAAQMD evaluated a significant increase of shredder throughput in

2    2009. (Engineering Evaluation Report, at 2. BAAQMD also questioned whether requirements of

3    BAAQMD's rules and the federal CAA that are critical to protecting public health had "been

4    fully satisfied." (*Id.*)

5         53.    Schnitzer's 2016 application relied on a 2007 source test and did not include a

6    current HRSA. BAAQMD acknowledged that Schnitzer had not provided accurate fugitive

7    emissions rates from the unenclosed shredder, so that BAAQMD lacked sufficient data to confirm

8    whether air quality requirements were met in relation to permitting the mega-shredder and

9    increased throughput. (*Id.*) Accordingly, on November 10, 2016, BAAQMD imposed a permit

10   condition (Condition No. 26401) requiring Schnitzer to conduct source tests and then propose

11   emission rate limits for its shredder, which BAAQMD would then impose as emissions limits, if

12   acceptable. (*Id.*) BAAQMD explained that it would use new emission estimates "to determine if

13   all new source review (NSR) and toxic NSR requirements for . . . previous permitting activities

14   were fully complied with. If the District finds that NSR has not been fully satisfied, the District

15   will require updated reviews, limits, offsets, and health risk assessments under this application, as

16   needed, to ensure full NSR compliance for . . . previous permitting activities." (*Id.*)

17        54.    BAAQMD then issued a PTO for the shredder and associated equipment that

18   reflected this backwards approach, under which BAAQMD allowed Schnitzer's operations to

19   continue before understanding Schnitzer's emissions and imposing required limits. For several

20   years thereafter, BAAQMD imposed a condition (Condition No. 26401) in Schnitzer's annual

21   PTO that recognized the need to understand Schnitzer's emissions and to set numerical limits

22   based on them to ensure compliance with applicable laws, including NSR and toxic NSR

23   requirements. The condition required Schnitzer to complete source tests and then propose

24   emission limits that BAAQMD would include in the permit if they met applicable requirements.

25        55.    For many years, Schnitzer did not comply with this requirement of the PTO and

26   BAAQMD did not impose limits on Schnitzer's emissions. Instead, BAAQMD repeatedly

27   renewed the PTO without considering whether the PTO conditions were adequate to ensure

28   compliance with applicable laws. In fact, BAAQMD renewed the PTO in 2017, 2018, and 2019

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

18
VERIFIED PETITION FOR WRIT OF MANDATE

despite the fact that source tests of the shredder stack had demonstrated clear violations of applicable BAAQMD, state, and federal laws, as further explained below.

**D.    Schnitzer's source tests confirm that the Facility's emissions exceed applicable trigger levels and require Major Facility Review.**

56.    After enclosing the shredder in 2017, Schnitzer completed several source tests. These source tests yielded alarming results, showing that the Facility's emissions POCs and TACs are very high, and revealing non-compliance with numerous laws.  On June 28-29, 2017, October 12-13, 2017, January 20-21, 2018, October 29-31, 2018, and January 21-23, 2019, Schnitzer conducted testing at the shredder stack, including testing for POCs, particulate matter (PM), and TAC emissions.  The tests showed that the shredder has a potential to emit several TACs—including benzene, cadmium, hexavalent chromium, lead, PCBs, and trichloroethylene—at levels that are many times greater than applicable chronic trigger levels.

57.    The test results also demonstrated that the Facility is a Major Facility under BAAQMD's rules and the shredder is a Major Source under the federal CAA due to the shredder's potential to emit VOCs in excess of applicable major source thresholds.  Emissions data for the Facility also showed that the Facility has a potential  to emit more than 25 tons of HAPs a year, including more than 10 tons a year of both toluene and xylene.[19]  The Facility's HAP emissions therefore also trigger Title V / Major Facility Permit requirements.  Therefore, the Facility is required to go through Major Facility Review and obtain a Major Facility Permit before operations continue.

58.    The significance of the test results was confirmed by the EPA, which, on January 27, 2020, issued Schnitzer a Notice of Violation finding that Schnitzer has been violating Title V of the CAA and federally enforceable requirements of BAAQMD's rules since at least 2007, including CAA section 502, 40 C.F.R. § 70.7(b), CAA section 110, and BAAQMD rules 2-1-302 and 8-2-301.  In September 2020, BAAQMD also entered into a "Compliance and Settlement

---

[19] See Exhibit 1. Emissions associated with the shredder aggregate are based on emission testing conducted at wTe Recycling, Inc. shredding facility in Greenfield, Massachusetts. Montrose Environmental, Final Report, Scrap Metal Shredding and Processing Emissions Testing - wTe Recycling, Inc., Greenfield, MA. 29 January 2016. That testing resulted in the development of emission factors for such processes that are used by regulators beyond just Massachusetts.

19

VERIFIED PETITION FOR WRIT OF MANDATE

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

Agreement" with Schnitzer. The Agreement states that total carbon emissions from the shredder violate Rule 8-2-301 but does not address any other of Schnitzer's ongoing violations.

**E.    BAAQMD Renewed Schnitzer's Permit Again in 2020 and 2021.**

59.    In December 2020, BAAQMD again renewed Schnitzer's permit, allowing Schnitzer to continue operating until at least October 2021. BAAQMD did not provide notice or a public comment period on the permit renewal. Nevertheless, the Athletics submitted a letter to BAAQMD identifying the many problems associated with Schnitzer's operations and air permitting. The Athletics demanded that BAAQMD ensure compliance with NSR, toxic NSR, Major Facility Review, and existing permit requirements, and that BAAQMD impose emission limits necessary to protect public health in West Oakland.

60.    In renewing the permit, BAAQMD introduced several new and modified conditions. For example, Condition # 27085 imposes the following hourly and yearly emission limits for PM10 and precursor organic compounds (POCs) from the shredder:

```
3. Total emissions from the S 6 Auto Shredder shall not
   exceed any of the emission limits listed below:
   a  Maximum Permitted Emission Rates:

                                  P-15 Stack      P 15 Stack
                                  Pounds/Hour     Tons/Year
   PM10                              5.91            6 15
   (total filterable + condensable)
   POC                             112.0           85.50
   (calculated as methane)
```

Additionally, Condition # 27085 strengthened previous permit conditions regarding Schnitzer's emissions, requiring that "[t]otal particulate emissions from the [shredder] stack shall not exceed a grain loading of 0.0046 grains/dscf" and that "[o]rganic emissions from [shredder] stack shall not exceed 300 ppmv (dry basis) of total carbon."

61.    BAAQMD renewed the PTO in late 2020 (2021 PTO) even though Schnitzer was and continues to be in violation of numerous air quality requirements, including those identified in the Athletics' comment letter.[20] As confirmed by both the 2017-2019 source tests and the table of Schnitzer's emissions attached to the renewed permit itself, Schnitzer has violated and

---

[20] BAAQMD renewed Schnitzer's PTO without first providing public notice and comment and without addressing the Athletics' comment letter or providing any explanation of its decision. Upon inquiry, BAAQMD also stated that the renewal decision was not subject to administrative appeal to BAAQMD's hearing board.

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

20

VERIFIED PETITION FOR WRIT OF MANDATE

1   continues to violate the POC and organic emission limits set by BAAQMD. The permit table and

2   source testing of the mega-shredder confirm that the shredder emits at least 183 pounds per hour

3   of POCs, well over the PTO's emission limit of 112 pounds per hour.

4       62.    The table of Schnitzer's emissions attached to its 2021 PTO also confirms that

5   Schnitzer's POC emissions are well over the trigger for BACT. The table states that Schnitzer's

6   shredder emits an annual average of 904 lbs/day of POCs, which amounts to 164.98 tons/year,

7   while the associated "infeed conveyor" that supplies the shredder with metal-containing feedstock

8   emits another 48 lbs/day of POCs, which amounts to another 8.76 tons/year. These emissions are

9   well over the regulatory trigger for the POC BACT requirements of 10 pounds of POC emissions

10  on any day. (BAAQMD Rule 2-2-301.)

11      63.    The 2017-2019 source tests and the table of emissions in the 2021 PTO also show

12  that Schnitzer continues to emit TACs—including benzene, cadmium, hexavalent chromium,

13  lead, PCBs, and trichloroethylene—at a rate that triggers TBACT requirements.

14      64.    Despite these emissions, the 2021 PTO still did not include enforceable emission

15  limits on many TACs emitted by the Facility or otherwise ensure that health risks caused by

16  Schnitzer's TAC emissions remain below applicable project risk limits under Rule 2-5-302.

17      65.    The high VOC emissions reported in the 2017-2019 source tests—well above the

18  Major Facility threshold of 100 tons per year—also show that the Facility is a Major Facility

19  under BAAQMD's rules and a Major Source under the CAA. This means Major Facility Review

20  is required and Schnitzer must obtain a Major Facility Permit (Title V Permit) before operations

21  continue.

22      66.    In late 2021, BAAQMD again renewed Schnitzer's Permit to Operate (2022 PTO)

23  (attached as Exhibit 5). This most recent and currently operative PTO applies to Schnitzer's

24  mega-shredder, infeed conveyor, cement silo, auto body component screener, drum magnet line

25  with enclosure, and related abatement equipment. The 2022 PTO carries Condition 27085 over

26  from the 2021 PTO, which imposes hourly and yearly emission limits for PM10 and POCs from

27  the shredder. The emissions table attached to the PTO shows that Schnitzer continues to violate

28  the PTO's emissions limits for POCs and organics. The table states that Schnitzer's shredder

101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750
VENABLE LLP

21

VERIFIED PETITION FOR WRIT OF MANDATE

1    emits an average of 880 lbs/day of POCs, which amounts to 160.6 tons/year. The associated

2    "infeed conveyor" that supplies the shredder with metal-containing feedstock emits another 46

3    lbs/day of POCs, which amounts to another 8.398 tons/year. Thus, Schnitzer continues to operate

4    in violation of its permit conditions and BAAQMD rules.

5         67.    Although the 2022 PTO also adds new conditions requiring Schnitzer to install and

6    operate two new regenerative thermal oxidizers and scrubbers to abate emissions, it does not set a

7    deadline for this to occur. To date this equipment has not been installed. The 2022 PTO also

8    does not require Schnitzer to permit its unpermitted sources—including the stockpiles—or

9    impose BACT for such sources.

10        68.    Schnitzer also continues to emit TACs at levels that significantly exceed trigger

11   levels at which TBACT is required. For instance, the PTO's emission table shows that the

12   Facility emits 900 lb/year of methylene chloride, which is more than ten times greater than the

13   BAAQMD chronic trigger level of 82 lb/year. (BAAQMD Rule 2-5, Table 2-5-1.) The

14   emissions table also shows that the Facility emits 220 lb/year of tetrachloroethylene, which is

15   more than fifteen times greater than the BAAQMD chronic trigger level of 14 lb/year. (*Id.*)

16   However, the 2022 PTO does not impose emission limitations for these TACs.

17        69.    Today, the Facility continues to operate even though Schnitzer has still not met all

18   applicable BACT and TBACT requirements. Beyond regenerative thermal oxidizers (which still

19   have not been installed), BACT and TBACT for POCs and organic TAC emissions from the

20   shredder would, at a minimum, include installing a fully enclosed "state-of-the-art" shredder

21   vented to a baghouse. Emissions control technology, including, but not limited to, an enclosure

22   and baghouse, must also be installed to address POC and TAC emissions from associated material

23   stockpiles, conveyors, and torch cutting to comply with BACT and TBACT.

24                              **FIRST CAUSE OF ACTION**

25                    **(For Writ of Mandate Under C.C.P. § 1085)**

26        70.    Petitioner incorporates all preceding paragraphs as if fully set forth herein.

27        71.    Under the California Health and Safety Code, Respondent BAAQMD must not

28   permit a facility to operate unless the facility complies with all "applicable orders, rules, and

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

22

VERIFIED PETITION FOR WRIT OF MANDATE

1    regulations of the district and of the state board." (HSC section 42301(b)(1).)  BAAQMD also

2    must "[r]equire, upon annual renewal, that each permit be reviewed to determine that the permit

3    conditions are adequate to ensure compliance with, and the enforceability of, district rules and

4    regulations . . . and, if the permit conditions are not consistent, require that the permit be revised

5    to specify the permit conditions in accordance with all applicable rules and regulations." (HSC

6    section 42301(e).)

7         72.    Similarly, under BAAQMD Rule 2-1-304, BAAQMD must not permit a facility to

8    operate if it "would not or does not comply with any emission limitations or other regulations of

9    the District . . . or federal or California laws or regulations." Furthermore, BAAQMD must

10   "evaluate the applicability of [the Major Facility Review] rule to each facility as part of the

11   District's annual permit renewal process required by Health & Safety Code Section 42301(e)."

12   BAAQMD Rule 2-6-424.

13        73.    BAAQMD has failed to perform its mandatory duties under these laws for the

14   following reasons:

15        a.    Schnitzer is not in compliance with the enforceable emissions limits of the 2022

16             PTO.  Condition No. 27085 of the 2022 PTO limits POC emissions from

17             Schnitzer's shredder to less than 112 pounds/hour and 85.5 tons/year.

18             Condition No. 27085 further requires that "[o]rganic emissions from [shredder]

19             stack shall not exceed 300 ppmv (dry basis) of total carbon." However,

20             Schnitzer has violated and continues to violate these POC and total organic

21             emission limits. Under these circumstances, the law requires BAAQMD to not

22             permit the Facility to operate.

23        b.    Schnitzer's shredder and associated sources emit POCs and TACs in excess of

24             the triggers for BACT and TBACT.  However, these sources do not comply

25             with BACT requirements for POC emissions or TBACT requirements for

26             organic TAC emissions, in violation of BAAQMD Rules 2-2 and 2-5. Under

27             these circumstances, the law requires BAAQMD to not permit the Facility to

28             operate.

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

23

VERIFIED PETITION FOR WRIT OF MANDATE

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

c.    BAAQMD Rule 2-5-302 requires BAAQMD to not permit a facility to operate "if the project risk exceeds... a cancer risk of 10.0 in one million." The WOCAP and underlying health risk data released by BAAQMD confirm that Schnitzer's shredder and associated sources cause a cancer risk at nearby sensitive receptors that exceeds 10 cancer cases per million. Under these circumstances, the law requires BAAQMD to not permit the Facility to operate.

d.    The Facility is operating in violation of the permitting requirements of BAAQMD Regulation 2, Rule 6, and Title V of the federal CAA. Source tests and the latest PTO show that the Facility is a Major Facility under BAAQMD's Rules and the shredder is a Major Source under the federal CAA because the shredder has a potential to emit over 100 tons/yr of POCs. BAAQMD Rule 2-6-212; see also 42 U.S.C. §§ 7661(2), 7602(j) (defining "major source" similarly). Schnitzer does not have a Major Facility (Title V) Permit and BAAQMD has not completed Major Facility Review of the Facility, as required by BAAQMD Regulation 2, Rule 6, and Title V of the federal CAA. BAAQMD has not released a Facility-specific HRA. Under these circumstances, the law requires BAAQMD to not permit the Facility to operate.

e.    The Facility is operating in violation of BAAQMD Rule 2-1-302, which requires a permit to be obtained before operating any source that may cause the emission of air contaminants. The Facility's operations include stockpiles and torch-cutting operations, which emit air contaminants. However, Schnitzer has not obtained a permit for these sources. Under these circumstances, the law requires BAAQMD to not permit the Facility to operate.

74.    Accordingly, BAAQMD has failed to perform its clear, mandatory duties under the state and federal CAA, the Health and Safety Code, and BAAQMD's own regulations. These ongoing violations of mandatory duties imposed on BAAQMD constitute action that is contrary to law, an abuse of discretion, and/or arbitrary and capricious.

75.    At all times material hereto, BAAQMD has been able to perform its duties and

VERIFIED PETITION FOR WRIT OF MANDATE

1    obligations as required by law, but has failed to do so.

2        76.    No administrative exhaustion was required.  To the extent administrative

3    exhaustion is required, Petitioner has exhausted available administrative remedies.  Petitioner has

4    no plain, speedy, and adequate remedy in the ordinary course of law, other than the relief sought

5    herein.

6        77.    Petitioner is beneficially interested in issuance of a writ because it maintains

7    business operations near Schnitzer and is currently proposing to build a ballpark in close

8    proximity to Schnitzer.  Petitioner, its employees and patrons, and the residents of West Oakland

9    are entitled to the protection of the environmental laws enacted to protect the public from sources

10    of air pollution like that emitted by Schnitzer's Facility.

11        78.    The writ of mandate sought by Petitioner will result in the enforcement of an

12    important right affecting the public interest, and will confer a significant benefit on the general

13    public, especially the West Oakland environmental justice community, as it will require

14    compliance with laws that were enacted to protect human health and the environment.

15        79.    Therefore, pursuant to Code of Civil Procedure section 1085, a Writ of Mandate

16    should issue directing BAAQMD to revoke Schnitzer's PTO and deny a new permit until the

17    applicable requirements are met.

18                        **SECOND CAUSE OF ACTION**

19                 **(For Declaratory Relief Under Code Civ.  Proc. § 1060)**

20        80.    Petitioner incorporates all preceding paragraphs as if fully set forth herein.

21        81.    An actual controversy has arisen and now exists between Petitioner and

22    Respondent BAAQMD concerning BAAQMD's obligations and duties under federal and state air

23    quality laws, and its own regulations.  As set forth herein, Petitioner contends that Respondent

24    was required by law to revoke Schnitzer's PTO and deny a new permit until the applicable

25    requirements are met.  Petitioner is informed and believes, and on that basis alleges, that

26    Respondent contends in all respects to the contrary.

27        82.    A judicial determination and declaration as to these issues is therefore necessary

28    and appropriate.

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

25
VERIFIED PETITION FOR WRIT OF MANDATE

**PRAYER FOR RELIEF**

Petitioner prays for relief as follows:

1.  A writ of mandate requiring Respondent to revoke Schnitzer's PTO for the Facility and not issue a new permit until all applicable requirements are met, as alleged above;

2.  A declaratory judgment under Code Civ. Proc. § 1060, declaring that Respondent violated its duties under the federal Clean Air Act, California Health and Safety Code, and its BAAQMD regulations, for the reasons alleged above, and that BAAQMD is required to revoke Schnitzer's PTO and deny a new permit until the applicable requirements are met;

3.  Costs of suit;

4.  Attorneys' fees as allowed by law, including under Code of Civil Procedure Section 1021.5;

5.  Any other relief that the Court deems just and proper.

Dated: May 2, 2022

VENABLE LLP

By:

William M. Sloan
Tyler G. Welti

Attorneys for Petitioner
The Athletics Investment Group, LLC

Dated: May 2, 2022

KEKER, VAN NEST & PETERS LLP

By:

R. James Slaughter
Eric H. MacMichael

Attorneys for Petitioner
The Athletics Investment Group, LLC

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

26

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT B

37

1                                   **VERIFICATION**

2   I, David Kaval, declare:

3       I have been authorized to make this verification on behalf of Petitioner THE ATHLETICS

4   INVESTMENT GROUP LLC.

5       I have read the foregoing Verified Petition for Writ of Mandate and know the contents

6   thereof, except as to those matters which are alleged on information and belief, and as to those

7   matters I believe them to be true.

8       I declare under penalty of perjury, under the laws of the State of California, that the foregoing

9   is true and correct.

10   Executed at **OAKLAND** California on May **2**, 2022

11

12

13                       David Kaval

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

<div align="center">27<br>VERIFIED PETITION FOR WRIT OF MANDATE</div>

# Exhibit 1

**TABLE 1**
**ESTIMATED SCHNITZER AIR POLLUTANT EMISSIONS (a)**
1101 Embarcadero West, Oakland, California

| Air Pollutant | Air Pollutant Emissions by Source (b) | | | | | | | | | | | | Total Individual HAP Emissions (d) | | Total Individual TAC Emissions (e) | | BAAQMD Chronic Trigger Level (f), (g) |
| | Shredder Stack (c) | | Shredder Fugitive Emissions (c) | | Shredder Stockpile Emissions (c) | | Joint Products Plant | | Cement Silo | | Torch Cutting | | | | | | |
| | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (lb/yr) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1,1-dichloroethene | 0.02 | 47 | 0.001 | 2 | 0.0007 | 1 | - (i) | - | - | - | - | - | 0.03 | 50 | 0.03 | 50 | 7,200 |
| 1,3-butadiene | 0.03 | 55 (h) | 0.001 | 3 | 0.0008 | 2 | - | - | - | - | - | - | 0.03 | 59 | 0.03 | 59 | 0.48 |
| 1,4-dichlorobenzene | 0.06 | 118 | 0.003 | 6 | 0.002 | 4 | - | - | - | - | - | - | 0.06 | 128 | 0.06 | 128 | 7.2 |
| 1,4-dioxane | 0.02 | 41 | 0.001 | 2 | 0.0006 | 1 | - | - | - | - | - | - | 0.02 | 44 | 0.02 | 44 | 11 |
| 2,2,4-trimethylpentane | 4 | 7,430 | 0.2 | 391 | 0.1 | 223 | - | - | - | - | - | - | 4 | 8,043 | - | - | - |
| Acetaldehyde | 0.3 | 576 | 0.02 | 30 | 0.009 | 17 | - | - | - | - | - | - | 0.3 | 624 | 0.3 | 624 | 29 |
| Acrylonitrile | 0.009 | 19 | 0.0005 | 1 | 0.0003 | 0.6 | - | - | - | - | - | - | 0.01 | 20 | 0.01 | 20 | 0.29 |
| Arsenic | 0.002 | 3 | 0.0001 | 0.15 | 0.0001 | 0.2 | 7E-05 | 0.1 | 4E-06 | 0.007 | 2.9E-05 | 0.06 | 0.002 | 4 | 0.002 | 4 | 0.0016 |
| Benzene | 1 | 2,111 | 0.1 | 111 | 0.03 | 63 | - | - | - | - | - | - | 1 | 2,285 | 1 | 2,285 | 2.9 |
| Beryllium | 0.0002 | 0.4 | 1.E-05 | 0.02 | - | - | - | - | 5E-09 | 1E-05 | - | - | 0.0002 | 0.4 | 0.0002 | 0.4 | 0.034 |
| Bis(2-ethylhexyl) phthalate | - | - | - | - | 0.0002 | 0.4 | 0.0003 | 0.6 | - | - | - | - | 0.0005 | 1 | 0.0005 | 1 | 29 |
| Cadmium | 0.0004 | 0.8 | 0.0002 | 0.4 | 0.0001 | 0.2 | 7E-05 | 0.15 | 4E-06 | 0.007 | 3E-05 | 0.06 | 0.0009 | 2 | 0.0009 | 2 | 0.019 |
| Carbon disulfide | 0.02 | 34 | 0.001 | 2 | 0.0005 | 1 | - | - | - | - | - | - | 0.02 | 37 | 0.02 | 37 | 31,000 |
| Chromium | - | - | - | - | 0.004 | 8 | 0.002 | 5 | 8E-05 | 0.2 | 0.0009 | 2 | 0.01 | 15 | - | - | - |
| Copper | 0.004 | 8 | 0.002 | 4 | 0.009 | 18 | 0.005 | 9 | 2E-04 | 0.4 | 0.002 | 4.5 | - | - | 0.02 | 45 | (j) |
| Cumene | 0.07 | 147 | 0.004 | 8 | 0.002 | 4 | - | - | - | - | - | - | 0.08 | 159 | 0.08 | - | - |
| Dioxins/furans (k) | 6E-09 | 1E-05 | 3E-10 | 6E-07 | - | - | - | - | - | - | - | - | 6E-09 | 1E-05 | 6E-09 | 1E-05 | 4E-08 |
| DPM (l) | - | - | - | - | 0.36 | 700 | - | - | - | - | - | - | - | - | 0.36 | 700 | 0.26 |
| Ethylbenzene | 2 | 4,472 | 0 | 235 | 0.07 | 134 | - | - | - | - | - | - | 2 | 4,841 | 2 | 4,841 | 33 |
| Hexachloroethane | 9 | 17,608 | 0.5 | 927 | 0.3 | 528 | - | - | - | - | - | - | 10 | 19,062 | - | - | - |
| Hexane | 3 | 6,477 | 0.2 | 341 | 0.1 | 194 | - | - | - | - | - | - | 4 | 7,012 | 4 | 7,012 | 270,000 |
| Hexavalent chromium | 2E-05 | 0.04 | 1E-05 | 0.02 | 0.0004 | 0.8 | 0.0002 | 0.5 | 8E-06 | 0.02 | 9E-05 | 0.2 | 0.001 | 2 | 0.0008 | 1.5 | 0.00051 |
| Lead | 0.003 | 6 | 0.002 | 3 | 0.05 | 92 | 0.02 | 43 | 1E-03 | 2 | 0.01 | 25 | 0.09 | 170 | 0.09 | 170 | 0.29 |
| Manganese | 0.004 | 7 | 0.002 | 4 | 0.002 | 4 | 0.0003 | 0.6 | 1E-03 | 0.003 | 0.0006 | 1 | 0.008 | 16 | 0.008 | 16 | 3.5 |
| Mercury | 0.002 | 4 | 0.0001 | 0.2 | 3.2E-05 | 0.06 | 2E-05 | 0.04 | 1E-06 | 0.002 | 8E-06 | 0.02 | 0.002 | 4 | 0.002 | 4 | 0.21 |
| Methanol | 0.5 | 983 | 0.03 | 52 | 0.01 | 29 | - | - | - | - | - | - | 0.5 | 1,064 | 0.5 | 1,064 | 150,000 |
| Methyl chloroform | 0.2 | 343 | 0.009 | 18 | 0.005 | 10 | - | - | - | - | - | - | 0.2 | 371 | 0.2 | 371 | 39,000 |
| Methyl isobutyl ketone | 0.07 | 136 | 0.004 | 7 | 0.002 | 4 | - | - | - | - | - | - | 0.07 | 147 | - | - | - |
| Methylene chloride | 0.08 | 156 | 0.004 | 8 | 0.002 | 5 | - | - | - | - | - | - | 0.08 | 169 | 0.08 | 169 | 82 |
| Nickel | 0.001 | 2.5 | 0.0007 | 1 | 0.004 | 8 | 0.002 | 4 | 1E-04 | 0.2 | 0.001 | 2 | 0.009 | 18 | 0.009 | 18 | 0.31 |
| Polychlorinated biphenyls | 0.02 | 31 | 0.001 | 2 | 9.4E-05 | 0.2 | 5E-05 | 0.1 | 3E-06 | 0.006 | 2E-05 | 0.05 | 0.02 | 33 | 0.02 | 33 | 0.0039 |
| Styrene | 0.3 | 697 | 0.02 | 37 | 0.01 | 21 | - | - | - | - | - | - | 0.4 | 755 | 0.4 | 755 | 35,000 |
| Tetrachloroethylene | 0.1 | 211 | 0.01 | 11 | 0.005 | 6 | - | - | - | - | - | - | 0.1 | 228 | 0.1 | 228 | 14 |
| Toluene | 9 | 18,107 | 0.5 | 953 | 2 | 3,621 | - | - | - | - | - | - | 11 | 22,681 | 11 | 22,681 | 12,000 |
| Trichloroethylene | 0.3 | 522 | 0.01 | 27 | 0.008 | 16 | - | - | - | - | - | - | 0.3 | 565 | 0.3 | 565 | 41 |
| Vanadium | 4E-05 | 0.08 | 2E-05 | 0.04 | 0.0003 | 0.7 | 0.0002 | 0.4 | 9E-06 | 0.02 | 8E-05 | 0.2 | - | - | 0.001 | 1 | (j) |
| Xylenes (m) | 11 | 22,840 | 0.6 | 1,202 | 0.3 | 685 | - | - | - | - | - | - | 12 | 24,727 | 12 | 24,727 | 27,000 |
| **Total Emissions: (n), (o)** | 42 | 83,167 | 2 | 4,390 | 3 | 6,403 | 0.03 | 63 | 0.002 | 3 | 0.02 | 35 | 47 | 93,335 | 33 | 66,655 | |
| **POC Emissions: (p), (q), (r)** | 230 | 460,000 | 12 | 24,000 | 18 | 35,000 | - | - | - | - | - | - | - | - | - | - | |

TABLE 1
ESTIMATED SCHNITZER AIR POLLUTANT EMISSIONS (a)
1101 Embarcadero West, Oakland, California

Notes:

(a) Estimated annual air pollutant emissions based on an infeed conveyor and shredder maximum throughput of 720,000 tons per year (ton/yr) and 100,000 of tons of heavy melt steel processed at the Schnitzer Steel Industries, Inc. (Schnitzer) facility annually.

(b) Breakdown of air pollutant emissions by source at the Schnitzer facility is provided in Tables 2 through 6.

(c) A Bay Area Air Quality Management District (BAAQMD) authority to construct and/or permit to operate for a new or modified source requires Best Available Control Technology (BACT) if the source has the potential to emit a BACT pollutant in an amount of 10 or more pounds on any day (lb/day). BACT pollutants include precursor organic compounds. BAAQMD 6 December 2017. Regulation 2, Rule 2, New Source Review. § 2-2-210 and § 2-2-301. The shredder and related material stockpiles emit more than 10 lb/day POCs and are subject to BACT. See Tables 2 and 3.

(d) A major facility or major source is one that has the potential to emit 10 tons per year or more of a single hazardous air pollutant (HAPs) or more of a combination of HAPs. All fugitive emissions of HAPs are included in determining a facility's potential to emit. BAAQMD 6 December 2017. Regulation 2, Rule 6, Major Facility Review. § 2-6-212.2.

(e) A toxic air contaminant (TAC) is an air pollutant that may cause or contribute to an increase in mortality or in serious illness or that may pose a present or potential hazard to human health. TACs consist of the substances listed in Table 2-5-1 Toxic Air Contaminant Trigger Levels included as part of BAAQMD 7 December 2016. Regulation 2, Rule 5, New Source Review of Toxic Air Contaminants.

(f) A lifetime cancer risk of 1.0 in a million (10⁻⁶) and a non-cancer hazard index of 0.2 were used as the target health risk levels to derive the chronic trigger levels. BAAQMD 7 December 2015. Regulation 2, Rule 5, New Source Review of Toxic Air Contaminants. Table 2-5-1.

(g) According to BAAQMD, Regulation 11, Rule 18, Reduction of Toxic Air Emissions at Existing Facilities, a Risk Reduction Plan is required if a significant risk threshold corresponding to a cancer risk equal to or greater than 10 in a million is exceeded. Comparison of TAC emission rates with chronic trigger levels indicates that significant risk thresholds are exceeded for numerous TACs and that Schnitzer must prepare a Risk Reduction Plan. Schnitzer does not appear to have prepared such a plan.

(h) Value shown in red boldface type indicates an air pollutant emission rate is greater than BAAQMD regulatory limit.

(i) Dash ("-") indicates data are not available.

(j) No chronic trigger level has been established for this TAC.

(k) Polychlorinated dibenzo-p-dioxins (dioxins) and polychlorinated dibenzofurans (furans)

(l) BAAQMD estimation of diesel exhaust particulate matter (DPM) emissions from ships transporting materials to and from the Schnitzer facility adjusted for an infeed conveyor and shredder maximum throughput of 720,000 tons per year. BAAQMD and West Oakland Environmental Indicators Project October 2019. *Owning Our Air, The West Oakland Community Action Plan - Volume 2: Appendices.* p. A-I-40-A-I-41, Leong, P. (BAAQMD) 25 April 2019. Email to "" Welti (Venuble LLP) *Re Follow-up/Availability for a Call Next Week;* BAAQMD 12 July 2018. Data Update. BAAQMD states DPM should be used as surrogate for all TAC emissions from diesel-fueled compression-ignition internal combustion engines.

(m) Sum of xylene emissions measured as o-xylene and m/p xylenes, which Schnitzer reported as mixed xylenes.

(n) A precursor organic compound (POC) is a carbon compound that photochemically reacts in the atmosphere to form ozone.

(o) Shredder stack, shredder fugitive, and shredder stockpile POC potential to emit are approximately 242, 12, and 15 lb/day, respectively, based on HAP and TAC emission rates. A new or modified source must obtain an authority to construct and permit to operate, and install Best Available Control Technology (BACT) if the potential to emit is 10 lb/day or more of POCs. BAAQMD 6 December 2017. Regulation 2, Rule 2, New Source Review. § 2-2-301.

(p) POC emission rates are greater than 100 ton/yr or 550 lb/day when calculated using the arithmetic average of emission factors of 0.20, 0.67, 0.5, 0.65, and 1.2 lbs/ton estimated from results of source tests conducted in June 2017, October 2017, September 2018, October 2018, and January 2019, respectively. Application of these emission factors indicates the Schnitzer facility has the potential to emit 100 tons per year or more of volatile organic compounds, which include POCs, thereby subjecting the facility to operating permit requirements of Title V of the federal Clean Air Act. BAAQMD 6 December 2017. Regulation 2, Rule 2, New Source Review. § 2-2-217.

(q) Fugitive POC emissions are based on an assumed 95 percent capture efficiency for the shredder enclosure. Trinity Consultants July 2019. *Authority to Construct Application, Schnitzer Steel Industries, Oakland, CA, Plant No. 208.* p. 3-3.

(r) Volatilization of POCs associated with handling and stockpiling shredded ferrous metal and metal shredder aggregate. POC emission factors based on emission testing conducted at wTe Recycling, Inc. shredding facility located in Greenfield, Massachusetts, Montrose Environmental. 29 January 2016. *Final Report, Scrap Metal Shredding and Processing Emissions Testing - wTe Recycling, Inc., Greenfield, MA;* and ratios of POC emission rates from shredder stack, shredder enclosure, and shredder stockpiles at Schnitzer facility in Oakland, California.

2 of 2

# Exhibit 2

**Dharam Singh**

From:          Carol Allen
Sent:          Thursday, April 27, 2006 10:17 AM
To:            Dharam Singh
Cc:            Scott Lutz
Subject:       Schnitzer Steel

Dharam,

I found an interesting 11/02 DTSC report (http://www.dtsc.ca.gov/HazardousWaste/upload/HWMP_REP_ASW_draft.pdf) on the internet concerning auto shredder waste. DTSC is recommending that treated auto shredder waste no longer be deemed non-hazardous. **DTSC tested the auto shredder waste from 3 CA facilities (2 in the Bay Area) for cadmium, total chromium, copper, lead, mercury, nickel, zinc, and PCBs.** I am curious to know if Schnitzer Steel was one of the 2 Bay Area sites that was tested. DTSC found that the treated auto shredder waste exceeded the haz waste criteria for several compounds, and they only included the test data for those compounds in this report. However, DTSC did find PCBs in the waste. They also mention a comparison to a 1992 report that shows that PCB levels in the auto shredder waste have declined from 1992 to 2002, but they don't say by how much or include the 1992 data. If you could contact the report author from DTSC, you might be able to get the test data showing the percentage decline in PCB emissions which you could apply to the PCB emission factor.

The DTSC report authors may also have more information about hex chrome in the waste versus total chrome. I agree with Randy that the amount of hex chrome in auto shredder fluff is probably nil, but its always good to get independent confirmation. I did see some nebulous references to hexavalent chrome in auto shredder fluff on the internet, but I couldn't find any hard data confirming its presence or estimating the % hex chrome per total chrome.

You might also ask DTSC about the shredder, scrubber, and demister process water (is it hazardous, what must a site test for to determine if the process water is hazardous, have PCBs or hex chrome ever been found in auto shredder process water).

One other thought I had this morning, have you considered whether or not an abatement factor might be appropriate due to this site's use of a scrubber and extra water during the shredding process compared to the damp shredding process the emission factors were developed for?

Carol Allen

1

# Exhibit 3

# ..GINEERING EVALUATION REP.. ..T
## SCHNITZER STEEL PRODUCTS COMPANY
## PLANT NUMBER 208
## APPLICATION NUMBER 16721

## BACKGROUND

Schnitzer Steel Products Company (SSPC) operates an automobile/appliance shredder at the facility in Oakland. SSPC replaced the old shredder with a new shredder, which was permitted under Application # 14194. The permit to operate was issued on 4/26/2007. The permit limits the shredder throughput at 431,471 tons per year. The shredder utilizes a wet system to avoid overheating. The shredding of automobiles/appliances results in emissions of particulate matter and toxic/hazardous pollutants. Particulate emissions are controlled by cyclones and scrubber/demister system. SSPC has submitted this application with a request for increase in the throughput limit from 431,471 tons per year to 720,000 tons per year.

The facility is a certified appliance recycler certified by Cal EPA and DTSC. Effective January 1, 2006 a certified recycler is required to remove materials such as mercury (found in switches & temperature control devices), used oil from compressors and transmissions, CFCs, HCFCs, and other non-CFC replacement refrigerants, all metal-encased capacitors and any parts that contain PCBs or DEHP, and any other materials that are regulated hazardous wastes before shredding. SSPC has a policy prohibiting the acceptance of scrap metal that contain hazardous substances. SSPC accepts scraps only from California Certified Appliance Recyclers.

The project is subject to CEQA review requirements of District Regulation 2-1-310. Since permit from any other regulatory agency is not required, the District is the lead agency for this project. An initial study is prepared, and on the basis of the study it is determined that the project does not have significant effect on the environment. Therefore, an Environmental Impact report (EIR) is not required and a Negative Declaration is adequate to comply with CEQA requirements.

The following source is covered by this application:

**S-6     Shredder (automobiles, appliances, misc. items); Riverside Engineering, Model # 122112, electric drive, 225 tph (avg.), abated by A-1 (cyclone), A-2 (cyclone), A-3 (scrubber), A-4 (HEAF), and A-9 (demister).**

## EMISSION CALCULATIONS

### Shredder:

PM10 and total organics emissions increases are calculated on the basis of the throughput increase from 431,471 tons/yr to 720,000 tons/yr and emission factors taken from the District approved source test report of March 2007. Toxics emissions are discussed and presented in the health risk screening analysis reports attached with this report.

SSPC conducted a source test in March 2007 (a copy attached) at the above referenced shredder, S-6, to generate emission factors specifically for hexavalent chromium, PCB, benzene, total organics, total particulate matter, and PM10 for the shredder system, and to demonstrate compliance with the permit condition ID# 23114.

PM emissions increase = (0.0013 lb/ton)(720,000 tons/yr − 431,471 tons/yr)
$$= 375 \text{ lb/yr}$$
$$= 0.188 \text{ tpy}$$

TOC emissions increase = (0.02 lb/ton)(720,000 tons/yr − 431,471 tons/yr)
$$= 5770 \text{ lb/yr}$$
$$= 2.885 \text{ tpy}$$
NPOC emissions increase = (6E-5 lb/ton+2E-4 lb/ton)(720,000 tons/yr − 431,471 tons/yr)
$$= 75 \text{ lb/yr}$$
$$= 0.04 \text{ tpy}$$
Maximum daily POC emissions = (0.02 lb/ton)(720,000 tons/yr)/(260 days/yr)
$$= 55.38 \text{ lb/day}$$

· **Diesel Fueled Trucks:**

An emission factor of 0.21 g/mile is used to estimate diesel-PM emissions from trucks. This factor is derived from CARB EMFAC2007 calculations for On-road Heavy-Duty Diesel Trucks (>33,000 lbs gross vehicle weight) assuming average operating conditions that exist in the Bay Area. Because diesel PM emissions from trucks are expected to decline over time as a result of regulatory action and technological advances, the factor used in the HRSA is a weighted average of the estimated emissions for a 40 year period going forward (i.e. 2007 − 2047). In addition to the transport emissions, it is determined that trucks idling at the facility would generate 22.8 lb/yr of diesel PM (assumes 22 minutes of idling per truck).

Truck activity due to the project will result in up to a total of 175 truck calls (increment of 70 truck calls) per day at the terminal. At 7 operating days per week, 52 weeks per year, the increased annual truck traffic will be 25,550 trucks per year. The domain for the analysis of the impact of truck traffic for this HRSA includes the traffic at the facility and the access roads to the freeway. Trucks are assumed to exit US 880, travel south on Martin Luther King Jr. Way, turn west onto Embarcadero West, enter the facility at 1101 Embarcadero West, pull past and back up to the unloading/loading area, then follow the same route back to the freeway. Due to the number of potential routes onto and off of the freeway, the modeling only goes as far as the intersection of Martin Luther King Jr. Way and US 880.

Truck Transit Diesel PM Emissions = (0.21 g/mile)(25,550 truck calls/yr)(1.16 miles/truck)
$$(\text{lb}/453.6 \text{ g})$$
$$= 13.7 \text{ lb/yr}$$
Truck Idling Diesel PM Emissions = 22.8 lb/yr
Total Truck Diesel PM Emissions = 13.7 lb/yr + 22.8 lb/yr
$$= 36.5 \text{ lb/yr}$$
$$= 0.018 \text{ tpy}$$
$CO_2$ emissions = 130.257 tpy (Ref.: District's emission inventory; provided by Amir Fanai, Planning)

**Ships and Tugs:**

The California Air Resources Board (CARB) recommends a PM emission factor of 1.5 g/kW-hr for cargo ships burning heavy fuel oil with a sulfur content of 2.5% (Ref. "A Critical Review of Ocean-Going Vessel Particulate Emission Factors", CARB 11/9/07). This emission factor is applied to the cargo ships servicing SSPC. Tug PM emission factors are provided by the applicant and approved by the District.

EXHIBIT B
46

**Emissions from shipping are based on the following scenario:**

A total of twenty six (26) cargo ships per year will make trips to the facility including ten (10) cargo ships due to incremental throughput. A cargo ship transits from Bar Pilot Station to the Golden Gate Bridge and then to Bay Bridge. Two (2) tugs will meet each cargo ship at the south side of the Bay Bridge and escort it along the shipping channel and Inner Harbor to the (SSPC) berth. The tugs then return to their home berth (Berth 8) and the ship "hotels" at SSP for approximately 4 days during loading. When the loaded ship is ready to depart, the tugs return and escort the ship back to the Bay Bridge. The outbound route is same as inbound. During shipping operations, cargo carriers and tugs operate at a number of different engine power levels depending on the operating mode.

For the purpose of CEQA review and cumulative emissions increase, shipping emissions are estimated only for ten (10) cargo ships (incremental numbers for incremental throughput of 288,529 tpy) and two (2) tugs.

Diesel PM emissions, NOx, CO, VOC, SO2, and green house gas (CO2) emissions are estimated from ships and tugs. A spreadsheet with details of basis and emission estimates is attached with this report.

However, for health risk screening analysis diesel PM emissions for the segment between Bay Bridge and facility berth are considered.

Emission estimates are as follows:

Diesel PM10 = 2234 lb/yr
          = 1.117 tpy
          = 0.77 tpy (between Bay Bridge and facility Berth)
NOx = 11.91 tpy
SO2 = 8.938 tpy
CO = 1.184 tpy
VOC = 0.461 tpy
CO2 = 623.743 tpy


**EMISSION SUMMARY**

Diesel PM10 emissions = 0.018 tpy (trucks) + 1.117 tpy (ships & tugs) = 1.135 tpy
PM10 = 0.188 tpy (shredder) + 0.018 tpy (trucks) + 1.117 tpy (ships & tugs) = 1.323 tpy
NOx  = 11.91 tpy (ships & tugs)
CO   = 1.184 tpy (ships & tugs)
SO2  = 8.938 tpy (ships & tugs)
POC = 2.885 tpy (shredder) + 0.461 tpy (ships & tugs) = 3.346 tpy
NPOC = 0.04 tpy (shredder)
CO2 = 623.743 tpy (ships & tugs) + 130.257 tpy (trucks) = 754.0 tpy


**PLANT CUMULATIVE INCREASE**

PM10 = 1.323 tpy
NOx  = 11.91 tpy

CO   = 1.184 tpy
SO2  = 8.938 tpy
POC  = 3.346 tpy
NPOC = 0.04 tpy

## OFFSET REQUIREMENTS

NOx emissions exceed 10 tpy and therefore are subject to the offset requirements of Regulation 2-2-302. Since emissions are less than 35 tpy, offsets are provided in a ratio of 1.0:1.0 from the Small Facility Banking account in the District's Emissions Bank in accordance with the provisions of Regulation 2-4-414.

**Offsets** = (11.91 tpy)(1.0)
        = **11.91 tpy**

## BACT DETERMINATION

### Particulate Emissions:

BACT requirements of Regulation 2-2-301 are triggered because uncontrolled PM10 emissions exceed 10 pounds per day. BACT for PM10 is also TBACT for particulate hazardous substances as determined when the shredder was initially permitted in 2006 (A# 14194).

Generally particulate emissions from automobile/appliance shredding operation are controlled by water injection with an abatement system consisting of cyclone/scrubber/filter/demister. Abatement factors depend on the configuration and operating parameter of the system. It can vary from as low as 57% to as high as 99.7% for scrubbers and other wet collectors (Ref.: Table 33, Air Pollution Engineering Manual, 2nd Edition, U.S.E.P.A). The above referenced abatement system is not effective in controlling organics such as benzene.

There is a facility Sims Hugo Neu (Plant # 5152) in Redwood City that operates an auto shredder. Particulate emissions from the shredder are abated by two dynamic cyclones and a cyclonic scrubber with a demister arranged in series. Exhaust loading from the scrubber w/demister is subject to the permit condition of not exceeding 0.01 gr/dscf (Condition ID# 3884, item 2). A source test conducted on 3/11/03 by the District demonstrated the auto shredder is in compliance with the grain loading limit of 0.01 gr/dscf. A source test conducted on the shredder at Schnitzer in March 2007 also demonstrated compliance with the grain loading limit of 0.01 gr/dscf.

Based on the above referenced information, TBACT for particulate hazardous substance emissions from an auto shredder is the use of water injection, cyclones, scrubber, filter, and demister arranged in series with an exhaust PM loading of 0.01 gr/dscf or less.

The shredder complies with the TBACT as determined for particulate emissions.

### Volatile Organics Emissions:

BACT requirements of Regulation 2-2-301 are triggered for volatile organic compounds emissions because it exceeds 10 lbs/day.

There is no BACT guideline for an auto shredder in the BACT/TBACT Workbook, however, BACT in the form of a fixed-bed carbon adsorption system is not cost-effective for POC emissions of 56 lb/day, and exhaust flow of 33,000 cfm.

A cost-effective analysis is done. It is determined that BACT is not cost-effective because cost of control is greater than the cost-effective cost of $17,500/ton. The cost does not include the cost of ductwork and blowers, which are likely to add significantly to the overall operating costs, and make the control system even more non cost-effective.

Annual cost based on Cost Base Date of 1989 = $79,749
Annual cost as of 2009 including inflation @3% per year
= ($79,749)[1+(0.03)(20 yrs)]
= $127,598
POC controlled @90% control efficiency = (7.2 tpy)(0.9)
$$= 6.48 \text{ tpy}$$
Annual cost per ton of POC controlled = $127,598/6.48 tpy
$$= \$19,691/\text{ton}$$


## CEQA REVIEW REQUIREMENTS

The project is subject to the CEQA review requirements of District Regulation 2-1-310. Since permits from any other regulatory agency are not required, the District is the lead agency for this project. An initial study is prepared, and on the basis of the study it is determined that the project does not have significant effect on the environment. Therefore, an Environmental Impact report (EIR) is not required and a Negative Declaration is adequate to comply with CEQA requirements.

To fulfill the Public Notice requirements, a Notice of Intent to Adopt Negative Declaration is filed with the Alameda County Clerk, and distributed along with draft Negative Declaration, and CEQA Initial Study to responsible agencies and to interested parties. Also, the CEQA documents are posted on the District's website and the Notice of Intent is published in a newspaper in general circulation in the area affected by the project. The public comment period ended on February 16, 2009. No Comments were received.

CEQA documents are submitted for the District approval and adoption.


## TOXIC EMISSIONS AND HEALTH RISK SCREENING ANALYSIS

Toxic emissions from the shredder are calculated on the basis of the proposed throughput rates of 350 tons/hr and a total throughput of 720,000 tons/yr after modification, and the District approved source test emission factors for benzene, hexavalent chromium, and PCB. For all of the other toxic compounds, the emission factors were taken from Table D-11.F of a 1996 report that was prepared for the Institute of Scrap Recycling Industries by Versar, Inc. Diesel PM emissions are estimated from ships, tugs, and trucks associated with the additional transportation requirements (10 cargo ships, 2 tugs, and 25,550 trucks per yr).

A health risk screening analysis (HRSA) is conducted for the purpose of demonstrating compliance with the new source review requirements for toxic air contaminants (TAC) as specified in Regulation 2 Rule 5. A health risk screening analysis is also conducted for CEQA

purposes, which evaluates ...e health risks resulting from trucks, tug. and cargo ships diesel PM emissions in addition to the health risk resulting from toxics emissions from the shredder.

A copy of the health risk screening analysis (HRSA) reports for shredder only TAC emissions and for the project including TAC emissions from trucks, tugs, and cargo ships is attached.

HRSA is conducted for the TAC emissions from the shredder only. Results from the HRSA report indicate that the maximum health impacts are: a cancer risk of 1.5 in a million and a chronic hazardous index of 0.03. The primary contributors to the cancer risk are the emissions of cadmium, hexavalent chromium, and PCB, which account for 95% of the risk. In accordance with the District's Regulation 2-5, these impact levels are considered acceptable, provided the shredder satisfies best available control technology requirements for particulate hazardous substances (TBACT). The shredder complies with the TBACT requirements as determined in the BACT determination section of this report.

HRSA is conducted for the project TAC emissions, which include TAC emissions from the shredder and diesel PM10 emissions of 0.77 tpy from ships, tugs, and trucks. Diesel PM 10 emissions from the ships and tugs are considered only for the distance between the facility berth and the Bay Bridge for health risk screening. Results from the HRSA report indicate that the maximum increased cancer risk is 5.9 in a million and the maximum increased chronic hazardous index is 0.027. A significant air quality impact with respect to TAC emissions is an increased cancer risk of greater than 10 in a million or a non-cancer chronic hazardous index above 1.0. Since the health risk impacts associated with this project are below these levels they are not considered significant for the purpose of CEQA review or public notification under the Air Toxics Hot Spots Program.


## STATEMENT OF COMPLIANCE

The shredder with increase throughput limit is expected to comply with the requirements of Regulation 6, Rule 1, Particulate Matter, General Requirements.

*6-1-301 Ringelmann No. 1 Limitation: Except as provided in Sections 6-1-303, 6-1-304 and 6-1-306, a person shall not emit from any source for a period or periods aggregating more than three minutes in any hour, a visible emission which is as dark or darker than No. 1 on the Ringelmann Chart, or of such opacity as to obscure an observer's view to an equivalent or greater degree. (Amended July 11, 1990)*
*6-1-310 Particulate Weight Limitation: A person shall not emit from any source particulate matter in excess of 343 mg per dscm (0.15 gr. per dscf) of exhaust gas volume.*

The project is subject to the CEQA review requirements of District Regulation 2-1-310. CEQA review requirements are discussed in a separate section of this report.

The project is over 1000 feet from the nearest school and therefore is not subject to the public notification requirements of Regulation 2-1-412, Public Notice, Schools.

BACT requirements of Regulation 2-2-301 are triggered for PM10 and POC emissions. BACT is discussed in BACT determination section of this report.

Offset requirements of Regulation 2-2-302 are triggered for NOx emissions and are discussed in a separate section of this report. Offset requirements of Regulation 2-2-302 are not triggered for POC emissions (< 10 tpy). Offset requirements of Regulation 2-2-303 are not triggered for PM10 or SO2 emissions because SSPC is not a major facility for PM10 or SO2.

PSD, NSPS, and NESHAPS do not apply.

## PERMIT CONDITIONS

Condition ID# 23114 is revised by increasing the scrap throughput limit to 720,000 tons/yr, and including ship and truck calls.

S-6 & S-7        Shredder and Infeed conveyor

1.  The owner/operator shall not exceed the scrap-in throughput limit of 720,000 tons in any calendar year at this facility.
    (basis: baseline 2005 production level of 431,471 tons/yr; cumulative increase for the incremental throughput; health risk screening analysis)

2.  The owner/operator shall enclose and vent the shredder to the abatement system at all times it is operating to minimize fugitive emissions.
    (basis: TBACT)

3.  The owner/operator shall abate particulate emissions from the shredder by water injection at a sufficient rate to ensure that non-metallic material exiting the unit be moist to the touch at all times, and abatement system consisting of cyclones, scrubber, filter, and demister at all times when the shredder is in operation. The PM grain loading at the exhaust outlet of the abatement system shall not exceed 0.01 gr/dscf.
    (basis: TBACT)

4.  The owner/operator shall operate the Recycling Center in such a manner that particulate emissions into the atmosphere from any operation/equipment for a period or periods aggregating more than three minutes in any hour shall not cause a visible emission which is as dark or darker than No. 0.5 on the Ringelmann Chart, or of such opacity as to obscure an observer's view to an equivalent or greater degree or result in fallout on adjacent property in such quantities as to cause public nuisance per District Regulation 1-301.
    (basis: Regulations 6-1-301; 1-301)

5.  The owner/operator shall use water spray to minimize fugitive dust emissions from material/scrap handling and storage to comply with condition 4. The owner/operator shall pave the site truck transport roads and sweep/spray with water/other actions deemed appropriate by the District, if necessary, to minimize fugitive dust emissions from trucking activities to comply with condition 4.
    (basis: Regulations 6-1-301; 1-301)

6.  The owner/operator shall not exceed a total of 26 ship calls and 63,875 truck calls per calendar year to haul in/out scrap/materials at the facility.
    (basis: Health risk screening analysis; CEQA review)

7.  In order to demonstrate compliance with condition numbers 1 and 6, the owner/operator shall keep records of monthly and yearly throughput of materials, ship and truck calls in a District approved log. The log shall be maintained for a period of at least 24 months from the date of data entry, and shall be made available to the District staff upon request for inspection.
    (basis: recordkeeping)

**RECOMMENDATION**

It is recommended that Schnitzer Steel Products Company be issued a revised permit condition ID# 231 14 for the shredder described in the background section of this report after approval and adoption of CEQA documents.

BY:_____

Dharam Singh, AQE II

# Exhibit 4

**ENGINEERING EVALUATION REPORT
SCHNITZER STEEL PRODUCTS COMPANY
PLANT NUMBER 208
APPLICATION NUMBER 27762**

Adeline St. Foot of (1101 Embarcadero West)
Oakland, CA 94607

## BACKGROUND

Schnitzer Steel Products Company (SSPC) operates an automobile/appliance shredder at the facility in Oakland. SSPC replaced the old shredder with a new shredder (S-6), which was permitted in 2006 under Application # 14194. The permit to operate was issued on 4/26/2007. The maximum permitted throughput rate for the new shredder was increased in 2009 pursuant to Application # 16721.

The shredder utilizes a wet system to avoid overheating. The shredding of automobiles/appliances results in emissions of particulate matter and toxic/hazardous pollutants. Particulate emissions are controlled by cyclones and scrubber/demister system. In addition, SSPC has been operating a drum magnet line (DML) and a Joint Products Plant (JPP) consisting of 2 trommels, 3 screens, classifiers, conveyors, and other material handling equipment abated by water spray since April 1, 2010 without a permit. At DML, ferrous materials are separated from the non-ferrous materials. At JPP, non-ferrous materials/metal is sorted, by metal type, from non-metallic materials. The non-metallic residue from JPP is treated with chemicals and shipped offsite for use as alternate daily landfill cover.

SSPC has submitted this application to obtain an Authority to Construct (ATC) and Permit to Operate (PTO) for an upgraded abatement system at the shredder to minimize fugitive emissions. In the existing configuration, the shredding operation has fugitive emissions that are not collected or controlled. The shredder and part of the associated conveyor will be enclosed and vented to two venturi scrubbers with the help of two blowers. The blowers will reduce the pressure in the enclosure as much as possible to improve the capture rate for fugitive shredder emissions, and the venturi scrubbers will remove particulate matter from the blower vent streams. The proposed enclosure and venturi scrubbers will replace the existing abatement devices (A-3, A-4, and A-5) at the shredder.

SSPC has also applied to obtain exemptions from ATC and PTO for DML and JPP with its new abatement device.

The application covers the following sources:
**S-11   Joint Products Plant w/enclosure (2 Trommels, 3 Screens, Classifiers, Conveyors, and other material handling equipment), abated by A-13 and A-14.**
**S-12   Drum Magnet Line w/enclosure.**
**A-11   Venturi Scrubber, SLY, Model #12, abating S-6.**
**A-12   Venturi Scrubber, SLY, Model #12, abating S-6.**
**A-13   Water Spray, abating S-11.**
**A-14   Baghouse, Custom made, abating S-11.**

## EMISSION CALCULATIONS

### Shredder:

The proposed abatement system (enclosure and venturi scrubbers) will capture most of the emissions from the shredding operation including fugitive emissions, which were not properly accounted for when the shredder was initially permitted. Stack emissions from the shredder were calculated using emission factors from the report prepared by Versar, Inc. in 1996 for Scrap Recycling Industries. The emission calculations were updated after SSPC conducted a District approved source test at the shredder stack in March 2007.

Overall, the proposal to enclosure the shredder operations and upgrade the particulate abatement system is expected to result in a reduction of the current actual emissions from the shredder. However, since current fugitive emission rates from the shredder are not known, it is not possible to quantify the impacts of the proposed enclosure and abatement system. The applicant has proposed to conduct a series of District approved source tests that will enable the District to estimate the current (pre-enclosure) and post-enclosure fugitive emissions as well as the post-enclosure stack emissions.

Once the pre and post enclosure emission estimates are available, the District will establish new maximum permitted emission rates for the proposed operations (post enclosure with improved abatement). These proposed emission rates (POC, PM10, PM2.5, and TACs) will be compared to the District's new best estimate of the total shredder emissions (stack plus fugitives) for: (a) the 2007 shredder replacement and (b) the 2009 increase in permitted shredder throughput, to determine if all new source review (NSR) and toxic NSR requirements for these previous permitting activities were fully complied with.   If the District finds that NSR has not been fully satisfied, the District will require updated reviews, limits, offsets, and health risk assessments under this application, as needed, to ensure full NSR compliance for these previous permitting activities.

### Drum Magnet Line w/enclosure:

The shredded material produced by S-6 travels by conveyor through the drum magnets where ferrous material is separated from non-ferrous materials. The shredded material has a high moisture content due to the water sprays applied during the shredding process. This conveyor line (S-12) is expected to have negligible particulate emissions due to the high moisture content, and it is exempt from Air District permit requirements per 2-1-115.1.4.2. This line will be covered with a floorless enclosure to prevent cross winds from generating any fugitive dust. The enclosure qualifies for permit exemption per Regulation 2-1-113.2.3.

### Joint Products Plant w/enclosure:

The applicant has submitted moisture test data and emission calculations (PM10, PM2.5, and TAC/HAP) to demonstrate that the S-11 Joint Products Plant (JPP) qualifies for permit exemption per Regulation 2-1-115.1.4.   The moisture test data indicates that the materials processed by JPP contain more than 5% moisture, which meets the criteria for permit exemption under Section 115.1.4.

The applicant has marked their emission calculations as "Trade Secret" and therefore these calculations are not included in this report.  However, the District has reviewed and verified these emission calculations.  Total particulate emissions from JPP (before the proposed

enclosure) are: 2.13 pounds/day of PM10, 0.57 pounds/day of PM2.5, 0.28 tons/year of PM10, and 0.07 tons/year of PM2.5. TAC emissions include copper, lead, manganese, nickel, sulfate, and vanadium. For each TAC, the total emissions from JPP (before enclosure) are less the each applicable acute and chronic health risk assessment (HRA) trigger level. Therefore, S-11 does not require permitting under Section 2-1-319 because particulate emissions are less than 5 tons/year and TAC emissions are less than all applicable HRA trigger levels.

SSPC is proposing to enclose and vent the JPP to a baghouse (A-14) to further reduce the residual fugitive particulate emissions. Since the source (S-11) is exempt from District permitting requirements, the enclosure and abatement system are also exempt from District permitting requirements per 2-1-113.2.4.

## PLANT CUMULATIVE INCREASE

Emissions from exempt equipment (S-11 and S-12) are not subject to new source review and are not included in the plant cumulative emission increase.

The current cumulative emission increases for this application are shown below:

PM10 = 0.0 tpy
PM2.5 = 0.0 tpy
POC = 0.0 tpy

As discussed earlier, the District will reevaluate past NSR permitting activities for the S-6 shredder to ensure that NSR has been fully satisfied. This may include adjustments to the cumulative emission increases for the shredder replacement and expansion projects under Applications # 14194 and # 16721, respectively.

## OFFSET REQUIREMENTS

As discussed earlier, the District will reevaluate past NSR permitting activities for the S-6 shredder to ensure that NSR has been fully satisfied. This may include adjustments to the offsets required for the shredder replacement and expansion projects under Applications # 14194 and # 16721, respectively.

## BEST AVAILABLE CONTROL TECHNOLOGY (BACT)

### Particulate Emissions:

BACT requirements of Regulation 2-2-301 were triggered for the S-6 Shredder under Applications # 14194 and # 16721 because uncontrolled PM10 emissions exceeded 10 pounds per day. BACT for PM10 was also determined to be TBACT for particulate hazardous substances when the shredder was initially permitted in 2006.

Generally particulate emissions from automobile/appliance shredding operation are controlled by water injection with an abatement system consisting of cyclone/scrubber/filter/demister. Abatement factors depend on the configuration and operating parameter of the system. It can vary from as low as 57% to as high as 99.7% for scrubbers and other wet collectors (Ref.: Table

33, Air Pollution Engineering Manual, 2nd Edition, U.S.E.P.A). The above referenced abatement system is not effective at controlling organics such as benzene.

Exhaust loading from the scrubbers will be subject to the permit condition of not exceeding 0.01 gr/dscf. A source test conducted on the shredder at Schnitzer in March 2007 demonstrated compliance with the grain loading limit of 0.01 gr/dscf.

Based on the above referenced information, TBACT for particulate hazardous substance emissions from an auto shredder is the use of water injection, and scrubbers arranged in series with an exhaust PM loading of 0.01 gr/dscf or less.

The shredder will be expected to comply with the BACT/TBACT as determined for particulate emissions.

**Precursor Organic Compounds Emissions:**

BACT requirements of Regulation 2-2-301 for POC emissions will be considered if applicable. Emissions data from the planned source test and the recalculation of total permitted emissions for the shredder will be used to determine POC BACT and offset applicability.


## CEQA REVIEW REQUIREMENTS

The project is categorically exempt from the requirements of CEQA review per District Regulation 2-1-312.2.

**2-1-312 Other Categories of Exempt Projects:** In addition to ministerial projects, the following categories of projects subject to permit review by the District will be exempt from the CEQA review, either because the category is exempted by the express terms of CEQA (subsections 2-1-312.1 through 312.9) or because the project has no potential for causing a significant adverse environmental impact (subsections 2-1-312.10 and 312.11). Any permit applicant wishing to qualify under any of the specific exemptions set forth in this Section 2-1-312 must include in its permit application CEQA-related information in accordance with subsection 2-1-426.1. In addition, the CEQA-related information submitted by any permit applicant wishing to qualify under subsection 2-1-312.11 must demonstrate to the satisfaction of the APCO that the proposed project has no potential for resulting in a significant environmental effect in connection with any of the environmental media or resources listed in Section II of Appendix I of the State CEQA Guidelines.

312.2 Permit applications to install air pollution control or abatement equipment.


## TOXIC EMISSIONS AND HEALTH RISK SCREENING ANALYSIS

If the new maximum permitted shredder emissions are determined to be higher than the TAC emissions rates originally evaluated under Application # 16721, the District will require a new health risk screening analysis for this project.

Application 27762
Plant 208

    1.4    Operating, loading and unloading the following sources which process exclusively material with a moisture content greater than or equal to 5 percent by weight:
        1.4.2    Conveyor, screw, auger, stacker or bucket elevator;

**Exemption: Regulation 2-1-113.2.3:**

113.2    The following sources and operations are exempt from the requirements of Sections 2-1-301 and 302:
    2.3    Structural changes which do not change the quality, nature or quantity of air contaminant emissions.

BY: _CAA for DS_ 11/10/16

Dharam Singh, PE
Air Quality Engineer II

# Exhibit 5

09/30/21                                A0208                        Page    1



**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

## PERMIT TO OPERATE

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

PLANT#   208

Schnitzer Steel Products Company
1101 Embarcadero-West
Oakland, CA   94607

COPY SENT TO:
Pamela Gray, Regional Environmental Manager
Schnitzer Steel Products Company
P O Box 747
Oakland, CA  94604

Location: Adeline St, Foot of
          Oakland, CA   94607

| S# | DESCRIPTION | [Schedule] | PAID |
|----|-------------|-----------|------|
| 6 | MTGL/SEC> Crushing/shredding, Steel<br>Shredder w/ water injection, electric, 225 tph (avg.)   [F]<br>   Abated by:   A6 Water Spray System<br>              A11 Venturi Scrubber<br>              A12 Venturi Scrubber<br>   Emissions at: P15 Stack | | 565 |
| 7 | MTGL/SEC> Conveying, Steel<br>Infeed Conveyor (electric)   [F]<br>   Abated by:   A6 Water Spray System<br>              A11 Venturi Scrubber<br>              A12 Venturi Scrubber<br>   Emissions at: P15 Stack | | 565 |
| 10 | MINERL> Storage, contained, Cement<br>Cement Silo   [F]<br>   Abated by:   A10 Baghouse, Pulse Jet<br>   Emissions at: P10 Stack | | 514 |
| 11 | MTGL/SEC> Screening, Auto body components, 120 tons/hr max<br>Joint Products Plants w/ enclosure (2 Trommels, 3 Screens,   Classifiers, Conveyors, and ot [exempt]<br>   Abated by:   A13 Water Spray System<br>              A14 Baghouse, Pulse Jet<br>   Emissions at: P14 Stack | | 0 |

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

09/30/21                          A0208                    Page    2



**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**                    **PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.     **PERMIT EXPIRATION DATE**
                                                                    NOV 1, 2022

   PLANT#   208

| S# | DESCRIPTION | [Schedule] | PAID |
|----|-------------|------------|------|
| 12 | MTGL/SEC> Screening, Auto body components, 5 tons/hr max Drum Magnet Line W/ enclosure | [exempt] | 0 |
| 13 | MTGL/SEC> Screening, Solid waste - other/not spec JPP from Wet Seperation Unit downstream | [exempt] | 0 |
| 16 | Standby Diesel engine, 779 hp, EPA# HCPXL18.1HTH Emergency Standby Diesel Generator Set     Abated by:    A19 Diesel Oxidation Catalyst     Emissions at: P16 Stack | [B,284 days] | 202 |

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

     4 Permitted Sources, 3 Exempt Sources

     *** See attached Permit Conditions ***

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

09/30/21                                  A0208                           Page    3

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**                 **PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.   **PERMIT EXPIRATION DATE**

NOV 1, 2022

Plant# 208

                    *** PERMIT CONDITIONS ***
===============================================================


        Source#    Subject to Condition Numbers
        -------    ----------------------------

           6       27085, 27348, 27410
           7       27085
          10       24125
          11       27085
          12       27085
          16       22850, 23787


The operating parameters described above are based on information supplied by permit holder and may differ from the limits
set forth in the attached conditions of the Permit to Operate. The limits of operation in the permit conditions are not to
be exceeded. Exceeding these limits is considered a violation of District regulations subject to enforcement action.

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

09/30/21                               A0208                    Page    4



**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

*** PERMIT CONDITIONS ***
==============================================================

**COND# 22850** *applies to S# 16*

   1. The owner/operator shall not exceed 50 hours
      per year per engine for reliability-related
      testing.
      [Basis: Title 17, California Code of
      Regulations, section 93115, ATCM for Stationary
      CI Engines]

   2. The owner/operator shall operate each emergency
      standby engine only for the following purposes:
      to mitigate emergency conditions, for emission
      testing to demonstrate compliance with a
      District, State or Federal emission limit, or
      for reliability-related activities (maintenance
      and other testing, but excluding emission
      testing). Operating while mitigating emergency
      conditions or while emission testing to show
      compliance with District, State or Federal
      emission limits is not limited.
      [Basis: Title 17, California Code of
      Regulations, section 93115, ATCM for Stationary
      CI Engines]

   3. The owner/operator shall operate each emergency
      standby engine only when a non-resettable
      totalizing meter (with a minimum display
      capability of 9,999 hours) that measures the
      hours of operation for the engine is installed,
      operated and properly maintained.
      [Basis: Title 17, California Code of
      Regulations, section 93115, ATCM for Stationary
      CI Engines]

   4. Records: The owner/operator shall maintain the
      following monthly records in a District-
      approved log for at least 36 months from the
      date of entry (60 months if the facility has
      been issued a Title V Major Facility Review
      Permit or a Synthetic Minor Operating Permit).
      Log entries shall be retained on-site, either
      at a central location or at the engine's
      location, and made immediately available to the
      District staff upon request.

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

09/30/21                              A0208                      Page    5

# BAY AREA AIR QUALITY MANAGEMENT DISTRICT

# PERMIT TO OPERATE

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**

NOV 1, 2022

Plant# 208

*** PERMIT CONDITIONS ***
============================================================

    a. Hours of operation for reliability-related
       activities (maintenance and testing).
    b. Hours of operation for emission testing to
       show compliance with emission limits.
    c. Hours of operation (emergency).
    d. For each emergency, the nature of the
       emergency condition.
    e. Fuel usage for each engine(s).
    [Basis: Title 17, California Code of
    Regulations, section 93115, ATCM for Stationary
    CI Engines]

5. At School and Near-School Operation:
   If the emergency standby engine is located on
   school grounds or within 500 feet of any school
   grounds, the following requirements shall
   apply:

   The owner/operator shall not operate each
   stationary emergency standby diesel-fueled
   engine for non-emergency use, including
   maintenance and testing, during the following
   periods:
   a. Whenever there is a school sponsored
      activity (if the engine is located on school
      grounds)
   b. Between 7:30 a.m. and 3:30 p.m. on days when
      school is in session.

   "School" or "School Grounds" means any public
   or private school used for the purposes of the
   education of more than 12 children in
   kindergarten or any of grades 1 to 12,
   inclusive, but does not include any private
   school in which education is primarily
   conducted in a private home(s). "School" or
   "School Grounds" includes any building or
   structure, athletic field, or other areas of
   school property but does not include unimproved
   school property.
   [Basis: Title 17, California Code of
   Regulations, section 93115, ATCM for Stationary
   CI Engines]

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

09/30/21                          A0208                          Page    6

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**                          **PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.       **PERMIT EXPIRATION DATE**
                                                                                                  NOV 1, 2022

Plant# 208
                          *** PERMIT CONDITIONS ***
             ==============================================================

**COND# 23787** *applies to S# 16*

    1.  The owner/operator shall abate the particulate emissions
       from the emergency diesel engine by the Diesel Oxidation
       Catalyst at all times the engine is in operation.
       [Basis: Toxics]

**COND# 24125** *applies to S# 10*

    S-10, Cement Silo

    1.  The Permit Holder shall ensure the visible particulate
       emissions from the silo do not exceed Ringelmann Number
       0.5 (or equivalent opacity) or result in fall out on
       adjacent property in such quantities as to cause
       annoyance to any other person.
       (basis: Regulation 6-1-301, 1-301)

    2.  The Permit Holder shall not exceed a throughput of
       21,900 tons of cement in any consecutive 12-month
       period. (basis: cumulative increase)

    3.  The Permit Holder shall abate emissions from the silo by
       a filter, A-10, at all times the silo is in operation.
       The filter shall be functioning properly within the
       manufacturer's specified pressure drop range.
       (basis: cumulative increase)

    4.  In order to demonstrate compliance with part 2 of the
       condition, the Permit Holder shall keep daily, monthly,
       and consecutive 12-month records of the material
       throughput in a District approved logbook. The records
       shall be kept on site for at least 24 months from the
       date of data entry and be made available to the District
       staff for inspection.
       (basis: cumulative increase, recordkeeping)

**COND# 27085** *applies to S#'s 6, 7, 11, 12, A12, A11*

    Condition # 27085

    S-6 Shredder and S-7 Infeed Conveyor; abated by A-6

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV


**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***
================================================================

Water Sprays, A-11 Venturi Scrubber, and A-12
Venturi Scrubber (Revision 1: A #14194, 6/16/06;
Revision 2: A #16721, 4/9/09; Revision 3: A #27762,
11/10/16; Revision 4: A #27762, 11/20/2020)

1. The owner/operator shall not exceed the scrap-in
   throughput limit of 720,000 tons in any calendar year at
   this facility. (Basis: Regulations 2-1-301 - baseline
   2005 production level of 431,471 tons/year - and 2-5-302
   and Cumulative Increase for the incremental throughput)

2. The owner/operator shall enclose the shredder, S-6,
   and shall vent the shredder emissions to the Venturi
   Scrubbers, A-11 and A-12, during all times that S-6 is
   operating. The owner/operator shall minimize fugitive
   emissions from the shredder enclosure during shredder
   operation by (a) designing the enclosure such that the
   total surface area of all openings in the enclosure does
   not exceed 5% of the total surface area of the enclosure
   walls, floor, and ceiling; (b) using curtain walls or
   strip curtains on the inlet feed conveyor opening; and c
   ensuring that the ventilation fan is operating within its
   design range. The owner/operator shall demonstrate that
   the ventilation fan is operating within its design range
   by maintaining the amperage greater than 480 amperes
   during shredder operation.  The owner/operator shall
   operate each Venturi Scrubber in accordance with
   manufacture specifications. The owner/operator shall
   demonstrate this by maintaining a minimum water flow rate
   of 300 gallons per minute (gpm) to each venturi scrubber
   and an effective pressure differential operating range
   15-22 inches of H2O across each venturi scrubber.
   (Basis: TBACT)

3. Total emissions from the S-6 Auto Shredder shall not
   exceed any of the emission limits listed below:
   a. Maximum Permitted Emission Rates:

|  | P-15 Stack Pounds/Hour | P-15 Stack Tons/Year |
|---|---|---|
| PM10 (total filterable + condensable) | 5.91 | 6.15 |
| POC (calculated as methane) | 112.0 | 85.50 |

375 Beale Street, Suite 600 San Francisco, CA 94105 • (415) 771.6000 • WWW.BAAQMD.GOV

09/30/21                          A0208                          Page    8



BAY AREA AIR QUALITY
MANAGEMENT DISTRICT

PERMIT
TO OPERATE

This document does not permit the holder to violate any BAAQMD regulation or any other law.

PERMIT EXPIRATION DATE
NOV 1, 2022

Plant# 208
                    *** PERMIT CONDITIONS ***
================================================================

     b.   Total particulate emissions from the P-15 stack
        shall not exceed a grain loading of 0.0046
        grains/dscf as determined in accordance with
        Regulation 6-1-602.1.
     c.   Organic emissions from the P-15 stack shall not
        exceed 300 ppmv (dry basis) of total carbon as
        determined in accordance with Regulation
        8-2-601.
     d.   The owner/operator shall demonstrate
        compliance with the Part 3a stack emission
        limits as described in Part 4.
    (Basis: Cumulative Increase, BACT, TBACT, and
    Regulations 2-5-302 and 8-2-301)

4. Source Testing Requirements for Part 3:
     a.   Within 180 days of issuance of this Permit to
        Operate, the owner/operator shall initiate quarterly
        monitoring for the total carbon concentration in
        stack P-15, using authorized procedures and methods,
        to demonstrate compliance with Parts 3a, 3c and
        Regulation 8-2-301, and to assess excess POC
        emissions in the event of non-compliance with Part
        3a, 3c or Regulation 8-2-301. This quarterly
        monitoring shall continue until an organic abatement
        system is operating and continued compliance with
        Regulation 8-2-301 has been demonstrated.
     b.   Within 90 days of issuance of this Permit to Operate
        and annually thereafter, unless noted otherwise, the
        owner/operator shall conduct a District approved
        source test at stack P-15, while the S-6 Auto
        Shredder is operating at or near the maximum
        operating rate, to demonstrate compliance with
        the P-15 stack emission limits in Parts 3a-c. The
        owner/operator shall record the shredder processing
        rate, the water application rates for the infeed
        conveyor and the shredder, the water flow rates and
        the pressure differential operating ranges at each
        venturi scrubber, and the ventilation fan amperage
        during the source test. The source test shall
        determine the hourly emission rate and the average
        emission factor (pounds of pollutant per ton of
        material processed by the shredder) for the
        following compounds:
        - total carbon (calculated as methane and as defined

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

09/30/21                              A0208                        Page    9

**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208
### *** PERMIT CONDITIONS ***
=============================================================

        in Regulation 8-2-202) shall be determined by Air
        District approved methods, such as EPA Methods 25A
        and 18,
    - total POC (calculated as methane), where
        total POC = total carbon (excluding methane only)
        - total NPOC. Total NPOC (calculated as methane)
        shall be determined by Air District approved
        methods, such as EPA Method 18 and EPA Method
        TO-15 or other similar GC/MS methods. Total NPOC
        is the sum of all NPOCs (other than methane)
        identified in Regulation 2-1-207, expressed as
        methane.
    - total particulate emissions shall be determined
        using EPA Method 5/202. All measured total
        particulate emissions shall be assumed to be PM10
        for comparison to the limits in Part 3a.
    - Full speciation of organic TACs shall be
        determined by Air District approved methods, such
        as EPA Method TO-15 or other similar GC/MS
        methods.
    - PCBs shall be determined by Air District approved
        methods, such as CARB Method 428.  (This test
        shall be conducted within 90 days of Permit to
        Operate issuance and once every four years
        thereafter.)
    - PAHs and naphthalene shall be determined by Air
        District approved methods, such as CARB Method
        429. (This test shall be conducted within 90 days
        of Permit to Operate issuance and once every four
        years thereafter.)
    - Full set of metal TACs (including arsenic (As),
        beryllium (Be), cadmium (Cd), chromium (Cr) which
        includes total chromium and hexavalent chromium
        (Cr VI), copper (Cu), lead (Pb), manganese (Mn),
        mercury (Hg), nickel (Ni), selenium (Se), and zinc
        (Zn)), shall be determined using Air District
        approved procedures for each compound, including
        CARB Method 425 for hexavalent chromium. (This
        test shall be conducted within 90 days of Permit
        to Operate issuance and once every four years
        thereafter.)
    - Annual emissions for Stack P-15 shall be
        calculated based on the most recent 12-month
        shredder feedstock throughput rate and the

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV



**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**

NOV 1, 2022

Plant# 208

\*\*\* PERMIT CONDITIONS \*\*\*
=============================================================

> pounds/ton emission factors determined by the most
> recent source test for total POC and total
> particulate emissions. Annual stack emission rates
> shall be compared to the Part 3a limits. The
> annual source test shall also determine the outlet
> grain loading and the concentration of total
> carbon in the P-15 stack to demonstrate compliance
> with Parts 3b and 3c using Air District approved
> methods.
>
> c.   The owner/operator shall submit a source test
>      protocol and notification of the scheduled source
>      test date to the Air District's Source Test Section
>      Manager and to the Permit Engineer at least 30 days
>      prior to the scheduled test date.
> d.   The owner/operator shall notify the Source Test
>      Section Manager of any changes to the scheduled test
>      date as soon as possible.
> e.   The owner/operator shall submit a copy of the source
>      test report to the Source Test Section Manager and
>      the Permit Engineer within 60 days of the test date.
> (Basis: Cumulative Increase, TBACT and Regulations
>  2-5-302 and 8-2-301)

5.  The owner/operator shall apply water sprays (A-6) at the
    shredder, S-6, and infeed conveyor, S-7, at sufficient
    rates to ensure that non-metallic material exiting the
    sources is moist to the touch at all times of operation.
    (Basis: Cumulative Increase, TBACT; and Regulation
     2-5-302)

6.  The owner/operator shall operate the Recycling Center in
    such a manner that particulate emissions into the
    atmosphere from any operation/equipment for a period or
    periods aggregating more than three minutes in any hour
    shall not cause a visible emission which is as dark or
    darker than No. 0.5 on the Ringelmann Chart, or of such
    opacity as to obscure an observer's view to an equivalent
    or greater degree or result in fallout on adjacent
    property in such quantities as to cause public nuisance
    per District Regulation 1-301.
    (Basis: Regulations 1-301 and 6-1-301)

7.  The owner/operator shall use water spray to minimize
    fugitive dust emissions from material/scrap handling and

375 Beale Street, Suite 600 San Francisco, CA 94105 · (415) 771.6000 · WWW.BAAQMD.GOV

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***
========================================================

storage to comply with Part 6. The owner/operator shall operate the facility at all times in accordance with its approved Emissions Minimization Plan (EMP).
(Basis: Regulations 1-301, 6-1-301, and 6-4-301)

8. The owner/operator shall not exceed a total of 26 ship calls and 63,875 truck calls per calendar year to haul in/out scrap/materials at the facility. (Basis: health risk assessment for CEQA review)

9. In order to demonstrate compliance with Part 1 and 8, the owner/operator shall keep records of monthly and yearly throughput of shredder feedstock materials, ship calls and truck calls in a District approved log. Shredder feedstock shall be totaled for each consecutive rolling 12-month period. The log shall be maintained for a period of at least 5 years from the date of data entry and shall be made available to the District staff for inspection upon request. (Basis: Regulations 2-1-301 and 2-5-302, Cumulative  Increase, CEQA)

**COND# 27348** *applies to S# 6*

A-11 Venturi Scrubber, A-12 Venturi Scrubber, A-15 Regenerative Thermal Oxidizer, A-16, Regenerative Thermal Oxidizer, A-17 Packed Bed Scrubber, and A-18 Packed Bed Scrubber abating S-6 Shredder and S-7 In-feed Conveyor.

1. The owner/operator shall abate emissions from A-11 and A 12 Venturi Scrubbers with A-15 and A-16 Regenerative Thermal Oxidizers during all periods of operation. Combined flow rate shall not exceed 180,000 acfm. (basis: Cumulative Increase, BACT/TBACT)
2. The owner/operator shall operate A-15 and A-16 each to meet the following VOC destruction efficiency requirements:
   a.  Outlet VOC concentration of 10 ppmv or less; or
   b.  All of the following standards depending on the applicable inlet VOC concentration:
   c.  VOC destruction efficiency > 98.5% if inlet VOC concentration > 2,000 ppmv;
   d.  VOC destruction efficiency > 97% if inlet VOC concentration > 200 to < 2,000 ppmv;

*375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771 6000 - WWW.BAAQMD.GOV*

EXHIBIT B
70



**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

PERMIT EXPIRATION DATE
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***
================================================================

    e.   VOC destruction efficiency > 90% if inlet VOC
       concentration < 200 ppmv.
(basis: Cumulative Increase; BACT/TBACT)

3.  The owner/operator shall operate A-15 and A-16 at a
    minimum combustion zone temperature of 1600 degrees F,
    at all times when the shredder S-6 is operating. The
    District may adjust this minimum temperature, if source
    test data demonstrates that an alternate temperature is
    necessary for or capable of maintaining compliance with
    Part 2 above. (basis:
Cumulative Increase; BACT/TBACT)

4.  To determine compliance with the temperature requirement
    in these permit conditions, the owner/operator shall
    equip A-15 and A-16 each with a temperature measuring
    device capable of continuously measuring and recording
    the temperature in each regenerative thermal oxidizer.
    The owner/operator shall install, and maintain in
    accordance with manufacturer's recommendations, a
    temperature measuring device that meets the following
    criteria: the minimum and maximum measurable
    temperatures with the device are 560 degrees F and 1750
    degrees F, respectively, and the minimum accuracy of the
    device over this temperature range shall be 1.0 percent
    of full-scale. (basis: Cumulative Increase; BACT/TBACT)

5.  The owner/operator shall report any non-compliance with
    Part 3 of this condition to the Director of the
    Compliance & Enforcement Division at the time that it is
    discovered. The submittal shall detail the corrective
    action taken and shall include the data showing the
    exceedance as well at the time of occurrence. (basis:
Cumulative Increase, Regulation 2-5)

6.  The temperature limit in Part 3 shall not apply during
    an "Allowable Temperature Excursion", provided that the
    temperature controller setpoint complies with the
    temperature limit. An Allowable Temperature Excursion is
    one of the following:

    a.   A temperature excursion not exceeding 20 degrees F;
       or

    b.   A temperature excursion for a period or periods
       which when combined are less than or equal to 15
       minutes in any hour; or

    c.   A temperature excursion for a period or periods
       which when combined are more than 15 minutes in any
       hour, provided that all three of the following

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

09/30/21                          A0208                    Page  13



**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.        PERMIT EXPIRATION DATE

NOV 1, 2022

Plant# 208
                    *** PERMIT CONDITIONS ***
==============================================================

            criteria are met.
       i.   the excursion does not exceed 50 degrees F;
       ii.  the duration of the excursion does not exceed
     24 hours; and
       iii. the total number of such excursions does not
            exceed 12 per calendar year (or any consecutive 12
            month period).
     . Two or more excursions greater than 15 minutes in duration
     occurring during the same 24 hour period shall be counted as
     one excursion toward the 12 excursion limit. (basis:
     Regulation 2-1-403)
     7.   For each Allowable Temperature Excursion that exceeds 20
          degrees F and 15 minutes in duration, the Permit Holder
          shall keep sufficient records to demonstrate that they
          meet the qualifying criteria described above. Records
          shall be retained for a minimum of five (or two years)
          years from the date of entry, and shall be made
          available to the District upon request. Records shall
          include at least the following information:
          a.   Temperature controller setpoint;
          b.   Starting date and time, and duration of each
               Allowable Temperature Excursion;
          c.   Measured temperature during each Allowable
               Temperature Excursion;
          d.   Number of Allowable Temperature Excursions per
               month, and total number for the current calendar
               year; and
          e.   All strip charts or other temperature records.
     (basis: Regulation 2-1-403)
     8.   The owner/operator shall not use more than 1,332,980
          therms combined during any consecutive twelve-month
          period in A-15 and A-16 regenerative thermal oxidizers.
          The A-15 and A-16 regenerative thermal oxidizers should
          be in operating mode not exceeding 8 hours per day, with
          the remaining hours in standby mode. (basis: Cumulative
          Increase)
     9.   The owner/operator shall abate emissions from A-15 and A
          16 Regenerative Thermal Oxidizers with A-17 and A-18
          Packed Bed Scrubbers during all periods of operation.
          Exhaust gas flow rate to each Packed Bed Scrubber shall
          not exceed 90,000 acfm, and liquid flow rate shall be at
          least 720 gallons per minute. (basis: Cumulative
          Increase, BACT/TBACT)

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

09/30/21                              A0208                         Page   14

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**                    **PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.    **PERMIT EXPIRATION DATE**

NOV 1, 2022

Plant# 208
              *** PERMIT CONDITIONS ***
===============================================================

10. The owner/operator shall not emit more than following
    from A-15 and A-16 Regenerative Thermal Oxidizers at
    stacks P-17 and P-18:

NOx                        CO
(lb/MMscf)                 lb/MMscf)
A-15 50                      84
A-16 50                      84
.(basis: Cumulative Increase, Source Test Method 13A and
Method 6)

11. The owner/operator shall not emit more than the
    following toxic air contaminants from the exhaust of A-
    17 and A-18 Packed Bed Scrubbers, combined, unless the
    owner/operator complies with all of the procedures and
    limits in Parts 11a-d:

    a.  Within 60 days of receiving source test results
        demonstrating that total emissions from stack P-17
        and P-18 combined exceed any one of the limits in
        this part, the owner/operator shall submit a permit
        application to the Air District to request revisions
        in the TAC emission limits below. The permit
        application shall include all information required
        to conduct an updated health risk assessment for the
        Shredder, Thermal Oxidizers, and Acid Gas Scrubbers,
        including new proposed emission limits for fugitive
        emissions from the shredder building and for each
        stack for the full list of potential TACs for these
        devices, as identified in Part 13, that also
        demonstrate compliance with the source test results.

    b.  The health risk assessment for this project shall
        demonstrate that total health risks resulting from
        the proposed limits on shredder building fugitive
        emissions, P-17 emissions, and P-18 emissions do not
        exceed the lower of (a) a cancer risk limit of 3.0
        in a million for this project or (b) the applicable
        project cancer risk limit identified in Regulation
        2, Rule 5. The health risk value shall be evaluated
        at the Maximally Exposed Individual Resident (MEIR)
        and Maximally Exposed Individual Worker (MEIW), but
        not the Point of Maximum Impact (PMI). In addition,
        the health risk assessment for this project shall
        demonstrate compliance with any other applicable
        limits or requirements of Regulation 2, Rule 5.

    c.  The health risk assessment shall be conducted in
        accordance with the Regulation 2-5 procedures in

375 Beale Street, Suite 600 San Francisco, CA 94105 · (415) 771.6000 · WWW.BAAQMD.GOV

09/30/21                               A0208                        Page   15

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

```
                *** PERMIT CONDITIONS ***
=================================================================
```

        effect at the time the HRA is conducted.

  d.  If the health risk assessment for the revised TAC emissions limits for the shredder and its associated abatement equipment find that health risks exceed any of the limits described in Part 11b, the owner/operator shall submit a compliance plan to reduced TAC emissions, change operational parameters, or make other improvements such that the health risk assessment meets the requirements of Part 11b. This compliance plan shall be submitted to the District within 60 days of notification by the District that such a plan is required. Pollutant _ Total Stack Emissions (P-17 + P-18)

| lb/hr | |
|---|---|
| Arsenic | 8.2E-6 |
| Benzene | 1.8E-2 |
| Butadiene, 1,3- | 4.5E-4 |
| Cadmium | 5.0E-4 |
| Chromium, Hexavalent | 7.8E-5 |
| Ethyl Benzene | 3.7E-2 |
| Lead | 3.2E-3 |
| Nickel | 1.5E-3 |
| PCBs | 2.6E-4 |
| Toluene | 1.5E-1 |

.(basis: Regulation 2-5)

12. Not later than 60 days from the startup of A-15 and/or A-16 and annually thereafter, the owner/operator shall conduct District approved source tests to determine initial compliance with the limits in parts 2 and 10. The owner/operator shall submit the source test results to the District staff no later than 60 days after the source test. (basis: Cumulative Increase, Regulation 2-5)

13. Not later than 60 days from the startup of A-15 and/or A-16 and every five years thereafter, the owner/operator shall conduct District approved source tests to determine compliance with the limits in part 11. In addition to the compounds identified in Part 11, this source test shall include, as a minimum, the full list of potential TACs for the Shredder, Thermal Oxidizers, and Acid Gas Scrubbers identified below. The owner/operator shall submit the source test results to the District staff no later than 60 days after the source test. (basis: Cumulative Increase,

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV



**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***
===========================================================

```
Regulation 2-5)
Potential TACs
Acetaldehyde
Arsenic
Benzene
Beryllium
Butadiene, 1,3-
Cadmium
Chromium, Hexavalent
Copper
Ethyl Benzene
Formaldehyde
Hexane
Isopropyl Alcohol
Lead
Manganese
Methanol
Methyl Chloroform
Methyl Ethyl Ketone
Methylene Chloride
Mercury
Naphthalene
Nickel
Polychlorinated Dibenzo-p-Dioxins (PCDDs), Polychlorinated
Dibenzo Furans (PCDFs), and Dioxin-like PCBs*
Perchloroethylene
PCBs
Propylene
PAHs (as benzo(a)pyrene)
Selenium
Styrene
Toluene
Vanadium
Xylenes (mixed)
o-Xylene
Cumene
Hexachloroethane (PCA)
Methyl Isobutyl Ketone (MiBK)
Trimethylpentane, 2,2,4-
Acrylonitrile
1,1 Dichloroethene
Carbon Disulfide
1,4-Dioxane
1,4-Dichlorobenzene
```

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**    **PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.    **PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***
==============================================================

Hydrogen Fluoride
Hydrogen Chloride

This is a large group of compounds with different toxic equivalency factors (TEF) values as listed in Table 2-5-1.

14. The owner/operator shall comply with all applicable testing requirements as specified in Volume V of the District's Manual of Procedures. The owner/operator shall notify the District's Source Test Section, in writing, of the source test protocols and projected test dates at least 7 days prior to testing. (basis: Cumulative Increase, Regulation 2-5)

·15. In order to demonstrate compliance with the above parts of this permit condition, the owner/operator shall maintain the following monthly records in a District approved log for at least 24 months from the date of entry. Log entries shall be retained on site and made available to District staff upon request:
    a.  Monthly quantity of Natural Gas Consumed in A-15 and A-16 combined.
    b.  Monthly quantities shall be totaled for each consecutive twelve month period.
    c.  All source test records required per Parts 12 and 13. (basis: Cumulative Increase)

**COND# 27410** *applies to S# 6*

This permit condition shall become effective upon the installation and start-up of the Regenerative Thermal Oxidizers (A-15 and A-16) and the Packed Bed Scrubbers (A-17 and A-18).

S-6 Shredder and S-7 Infeed Conveyor; abated by A-6 Water Sprays, A-11 Venturi Scrubber, A-12 Venturi Scrubber, A-15 Regenerative Thermal Oxidizer, A-16, Regenerative Thermal Oxidizer, A-17 Packed Bed Scrubber, and A-18 Packed Bed Scrubber. (Revision 1: A #14194, 6/16/06; Revision 2: A #16721, 4/9/09; Revision 3: A #27762, 11/10/16; Revision 4: A #27762, 11/20/2020, A #30009, enter issue date)

1.  The owner/operator shall not exceed the scrap-in throughput limit of 720,000 tons in any calendar year at

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

09/30/21                              A0208                        Page   18

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**

NOV 1, 2022

Plant# 208

*** PERMIT CONDITIONS ***
================================================================

this facility. (Basis: Regulations 2-1-301 - baseline
2005 production level of 431,471 tons/year - and 2-5-302
and Cumulative Increase for the incremental throughput)

2.   The owner/operator shall enclose the shredder, S-6, and
shall vent the captured shredder emissions to the
Venturi Scrubbers, A-11 and A-12, followed by
Regenerative Thermal Oxidizers, A-15 and A-16, followed
by Packed Bed Scrubbers, A-17 and A-18, during all times
that S-6 is operating. The owner/operator shall minimize
fugitive emissions from the shredder enclosure during
shredder operation by (a) designing the enclosure such
that the total surface area of all openings in the
enclosure does not exceed 5% of the total surface area
of the enclosure walls, floor, and ceiling; (b) using
curtain walls or strip curtains on the inlet feed
conveyor opening; and c ensuring that the ventilation
fan is operating within its design range. The
owner/operator shall demonstrate that the ventilation
fan is operating within its design range by maintaining
the amperage greater than 480 amperes during shredder
operation. The owner/operator shall operate each Venturi
Scrubber in accordance with manufacture specifications.
The owner/operator shall demonstrate this by maintaining
a minimum water flow rate of 300 gallons per minute
(gpm) to each venturi scrubber and an effective pressure
differential operating range 15-22 inches of $H_2O$ across
each venturi scrubber. (Basis: TBACT)

3.   Total emissions from the S-6 Auto Shredder shall not
exceed any of the emission limits listed below:
a.   Maximum Permitted Emission Rates:

| | P-17 and P-18 Pounds/Hour Per Stack | P-17 and P-18 Tons/Year Per Stack |
|---|---|---|
| PM10 (total filterable + condensable) | 3.11 | 3.30 |
| POC (calculated as methane) | 3.11 | 1.95 |

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

09/30/21                          A0208                          Page   19



**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***
=============================================================

   b.  Total particulate emissions from stacks P-17 and P-18 shall not exceed a grain loading of 0.0047 grains/dscf in each stack as determined in accordance with Regulation 6-1-602.1.
   c.  Organic emissions from stacks P-17 and P-18 shall not exceed 10 ppmv (dry basis) of total carbon in each stack as determined in accordance with Regulation 8-2-601.
   d.  The owner/operator shall demonstrate compliance with the Part 3a stack emission limits as described in Part 4.
(Basis: Cumulative Increase, BACT, TBACT, and Regulations 2-5-302 and 8-2-301)

4.  Source Testing Requirements for Part 3:
   a.  The owner/operator shall conduct quarterly monitoring for the total carbon concentration in stacksP-17 and P-18, using authorized procedures and methods, to demonstrate compliance with Parts 3a, 3c and Regulation 8-2-301. This quarterly monitoring shall continue until an organic abatement system is operating and continued compliance with Regulation 8-2-301 has been demonstrated.
   b.  On an annual basis, unless noted otherwise, the owner/operator shall conduct a District approved source test at stacks P-17 and P-18, while the S-6 Auto Shredder is operating at or near the maximum operating rate, to demonstrate compliance with the stack emission limits in Parts 3a-c. The owner/operator shall record the shredder processing rate, the water application rates for the infeed conveyor and the shredder, the water flow rates and the pressure differential operating ranges at each venturi scrubber, and the ventilation fan amperage during the source test. The source test shall determine the hourly emission rate and the average emission factor (pounds of pollutant per ton of material processed by the shredder) for the following compounds:
-total carbon (calculated as methane and as defined in Regulation 8-2-202) shall be determined by Air District approved methods, such as EPA Methods 25A and 18,
-total POC (calculated as methane), where total POC =

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

09/30/21                                A0208                          Page   20

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.     **PERMIT EXPIRATION DATE**

NOV 1, 2022

Plant# 208

                          *** PERMIT CONDITIONS ***
        ===========================================================

          total carbon (excluding methane only) - total NPOC.
          Total NPOC (calculated as methane) shall be determined
          by Air District approved methods, such as EPA Method 18
          and EPA Method TO-15 or other similar GC/MS methods.
          Total NPOC is the sum of all NPOCs (other than methane)
          identified in Regulation 2-1-207, expressed as methane.
          -total particulate emissions shall be determined using
          EPA Method 5/202. All measured total particulate
          emissions shall be assumed to be PM10 for comparison to
          the limits in Part 3a.
     -Full speciation of organic TACs shall be determined by Air
     District approved methods, such as EPA Method TO-15 or other
     similar GC/MS methods.
     -PCBs shall be determined by Air District approved methods,
     such as CARB Method 428. (This test shall be conducted
     within 90 days of Permit to Operate issuance and once every
     four years thereafter.)
     -PAHs and naphthalene shall be determined by Air District
     approved methods, such as CARB Method 429. (This test shall
     be conducted within 90 days of Permit to Operate issuance
     and once every four years thereafter.)
     -Full set of metal TACs (including arsenic (As), beryllium
     (Be), cadmium (Cd), chromium (Cr) which includes total
     chromium and hexavalent chromium (Cr VI), copper (Cu), lead
     (Pb), manganese (Mn), mercury (Hg), nickel (Ni), selenium
     (Se), and zinc (Zn)), shall be determined using Air District
     approved procedures for each compound, including CARB Method
     425 for hexavalent chromium. (This test shall be conducted
     within 90 days of Permit to Operate issuance and once every
     four years thereafter.)
     -Dioxin and furans shall be determined by Air District
     approved methods, such as EPA Method 23/23A.
     -Annual emissions for each stack shall be calculated based
     on the most recent 12-month shredder feedstock throughput
     rate and the pounds/ton emission factors determined by the
     most recent source test for total POC and total particulate
     emissions. Annual stack emission rates shall be compared to
     the Part 3a limits.
     The annual source test shall also determine the outlet grain
     loading and the concentration of total carbon in stacks P-17
     and P-18 to demonstrate compliance with Parts 3b and 3c
     using Air District approved methods.
          c.   The owner/operator shall submit a source test
               protocol and notification of the scheduled source

        375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.    **PERMIT EXPIRATION DATE**

NOV 1, 2022

Plant# 208

*** PERMIT CONDITIONS ***
==============================================================

        test date to the Air District's Source Test Section
Manager and to the Permit Engineer at least 30 days
prior to the scheduled test date.
d.   The owner/operator shall notify the Source Test
Section Manager of any changes to the scheduled test
date as soon as possible.
e.   The owner/operator shall submit a copy of the source
test report to the Source Test Section Manager and
the Permit Engineer within 60 days of the test date.
(Basis: Cumulative Increase, TBACT and Regulations 2

-

5-302 and 8-2-301)

5.   The owner/operator shall apply water sprays (A-6) at the
shredder, S-6, and infeed conveyor, S-7, at sufficient
rates to ensure that non-metallic material exiting the
sources is moist to the touch at all times of operation.
(Basis: Cumulative Increase, TBACT; and Regulation 2-5-
302)

6.   The owner/operator shall operate the Recycling Center in
such a manner that particulate emissions into the
atmosphere from any operation/equipment for a period or
periods aggregating more than three minutes in any hour
shall not cause a visible emission which is as dark or
darker than No. 0.5 on the Ringelmann Chart, or of such
opacity as to obscure an observer's view to an
equivalent or greater degree or result in fallout on
adjacent property in such quantities as to cause public
nuisance per District Regulation 1-301. (Basis:
Regulations 1-301 and 6-1-301)

7.   The owner/operator shall use water spray to minimize
fugitive dust emissions from material/scrap handling and
storage to comply with Part 6. The owner/operator shall
operate the facility at all times in accordance with its
approved Emissions Minimization Plan (EMP). (Basis:
Regulations 1-301, 6-1-301, and 6-4-301)

8.   The owner/operator shall not exceed a total of 26 ship
calls and 63,875 truck calls per calendar year to haul
in/out scrap/materials at the facility. (Basis: health
risk assessment for CEQA review)

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

09/30/21                              A0208                      Page   22

 **BAY AREA AIR QUALITY**
**MANAGEMENT DISTRICT**

**PERMIT**
**TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.   **PERMIT EXPIRATION DATE**
                                                                                 NOV 1, 2022

Plant# 208
                        *** PERMIT CONDITIONS ***
        ==============================================================

   9.   In order to demonstrate compliance with Part 1 and 8,
        the owner/operator shall keep records of monthly and
        yearly throughput of shredder feedstock materials, ship
        calls and truck calls in a District approved log.
        Shredder feedstock shall be totaled for each consecutive
        rolling 12-month period. The log shall be maintained for
        a period of at least 5 years from the date of data entry
        and shall be made available to the District staff for
        inspection upon request. (Basis:
   Regulations 2-1-301 and 2-5-302, Cumulative Increase, CEQA)


   ~~~~~~~~~~~~~~~~~~~~~~~~~~~ END OF CONDITIONS ~~~~~~~~~~~~~~~~~~~~~~~~~~~

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

```
Bay Area Air Quality          ** SOURCE EMISSIONS **              PLANT #  208
Management  District                                             Sep 30, 2021
-----------------------------------------------------------------------------
                                              Annual Average lbs/day
S#    Source Description                  PART   ORG   NOx   SO2    CO
--    ------ -----------                  ----   ---   ---   ---    --

6     Shredder w/ water injection, electric, 225   20.8   880    -     -     -
7     Infeed Conveyor (electric)                    11    46    -     -     -
10    Cement Silo                                    -     -    -     -     -
11    Joint Products Plants w/ enclosure (2 Trom    -     -    -     -     -
12    Drum Magnet Line W/ enclosure                 .5     -    -     -     -
13    JPP from Wet Seperation Unit downstream        -     -    -     -     -
16    Emergency Standby Diesel Generator Set         -     -    -     -     -
                                              ----- ----- ----- ----- -----
      T O T A L S                             32.3  926
```

**  PLANT TOTALS FOR EACH EMITTED TOXIC POLLUTANT  **

```
        Pollutant Name                         Emissions lbs/day
        --------- ----                         --------- -------

        Benzene                                      3.59
        Ethylene dichloride                           .09
        Hexane                                      11.19
        Isopropyl alcohol                           1.10
        Methyl ethyl ketone (MEK)                   2.40
        Methyl alcohol                              2.55
        Perchloroethylene                            .60
        Styrene                                     1.29
        Toluene                                     31.12
        Xylene                                      40.98
        Ethylbenzene                                8.31
        Acrylonitrile                                .05
        Vinylidene chloride                          .12
        Methylene chloride                          2.57
        1,3-butadiene                                .11
        Polychlorinated biphenyl (PCB)               .08
        Propylene                                   3.11
        1,1,1-Trichloroethane                        .31
        Copper (all) pollutant                       .05
        Lead (all) pollutant                         .02
        Manganese                                    .03
        Nickel pollutant                             .01
```

EXHIBIT B

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT, and ALEXANDER
CROCKETT, in his official capacity as Interim Executive Officer of the BAAQMD,
Respondents. And SCHNITZER STEEL INDUSTRIES, INC., Real Party in Interest.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

THE ATHLETICS INVESTMENT GROUP, LLC,
Petitioner

> To keep other people from
> seeing what you entered on
> your form, please press the
> Clear This Form button at the
> end of the form when finished.

**ELECTRONICALLY FILED**
Superior Court of California
County of Alameda
05/06/2022
Chad Finke, Executive Officer / Clerk of the Court
By: ___X. Bowie___ Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legeles gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* Rene C. Davidson Courthouse <br> 1225 Fallon Street <br> Oakland, CA 94612 | CASE NUMBER: <br> *(Número del Caso):* <br> 22CV010930 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
William M. Sloan, Venable LLP, 101 California St Suite 3800, San Francisco, CA 94111; (415) 653 3570

| DATE: <br> *(Fecha)* 05/06/2022 | Chad Finke, Executive Officer / Clerk of the Court | Clerk, by <br> *(Secretario)* ___X. Bowie___ | , Deputy <br> *(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* ALEXANDER CROCKETT, in his official capacity as Interim Executive Officer of the Bay Area Air Quality Management District

under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)     ☒ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use <br> Judicial Council of California <br> SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 <br> *www.courtinfo.ca.gov* |
|---|---|---|

Save This Form     Print This Form     Clear This Form     For your protection and privacy, please press the Clear This Form button after you have printed the form.

EXHIBIT C

83

RECEIVED MAY 1 6 2022

1

VENABLE LLP
William M. Sloan (SBN 203583)

2

wmsloan@venable.com
Tyler G. Welti (SBN 231697)

3

tgwelti@venable.com
101 California Street, Suite 3800

4

San Francisco, CA 94111
Telephone:   415 653 3750

5

Facsimile:    415 653 3755

6

KEKER, VAN NEST & PETERS LLP
R. James Slaughter  (SBN 192813)

7

rslaughter@keker.com
Eric H. MacMichael (SBN 231697)

8

emacmichael@keker.com
633 Battery Street

9

San Francisco, CA 94111-1809
Telephone:   415 391 5400

10

Facsimile:    415 397 7188

11

12

Attorneys for *Petitioner*
*The Athletics Investment Group, LLC*

13

14

SUPERIOR COURT OF THE STATE OF CALIFORNIA

15

IN AND FOR THE COUNTY OF ALAMEDA

16

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
05/06/2022 at 01:27:07 PM
By: Xian-xii Bowie, Deputy Clerk

17

THE ATHLETICS INVESTMENT GROUP,
LLC,

18

Petitioner,

19

v.

20

THE BAY AREA AIR QUALITY
MANAGEMENT DISTRICT, and

21

ALEXANDER CROCKETT, in his official
capacity as Interim Executive Officer of

22

the BAAQMD,

23

Respondents.

24

25

SCHNITZER STEEL INDUSTRIES, INC.,

26

Real Party in Interest,

27

28

Case No. 22CV010930

**VERIFIED PETITION FOR WRIT
OF MANDATE AND COMPLAINT
FOR DECLARATORY RELIEF**

**(Code Civ. Proc. §§ 1085, 1060)**

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT C

84

# INTRODUCTION

1.    This case is about Respondent Bay Area Air Quality Management District's (BAAQMD) longstanding failure to regulate Real Party in Interest Schnitzer Steel Industries, Inc.'s (Schnitzer) air pollution in West Oakland, an environmental justice community that suffers one of the heaviest pollution burdens in California.

2.    BAAQMD administers the federal and California Clean Air Acts (each, a CAA; collectively, the CAAs) for the nine-county San Francisco Bay Area. Under federal and state law, BAAQMD must apply the CAAs and BAAQMD's rules (Rules) to certain emitters of air contaminants that operate within BAAQMD's jurisdiction, such as Schnitzer.

3.    Schnitzer operates a metal-shredding operation (Facility) in West Oakland. It is an emitter of air contaminants that operates within BAAQMD's jurisdiction. It is unlawful for Schnitzer to emit air contaminants from the Facility without authorization, including a permit (Permit to Operate, or PTO) issued by BAAQMD.

4.    For many years, BAAQMD has failed to fulfill its non-discretionary regulatory obligations, imposed by both federal and state law, with respect to Schnitzer's Facility. To start, the law specifies that where a facility's emissions exceed certain regulatory thresholds, it is a "Major Facility" and must obtain a "Major Facility Review" / Title V Permit. It is clear that the Facility meets the requirements for being a Major Facility, because emissions data for the mega-shredder, which shreds automobiles and other metal-containing waste, show unequivocally that Schnitzer's high emissions of volatile organic compounds (VOCs)[1] and hazardous air pollutants (HAPs) exceed the regulatory thresholds. BAAQMD has actual knowledge of these facts. But BAAQMD has not required Schnitzer to obtain a Major Facility Review Permit.

5.    Furthermore, Schnitzer emits air contaminants in amounts exceeding various thresholds set by law, including the conditions of its PTO. Federal and state law require the local air regulator—here, BAAQMD—not to permit an emitter to operate if it is not in compliance with

---

[1] VOCs include precursor organic compounds (POCs), which are "[a]ny compound of carbon, excluding methane, carbon monoxide, carbon dioxide, carbonic acid, metallic carbides or carbonates and ammonium carbonate." BAAQMD Rules 1-235, 1-233. POCs participate in atmospheric photochemical reactions to create ozone pollution.

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

2

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT C
85

1  applicable emissions limits or other CAA requirements.  But BAAQMD has issued and re-issued

2  Schnitzer's PTO many times even though BAAQMD officials have actual knowledge that

3  Schnitzer's emissions violate the CAA, BAAQMD Rules, and its permit conditions.  Indeed,

4  BAAQMD has known for many years that Schnitzer's Facility emits excessive levels of several

5  air pollutants that cause substantial health risks for the West Oakland community.  BAAQMD's

6  own findings also clearly show the alarming health impacts of this air pollution.  BAAQMD

7  prepared a community-wide emissions inventory and health risk assessment as part of the West

8  Oakland Community Action Plan, which aims to improve air quality in the West Oakland

9  environmental justice community. The inventory shows that Schnitzer's emissions cause a public

10 health risk in West Oakland that is impermissible under BAAQMD's Rules.  In fact, the

11 emissions and health risk data show that Schnitzer emits substantially more of every inventoried

12 pollutant (PM2.5, diesel particulate matter (PM), and TACs) and causes more cancer risk than

13 any other permitted source in West Oakland.

14         6.      Compounding the problem, the PTO that Schnitzer does possess does not include

15 various sources at the Facility.  The Facility contains stockpiles of metal shredder aggregate that

16 emit air contaminants.  Schnitzer also engages in "torch-cutting," which is the process of breaking

17 apart large objects with the use of heat and flame; this practice emits air contaminants.  These

18 activities emit air contaminants and cannot occur without a permit.  Schnitzer has not obtained a

19 permit for its stockpiles or to engage in torch-cutting.  BAAQMD has actual knowledge of this

20 deficiency and, correspondingly, a legal obligation to not renew Schnitzer's PTO.  BAAQMD has

21 failed to do so.

22         7.      Despite knowing that Schnitzer is violating several air quality laws and emissions

23 limits set by BAAQMD, BAAQMD has continued to renew Schnitzer's PTO.  In doing so,

24 BAAQMD has violated its legal duty to not issue or renew a permit for a facility that is violating

25 emission limitations, BAAQMD Rules, or federal or California laws.  Underscoring this fact,

26 PTO renewals issued by BAAQMD in 2020 and 2021 set limits on emissions of pollutants that

27 tables in the permits themselves show Schnitzer is exceeding.

28         8.      The brunt of BAAQMD's failure to regulate Schnitzer's Facility as required by

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

3

VERIFIED PETITION FOR WRIT OF MANDATE
EXHIBIT C
86

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

1   law falls on West Oakland, a low-income community of color with a long history of suffering

2   disproportionately high environmental pollution. Within this community, Schnitzer's Facility is

3   located closer to nearly every class of sensitive receptor— including hospitals, schools, and

4   daycare centers—than any other metal shredder in California. Indeed, the Facility is less than a

5   mile away from schools, hospitals, senior living centers, parks, and about 23,000 residents. The

6   Facility adjoins the Oakland Inner Harbor of the San Francisco Bay, which is impaired by

7   multiple pollutants. This area is already designated under the federal CAA as a nonattainment

8   area for the 2015 8-hour ozone and the 2006 PM2.5 national ambient air quality standards

9   (NAAQS). In this sensitive location, Schnitzer shreds more material, generates more hazardous

10  waste, and emits more air pollutants than any other metal shredding facility in the State.

11          9.      Petitioner the Athletics Investment Group LLC (the Athletics) maintains its

12  business operations near the Facility and has proposed to build a ballpark for Major League

13  Baseball games and other events close to the Facility. The Athletics bring this lawsuit to compel

14  BAAQMD to perform its duties under state air quality law with respect to regulating the

15  Schnitzer Facility and thereby fulfill BAAQMD's responsibility to protect the West Oakland

16  community. Specifically, BAAQMD must deny Schnitzer's permit to operate because Schnitzer

17  is in violation of emission limitations, BAAQMD Rules, and applicable federal and California air

18  quality laws.

19

20

21

22

23

24

25

26

27

28

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction over this petition for a writ of mandate under section 1085 of the California Code of Civil Procedure and Article VI, Section 10 of the California Constitution.  The Court has jurisdiction over the complaint for declaratory relief under California Code of Civil Procedure § 1060.

11.     Venue is proper in this Court under section 401 of the Code of Civil Procedure because this is an action against the State or a department, officer, or other agency of the State, which may be commenced in any county in which the California Attorney General has an office. The California Attorney General has an office in Alameda County.  Venue is also proper under section 395 because the relevant operations of Real Party in Interest Schnitzer Steel Industries, Inc. occur in Alameda County.

**PARTIES**

12.     Petitioner Athletics Investment Group LLC is a limited liability corporation organized under California law and having a principal place of business at 55 Harrison Street, Oakland, California 94607.

13.     Respondent BAAQMD is a California state public agency, organized and existing under and under California Health & Safety Code section 40200, *et seq.*

14.     Respondent Alexander Crockett is the Interim Executive Officer of BAAQMD. He is sued in his official capacity only.

15.     Real Party in Interest Schnitzer is a corporation organized under Oregon law.  It operates a metal shredding facility located at 1101 Embarcadero West, Oakland, California, 94607.

**LEGAL OVERVIEW**

16.     In California, local and regional authorities have the primary authority and responsibility to control air pollution from all sources other than motor vehicles. (Health & Saf. Code, § 39002.)  BAAQMD is tasked with regulating stationary sources of air pollution in the nine counties that surround the San Francisco Bay, including Alameda County. (Health & Saf. Code, § 40200.)

17.     In particular, California law directs BAAQMD to "adopt and enforce rules and regulations to achieve and maintain the state and federal ambient air quality standards in all areas affected by emission sources under [its] jurisdiction, and … enforce all applicable provisions of state and federal law." (Health & Saf. Code, § 40001(a).)  This includes the federal and California CAAs.

18.     BAAQMD must also implement a permit system that requires parties to obtain a permit to operate "any article, machine, equipment, or other contrivance which may cause the issuance of air contaminants." (Health & Saf. Code, § 42300(a).)  Among other things, BAAQMD's permit system must:

> Prohibit the issuance of a permit unless the air pollution control officer is satisfied, on the basis of criteria adopted by the district board, that the article, machine, equipment, or contrivance will comply with all of the following:
> (1) All applicable orders, rules, and regulations of the district and of the state board.
> (2) All applicable provisions of [the California CAA]….

(Health and Saf. Code § 42301(b).)

19.     This is an ongoing obligation on BAAQMD in regulating the facilities within its jurisdiction.  The law requires that BAAQMD's permitting system must:

> Require, upon annual renewal, that each permit be reviewed to determine that the permit conditions are adequate to ensure compliance with, and the enforceability of, district rules and regulations applicable to the article, machine, equipment, or contrivance for which the permit was issued which were in effect at the time the permit was issued or modified, or which have subsequently been adopted and made retroactively applicable to an existing article, machine, equipment, or contrivance, by the district board and, if the permit conditions are not consistent, require that the permit be revised to specify the permit conditions in accordance with all applicable rules and regulations.

(Health and Saf. Code § 42301(e).)

20.     BAAQMD Rule 2-1-302 requires a facility to obtain an authority to construct and PTO for any equipment that may cause the emission of air contaminants.  The steps to obtain a permit, and the conditions imposed on a given facility, vary depending on the amount and type of air contaminants the facility emits.  BAAQMD must regulate any facility that emits District Best Available Control Technology (BACT) Pollutants or TACs above certain levels.  District BACT

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

6

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT C
89

**VENABLE LLP**
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

1   Pollutants include "[p]recursor organic compounds (POCs), non-precursor organic compounds

2   (NPOCs), oxides of nitrogen (NOx), sulfur dioxide (SO2), PM10, PM2.5, and carbon monoxide

3   (CO)." (BAAQMD Rule 2-2-210.)  A TAC is "an air pollutant that may cause or contribute to an

4   increase in mortality or in serious illness or that may pose a present or potential hazard to human

5   health." (BAAQMD Rule 2-5-222.)

6        21.     BAAQMD's Regulation 2, Rule 2, implements the New Source Review (NSR)

7   provisions of the federal and California Clean Air Acts.  Under these provisions, a permit to

8   construct or operate a new or modified source must require BACT to "control emissions of

9   District BACT pollutants" if the source "will have the potential to emit [a District BACT

10  pollutant] in an amount of 10.0 or more pounds on any day." (Rule 2-2-301.)  BACT requires

11  "the most effective emission control" or "the most stringent emission limitation" to be installed

12  for a new or modified source.[2]  (Rule 2-2-202.)  BAAQMD's NSR regulations also require

13  offsets for any source with the potential to emit more than specified levels of pollutants, which

14  are 10 tons per year for POCs and Nitrous Oxide. (Rule 2-2-302.)

15       22.     BAAQMD's Regulation 2, Rule 5 creates additional toxic new source review

16  requirements for sources of TACs.  BAAQMD must require Toxic BACT (TBACT) for any

17  permitted source of TACs where the source presents a cancer risk greater than 1.0 in one million

18  (10-6 or 1.0E-6) at the "Maximally Exposed Individual" location[3] or a chronic hazard index

19  greater than 0.20.  (Rule 2-3-301.)  A facility's health risk is determined by completing a Health

20  Risk Assessment (HRA).[4]

---

[2] Under BAAQMD's rules, "BACT" is equivalent to the stringent Lowest Achievable Emission Rate (LAER) standard used in the federal non-attainment NSR Program. See BAAQMD Rule 2-2-202; 42 U.S.C. § 7503; 40 C.F.R. §§ 51.165(i), 51.161.

[3] BAAQMD Rule 2-5-212 defines "Maximally Exposed Individual" as "A person that may be located at the receptor location where the highest exposure to toxic air contaminants emitted from a given source or project is predicted, as shown by an APCO-approved HRA. MEI locations are typically determined for maximum cancer risk, chronic hazard index and acute hazard index based on exposure to residential, worker, and student receptors." See also CalEPA Office of Environmental Health Hazard Assessment, Air Toxics Hot Spots Program Risk Assessment Guidelines (Feb. 2015).

[4] An HRA, which is also known as a Health Risk Screening Analysis (HRSA), is "[a]n analysis that estimates the increased likelihood of health risk for individuals in the affected population that may be exposed to emissions of one or more toxic air contaminants." (BAAQMD Rule 2-5-211.)

---

7

23.     In addition, BAAQMD must deny a permit for a source of TACs "if the project risk exceeds any of the following project risk limits: [(1)] a cancer risk of 10.0 in one million (10-5 or 1.0E-5); [(2)] a chronic hazard index of 1.0; [(3)] an acute hazard index of 1.0." (BAAQMD Rule 2-2-301.)

24.     If a facility has the potential to emit in excess of applicable major source thresholds,[5] it must go through Major Facility Review and obtain a Major Facility Review Permit (also known as a Title V Permit) before operating. A facility is subject to Major Facility Review if it "has the potential to emit 100 tons per year or more of any regulated air pollutant" or "has the potential to emit 10 tons per year or more of a single hazardous air pollutant, 25 tons per year or more of a combination of hazardous air pollutants, or such lesser quantity as the EPA Administrator may establish by rule." (BAAQMD Rule 2-1-2 17 (defining PTE); BAAQMD Rule 2-6-222 (defining regulated air pollutants).) The Major Facility Review process requires large emitters to obtain a single, comprehensive operating permit that shows all federal, state, and local air quality requirements, and includes a public notice and EPA review period. (BAAQMD Rule 2-6-411.)

25.     Under BAAQMD's regulations and the California Health and Safety Code, these obligations continue to apply after a source is constructed. For example, Health and Safety Code § 42301(e) requires BAAQMD, before renewing a permit, "to determine that the permit conditions are adequate to ensure compliance with, and the enforceability of, [applicable] district rules and regulations" that were in effect when the permit was issued. BAAQMD Rule 2-6-424 requires BAAQMD to "evaluate the applicability of [the Major Facility Review] rule to each facility as part of the District's annual permit renewal process required by Health & Safety Code Section 42301(e)." And BAAQMD Rule 2-1-304 states that BAAQMD "shall deny an authority to construct or a permit to operate if the APCO finds that the subject of the application would not

---

[5] *See* BAAQMD Rule 2-6-212 (defining "Major Facility"); BAAQMD Rule 2-1-302 (requiring any major facility to comply with BAAQMD Rule 2-6); *see also* 42 U.S.C. § 7661a(a) (making it unlawful to operate a major source except in compliance with a Title V permit); 40 C.F.R. § 70.7(b) (requiring a major source to submit a timely and complete application under an approved permit program).

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

1    or does not comply with any emission limitations or other regulations of the District … or with

2    applicable permit conditions or federal or California laws or regulations."

3         26.     In other words, BAAQMD has a clear, present, mandatory duty to deny a facility

4    permission to operate if the source violates or would violate applicable laws, regulations, or

5    permit conditions.

6                            **FACTUAL ALLEGATIONS**

7     **A.**      **Schnitzer's Metal-Shredding Operations in West Oakland**

8         27.     Schnitzer operates the largest metal shredder in California. The Facility is located

9    within the West Oakland environmental justice community. Schnitzer is a large, profitable

10    company able to implement best management practices necessary for protecting public health and

11    the environment. Schnitzer is a multinational company with operations that include both

12    acquiring, processing, and selling scrap metals, and manufacturing and selling finished steel

13    products. Over the last three years, Schnitzer has generated an average of over $2.2 billion in

14    total revenue, with cashflow from operations averaging approximately $153 million.

15         28.     Schnitzer's Facility receives and stockpiles junked products containing metal, such

16    as vehicles, appliances, construction, and demolition materials, and manufacturing waste. Junk

17    vehicles and other metal-containing "feedstock" regularly contain hazardous materials, including

18    gasoline, oil, antifreeze, lead-acid batteries, vehicle air bags, compressed gas cylinders (e.g.,

19    propane tanks, compressed gas tanks, and fire extinguishers), refrigerants in air conditioning or

20    heat transfer systems, capacitors containing polychlorinated biphenyls (PCBs), light ballasts,

21    transformers, and items containing elemental mercury (e.g., tilt-switches or thermostats).

22         29.     Schnitzer loads this stockpiled feedstock into the "mega shredder," which grinds

23    the feedstock to small pieces and releases emissions into the air. From there, magnets remove

24    ferrous metals from the shredded feedstock. The remaining material, called "metal shredder

25    aggregate," is dropped off a conveyor belt and stored in large stockpiles. This aggregate typically

26    contains non-ferrous metal and a mixture of material often called "metal shredder residue," which

27    consists of metals, plastics, rubber, glass, foam, fabrics, carpet, wood, residual automobile fluids,

28    road dirt, and other debris.

**VENABLE LLP**
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

30.     Schnitzer eventually moves stockpiled aggregate to the Facility's "joint product plant," where non-ferrous metals such as aluminum, copper, lead, and zinc are removed.  The remaining metal shredder residue is stockpiled, eventually "treated" (sprayed with a sodium or potassium silicate solution and an alkaline activator such as cement), and then again stockpiled outside the joint products plant.

31.     Every year, Schnitzer also uses torches and other equipment to process about 100,000 tons of larger metal-containing materials that are too large to go through the shredder.

32.     Each of these steps of the shredding process (including the stockpiling of material and torch-cutting) emits air pollutants, including VOCs, particulate matter, and many TACs/HAPs, as explained further below.

**B.      Schnitzer's Operations Emit Numerous Pollutants and Cause Substantial Health Risk.**

33.     Schnitzer's Facility has polluted West Oakland for decades, including by emitting hundreds of tons a year of hazardous pollutants into the atmosphere in violation of state and federal air quality standards.  The Facility's shredder stack, along with associated conveyors, is a "source" that emits large amounts of pollutants into the air.  (BAAQMD Rule 2-6-228 [Defining "source" as "[a]ny article, machine, equipment, operation, contrivance or related groupings of such that may produce and/or emit any regulated air pollutant or hazardous air pollutant."])  On multiple occasions, source testing conducted at the Facility revealed that the shredder emits volatile organic compounds (VOCs), lead, and numerous other TACs, such as benzene, cadmium, hexavalent chromium, polychlorinated biphenyls (PCBs), and trichloroethylene.  Schnitzer's PTO also covers an infeed conveyor, cement silo, auto body component screener, drum magnet line with enclosure, and related abatement equipment.

34.     Schnitzer's torch cutting is another source subject to BAAQMD's regulation and permitting.  Schnitzer uses torch cutting to break apart large metal pieces of heavy melting steel.  Torch cutting vaporizes metal, resulting in emissions of fine particulate matter (PM2.5) and metals, including nickel, cadmium, hexavalent chromium, copper, lead, and other TACs.  Torch cutting occurs at a part of the facility that is specifically designated for torch cutting operations.

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3600
SAN FRANCISCO, CA 94111
415.653.3750

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

1  BAAQMD has not permitted Schnitzer's torch cutting and does not appear to have evaluated

2  associated emissions in reviewing and permitting the Facility.

3       35.     The Facility's large, uncovered stockpiles of hazardous materials are also a



"source" of pollutants that could be controlled by enclosing them. Schnitzer's stockpiles emit

PM, POCs, TACs, and other pollutants as a result of wind erosion and materials handling, on top

of emissions from regular fires. Schnitzer stores this hazardous material in large, multistory

stockpiles outside and uncovered, where contaminants can blow offsite into surrounding

communities and the Bay, and, as has occurred many times and is depicted here, catch fire.[6]

21       36.     Air pollution emissions from Schnitzer's mega-shredder, stockpiles, and other

sources raise heightened health concerns because the materials handled consist of "aggregate"

and "shredder residue" that exceed toxicity thresholds for hazardous waste under California law

due to high concentrations of lead, copper, and zinc. Available data show that emissions from

---

[6] KTVU Fox 2, Crews responding to blaze at Schnitzer Steel in Oakland (June 17, 2020),
https://www.ktvu.com/news/crews-responding-to-blaze-at-schnitzer-steel-in-oakland; *see also*
Laura Anthony, ABC Channel 7 News, West Oakland fire is recycling plant's fifth in eight years,
(June 4, 2018), http://abc7news.com/oakland-fire-is-recycling-plants-fifth-in-eight-
years/3561037/ [quoting a BAAQMD official describing the smoke from a June 2, 2018 fire as a
"toxic brew"].

1   stockpiles exceed trigger levels and that a health risk assessment of stockpile emissions is

2   required.  As summarized in the attached table (attached as Exhibit 1), wind erosion of the

3   shredded ferrous metal and aggregate stockpiles alone results in emission of TACs—such as

4   arsenic, hexavalent chromium, lead, and nickel—at rates higher than their corresponding chronic

5   trigger levels.  TAC emission rates associated with storage piles are even higher when emissions

6   from off-gassing, material handling, stockpiles of shredder residue and harvested non-ferrous

7   metal, and processing of heavy melt steel are accounted for.  As Table 1 also shows, the

8   stockpiles emit POCs at rates higher than the 10 pound/day trigger for BACT under Rule 2-2-301.

9   Schnitzer's operations have also caused a significant amount of light fibrous material (LFM)—

10   which, like aggregate and metal shredder residue, is hazardous waste under California law—and

11   contaminated dust to be emitted and deposited across a large area of West Oakland and into the

12   San Francisco Bay.[7] Accordingly, available data show TAC emissions from the stockpiles are

13   likely to result in greater than a one in a million cancer risk ($10^{-6}$) for the maximally exposed

14   individual.[8] If the risk is greater than $10^{-6}$, the Facility must apply TBACT.[9]

15        37.      On June 28-29, 2017, October 12-13, 2017, January 20-21, 2018, October 29-31,

16   2018, and January 21-23, 2019, Schnitzer conducted testing at the shredder stack, including

17   testing for VOCs, particulate matter, and TAC emissions.  The tests show that the shredder has a

18   potential to emit many TACs—including benzene, cadmium, hexavalent chromium, lead, PCBs,

19   and trichloroethylene—at levels that are many times greater than applicable chronic trigger

20

21

22   _____

23   [7] *See, e.g.*, Department of Toxic Substances Control, Enforcement Order for Corrective Action, Docket No. HWCA-FY20/21-006 (Feb. 23, 2021); *see also* Alameda County District Attorney's Office, California Attorney General's Office, Department of Toxic Substances Control, Community Meeting concerning Schnitzer Steel Industries, Inc. (Nov. 20, 2014).

25   [8] BAAQMD Rule 2-5-401 ("An application for an Authority to Construct or Permit to Operate for any project subject to this rule shall contain an HRA conducted in accordance with Section 2-5-603 or the information necessary for the APCO to conduct an HRA. The APCO shall prepare an HRA where the applicant submits none.").

27   [9] BAAQMD Rule 2-3-301 ("The applicant shall apply TBACT to any new or modified source of TACs where the source risk is a cancer risk greater than 1.0 in one million ($10^{-6}$ or 1.0E-6), and/or a chronic hazard index greater than 0.20.").

28

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

12
VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT C

1    levels.[10]

2         38.    The October 2017, January 2018, October 2018, and January 2019 test results also

3    show that the Facility is a Major Facility under BAAQMD's rules and the shredder is a Major

4    Source under the federal CAA due to the shredder's potential to emit VOCs in excess of

5    applicable major source thresholds.[11]   Schnitzer does not have a Major Facility Permit, as

6    required by BAAQMD's Rules and the federal CAA, and did not timely apply for such a permit

7    when it became subject to BAAQMD Regulation 6, Rule 2 and Title V of the CAA.  As further

8    explained below, the test results also confirm that Schnitzer's Facility is a significant source of

9    TACs that are causing an unacceptably high health risk in West Oakland.

10        39.    Health risk data released by BAAQMD demonstrates the serious health and safety

11   risks associated with Schnitzer's air emissions.  BAAQMD compiled and released health risk data

12   about Schnitzer's emissions as part of the community-wide emissions inventory prepared in

13   connection with the West Oakland Community Action Plan (WOCAP).[12]  The WOCAP was

14   prepared by the West Oakland community and several agencies, including BAAQMD, under the

15   Community Air Protection Program, also known as Assembly Bill 617.  AB 617 provides for

16   community-based emissions reductions in neighborhoods most disproportionately impacted by air

17   pollution.  West Oakland was selected as a first priority environmental justice community and

18   was the first community in the State to issue an action plan under AB 617.  The WOCAP

19   identifies existing sources of air pollution in West Oakland and sets forth strategies to improve air

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

20
21   [10] The Facility's potential to emit these pollutants is shown by emission rates derived from these
     source test results and the Facility's authorized throughput capacity of 720,000 tons/year.
     BAAQMD chronic trigger levels are specified in BAAQMD Regulation 2, Rule 5.

22   [11] *See* BAAQMD Rule 2-6-212 (defining "Major Facility"); BAAQMD Rule 2-1-302 (requiring
     any major facility to comply with BAAQMD Rule 2-6); 42 U.S.C. § 7661a(a) (making it unlawful
23   to operate a major source except in compliance with a Title V permit); 40 C.F.R. § 70.7(b)
     (requires a major source to submit a timely and complete application under an approved permit
24   program).

25   [12] *See* BAAQMD, Owning Our Air: The West Oakland Community Action Plan, Vol. 1 (Oct.
     2019),    *available    at*    https://www.baaqmd.gov/~/media/files/ab617-community-health/west-
26   oakland/100219-files/final-plan-vol-1-100219-pdf.pdf?la=en;        *id.*       at       Vol.       2,
     https://www.baaqmd.gov/~/media/files/ab617-community-health/west-oakland/100219-
27   files/final-plan-vol-2-100219-pdf.pdf?la=en; *see also* "2017 WestOakland-CANCRISK-hex_map"
     contained in Supporting Data Package (v1.0), *available at* https://www.baaqmd.gov/community-
28   health/community-health-protection-program/west-oakland-community-action-plan.

VERIFIED PETITION FOR WRIT OF MANDATE
EXHIBIT C

quality across the community, such as relocating significant stationary sources of pollution and increasing monitoring and enforcement.

40.     The WOCAP shows that Schnitzer emits substantially more of every inventoried pollutant (PM2.5, diesel particulate matter, and TACs) and causes more cancer risk than any other permitted source in West Oakland.[13]   The WOCAP and underlying health risk data released by BAAQMD also confirm that the cancer risk caused by Schnitzer's stationary sources exceeds Rule 2-5-302's limit of 10 cases per million people at the maximally exposed receptor.  For instance, cancer risk mapping data provided by BAAQMD shows that Schnitzer's permitted source emissions cause an excess cancer risk of well over 10 in one million at the location of a residential receptor (Phoenix Lofts) located near the Facility.  The WOCAP also shows that the excess cancer risk caused by the Facility approaches 10 cases per million across the entirety of residential zone 2, with 7 cases per million caused by its permitted stationary sources (the mega-shredder) and over 3 more cases per million caused by its ship and truck emissions.[14]

41.     Notwithstanding all this, Schnitzer has continued to operate in violation of the Clean Air Act, BAAQMD's rules, and its permit conditions.  And BAAQMD has continued to renew Schnitzer's PTO despite Schnitzer's failure to comply with BAAQMD, state, and federal air quality requirements and the PTO's emissions limits and other conditions.

**C.     Air Permitting History of Schnitzer's Facility**

---

[13] WOCAP, Vol. 1 at 5-7, 5-8, 5-25, 6-12, 6-15, 6-16, 6-19; WOCAP, Vol. 2 at A.I-16, A.I-105, A.II 8-10, A.II-32-34, A.II-36-37; *see also* "2017 WestOakland-CANCRISK-hex_map" contained in Supporting Data Package (v1.0), https://www.baaqmd.gov/community-health/community-health-protection-program/west-oakland-community-action-plan. The WOCAP and underlying data do not appear to apply directly to assessing compliance with BAAQMD's rules. The WOCAP emissions inventory and health risk assessment appear to be based on estimated actual emissions rather than potential to emit, which is the metric used to determine compliance with BAAQMD's rules. Additionally, it is unclear if the emissions inventory for Schnitzer was based on all recent source tests (the data file is labeled *2017* cancer risk) or accounted for all TACs that Schnitzer emits. The "stationary source" emissions and health risk attributed to Schnitzer appear to be based only on the shredder, not other sources and equipment like the stockpiles and joint products plant. WOCAP, Vol. 2 at A.I-19 (describing the "source" as "shredder"). Schnitzer's truck and vessel emissions are listed separately.

[14] WOCAP, Vol. 2 at A.I-105, A.II 8-10, A.II-32-34, A.II-36-37. These numbers are lower than would be shown by an HSRA based on more recent source tests and accounting for emissions from torch cutting, stockpiles, and other sources.

---

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653.3750

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

42.      In 2006, Schnitzer applied for permits to construct and operate a new "mega-shredder" at the Facility and began operating the mega-shredder on or about November 1, 2006.

43.      BAAQMD determined Schnitzer's application was incomplete, in part because emission factors for several TACs emitted by the shredder were not provided.  BAAQMD identified the TACs lead, asbestos, cadmium, hexavalent chromium, mercury, nickel, and zinc. (Letter from BAAQMD to Schnitzer Steel Products Company, Feb. 16, 2006.)

44.      In response, Schnitzer relied on academic literature to estimate emission levels for some but not all of the TACs associated with automobile shredding, rather than by measuring the actual levels of emissions coming from the Facility.  BAAQMD accepted the abbreviated list of TACs even though BAAQMD was then aware that testing conducted by another state agency, the Department of Toxic Substances Control, showed that other TACs were present in Schnitzer's shredder residue.  (Internal BAAQMD Email from Carol Allen to Dharam Singh, April 27, 2006, noting that DTSC had found "cadmium, total chromium, copper, lead, mercury, nickel, zinc, and PCBs" in auto shredder residue (attached hereto as Exhibit 2).)

45.      Based on emission factors reported in academic literature for the incomplete list of TACs, and with the actual emission levels obscured, BAAQMD completed an HRA for the shredder replacement in 2006 that indicated a maximum cancer risk of $22 \times 10^{-6}$.  The cancer risk was primarily due to polychlorinated biphenyls (PCBs) and hexavalent chromium emissions.  In the HRA, BAAQMD concluded the maximum risk was unacceptable because it was greater than the risk threshold of $10 \times 10^{-6}$ specified in BAAQMD Rule 2-5-302.

46.      Schnitzer responded that the HRA (and the academic literature it relied on) overstated actual emissions from the new shredder.  Schnitzer committed to performing a source test to measure emission factors for PCBs, hexavalent chromium, benzene, total organic compounds, and particulate matter (PM) from the shredder.  BAAQMD incorporated this requirement to undertake source tests to confirm whether applicable requirements are met based on the Facility's emissions into the authority to construct it issued for the new shredder.

47.      Schnitzer conducted the source test in March 2007. The results showed emission factors for PCBs, hexavalent chromium, benzene, total organic compounds, and PM from the

15
VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT C
98

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

shredder to be about 80 to 99.7 percent lower than the values used by BAAQMD in its 2006 HRA. But the source test did not conform to BAAQMD procedures because the shredder was not enclosed, resulting in a large percentage of the shredder's emissions escaping undetected and Schnitzer significantly underreporting its actual emissions.

48.     On or about April 26, 2007, BAAQMD issued Schnitzer a PTO (2007 PTO). The PTO included a throughput limit (the amount of material that may pass through the shredder) of 431,471 tons per year. The 2007 PTO did not contain emission limits for many pollutants emitted by the shredder, including TACs.

49.     Although BAAQMD had originally found that the Facility did not comply with cancer risk thresholds, in 2008, BAAQMD completed a partial Health Risk Screening Analysis ("HRSA"), in reliance on the incomplete information Schnitzer had provided, and found that the project was below risk limits. However, BAAQMD based the 2008 HRSA on Schnitzer's inaccurate source test results that Schnitzer reported in March 2007. The 2008 HRSA also did not include many pollutants that: (1) BAAQMD had already identified as potential health concerns caused by Schnitzer;[15] (2) Schnitzer later acknowledged are emitted from the mega-shredder;[16] and/or (3) are otherwise known to be associated with metal shredding emissions.[17]

50.     BAAQMD has since acknowledged these errors—including that the 2008 HRSA did not account for emissions from the shredder and associated operations that did not pass

---

[15] The 2008 HRSA omitted asbestos, mercury, and nickel even though BAAQMD identified those toxic pollutants in a February 16, 2006 letter to Schnitzer.

[16] The 2008 HRSA did not consider many HAPs that Schnitzer's consultant has acknowledged that the Facility emits. *See* Trinity Consultants, Synthetic Minor Operation Permit Application, Schnitzer Steel, Industries (July 2019) at 3-3 (listing HAPs).

[17] The 2008 HRSA also did not include polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans, which are known to exist in automobile shredder residue. *See, e.g.*, Sakai, S., et al., An International Comparative Study of End-of-Life Vehicle (ELV) Recycling Systems, The Journal of Material Cycles and Waste Management, Vol. 16 (2014) at 8; Zevenhoven, R. and L. Saeed, Automotive Shredder Residue (ASR) and Compact Disc (CD) Waste: Options for Recovery of Materials and Energy, Helsinki University of Technology (Apr. 2003) at 13.

16

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT C
99

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

1  through the stack, which public records indicate are significant.[18]  BAAQMD acknowledged that

2  the HRSA was conducted for TAC emissions only, and that it did not account for fugitive

3  emissions when it permitted the shredder replacement and increased throughput. (BAAQMD

4  Engineering Evaluation Report, Schnitzer Steel Products Company, Plant No. 208, App. No.

5  16721 (Mar. 2009), (2009 Engineering Evaluation Report, attached as Exhibit 3), at 6; BAAQMD

6  Engineering Evaluation Report, Schnitzer Steel Products Company, Plant Number 208,

7  Application Number 27762 (Nov. 11, 2016) (2016 Engineering Evaluation Report, attached as

8  Exhibit 4), at 2.

9       51.    In permitting the Facility in 2008, BAAQMD also found NSR to be required due

10  to the Facility's PM10 emissions.  But BAAQMD did not impose BACT or offsets for POCs or

11  other pollutants that the shredder and associated operations, such as stockpiles of hazardous

12  shredded materials and torch-cutting, emit in significant quantities.

13       52.    In 2016, Schnitzer applied for a permit to construct an upgraded abatement system

14  at the mega-shredder designed to improve the capture rate for shredder emissions of particulate

15  pollution.  In considering this permit, BAAQMD acknowledged concerns about Schnitzer's

16  emissions and compliance with applicable requirements under BAAQMD Rules and the federal

17  CAA.  In an Engineering Report, BAAQMD conceded that emissions from Schnitzer's shredder

18  and associated operations "were not properly accounted for when the shredder was initially

19

20  [18] For example, BAAQMD records attribute most of Schnitzer's particulate emissions to
emissions that did not pass through the stack. *See* BAAQMD Staff Report on Proposed Rules 12-

21  13 & 6-4 (Feb. 2013) at 42, *available at* https://www.baaqmd.gov/~/media/files/planning-and-
research/public-hearings/2013/1213_0604_sr_030713.pdf (estimating before enclosure of the

22  shredder that Schnitzer's annual fugitive emissions of particulate matter (PM) to be almost 90x
greater than its process emissions of PM, at 11.5 tons and 0.13 tons, respectively).  While the

23  term "fugitive emissions" is used to describe emissions from the shredder and associated
operations that do not pass through a stack, these emissions may reasonably be made to pass

24  through a stack with the use of control measures (e.g., enclosure) and thus are not "fugitive"
emissions under BAAQMD or federal rules. *See* 40 C.F.R. § 70.2 ("Fugitive emissions are those

25  emissions which could not reasonably pass through a stack, chimney, vent, or other functionally-
equivalent opening."); BAAQMD Rule 2-1-203; U.S. EPA, Mem. re Interpretation of Definition

26  of Fugitive Emissions in Parts 70 and 71 (Feb. 10, 1999) at 2 ("EPA Fugitive Emissions
Interpretation Memo"), https://www.epa.gov/sites/production/files/2015-08/documents/fug-

27  def.pdf (explaining that "[i]n determining whether emissions could reasonably be collected (or if
any emissions source could reasonably pass through a stack, etc.), 'reasonableness' should be

28  construed broadly").

1   permitted" in 2007 or when BAAQMD evaluated a significant increase of shredder throughput in

2   2009. (Engineering Evaluation Report, at 2. BAAQMD also questioned whether requirements of

3   BAAQMD's rules and the federal CAA that are critical to protecting public health had "been

4   fully satisfied." (*Id.*)

5         53.    Schnitzer's 2016 application relied on a 2007 source test and did not include a

6   current HRSA. BAAQMD acknowledged that Schnitzer had not provided accurate fugitive

7   emissions rates from the unenclosed shredder, so that BAAQMD lacked sufficient data to confirm

8   whether air quality requirements were met in relation to permitting the mega-shredder and

9   increased throughput. (*Id.*) Accordingly, on November 10, 2016, BAAQMD imposed a permit

10   condition (Condition No. 26401) requiring Schnitzer to conduct source tests and then propose

11   emission rate limits for its shredder, which BAAQMD would then impose as emissions limits, if

12   acceptable. (*Id.*) BAAQMD explained that it would use new emission estimates "to determine if

13   all new source review (NSR) and toxic NSR requirements for . . . previous permitting activities

14   were fully complied with. If the District finds that NSR has not been fully satisfied, the District

15   will require updated reviews, limits, offsets, and health risk assessments under this application, as

16   needed, to ensure full NSR compliance for . . . previous permitting activities." (*Id.*)

17         54.    BAAQMD then issued a PTO for the shredder and associated equipment that

18   reflected this backwards approach, under which BAAQMD allowed Schnitzer's operations to

19   continue before understanding Schnitzer's emissions and imposing required limits. For several

20   years thereafter, BAAQMD imposed a condition (Condition No. 26401) in Schnitzer's annual

21   PTO that recognized the need to understand Schnitzer's emissions and to set numerical limits

22   based on them to ensure compliance with applicable laws, including NSR and toxic NSR

23   requirements. The condition required Schnitzer to complete source tests and then propose

24   emission limits that BAAQMD would include in the permit if they met applicable requirements.

25         55.    For many years, Schnitzer did not comply with this requirement of the PTO and

26   BAAQMD did not impose limits on Schnitzer's emissions. Instead, BAAQMD repeatedly

27   renewed the PTO without considering whether the PTO conditions were adequate to ensure

28   compliance with applicable laws. In fact, BAAQMD renewed the PTO in 2017, 2018, and 2019

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

18

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT C
101

1    despite the fact that source tests of the shredder stack had demonstrated clear violations of

2    applicable BAAQMD, state, and federal laws, as further explained below.

3        **D.   Schnitzer's source tests confirm that the Facility's emissions exceed**
         **applicable trigger levels and require Major Facility Review.**

4        56.   After enclosing the shredder in 2017, Schnitzer completed several source tests.

5    These source tests yielded alarming results, showing that the Facility's emissions POCs and

6    TACs are very high, and revealing non-compliance with numerous laws.  On June 28-29, 2017,

7    October 12-13, 2017, January 20-21, 2018, October 29-31, 2018, and January 21-23, 2019,

8    Schnitzer conducted testing at the shredder stack, including testing for POCs, particulate matter

9    (PM), and TAC emissions.  The tests showed that the shredder has a potential to emit several

10   TACs—including benzene, cadmium, hexavalent chromium, lead, PCBs, and trichloroethylene—

11   at levels that are many times greater than applicable chronic trigger levels.

12       57.   The test results also demonstrated that the Facility is a Major Facility under

13   BAAQMD's rules and the shredder is a Major Source under the federal CAA due to the

14   shredder's potential to emit VOCs in excess of applicable major source thresholds.  Emissions

15   data for the Facility also showed that the Facility has a potential  to emit more than 25 tons of

16   HAPs a year, including more than 10 tons a year of both toluene and xylene.[19]  The Facility's

17   HAP emissions therefore also trigger Title V / Major Facility Permit requirements.   Therefore,

18   the Facility is required to go through Major Facility Review and obtain a Major Facility Permit

19   before operations continue.

20       58.   The significance of the test results was confirmed by the EPA, which, on January

21   27, 2020, issued Schnitzer a Notice of Violation finding that Schnitzer has been violating Title V

22   of the CAA and federally enforceable requirements of BAAQMD's rules since at least 2007,

23   including CAA section 502, 40 C.F.R. § 70.7(b), CAA section 110, and BAAQMD rules 2-1-302

24   and 8-2-301.  In September 2020, BAAQMD also entered into a "Compliance and Settlement

25

26   [19] See Exhibit 1. Emissions associated with the shredder aggregate are based on emission testing
     conducted at wTe Recycling, Inc. shredding facility in Greenfield, Massachusetts. Montrose
27   Environmental, Final Report, Scrap Metal Shredding and Processing Emissions Testing - wTe
     Recycling, Inc., Greenfield, MA. 29 January 2016. That testing resulted in the development of
28   emission factors for such processes that are used by regulators beyond just Massachusetts.

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

19

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT C
102

1  Agreement" with Schnitzer. The Agreement states that total carbon emissions from the shredder

2  violate Rule 8-2-301 but does not address any other of Schnitzer's ongoing violations.

3  **E.   BAAQMD Renewed Schnitzer's Permit Again in 2020 and 2021.**

4  59.   In December 2020, BAAQMD again renewed Schnitzer's permit, allowing

5  Schnitzer to continue operating until at least October 2021. BAAQMD did not provide notice or

6  a public comment period on the permit renewal. Nevertheless, the Athletics submitted a letter to

7  BAAQMD identifying the many problems associated with Schnitzer's operations and air

8  permitting. The Athletics demanded that BAAQMD ensure compliance with NSR, toxic NSR,

9  Major Facility Review, and existing permit requirements, and that BAAQMD impose emission

10  limits necessary to protect public health in West Oakland.

11  60.   In renewing the permit, BAAQMD introduced several new and modified

12  conditions. For example, Condition # 27085 imposes the following hourly and yearly emission

13  limits for PM10 and precursor organic compounds (POCs) from the shredder:

```
3. Total emissions from the S-6 Auto Shredder shall not
   exceed any of the emission limits listed below:
   a. Maximum Permitted Emission Rates:

                                 P-15 Stack      P-15 Stack
                                 Pounds/Hour     Tons/Year
PM10                                 5.91            6.15
(total filterable + condensable)
POC                                112.0           85.50
(calculated as methane)
```

18  Additionally, Condition # 27085 strengthened previous permit conditions regarding Schnitzer's

19  emissions, requiring that "[t]otal particulate emissions from the [shredder] stack shall not exceed

20  a grain loading of 0.0046 grains/dscf" and that "[o]rganic emissions from [shredder] stack shall

21  not exceed 300 ppmv (dry basis) of total carbon."

22  61.   BAAQMD renewed the PTO in late 2020 (2021 PTO) even though Schnitzer was

23  and continues to be in violation of numerous air quality requirements, including those identified

24  in the Athletics' comment letter.[20] As confirmed by both the 2017-2019 source tests and the

25  table of Schnitzer's emissions attached to the renewed permit itself, Schnitzer has violated and

---

[20] BAAQMD renewed Schnitzer's PTO without first providing public notice and comment and
without addressing the Athletics' comment letter or providing any explanation of its decision.
Upon inquiry, BAAQMD also stated that the renewal decision was not subject to administrative
appeal to BAAQMD's hearing board.

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653 3750

**VENABLE LLP**
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653.3750

1 continues to violate the POC and organic emission limits set by BAAQMD.  The permit table and

2 source testing of the mega-shredder confirm that the shredder emits at least 183 pounds per hour

3 of POCs, well over the PTO's emission limit of 112 pounds per hour.

4       62.     The table of Schnitzer's emissions attached to its 2021 PTO also confirms that

5 Schnitzer's POC emissions are well over the trigger for BACT.  The table states that Schnitzer's

6 shredder emits an annual average of 904 lbs/day of POCs, which amounts to 164.98 tons/year,

7 while the associated "infeed conveyor" that supplies the shredder with metal-containing feedstock

8 emits another 48 lbs/day of POCs, which amounts to another 8.76 tons/year. These emissions are

9 well over the regulatory trigger for the POC BACT requirements of 10 pounds of POC emissions

10 on any day.  (BAAQMD Rule 2-2-301.)

11       63.     The 2017-2019 source tests and the table of emissions in the 2021 PTO also show

12 that Schnitzer continues to emit TACs—including benzene, cadmium, hexavalent chromium,

13 lead, PCBs, and trichloroethylene—at a rate that triggers TBACT requirements.

14       64.     Despite these emissions, the 2021 PTO still did not include enforceable emission

15 limits on many TACs emitted by the Facility or otherwise ensure that health risks caused by

16 Schnitzer's TAC emissions remain below applicable project risk limits under Rule 2-5-302.

17       65.     The high VOC emissions reported in the 2017-2019 source tests—well above the

18 Major Facility threshold of 100 tons per year—also show that the Facility is a Major Facility

19 under BAAQMD's rules and a Major Source under the CAA.  This means Major Facility Review

20 is required and Schnitzer must obtain a Major Facility Permit (Title V Permit) before operations

21 continue.

22       66.     In late 2021, BAAQMD again renewed Schnitzer's Permit to Operate (2022 PTO)

23 (attached as Exhibit 5).  This most recent and currently operative PTO applies to Schnitzer's

24 mega-shredder, infeed conveyor, cement silo, auto body component screener, drum magnet line

25 with enclosure, and related abatement equipment.  The 2022 PTO carries Condition 27085 over

26 from the 2021 PTO, which imposes hourly and yearly emission limits for PM10 and POCs from

27 the shredder.  The emissions table attached to the PTO shows that Schnitzer continues to violate

28 the PTO's emissions limits for POCs and organics. The table states that Schnitzer's shredder

<div align="center">21</div>

<div align="center">VERIFIED PETITION FOR WRIT OF MANDATE</div>

<div align="center">EXHIBIT C

104</div>

1   emits an average of 880 lbs/day of POCs, which amounts to 160.6 tons/year. The associated

2   "infeed conveyor" that supplies the shredder with metal-containing feedstock emits another 46

3   lbs/day of POCs, which amounts to another 8.398 tons/year. Thus, Schnitzer continues to operate

4   in violation of its permit conditions and BAAQMD rules.

5       67.    Although the 2022 PTO also adds new conditions requiring Schnitzer to install and

6   operate two new regenerative thermal oxidizers and scrubbers to abate emissions, it does not set a

7   deadline for this to occur. To date this equipment has not been installed. The 2022 PTO also

8   does not require Schnitzer to permit its unpermitted sources—including the stockpiles—or

9   impose BACT for such sources.

10       68.    Schnitzer also continues to emit TACs at levels that significantly exceed trigger

11   levels at which TBACT is required. For instance, the PTO's emission table shows that the

12   Facility emits 900 lb/year of methylene chloride, which is more than ten times greater than the

13   BAAQMD chronic trigger level of 82 lb/year. (BAAQMD Rule 2-5, Table 2-5-1.) The

14   emissions table also shows that the Facility emits 220 lb/year of tetrachloroethylene, which is

15   more than fifteen times greater than the BAAQMD chronic trigger level of 14 lb/year. (*Id.*)

16   However, the 2022 PTO does not impose emission limitations for these TACs.

17       69.    Today, the Facility continues to operate even though Schnitzer has still not met all

18   applicable BACT and TBACT requirements. Beyond regenerative thermal oxidizers (which still

19   have not been installed), BACT and TBACT for POCs and organic TAC emissions from the

20   shredder would, at a minimum, include installing a fully enclosed "state-of-the-art" shredder

21   vented to a baghouse. Emissions control technology, including, but not limited to, an enclosure

22   and baghouse, must also be installed to address POC and TAC emissions from associated material

23   stockpiles, conveyors, and torch cutting to comply with BACT and TBACT.

24   <div align="center">**FIRST CAUSE OF ACTION**</div>

25   <div align="center">**(For Writ of Mandate Under C.C.P. § 1085)**</div>

26       70.    Petitioner incorporates all preceding paragraphs as if fully set forth herein.

27       71.    Under the California Health and Safety Code, Respondent BAAQMD must not

28   permit a facility to operate unless the facility complies with all "applicable orders, rules, and

**VENABLE LLP**
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653.3750

<div align="center">22</div>

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

1   regulations of the district and of the state board." (HSC section 42301(b)(1).) BAAQMD also

2   must "[r]equire, upon annual renewal, that each permit be reviewed to determine that the permit

3   conditions are adequate to ensure compliance with, and the enforceability of, district rules and

4   regulations . . . and, if the permit conditions are not consistent, require that the permit be revised

5   to specify the permit conditions in accordance with all applicable rules and regulations." (HSC

6   section 42301(e).)

7        72.     Similarly, under BAAQMD Rule 2-1-304, BAAQMD must not permit a facility to

8   operate if it "would not or does not comply with any emission limitations or other regulations of

9   the District . . . or federal or California laws or regulations." Furthermore, BAAQMD must

10   "evaluate the applicability of [the Major Facility Review] rule to each facility as part of the

11   District's annual permit renewal process required by Health & Safety Code Section 42301(e)."

12   BAAQMD Rule 2-6-424.

13        73.     BAAQMD has failed to perform its mandatory duties under these laws for the

14   following reasons:

15        a.     Schnitzer is not in compliance with the enforceable emissions limits of the 2022

16        PTO. Condition No. 27085 of the 2022 PTO limits POC emissions from

17        Schnitzer's shredder to less than 112 pounds/hour and 85.5 tons/year.

18        Condition No. 27085 further requires that "[o]rganic emissions from [shredder]

19        stack shall not exceed 300 ppmv (dry basis) of total carbon." However,

20        Schnitzer has violated and continues to violate these POC and total organic

21        emission limits. Under these circumstances, the law requires BAAQMD to not

22        permit the Facility to operate.

23        b.     Schnitzer's shredder and associated sources emit POCs and TACs in excess of

24        the triggers for BACT and TBACT. However, these sources do not comply

25        with BACT requirements for POC emissions or TBACT requirements for

26        organic TAC emissions, in violation of BAAQMD Rules 2-2 and 2-5. Under

27        these circumstances, the law requires BAAQMD to not permit the Facility to

28        operate.

<center>23</center>
<center>VERIFIED PETITION FOR WRIT OF MANDATE</center>

EXHIBIT C
106

c.    BAAQMD Rule 2-5-302 requires BAAQMD to not permit a facility to operate

"if the project risk exceeds... a cancer risk of 10.0 in one million." The

WOCAP and underlying health risk data released by BAAQMD confirm that

Schnitzer's shredder and associated sources cause a cancer risk at nearby

sensitive receptors that exceeds 10 cancer cases per million. Under these

circumstances, the law requires BAAQMD to not permit the Facility to operate.

d.    The Facility is operating in violation of the permitting requirements of

BAAQMD Regulation 2, Rule 6, and Title V of the federal CAA. Source tests

and the latest PTO show that the Facility is a Major Facility under BAAQMD's

Rules and the shredder is a Major Source under the federal CAA because the

shredder has a potential to emit over 100 tons/yr of POCs. BAAQMD Rule 2-

6-212; see also 42 U.S.C. §§ 7661(2), 7602(j) (defining "major source"

similarly). Schnitzer does not have a Major Facility (Title V) Permit and

BAAQMD has not completed Major Facility Review of the Facility, as required

by BAAQMD Regulation 2, Rule 6, and Title V of the federal CAA.

BAAQMD has not released a Facility-specific HRA. Under these

circumstances, the law requires BAAQMD to not permit the Facility to operate.

e.    The Facility is operating in violation of BAAQMD Rule 2-1-302, which

requires a permit to be obtained before operating any source that may cause the

emission of air contaminants. The Facility's operations include stockpiles and

torch-cutting operations, which emit air contaminants. However, Schnitzer has

not obtained a permit for these sources. Under these circumstances, the law

requires BAAQMD to not permit the Facility to operate.

74.    Accordingly, BAAQMD has failed to perform its clear, mandatory duties under

the state and federal CAA, the Health and Safety Code, and BAAQMD's own regulations. These

ongoing violations of mandatory duties imposed on BAAQMD constitute action that is contrary

to law, an abuse of discretion, and/or arbitrary and capricious.

75.    At all times material hereto, BAAQMD has been able to perform its duties and

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

24

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT C
107

1   obligations as required by law, but has failed to do so.

2          76.     No administrative exhaustion was required. To the extent administrative

3   exhaustion is required, Petitioner has exhausted available administrative remedies. Petitioner has

4   no plain, speedy, and adequate remedy in the ordinary course of law, other than the relief sought

5   herein.

6          77.     Petitioner is beneficially interested in issuance of a writ because it maintains

7   business operations near Schnitzer and is currently proposing to build a ballpark in close

8   proximity to Schnitzer. Petitioner, its employees and patrons, and the residents of West Oakland

9   are entitled to the protection of the environmental laws enacted to protect the public from sources

10   of air pollution like that emitted by Schnitzer's Facility.

11         78.     The writ of mandate sought by Petitioner will result in the enforcement of an

12   important right affecting the public interest, and will confer a significant benefit on the general

13   public, especially the West Oakland environmental justice community, as it will require

14   compliance with laws that were enacted to protect human health and the environment.

15         79.     Therefore, pursuant to Code of Civil Procedure section 1085, a Writ of Mandate

16   should issue directing BAAQMD to revoke Schnitzer's PTO and deny a new permit until the

17   applicable requirements are met.

18                     **SECOND CAUSE OF ACTION**

19          **(For Declaratory Relief Under Code Civ. Proc. § 1060)**

20          80.     Petitioner incorporates all preceding paragraphs as if fully set forth herein.

21          81.     An actual controversy has arisen and now exists between Petitioner and

22   Respondent BAAQMD concerning BAAQMD's obligations and duties under federal and state air

23   quality laws, and its own regulations. As set forth herein, Petitioner contends that Respondent

24   was required by law to revoke Schnitzer's PTO and deny a new permit until the applicable

25   requirements are met. Petitioner is informed and believes, and on that basis alleges, that

26   Respondent contends in all respects to the contrary.

27          82.     A judicial determination and declaration as to these issues is therefore necessary

28   and appropriate.

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415 653.3750

## PRAYER FOR RELIEF

Petitioner prays for relief as follows:

1.    A writ of mandate requiring Respondent to revoke Schnitzer's PTO for the Facility and not issue a new permit until all applicable requirements are met, as alleged above;

2.    A declaratory judgment under Code Civ. Proc. § 1060, declaring that Respondent violated its duties under the federal Clean Air Act, California Health and Safety Code, and its BAAQMD regulations, for the reasons alleged above, and that BAAQMD is required to revoke Schnitzer's PTO and deny a new permit until the applicable requirements are met;

3.    Costs of suit;

4.    Attorneys' fees as allowed by law, including under Code of Civil Procedure Section 1021.5;

5.    Any other relief that the Court deems just and proper.

Dated: May 2, 2022

VENABLE LLP

By:  William M. Sloan
     Tyler G. Welti

Attorneys for Petitioner
The Athletics Investment Group, LLC

Dated: May 2, 2022

KEKER, VAN NEST & PETERS LLP

By:  R. James Slaughter
     Eric H. MacMichael

Attorneys for Petitioner
The Athletics Investment Group, LLC

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

1                                     **VERIFICATION**

2   I, David Kaval, declare:

3       I have been authorized to make this verification on behalf of Petitioner THE ATHLETICS

4   INVESTMENT GROUP LLC.

5       I have read the foregoing Verified Petition for Writ of Mandate and know the contents

6   thereof, except as to those matters which are alleged on information and belief, and as to those

7   matters I believe them to be true.

8       I declare under penalty of perjury, under the laws of the State of California, that the foregoing

9   is true and correct.

10       Executed at **OAKLAND** California on May **2**, 2022

11

12

13                     David Kaval

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3400
SAN FRANCISCO, CA 94111
415 653 3750

27
VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT C
110

.

# Exhibit 1

EXHIBIT C
111

**TABLE 1**
**ESTIMATED SCHNITZER AIR POLLUTANT EMISSIONS (a)**
1101 Embarcadero West, Oakland, California

| Air Pollutant | Air Pollutant Emissions by Source (b) | | | | | | | | | | | | | | | | BAAQMD Chronic Trigger Level (f), (g) |
| | Shredder Stack (c) | | Shredder Fugitive Emissions (c) | | Shredder Stockpile Emissions (c) | | Joint Products Plant | | Cement Silo | | Torch Cutting | | Total Individual HAP Emissions (d) | | Total Individual TAC Emissions (e) | | |
| | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (ton/yr) | (lb/yr) | (lb/yr) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1,1-dichloroethane | 0.02 | 47 | 0.001 | 2 | 0.0007 | 1 | - (i) | - | - | - | - | - | 0.03 | 50 | 0.03 | 50 | 7,200 |
| 1,3-butadiene | 0.03 | 59 (h) | 0.001 | 3 | 0.0008 | 2 | - | - | - | - | - | - | 0.03 | 59 | 0.03 | 59 | 0.48 |
| 1,4-dichlorobenzene | 0.06 | 118 | 0.003 | 6 | 0.002 | 4 | - | - | - | - | - | - | 0.06 | 128 | 0.06 | 128 | 7.2 |
| 1,4-dioxane | 0.02 | 41 | 0.001 | 2 | 0.0006 | 1 | - | - | - | - | - | - | 0.02 | 44 | 0.02 | 44 | 11 |
| 2,2,4-trimethylpentane | 4 | 7,430 | 0.2 | 391 | 0.1 | 223 | - | - | - | - | - | - | 4 | 8,043 | - | - | - |
| Acetaldehyde | 0.3 | 576 | 0.02 | 30 | 0.009 | 17 | - | - | - | - | - | - | 0.3 | 624 | 0.3 | 624 | 29 |
| Acrylonitrile | 0.009 | 19 | 0.0005 | 1 | 0.0003 | 0.6 | - | - | - | - | - | - | 0.01 | 20 | 0.01 | 20 | 0.29 |
| Arsenic | 0.002 | 3 | 0.0001 | 0.15 | 0.0001 | 0.2 | 7E-05 | 0.1 | 4E-06 | 0.007 | 2.9E-05 | 0.06 | 0.002 | 4 | 0.002 | 4 | 0.0016 |
| Benzene | 1 | 2,111 | 0.1 | 111 | 0.03 | 68 | - | - | - | - | - | - | 1 | 2,285 | 1 | 2,285 | 2.9 |
| Beryllium | 0.0002 | 0.4 | 1E-05 | 0.02 | - | - | - | - | 5E-09 | 1E-05 | - | - | 0.0002 | 0.4 | 0.0002 | 0.4 | 0.034 |
| Bis(2-ethylhexyl) phthalate | - | - | - | - | 0.0002 | 0.4 | 0.0003 | 0.6 | - | - | - | - | 0.0005 | 1 | 0.0005 | 1 | 29 |
| Cadmium | 0.0004 | 0.8 | 0.0002 | 0.4 | 0.0001 | 0.2 | 7E-05 | 0.15 | 4E-06 | 0.007 | 3E-05 | 0.06 | 0.0009 | 2 | 0.0009 | 2 | 0.019 |
| Carbon disulfide | 0.02 | 34 | 0.001 | 2 | 0.0005 | 1 | - | - | - | - | - | - | 0.02 | 37 | 0.02 | 37 | 31,000 |
| Chromium | - | - | - | - | 0.004 | 8 | 0.002 | 5 | 8E-05 | 0.2 | 0.0009 | 2 | 0.01 | 15 | - | - | - |
| Copper | 0.004 | 8 | 0.002 | 4 | 0.009 | 18 | 0.005 | 9 | 2E-04 | 0.4 | 0.002 | 4.5 | - | - | 0.02 | 45 | (j) |
| Cumene | 0.07 | 147 | 0.004 | 8 | 0.002 | 4 | - | - | - | - | - | - | 0.08 | 159 | 0.08 | - | - |
| Dioxins/furans (k) | 6E-09 | 1E-05 | 3E-10 | 6E-07 | - | - | - | - | - | - | - | - | - | - | 6E-09 | 1E-05 | 4E-06 |
| DPM (l) | - | - | - | - | 0.36 | 700 | - | - | - | - | - | - | - | - | 0.36 | 700 | 0.26 |
| Ethylbenzene | 2 | 4,472 | 0 | 235 | 0.07 | 134 | - | - | - | - | - | - | 2 | 4,841 | 2 | 4,841 | 33 |
| Hexachloroethane | 9 | 17,608 | 0.5 | 927 | 0.3 | 528 | - | - | - | - | - | - | 10 | 19,062 | - | - | - |
| Hexane | 3 | 6,477 | 0.2 | 341 | 0.1 | 194 | - | - | - | - | - | - | 4 | 7,012 | 4 | 7,012 | 270,000 |
| Hexavalent chromium | 2E-05 | 0.04 | 1E-05 | 0.02 | 0.0004 | 0.8 | 0.0002 | 0.5 | 8E-06 | 0.02 | 9E-05 | 0.2 | 0.001 | 2 | 0.0008 | 1.5 | 0.00051 |
| Lead | 0.003 | 6 | 0.002 | 3 | 0.05 | 92 | 0.02 | 43 | 1E-03 | 2 | 0.01 | 25 | 0.09 | 170 | 0.09 | 170 | 0.29 |
| Manganese | 0.004 | 7 | 0.002 | 4 | 0.002 | 4 | 0.0003 | 0.6 | 1E-06 | 0.003 | 0.0006 | 1 | 0.008 | 16 | 0.008 | 16 | 3.5 |
| Mercury | 0.002 | 4 | 0.0001 | 0.2 | 3.2E-05 | 0.06 | 2E-05 | 0.04 | 1E-06 | 0.002 | 8E-06 | 0.02 | 0.002 | 4 | 0.002 | 4 | 0.21 |
| Methanol | 0.5 | 983 | 0.03 | 52 | 0.01 | 29 | - | - | - | - | - | - | 0.5 | 1,064 | 0.5 | 1,064 | 150,000 |
| Methyl chloroform | 0.2 | 343 | 0.009 | 18 | 0.005 | 10 | - | - | - | - | - | - | 0.2 | 371 | 0.2 | 371 | 39,000 |
| Methyl isobutyl ketone | 0.07 | 136 | 0.004 | 7 | 0.002 | 4 | - | - | - | - | - | - | 0.07 | 147 | - | - | - |
| Methylene chloride | 0.08 | 158 | 0.004 | 8 | 0.002 | 5 | - | - | - | - | - | - | 0.08 | 169 | 0.08 | 169 | 82 |
| Nickel | 0.001 | 2.5 | 0.0007 | 1 | 0.004 | 8 | 0.002 | 4 | 1E-04 | 0.2 | 0.001 | 2 | 0.009 | 18 | 0.009 | 18 | 0.31 |
| Polychlorinated biphenyls | 0.02 | 31 | 0.001 | 2 | 9.4E-05 | 0.2 | 5E-05 | 0.1 | 3E-06 | 0.006 | 2E-05 | 0.05 | 0.02 | 33 | 0.02 | 33 | 0.0039 |
| Styrene | 0.3 | 697 | 0.02 | 37 | 0.01 | 21 | - | - | - | - | - | - | 0.4 | 755 | 0.4 | 755 | 35,000 |
| Tetrachloroethylene | 0.1 | 211 | 0.01 | 11 | 0.003 | 6 | - | - | - | - | - | - | 0.1 | 228 | 0.1 | 228 | 14 |
| Toluene | 9 | 18,107 | 0.5 | 953 | 2 | 3,621 | - | - | - | - | - | - | 11 | 22,681 | 11 | 22,681 | 12,000 |
| Trichloroethylene | 0.3 | 532 | 0.01 | 27 | 0.008 | 16 | - | - | - | - | - | - | 0.3 | 565 | 0.3 | 565 | 41 |
| Vanadium | 4E-05 | 0.08 | 2E-05 | 0.04 | 0.0003 | 0.7 | 0.0002 | 0.4 | 9E-06 | 0.02 | 8E-05 | 0.2 | - | - | 0.001 | 1 | (j) |
| Xylenes (m) | 11 | 22,840 | 0.6 | 1,202 | 0.3 | 685 | - | - | - | - | - | - | 12 | 24,727 | 12 | 24,727 | 27,000 |
| **Total Emissions: (n), (o)** | 42 | 83,187 | 2 | 4,390 | 3 | 6,403 | 0.03 | 63 | 0.002 | 3 | 0.02 | 35 | 47 | 93,335 | 33 | 66,655 | |
| **POC Emissions: (p), (q), (r)** | 230 | 460,000 | 12 | 24,000 | 18 | 35,000 | - | - | - | - | - | - | - | - | - | - | |

EXHIBIT C
112

**TABLE 1**
**ESTIMATED SCHNITZER AIR POLLUTANT EMISSIONS (a)**
1101 Embarcadero West, Oakland, California

**Notes:**

(a) Estimated annual air pollutant emissions based on an infeed conveyor and shredder maximum throughput of 720,000 tons per year (ton/yr) and 100,000 of tons of heavy melt steel processed at the Schnitzer Steel Industries, Inc. (Schnitzer) facility annually.

(b) Breakdown of air pollutant emissions by source at the Schnitzer facility is provided in Tables 2 through 6.

(c) A Bay Area Air Quality Management District (BAAQMD) authority to construct and/or permit to operate for a new or modified source requires Best Available Control Technology (BACT) if the source has the potential to emit a BACT pollutant in an amount of 10 or more pounds on any day (lb/day). BACT pollutants include precursor organic compounds. BAAQMD. 6 December 2017. Regulation 2, Rule 2, New Source Review. § 2-2-210 and § 2-2-301. The shredder and related material stockpiles emit more than 10 lb/day POCs and are subject to BACT. See Tables 2 and 3.

(d) A major facility or major source is one that has the potential to emit 10 tons per year or more of a single hazardous air pollutant (HAP) or 25 ton/yr or more of a combination of HAPs. All fugitive emissions of HAPs are included in determining a facility's potential to emit. BAAQMD. 6 December 2017. Regulation 2, Rule 6, Major Facility Review. § 2-6-212.2.

(e) A toxic air contaminant (TAC) is an air pollutant that may cause or contribute to an increase in mortality or in serious illness or that may pose a present or potential hazard to human health. TACs consist of the substances listed in Table 2-5-1 Toxic Air Contaminant Trigger Levels included as part of BAAQMD. 7 December 2016. Regulation 2, Rule 5, New Source Review of Toxic Air Contaminants.

(f) A lifetime cancer risk of 1.0 in a million ($10^{-6}$) and a non-cancer hazard index of 0.2 were used as the target health risk levels to derive the chronic trigger levels. BAAQMD. 7 December 2016. Regulation 2, Rule 5, New Source Review of Toxic Air Contaminants. Table 2-5-1.

(g) According to BAAQMD, Regulation 11, Rule 18, Reduction of Toxic Air Emissions at Existing Facilities, a Risk Reduction Plan is required if a significant risk threshold corresponding to a cancer risk equal to or greater than 1.0 in a million is exceeded. Comparison of TAC emission rates with chronic trigger levels indicates that significant risk thresholds are exceeded for numerous TACs and that Schnitzer must prepare a Risk Reduction Plan. Schnitzer does not appear to have prepared such a plan.

(h) Value shown in red boldface type indicates air pollutant emission rate is greater than BAAQMD regulatory limit.

(i) Dash ("--") indicates data are not available.

(j) No chronic trigger level has been established for this TAC.

(k) Polychlorinated dibenzo-p-dioxins (dioxins) and polychlorinated dibenzofurans (furans).

(l) BAAQMD estimation of diesel exhaust particulate matter (DPM) emissions from ships transporting materials to and from the Schnitzer facility adjusted for an infeed conveyor and shredder maximum throughput of 720,000 tons per year. BAAQMD and West Oakland Environmental Indicators Project. October 2019. *Owning Our Air, The West Oakland Community Action Plan - Volume 2: Appendices.* p. A.I-40-A.I-41; Leong, P. (BAAQMD) 25 April 2019. Email to T. Welti (Venable LLP) *Re Follow-up/Availability for a Call Next Week;* BAAQMD. 12 July 2018. Data Update. BAAQMD states DPM should be used as surrogate for all TAC emissions from diesel-fueled compression-ignition internal combustion engines.

(m) Sum of xylene emissions measured as o-xylene and m/p-xylenes, which Schnitzer reported as mixed xylenes.

(n) A precursor organic compound (POC) is a carbon compound that photochemically reacts in the atmosphere to form ozone.

(o) Shredder stack, shredder fugitive, and shredder stockpile POC potential to emit are approximately 240, 12, and 15 lb/day, respectively, based on HAP and TAC emission rates  A new or modified source must obtain an authority to construct and permit to operate, and install Best Available Control Technology (BACT) if the potential to emit is 10 lb/day or more of POCs. BAAQMD. 6 December 2017. Regulation 2, Rule 2, New Source Review. § 2-2-301.

(p) POC emission rates are greater than 100 ton/yr or 550 lb/day when calculated using the arithmetic average of emission factors of 0.28, 0.57, 0.5, 0.65, and 1.2 lbs/ton estimated from results of source tests conducted in June 2017, October 2017, January 2018, October 2018, and January 2019, respectively. Application of these emission factors indicates the Schnitzer facility has the potential to emit 100 tons per year or more of volatile organic compounds, which include POCs, thereby subjecting the facility to operating permit requirements of Title V of the federal Clean Air Act. BAAQMD. 6 December 2017. Regulation 2, Rule 2, New Source Review. § 2-2-217.

(q) Fugitive POC emissions are based on an assumed 95 percent capture efficiency for the shredder enclosure. Trinity Consultants. July 2019. *Authority to Construct Application, Schnitzer Steel Industries, Oakland, CA, Plant No. 208.* p. 3-1.

(r) Volatilization of POCs associated with handling and stockpiling shredded ferrous metal and metal shredder aggregate. POC emission factors based on emission testing conducted at wTe Recycling, Inc. shredding facility located in Greenfield, Massachusetts; Montrose Environmental, 29 January 2016, *Final Report, Scrap Metal Shredding and Processing Emissions Testing - wTe Recycling, Inc., Greenfield, MA;* and ratios of POC emission rates from shredder stack, shredder enclosure, and shredder stockpiles at Schnitzer facility in Oakland, California.

EXHIBIT C
113

# Exhibit 2

EXHIBIT C
114

**Dharam Singh**

| | |
|---|---|
| **From:** | Carol Allen |
| **Sent:** | Thursday, April 27, 2006 10:17 AM |
| **To:** | Dharam Singh |
| **Cc:** | Scott Lutz |
| **Subject:** | Schnitzer Steel |

Dharam,

I found an interesting 11/02 DTSC report (http://www.dtsc.ca.gov/HazardousWaste/upload/HWMP_REP_ASW_draft.pdf) on the internet concerning auto shredder waste. DTSC is recommending that treated auto shredder waste no longer be deemed non-hazardous. DTSC tested the auto shredder waste from 3 CA facilities (2 in the Bay Area) for cadmium, total chromium, copper, lead, mercury, nickel, zinc, and PCBs. I am curious to know if Schnitzer Steel was one of the 2 Bay Area sites that was tested. DTSC found that the treated auto shredder waste exceeded the haz waste criteria for several compounds, and they only included the test data for those compounds in this report. However, DTSC did find PCBs in the waste. They also mention a comparison to a 1992 report that shows that PCB levels in the auto shredder waste have declined from 1992 to 2002, but they don't say by how much or include the 1992 data. If you could contact the report author from DTSC, you might be able to get the test data showing the percentage decline in PCB emissions which you could apply to the PCB emission factor.

The DTSC report authors may also have more information about hex chrome in the waste versus total chrome. I agree with Randy that the amount of hex chrome in auto shredder fluff is probably nil, but its always good to get independent confirmation. I did see some nebulous references to hexavalent chrome in auto shredder fluff on the internet, but I couldn't find any hard data confirming its presence or estimating the % hex chrome per total chrome.

You might also ask DTSC about the shredder, scrubber, and demister process water (is it hazardous, what must a site test for to determine if the process water is hazardous, have PCBs or hex chrome ever been found in auto shredder process water).

One other thought I had this morning, have you considered whether or not an abatement factor might be appropriate due to this site's use of a scrubber and extra water during the shredding process compared to the damp shredding process the emission factors were developed for?

Carol Allen

# Exhibit 3

EXHIBIT C
116

# ,ṄGINEERING EVALUATION REP..T
## SCHNITZER STEEL PRODUCTS COMPANY
## PLANT NUMBER 208
## APPLICATION NUMBER 16721

## BACKGROUND

Schnitzer Steel Products Company (SSPC) operates an automobile/appliance shredder at the facility in Oakland. SSPC replaced the old shredder with a new shredder, which was permitted under Application # 14194. The permit to operate was issued on 4/26/2007. The permit limits the shredder throughput at 431,471 tons per year. The shredder utilizes a wet system to avoid overheating. The shredding of automobiles/appliances results in emissions of particulate matter and toxic/hazardous pollutants. Particulate emissions are controlled by cyclones and scrubber/demister system. SSPC has submitted this application with a request for increase in the throughput limit from 431,471 tons per year to 720,000 tons per year.

The facility is a certified appliance recycler certified by Cal EPA and DTSC. Effective January 1, 2006 a certified recycler is required to remove materials such as mercury (found in switches & temperature control devices), used oil from compressors and transmissions, CFCs, HCFCs, and other non-CFC replacement refrigerants, all metal-encased capacitors and any parts that contain PCBs or DEHP, and any other materials that are regulated hazardous wastes before shredding. SSPC has a policy prohibiting the acceptance of scrap metal that contain hazardous substances. SSPC accepts scraps only from California Certified Appliance Recyclers.

The project is subject to CEQA review requirements of District Regulation 2-1-310. Since permit from any other regulatory agency is not required, the District is the lead agency for this project. An initial study is prepared, and on the basis of the study it is determined that the project does not have significant effect on the environment. Therefore, an Environmental Impact report (EIR) is not required and a Negative Declaration is adequate to comply with CEQA requirements.

The following source is covered by this application:

**S-6     Shredder (automobiles, appliances, misc. items); Riverside Engineering, Model # 122112, electric drive, 225 tph (avg.), abated by A-1 (cyclone), A-2 (cyclone), A-3 (scrubber), A-4 (HEAF), and A-9 (demister).**

## EMISSION CALCULATIONS

### Shredder:

PM10 and total organics emissions increases are calculated on the basis of the throughput increase from 431,471 tons/yr to 720,000 tons/yr and emission factors taken from the District approved source test report of March 2007. Toxics emissions are discussed and presented in the health risk screening analysis reports attached with this report.

SSPC conducted a source test in March 2007 (a copy attached) at the above referenced shredder, S-6, to generate emission factors specifically for hexavalent chromium, PCB, benzene, total organics, total particulate matter, and PM10 for the shredder system, and to demonstrate compliance with the permit condition ID# 23114.

EXHIBIT C
117

PM emissions increase = (0.0013 lb/ton)(720,000 tons/yr − 431,471 tons/yr)
$$= 375 \text{ lb/yr}$$
$$= 0.188 \text{ tpy}$$

TOC emissions increase = (0.02 lb/ton)(720,000 tons/yr − 431,471 tons/yr)
$$= 5770 \text{ lb/yr}$$
$$= 2.885 \text{ tpy}$$

NPOC emissions increase = (6E-5 lb/ton+2E-4 lb/ton)(720,000 tons/yr − 431,471 tons/yr)
$$= 75 \text{ lb/yr}$$
$$= 0.04 \text{ tpy}$$

Maximum daily POC emissions = (0.02 lb/ton)(720,000 tons/yr)/(260 days/yr)
$$= 55.38 \text{ lb/day}$$

## · Diesel Fueled Trucks:

An emission factor of 0.21 g/mile is used to estimate diesel-PM emissions from trucks. This factor is derived from CARB EMFAC2007 calculations for On-road Heavy-Duty Diesel Trucks (>33,000 lbs gross vehicle weight) assuming average operating conditions that exist in the Bay Area. Because diesel PM emissions from trucks are expected to decline over time as a result of regulatory action and technological advances, the factor used in the HRSA is a weighted average of the estimated emissions for a 40 year period going forward (i.e. 2007 − 2047). In addition to the transport emissions, it is determined that trucks idling at the facility would generate 22.8 lb/yr of diesel PM (assumes 22 minutes of idling per truck).

Truck activity due to the project will result in up to a total of 175 truck calls (increment of 70 truck calls) per day at the terminal. At 7 operating days per week, 52 weeks per year, the increased annual truck traffic will be 25,550 trucks per year. The domain for the analysis of the impact of truck traffic for this HRSA includes the traffic at the facility and the access roads to the freeway. Trucks are assumed to exit US 880, travel south on Martin Luther King Jr. Way, turn west onto Embarcadero West, enter the facility at 1101 Embarcadero West, pull past and back up to the unloading/loading area, then follow the same route back to the freeway. Due to the number of potential routes onto and off of the freeway, the modeling only goes as far as the intersection of Martin Luther King Jr. Way and US 880.

Truck Transit Diesel PM Emissions = (0.21 g/mile)(25,550 truck calls/yr)(1.16 miles/truck)
$$\text{(lb/453.6 g)}$$
$$= 13.7 \text{ lb/yr}$$

Truck Idling Diesel PM Emissions = 22.8 lb/yr

Total Truck Diesel PM Emissions = 13.7 lb/yr + 22.8 lb/yr
$$= 36.5 \text{ lb/yr}$$
$$= 0.018 \text{ tpy}$$

$CO_2$ emissions = 130.257 tpy (Ref.: District's emission inventory; provided by Amir Fanai, Planning)

## Ships and Tugs:

The California Air Resources Board (CARB) recommends a PM emission factor of 1.5 g/kW-hr for cargo ships burning heavy fuel oil with a sulfur content of 2.5% (Ref. "A Critical Review of Ocean-Going Vessel Particulate Emission Factors", CARB 11/9/07). This emission factor is applied to the cargo ships servicing SSPC. Tug PM emission factors are provided by the applicant and approved by the District.

EXHIBIT C
118

**Emissions from shipping are based on the following scenario:**

A total of twenty six (26) cargo ships per year will make trips to the facility including ten (10) cargo ships due to incremental throughput. A cargo ship transits from Bar Pilot Station to the Golden Gate Bridge and then to Bay Bridge. Two (2) tugs will meet each cargo ship at the south side of the Bay Bridge and escort it along the shipping channel and Inner Harbor to the (SSPC) berth. The tugs then return to their home berth (Berth 8) and the ship "hotels" at SSP for approximately 4 days during loading. When the loaded ship is ready to depart, the tugs return and escort the ship back to the Bay Bridge. The outbound route is same as inbound. During shipping operations, cargo carriers and tugs operate at a number of different engine power levels depending on the operating mode.

For the purpose of CEQA review and cumulative emissions increase, shipping emissions are estimated only for ten (10) cargo ships (incremental numbers for incremental throughput of 288,529 tpy) and two (2) tugs.

Diesel PM emissions, NOx, CO, VOC, SO2, and green house gas (CO2) emissions are estimated from ships and tugs. A spreadsheet with details of basis and emission estimates is attached with this report.

However, for health risk screening analysis diesel PM emissions for the segment between Bay Bridge and facility berth are considered.

Emission estimates are as follows:

Diesel PM10 = 2234 lb/yr
            = 1.117 tpy
            = 0.77 tpy (between Bay Bridge and facility Berth)
NOx = 11.91 tpy
SO2 = 8.938 tpy
CO = 1.184 tpy
VOC = 0.461 tpy
CO2 = 623.743 tpy


## EMISSION SUMMARY

Diesel PM10 emissions = 0.018 tpy (trucks) + 1.117 tpy (ships & tugs) = 1.135 tpy
PM10 = 0.188 tpy (shredder) + 0.018 tpy (trucks) + 1.117 tpy (ships & tugs) = 1.323 tpy
NOx = 11.91 tpy (ships & tugs)
CO = 1.184 tpy (ships & tugs)
SO2 = 8.938 tpy (ships & tugs)
POC = 2.885 tpy (shredder) + 0.461 tpy (ships & tugs) = 3.346 tpy
NPOC = 0.04 tpy (shredder)
CO2 = 623.743 tpy (ships & tugs) + 130.257 tpy (trucks) = 754.0 tpy


## PLANT CUMULATIVE INCREASE

PM10 = 1.323 tpy
NOx = 11.91 tpy

EXHIBIT C
119

CO    = 1.184 tpy
SO2  = 8.938 tpy
POC  = 3.346 tpy
NPOC = 0.04 tpy

## OFFSET REQUIREMENTS

NOx emissions exceed 10 tpy and therefore are subject to the offset requirements of Regulation 2-2-302. Since emissions are less than 35 tpy, offsets are provided in a ratio of 1.0:1.0 from the Small Facility Banking account in the District's Emissions Bank in accordance with the provisions of Regulation 2-4-414.

**Offsets** = (11.91 tpy)(1.0)
         = **11.91 tpy**

## BACT DETERMINATION

**Particulate Emissions:**

BACT requirements of Regulation 2-2-301 are triggered because uncontrolled PM10 emissions exceed 10 pounds per day. BACT for PM10 is also TBACT for particulate hazardous substances as determined when the shredder was initially permitted in 2006 (A# 14194).

Generally particulate emissions from automobile/appliance shredding operation are controlled by water injection with an abatement system consisting of cyclone/scrubber/filter/demister. Abatement factors depend on the configuration and operating parameter of the system. It can vary from as low as 57% to as high as 99.7% for scrubbers and other wet collectors (Ref.: Table 33, Air Pollution Engineering Manual, 2nd Edition, U.S.E.P.A). The above referenced abatement system is not effective in controlling organics such as benzene.

There is a facility Sims Hugo Neu (Plant # 5152) in Redwood City that operates an auto shredder. Particulate emissions from the shredder are abated by two dynamic cyclones and a cyclonic scrubber with a demister arranged in series. Exhaust loading from the scrubber w/demister is subject to the permit condition of not exceeding 0.01 gr/dscf (Condition ID# 3884, item 2). A source test conducted on 3/11/03 by the District demonstrated the auto shredder is in compliance with the grain loading limit of 0.01 gr/dscf. A source test conducted on the shredder at Schnitzer in March 2007 also demonstrated compliance with the grain loading limit of 0.01 gr/dscf.

Based on the above referenced information, TBACT for particulate hazardous substance emissions from an auto shredder is the use of water injection, cyclones, scrubber, filter, and demister arranged in series with an exhaust PM loading of 0.01 gr/dscf or less.

The shredder complies with the TBACT as determined for particulate emissions.

**Volatile Organics Emissions:**

BACT requirements of Regulation 2-2-301 are triggered for volatile organic compounds emissions because it exceeds 10 lbs/day.

EXHIBIT C
120

There is no BACT guideli... for an auto shredder in the BACT/TB... r Workbook, however, BACT in the form of a fixed-bed carbon adsorption system is not cost-effective for POC emissions of 56 lb/day, and exhaust flow of 33,000 cfm.

A cost-effective analysis is done. It is determined that BACT is not cost-effective because cost of control is greater than the cost-effective cost of $17,500/ton. The cost does not include the cost of ductwork and blowers, which are likely to add significantly to the overall operating costs, and make the control system even more non cost-effective.

Annual cost based on Cost Base Date of 1989 = $79,749
Annual cost as of 2009 including inflation @3% per year
= ($79,749)[1+(0.03)(20 yrs)]
= $127,598
POC controlled @90% control efficiency = (7.2 tpy)(0.9)
= 6.48 tpy
Annual cost per ton of POC controlled = $127,598/6.48 tpy
= $19,691/ton

## CEQA REVIEW REQUIREMENTS

The project is subject to the CEQA review requirements of District Regulation 2-1-310. Since permits from any other regulatory agency are not required, the District is the lead agency for this project. An initial study is prepared, and on the basis of the study it is determined that the project does not have significant effect on the environment. Therefore, an Environmental Impact report (EIR) is not required and a Negative Declaration is adequate to comply with CEQA requirements.

To fulfill the Public Notice requirements, a Notice of Intent to Adopt Negative Declaration is filed with the Alameda County Clerk, and distributed along with draft Negative Declaration, and CEQA Initial Study to responsible agencies and to interested parties. Also, the CEQA documents are posted on the District's website and the Notice of Intent is published in a newspaper in general circulation in the area affected by the project. The public comment period ended on February 16, 2009. No Comments were received.

CEQA documents are submitted for the District approval and adoption.

## TOXIC EMISSIONS AND HEALTH RISK SCREENING ANALYSIS

Toxic emissions from the shredder are calculated on the basis of the proposed throughput rates of 350 tons/hr and a total throughput of 720,000 tons/yr after modification, and the District approved source test emission factors for benzene, hexavalent chromium, and PCB. For all of the other toxic compounds, the emission factors were taken from Table D-11.F of a 1996 report that was prepared for the Institute of Scrap Recycling Industries by Versar, Inc. Diesel PM emissions are estimated from ships, tugs, and trucks associated with the additional transportation requirements (10 cargo ships, 2 tugs, and 25,550 trucks per yr).

A health risk screening analysis (HRSA) is conducted for the purpose of demonstrating compliance with the new source review requirements for toxic air contaminants (TAC) as specified in Regulation 2 Rule 5. A health risk screening analysis is also conducted for CEQA

EXHIBIT C
121

purposes, which evaluates ...e health risks resulting from trucks, tug, and cargo ships diesel PM emissions in addition to the health risk resulting from toxics emissions from the shredder.

A copy of the health risk screening analysis (HRSA) reports for shredder only TAC emissions and for the project including TAC emissions from trucks, tugs, and cargo ships is attached.

HRSA is conducted for the TAC emissions from the shredder only. Results from the HRSA report indicate that the maximum health impacts are: a cancer risk of 1.5 in a million and a chronic hazardous index of 0.03. The primary contributors to the cancer risk are the emissions of cadmium, hexavalent chromium, and PCB, which account for 95% of the risk. In accordance with the District's Regulation 2-5, these impact levels are considered acceptable, provided the shredder satisfies best available control technology requirements for particulate hazardous substances (TBACT). The shredder complies with the TBACT requirements as determined in the BACT determination section of this report.

HRSA is conducted for the project TAC emissions, which include TAC emissions from the shredder and diesel PM10 emissions of 0.77 tpy from ships, tugs, and trucks. Diesel PM 10 emissions from the ships and tugs are considered only for the distance between the facility berth and the Bay Bridge for health risk screening. Results from the HRSA report indicate that the maximum increased cancer risk is 5.9 in a million and the maximum increased chronic hazardous index is 0.027. A significant air quality impact with respect to TAC emissions is an increased cancer risk of greater than 10 in a million or a non-cancer chronic hazardous index above 1.0. Since the health risk impacts associated with this project are below these levels they are not considered significant for the purpose of CEQA review or public notification under the Air Toxics Hot Spots Program.

## STATEMENT OF COMPLIANCE

The shredder with increase throughput limit is expected to comply with the requirements of Regulation 6, Rule 1, Particulate Matter, General Requirements.

*6-1-301 Ringelmann No. 1 Limitation: Except as provided in Sections 6-1-303, 6-1-304 and 6-1-306, a person shall not emit from any source for a period or periods aggregating more than three minutes in any hour, a visible emission which is as dark or darker than No. 1 on the Ringelmann Chart, or of such opacity as to obscure an observer's view to an equivalent or greater degree.*
*(Amended July 11, 1990)*
*6-1-310 Particulate Weight Limitation: A person shall not emit from any source particulate matter in excess of 343 mg per dscm (0.15 gr. per dscf) of exhaust gas volume.*

The project is subject to the CEQA review requirements of District Regulation 2-1-310. CEQA review requirements are discussed in a separate section of this report.

The project is over 1000 feet from the nearest school and therefore is not subject to the public notification requirements of Regulation 2-1-412, Public Notice, Schools.

BACT requirements of Regulation 2-2-301 are triggered for PM10 and POC emissions. BACT is discussed in BACT determination section of this report.

Offset requirements of Regulation 2-2-302 are triggered for NOx emissions and are discussed in a separate section of this report. Offset requirements of Regulation 2-2-302 are not triggered for POC emissions (< 10 tpy). Offset requirements of Regulation 2-2-303 are not triggered for PM10 or SO2 emissions because SSPC is not a major facility for PM10 or SO2.

EXHIBIT C
122

PSD, NSPS, and NESHAPS do not apply.

## PERMIT CONDITIONS

Condition ID# 23114 is revised by increasing the scrap throughput limit to 720,000 tons/yr, and including ship and truck calls.

S-6 & S-7        Shredder and Infeed conveyor

1.  The owner/operator shall not exceed the scrap-in throughput limit of 720,000 tons in any calendar year at this facility.
    (basis: baseline 2005 production level of 431,471 tons/yr; cumulative increase for the incremental throughput; health risk screening analysis)

2.  The owner/operator shall enclose and vent the shredder to the abatement system at all times it is operating to minimize fugitive emissions.
    (basis: TBACT)

3.  The owner/operator shall abate particulate emissions from the shredder by water injection at a sufficient rate to ensure that non-metallic material exiting the unit be moist to the touch at all times, and abatement system consisting of cyclones, scrubber, filter, and demister at all times when the shredder is in operation. The PM grain loading at the exhaust outlet of the abatement system shall not exceed 0.01 gr/dscf.
    (basis: TBACT)

4.  The owner/operator shall operate the Recycling Center in such a manner that particulate emissions into the atmosphere from any operation/equipment for a period or periods aggregating more than three minutes in any hour shall not cause a visible emission which is as dark or darker than No. 0.5 on the Ringelmann Chart, or of such opacity as to obscure an observer's view to an equivalent or greater degree or result in fallout on adjacent property in such quantities as to cause public nuisance per District Regulation 1-301.
    (basis: Regulations 6-1-301; 1-301)

5.  The owner/operator shall use water spray to minimize fugitive dust emissions from material/scrap handling and storage to comply with condition 4. The owner/operator shall pave the site truck transport roads and sweep/spray with water/other actions deemed appropriate by the District, if necessary, to minimize fugitive dust emissions from trucking activities to comply with condition 4.
    (basis: Regulations 6-1-301; 1-301)

6.  The owner/operator shall not exceed a total of 26 ship calls and 63,875 truck calls per calendar year to haul in/out scrap/materials at the facility.
    (basis: Health risk screening analysis; CEQA review)

7.  In order to demonstrate compliance with condition numbers 1 and 6, the owner/operator shall keep records of monthly and yearly throughput of materials, ship and truck calls in a District approved log. The log shall be maintained for a period of at least 24 months from the date of data entry, and shall be made available to the District staff upon request for inspection.
    (basis: recordkeeping)

EXHIBIT C

123

**RECOMMENDATION**

It is recommended that Schnitzer Steel Products Company be issued a revised permit condition ID# 23114 for the shredder described in the background section of this report after approval and adoption of CEQA documents.


BY:_____

    Dharam Singh, AQE II

EXHIBIT C

124

# Exhibit 4

EXHIBIT C
125

# ENGINEERING EVALUATION REPORT
# SCHNITZER STEEL PRODUCTS COMPANY
# PLANT NUMBER 208
# APPLICATION NUMBER 27762

Adeline St. Foot of (1101 Embarcadero West)
Oakland, CA 94607

## BACKGROUND

Schnitzer Steel Products Company (SSPC) operates an automobile/appliance shredder at the facility in Oakland. SSPC replaced the old shredder with a new shredder (S-6), which was permitted in 2006 under Application # 14194. The permit to operate was issued on 4/26/2007. The maximum permitted throughput rate for the new shredder was increased in 2009 pursuant to Application # 16721.

The shredder utilizes a wet system to avoid overheating. The shredding of automobiles/appliances results in emissions of particulate matter and toxic/hazardous pollutants. Particulate emissions are controlled by cyclones and scrubber/demister system. In addition, SSPC has been operating a drum magnet line (DML) and a Joint Products Plant (JPP) consisting of 2 trommels, 3 screens, classifiers, conveyors, and other material handling equipment abated by water spray since April 1, 2010 without a permit. At DML, ferrous materials are separated from the non-ferrous materials. At JPP, non-ferrous materials/metal is sorted, by metal type, from non-metallic materials. The non-metallic residue from JPP is treated with chemicals and shipped offsite for use as alternate daily landfill cover.

SSPC has submitted this application to obtain an Authority to Construct (ATC) and Permit to Operate (PTO) for an upgraded abatement system at the shredder to minimize fugitive emissions. In the existing configuration, the shredding operation has fugitive emissions that are not collected or controlled. The shredder and part of the associated conveyor will be enclosed and vented to two venturi scrubbers with the help of two blowers. The blowers will reduce the pressure in the enclosure as much as possible to improve the capture rate for fugitive shredder emissions, and the venturi scrubbers will remove particulate matter from the blower vent streams. The proposed enclosure and venturi scrubbers will replace the existing abatement devices (A-3, A-4, and A-5) at the shredder.

SSPC has also applied to obtain exemptions from ATC and PTO for DML and JPP with its new abatement device.

The application covers the following sources:
**S-11** **Joint Products Plant w/enclosure (2 Trommels, 3 Screens, Classifiers, Conveyors, and other material handling equipment), abated by A-13 and A-14.**
**S-12** **Drum Magnet Line w/enclosure.**
**A-11** **Venturi Scrubber, SLY, Model #12, abating S-6.**
**A-12** **Venturi Scrubber, SLY, Model #12, abating S-6.**
**A-13** **Water Spray, abating S-11.**
**A-14** **Baghouse, Custom made, abating S-11.**

EXHIBIT C
126

## EMISSION CALCULATIONS

### Shredder:

The proposed abatement system (enclosure and venturi scrubbers) will capture most of the emissions from the shredding operation including fugitive emissions, which were not properly accounted for when the shredder was initially permitted. Stack emissions from the shredder were calculated using emission factors from the report prepared by Versar, Inc. in 1996 for Scrap Recycling Industries. The emission calculations were updated after SSPC conducted a District approved source test at the shredder stack in March 2007.

Overall, the proposal to enclosure the shredder operations and upgrade the particulate abatement system is expected to result in a reduction of the current actual emissions from the shredder. However, since current fugitive emission rates from the shredder are not known, it is not possible to quantify the impacts of the proposed enclosure and abatement system. The applicant has proposed to conduct a series of District approved source tests that will enable the District to estimate the current (pre-enclosure) and post-enclosure fugitive emissions as well as the post-enclosure stack emissions.

Once the pre and post enclosure emission estimates are available, the District will establish new maximum permitted emission rates for the proposed operations (post enclosure with improved abatement). These proposed emission rates (POC, PM10, PM2.5, and TACs) will be compared to the District's new best estimate of the total shredder emissions (stack plus fugitives) for: (a) the 2007 shredder replacement and (b) the 2009 increase in permitted shredder throughput, to determine if all new source review (NSR) and toxic NSR requirements for these previous permitting activities were fully complied with. If the District finds that NSR has not been fully satisfied, the District will require updated reviews, limits, offsets, and health risk assessments under this application, as needed, to ensure full NSR compliance for these previous permitting activities.

### Drum Magnet Line w/enclosure:

The shredded material produced by S-6 travels by conveyor through the drum magnets where ferrous material is separated from non-ferrous materials. The shredded material has a high moisture content due to the water sprays applied during the shredding process. This conveyor line (S-12) is expected to have negligible particulate emissions due to the high moisture content, and it is exempt from Air District permit requirements per 2-1-115.1.4.2. This line will be covered with a floorless enclosure to prevent cross winds from generating any fugitive dust. The enclosure qualifies for permit exemption per Regulation 2-1-113.2.3.

### Joint Products Plant w/enclosure:

The applicant has submitted moisture test data and emission calculations (PM10, PM2.5, and TAC/HAP) to demonstrate that the S-11 Joint Products Plant (JPP) qualifies for permit exemption per Regulation 2-1-115.1.4. The moisture test data indicates that the materials processed by JPP contain more than 5% moisture, which meets the criteria for permit exemption under Section 115.1.4.

The applicant has marked their emission calculations as "Trade Secret" and therefore these calculations are not included in this report. However, the District has reviewed and verified these emission calculations. Total particulate emissions from JPP (before the proposed

EXHIBIT C
127

enclosure) are: 2.13 pounds/day of PM10, 0.57 pounds/day of PM2.5, 0.28 tons/year of PM10, and 0.07 tons/year of PM2.5. TAC emissions include copper, lead, manganese, nickel, sulfate, and vanadium. For each TAC, the total emissions from JPP (before enclosure) are less the each applicable acute and chronic health risk assessment (HRA) trigger level. Therefore, S-11 does not require permitting under Section 2-1-319 because particulate emissions are less than 5 tons/year and TAC emissions are less than all applicable HRA trigger levels.

SSPC is proposing to enclose and vent the JPP to a baghouse (A-14) to further reduce the residual fugitive particulate emissions. Since the source (S-11) is exempt from District permitting requirements, the enclosure and abatement system are also exempt from District permitting requirements per 2-1-113.2.4.


## PLANT CUMULATIVE INCREASE

Emissions from exempt equipment (S-11 and S-12) are not subject to new source review and are not included in the plant cumulative emission increase.

The current cumulative emission increases for this application are shown below:

PM10  = 0.0 tpy
PM2.5 = 0.0 tpy
POC = 0.0 tpy

As discussed earlier, the District will reevaluate past NSR permitting activities for the S-6 shredder to ensure that NSR has been fully satisfied. This may include adjustments to the cumulative emission increases for the shredder replacement and expansion projects under Applications # 14194 and # 16721, respectively.


## OFFSET REQUIREMENTS

As discussed earlier, the District will reevaluate past NSR permitting activities for the S-6 shredder to ensure that NSR has been fully satisfied. This may include adjustments to the offsets required for the shredder replacement and expansion projects under Applications # 14194 and # 16721, respectively.


## BEST AVAILABLE CONTROL TECHNOLOGY (BACT)

### Particulate Emissions:

BACT requirements of Regulation 2-2-301 were triggered for the S-6 Shredder under Applications # 14194 and # 16721 because uncontrolled PM10 emissions exceeded 10 pounds per day. BACT for PM10 was also determined to be TBACT for particulate hazardous substances when the shredder was initially permitted in 2006.

Generally particulate emissions from automobile/appliance shredding operation are controlled by water injection with an abatement system consisting of cyclone/scrubber/filter/demister. Abatement factors depend on the configuration and operating parameter of the system. It can vary from as low as 57% to as high as 99.7% for scrubbers and other wet collectors (Ref.: Table

EXHIBIT C
128

33, Air Pollution Engineering Manual, 2nd Edition, U.S.E.P.A). The above referenced abatement system is not effective at controlling organics such as benzene.

Exhaust loading from the scrubbers will be subject to the permit condition of not exceeding 0.01 gr/dscf. A source test conducted on the shredder at Schnitzer in March 2007 demonstrated compliance with the grain loading limit of 0.01 gr/dscf.

Based on the above referenced information, TBACT for particulate hazardous substance emissions from an auto shredder is the use of water injection, and scrubbers arranged in series with an exhaust PM loading of 0.01 gr/dscf or less.

The shredder will be expected to comply with the BACT/TBACT as determined for particulate emissions.

**Precursor Organic Compounds Emissions:**

BACT requirements of Regulation 2-2-301 for POC emissions will be considered if applicable. Emissions data from the planned source test and the recalculation of total permitted emissions for the shredder will be used to determine POC BACT and offset applicability.

## CEQA REVIEW REQUIREMENTS

The project is categorically exempt from the requirements of CEQA review per District Regulation 2-1-312.2.

**2-1-312 Other Categories of Exempt Projects:** In addition to ministerial projects, the following categories of projects subject to permit review by the District will be exempt from the CEQA review, either because the category is exempted by the express terms of CEQA (subsections 2-1-312.1 through 312.9) or because the project has no potential for causing a significant adverse environmental impact (subsections 2-1-312.10 and 312.11). Any permit applicant wishing to qualify under any of the specific exemptions set forth in this Section 2-1-312 must include in its permit application CEQA-related information in accordance with subsection 2-1-426.1. In addition, the CEQA-related information submitted by any permit applicant wishing to qualify under subsection 2-1-312.11 must demonstrate to the satisfaction of the APCO that the proposed project has no potential for resulting in a significant environmental effect in connection with any of the environmental media or resources listed in Section II of Appendix I of the State CEQA Guidelines.

312.2 Permit applications to install air pollution control or abatement equipment.

## TOXIC EMISSIONS AND HEALTH RISK SCREENING ANALYSIS

If the new maximum permitted shredder emissions are determined to be higher than the TAC emissions rates originally evaluated under Application # 16721, the District will require a new health risk screening analysis for this project.

EXHIBIT C

129

    1.4     Operating, loading and unloading the following sources which process exclusively material with a moisture content greater than or equal to 5 percent by weight:
        1.4.2   Conveyor, screw, auger, stacker or bucket elevator;

**Exemption: Regulation 2-1-113.2.3:**

113.2  The following sources and operations are exempt from the requirements of Sections 2-1-301 and 302:
     2.3   Structural changes which do not change the quality, nature or quantity of air contaminant emissions.

BY: _CAA for DS  11/10/16_

Dharam Singh, PE
Air Quality Engineer II

EXHIBIT C
130

# Exhibit 5

EXHIBIT C
131

09/30/21                              A0208                         Page    1



## BAY AREA AIR QUALITY MANAGEMENT DISTRICT

# PERMIT
## TO OPERATE

This document does not permit the holder to violate any BAAQMD regulation or any other law.     **PERMIT EXPIRATION DATE**
                                                                                                NOV 1, 2022

PLANT#    208

Schnitzer Steel Products Company
1101 Embarcadero-West
Oakland, CA   94607

COPY SENT TO:
Pamela Gray, Regional Environmental Manager
Schnitzer Steel Products Company
P O Box 747
Oakland, CA  94604

Location: Adeline St, Foot of
          Oakland, CA   94607

| S# | DESCRIPTION | [Schedule] | PAID |
|----|-------------|------------|------|
| 6 | MTGL/SEC> Crushing/shredding, Steel Shredder w/ water injection, electric, 225 tph (avg.)     Abated by:     A6 Water Spray System     A11 Venturi Scrubber     A12 Venturi Scrubber     Emissions at: P15 Stack | [F] | 565 |
| 7 | MTGL/SEC> Conveying, Steel Infeed Conveyor (electric)     Abated by:     A6 Water Spray System     A11 Venturi Scrubber     A12 Venturi Scrubber     Emissions at: P15 Stack | [F] | 565 |
| 10 | MINERL> Storage, contained, Cement Cement Silo     Abated by:     A10 Baghouse, Pulse Jet     Emissions at: P10 Stack | [F] | 514 |
| 11 | MTGL/SEC> Screening, Auto body components, 120 tons/hr max Joint Products Plants w/ enclosure (2 Trommels, 3 Screens,    Classifiers, Conveyors, and ot     Abated by:     A13 Water Spray System     A14 Baghouse, Pulse Jet     Emissions at: P14 Stack | [exempt] | 0 |

375 Beale Street, Suite 600 San Francisco, CA 94105 · (415) 771.6000 · WWW.BAAQMD.GOV

EXHIBIT C
132

09/30/21                          A0208                    Page    2

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

# PERMIT
## TO OPERATE

This document does not permit the holder to violate any BAAQMD regulation or any other law.    **PERMIT EXPIRATION DATE**
NOV 1, 2022

PLANT#   208

| S# | DESCRIPTION | [Schedule] | PAID |
| --- | --- | --- | --- |
| 12 | MTGL/SEC> Screening, Auto body components, 5 tons/hr max Drum Magnet Line W/ enclosure | [exempt] | 0 |
| 13 | MTGL/SEC> Screening, Solid waste - other/not spec JPP from Wet Seperation Unit downstream | [exempt] | 0 |
| 16 | Standby Diesel engine, 779 hp, EPA# HCPXL18.1HTH Emergency Standby Diesel Generator Set   Abated by:   A19 Diesel Oxidation Catalyst   Emissions at: P16 Stack | [B,284 days] | 202 |

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

4 Permitted Sources, 3 Exempt Sources

*** See attached Permit Conditions ***

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
133

09/30/21                            A0208                        Page    3

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***

===============================================================

| Source# | Subject to Condition Numbers |
|---------|------------------------------|
| 6 | 27085, 27348, 27410 |
| 7 | 27085 |
| 10 | 24125 |
| 11 | 27085 |
| 12 | 27085 |
| 16 | 22850, 23787 |

The operating parameters described above are based on information supplied by permit holder and may differ from the limits set forth in the attached conditions of the Permit to Operate. The limits of operation in the permit conditions are not to be exceeded. Exceeding these limits is considered a violation of District regulations subject to enforcement action.

EXHIBIT C
134

09/30/21                              A0208                        Page    4

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

*** PERMIT CONDITIONS ***
=============================================================

**COND# 22850** *applies to S# 16*

1. The owner/operator shall not exceed 50 hours per year per engine for reliability-related testing.
   [Basis: Title 17, California Code of Regulations, section 93115, ATCM for Stationary CI Engines]

2. The owner/operator shall operate each emergency standby engine only for the following purposes: to mitigate emergency conditions, for emission testing to demonstrate compliance with a District, State or Federal emission limit, or for reliability-related activities (maintenance and other testing, but excluding emission testing). Operating while mitigating emergency conditions or while emission testing to show compliance with District, State or Federal emission limits is not limited.
   [Basis: Title 17, California Code of Regulations, section 93115, ATCM for Stationary CI Engines]

3. The owner/operator shall operate each emergency standby engine only when a non-resettable totalizing meter (with a minimum display capability of 9,999 hours) that measures the hours of operation for the engine is installed, operated and properly maintained.
   [Basis: Title 17, California Code of Regulations, section 93115, ATCM for Stationary CI Engines]

4. Records: The owner/operator shall maintain the following monthly records in a District-approved log for at least 36 months from the date of entry (60 months if the facility has been issued a Title V Major Facility Review Permit or a Synthetic Minor Operating Permit). Log entries shall be retained on-site, either at a central location or at the engine's location, and made immediately available to the District staff upon request.

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
135

09/30/21                          A0208                    Page    5

**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**

NOV 1, 2022

Plant# 208
               *** PERMIT CONDITIONS ***
==============================================================

    a. Hours of operation for reliability-related
       activities (maintenance and testing).
    b. Hours of operation for emission testing to
       show compliance with emission limits.
    c. Hours of operation (emergency).
    d. For each emergency, the nature of the
       emergency condition.
    e. Fuel usage for each engine(s).
    [Basis: Title 17, California Code of
    Regulations, section 93115, ATCM for Stationary
    CI Engines]

5. At School and Near-School Operation:
    If the emergency standby engine is located on
    school grounds or within 500 feet of any school
    grounds, the following requirements shall
    apply:

    The owner/operator shall not operate each
    stationary emergency standby diesel-fueled
    engine for non-emergency use, including
    maintenance and testing, during the following
    periods:
    a. Whenever there is a school sponsored
       activity (if the engine is located on school
       grounds)
    b. Between 7:30 a.m. and 3:30 p.m. on days when
       school is in session.

    "School" or "School Grounds" means any public
    or private school used for the purposes of the
    education of more than 12 children in
    kindergarten or any of grades 1 to 12,
    inclusive, but does not include any private
    school in which education is primarily
    conducted in a private home(s). "School" or
    "School Grounds" includes any building or
    structure, athletic field, or other areas of
    school property but does not include unimproved
    school property.
    [Basis: Title 17, California Code of
    Regulations, section 93115, ATCM for Stationary
    CI Engines]

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
136

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***

===============================================================

**COND# 23787** *applies to S# 16*

1. The owner/operator shall abate the particulate emissions from the emergency diesel engine by the Diesel Oxidation Catalyst at all times the engine is in operation. [Basis: Toxics]

**COND# 24125** *applies to S# 10*

S-10, Cement Silo

1. The Permit Holder shall ensure the visible particulate emissions from the silo do not exceed Ringelmann Number 0.5 (or equivalent opacity) or result in fall out on adjacent property in such quantities as to cause annoyance to any other person. (basis: Regulation 6-1-301, 1-301)

2. The Permit Holder shall not exceed a throughput of 21,900 tons of cement in any consecutive 12-month period. (basis: cumulative increase)

3. The Permit Holder shall abate emissions from the silo by a filter, A-10, at all times the silo is in operation. The filter shall be functioning properly within the manufacturer's specified pressure drop range. (basis: cumulative increase)

4. In order to demonstrate compliance with part 2 of the condition, the Permit Holder shall keep daily, monthly, and consecutive 12-month records of the material throughput in a District approved logbook. The records shall be kept on site for at least 24 months from the date of data entry and be made available to the District staff for inspection. (basis: cumulative increase, recordkeeping)

**COND# 27085** *applies to S#'s 6, 7, 11, 12, A12, A11*

Condition # 27085

S-6 Shredder and S-7 Infeed Conveyor; abated by A-6

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
137



**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***

================================================================

Water Sprays, A-11 Venturi Scrubber, and A-12
Venturi Scrubber (Revision 1: A #14194, 6/16/06;
Revision 2: A #16721, 4/9/09; Revision 3: A #27762,
11/10/16; Revision 4: A #27762, 11/20/2020)

1. The owner/operator shall not exceed the scrap-in
   throughput limit of 720,000 tons in any calendar year at
   this facility. (Basis: Regulations 2-1-301 - baseline
   2005 production level of 431,471 tons/year - and 2-5-302
   and Cumulative Increase for the incremental throughput)

2. The owner/operator shall enclose the shredder, S-6,
   and shall vent the shredder emissions to the Venturi
   Scrubbers, A-11 and A-12, during all times that S-6 is
   operating. The owner/operator shall minimize fugitive
   emissions from the shredder enclosure during shredder
   operation by (a) designing the enclosure such that the
   total surface area of all openings in the enclosure does
   not exceed 5% of the total surface area of the enclosure
   walls, floor, and ceiling; (b) using curtain walls or
   strip curtains on the inlet feed conveyor opening; and c
   ensuring that the ventilation fan is operating within its
   design range. The owner/operator shall demonstrate that
   the ventilation fan is operating within its design range
   by maintaining the amperage greater than 480 amperes
   during shredder operation.  The owner/operator shall
   operate each Venturi Scrubber in accordance with
   manufacture specifications. The owner/operator shall
   demonstrate this by maintaining a minimum water flow rate
   of 300 gallons per minute (gpm) to each venturi scrubber
   and an effective pressure differential operating range
   15-22 inches of H2O across each venturi scrubber.
   (Basis: TBACT)

3. Total emissions from the S-6 Auto Shredder shall not
   exceed any of the emission limits listed below:
   a. Maximum Permitted Emission Rates:

|  | P-15 Stack Pounds/Hour | P-15 Stack Tons/Year |
|---|---|---|
| PM10 (total filterable + condensable) | 5.91 | 6.15 |
| POC (calculated as methane) | 112.0 | 85.50 |

375 Beale Street, Suite 600 San Francisco, CA 94105 · (415) 771.6000 · WWW.BAAQMD.GOV

EXHIBIT C
138

```
╔═══════════════════════════════════════════════════════════════╗
║  ⩰  BAY AREA AIR QUALITY            PERMIT            ║
║     MANAGEMENT DISTRICT              TO OPERATE          ║
╚═══════════════════════════════════════════════════════════════╝
```

This document does not permit the holder to violate any BAAQMD regulation or any other law.   **PERMIT EXPIRATION DATE**

NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***
======================================================================

    b.  Total particulate emissions from the P-15 stack shall not exceed a grain loading of 0.0046 grains/dscf as determined in accordance with Regulation 6-1-602.1.

    c.  Organic emissions from the P-15 stack shall not exceed 300 ppmv (dry basis) of total carbon as determined in accordance with Regulation 8-2-601.

    d.  The owner/operator shall demonstrate compliance with the Part 3a stack emission limits in Part 4.

(Basis: Cumulative Increase, BACT, TBACT, and Regulations 2-5-302 and 8-2-301)

4. Source Testing Requirements for Part 3:

    a.  Within 180 days of issuance of this Permit to Operate, the owner/operator shall initiate quarterly monitoring for the total carbon concentration in stack P-15, using authorized procedures and methods, to demonstrate compliance with Parts 3a, 3c and Regulation 8-2-301, and to assess excess POC emissions in the event of non-compliance with Part 3a, 3c or Regulation 8-2-301. This quarterly monitoring shall continue until an organic abatement system is operating and continued compliance with Regulation 8-2-301 has been demonstrated.

    b.  Within 90 days of issuance of this Permit to Operate and annually thereafter, unless noted otherwise, the owner/operator shall conduct a District approved source test at stack P-15, while the S-6 Auto Shredder is operating at or near the maximum operating rate, to demonstrate compliance with the P-15 stack emission limits in Parts 3a-c. The owner/operator shall record the shredder processing rate, the water application rates for the infeed conveyor and the shredder, the water flow rates and the pressure differential operating ranges at each venturi scrubber, and the ventilation fan amperage during the source test. The source test shall determine the hourly emission rate and the average emission factor (pounds of pollutant per ton of material processed by the shredder) for the following compounds:

    - total carbon (calculated as methane and as defined

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
139

09/30/21                              A0208                         Page    9

This document does not permit the holder to violate any BAAQMD regulation or any other law.     **PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208
                    *** PERMIT CONDITIONS ***
          ===============================================================

            in Regulation 8-2-202) shall be determined by Air
            District approved methods, such as EPA Methods 25A
            and 18,
          - total POC (calculated as methane), where
            total POC = total carbon (excluding methane only)
            - total NPOC. Total NPOC (calculated as methane)
            shall be determined by Air District approved
            methods, such as EPA Method 18 and EPA Method
            TO-15 or other similar GC/MS methods. Total NPOC
            is the sum of all NPOCs (other than methane)
            identified in Regulation 2-1-207, expressed as
            methane.
          - total particulate emissions shall be determined
            using EPA Method 5/202. All measured total
            particulate emissions shall be assumed to be PM10
            for comparison to the limits in Part 3a.
          - Full speciation of organic TACs shall be
            determined by Air District approved methods, such
            as EPA Method TO-15 or other similar GC/MS
            methods.
          - PCBs shall be determined by Air District approved
            methods, such as CARB Method 428.  (This test
            shall be conducted within 90 days of Permit to
            Operate issuance and once every four years
            thereafter.)
          - PAHs and naphthalene shall be determined by Air
            District approved methods, such as CARB Method
            429. (This test shall be conducted within 90 days
            of Permit to Operate issuance and once every four
            years thereafter.)
          - Full set of metal TACs (including arsenic (As),
            beryllium (Be), cadmium (Cd), chromium (Cr) which
            includes total chromium and hexavalent chromium
            (Cr VI), copper (Cu), lead (Pb), manganese (Mn),
            mercury (Hg), nickel (Ni), selenium (Se), and zinc
            (Zn)), shall be determined using Air District
            approved procedures for each compound, including
            CARB Method 425 for hexavalent chromium. (This
            test shall be conducted within 90 days of Permit
            to Operate issuance and once every four years
            thereafter.)
          - Annual emissions for Stack P-15 shall be
            calculated based on the most recent 12-month
            shredder feedstock throughput rate and the

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
140



## BAY AREA AIR QUALITY MANAGEMENT DISTRICT

# PERMIT TO OPERATE

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***
============================================================

    pounds/ton emission factors determined by the most recent source test for total POC and total particulate emissions. Annual stack emission rates shall be compared to the Part 3a limits. The annual source test shall also determine the outlet grain loading and the concentration of total carbon in the P-15 stack to demonstrate compliance with Parts 3b and 3c using Air District approved methods.

c.    The owner/operator shall submit a source test protocol and notification of the scheduled source test date to the Air District's Source Test Section Manager and to the Permit Engineer at least 30 days prior to the scheduled test date.

d.    The owner/operator shall notify the Source Test Section Manager of any changes to the scheduled test date as soon as possible.

e.    The owner/operator shall submit a copy of the source test report to the Source Test Section Manager and the Permit Engineer within 60 days of the test date.

(Basis: Cumulative Increase, TBACT and Regulations 2-5-302 and 8-2-301)

5.    The owner/operator shall apply water sprays (A-6) at the shredder, S-6, and infeed conveyor, S-7, at sufficient rates to ensure that non-metallic material exiting the sources is moist to the touch at all times of operation. (Basis: Cumulative Increase, TBACT; and Regulation 2-5-302)

6.    The owner/operator shall operate the Recycling Center in such a manner that particulate emissions into the atmosphere from any operation/equipment for a period or periods aggregating more than three minutes in any hour shall not cause a visible emission which is as dark or darker than No. 0.5 on the Ringelmann Chart, or of such opacity as to obscure an observer's view to an equivalent or greater degree or result in fallout on adjacent property in such quantities as to cause public nuisance per District Regulation 1-301. (Basis: Regulations 1-301 and 6-1-301)

7.    The owner/operator shall use water spray to minimize fugitive dust emissions from material/scrap handling and

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
141

09/30/21                              A0208                        Page   11

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.   **PERMIT EXPIRATION DATE**

NOV 1, 2022

Plant# 208

*** PERMIT CONDITIONS ***
============================================================

> storage to comply with Part 6. The owner/operator shall
> operate the facility at all times in accordance with its
> approved Emissions Minimization Plan (EMP).
> (Basis: Regulations 1-301, 6-1-301, and 6-4-301)

8. The owner/operator shall not exceed a total of 26 ship
   calls and 63,875 truck calls per calendar year to haul
   in/out scrap/materials at the facility. (Basis: health
   risk assessment for CEQA review)

9. In order to demonstrate compliance with Part 1 and 8,
   the owner/operator shall keep records of monthly and
   yearly throughput of shredder feedstock materials, ship
   calls and truck calls in a District approved log.
   Shredder feedstock shall be totaled for each consecutive
   rolling 12-month period. The log shall be maintained for
   a period of at least 5 years from the date of data entry
   and shall be made available to the District staff for
   inspection upon request. (Basis: Regulations 2-1-301 and
   2-5-302, Cumulative  Increase, CEQA)


**COND# 27348** *applies to S# 6*

> A-11 Venturi Scrubber, A-12 Venturi Scrubber, A-15
> Regenerative Thermal Oxidizer, A-16, Regenerative Thermal
> Oxidizer, A-17 Packed Bed Scrubber, and A-18 Packed Bed
> Scrubber abating S-6 Shredder and S-7 In-feed Conveyor.

1. The owner/operator shall abate emissions from A-11 and A
   12 Venturi Scrubbers with A-15 and A-16 Regenerative
   Thermal Oxidizers during all periods of operation.
   Combined flow rate shall not exceed 180,000 acfm.
   (basis: Cumulative Increase, BACT/TBACT)
2. The owner/operator shall operate A-15 and A-16 each to
   meet the following VOC destruction efficiency
   requirements:
   a. Outlet VOC concentration of 10 ppmv or less; or
   b. All of the following standards depending on the
      applicable inlet VOC concentration:
   c. VOC destruction efficiency > 98.5% if inlet VOC
      concentration > 2,000 ppmv;
   d. VOC destruction efficiency > 97% if inlet VOC
      concentration > 200 to < 2,000 ppmv;

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771 6000 - WWW.BAAQMD.GOV

EXHIBIT C
142

 BAY AREA AIR QUALITY MANAGEMENT DISTRICT

**PERMIT** TO OPERATE

This document does not permit the holder to violate any BAAQMD regulation or any other law.

PERMIT EXPIRATION DATE
NOV 1, 2022

Plant# 208

```
            *** PERMIT CONDITIONS ***
============================================================
```

 e. VOC destruction efficiency > 90% if inlet VOC
   concentration < 200 ppmv.
(basis: Cumulative Increase; BACT/TBACT)

3. The owner/operator shall operate A-15 and A-16 at a
  minimum combustion zone temperature of 1600 degrees F,
  at all times when the shredder S-6 is operating. The
  District may adjust this minimum temperature, if source
  test data demonstrates that an alternate temperature is
  necessary for or capable of maintaining compliance with
  Part 2 above. (basis:
Cumulative Increase; BACT/TBACT)

4. To determine compliance with the temperature requirement
  in these permit conditions, the owner/operator shall
  equip A-15 and A-16 each with a temperature measuring
  device capable of continuously measuring and recording
  the temperature in each regenerative thermal oxidizer.
  The owner/operator shall install, and maintain in
  accordance with manufacturer's recommendations, a
  temperature measuring device that meets the following
  criteria: the minimum and maximum measurable
  temperatures with the device are 560 degrees F and 1750
  degrees F, respectively, and the minimum accuracy of the
  device over this temperature range shall be 1.0 percent
  of full-scale. (basis: Cumulative Increase; BACT/TBACT)

5. The owner/operator shall report any non-compliance with
  Part 3 of this condition to the Director of the
  Compliance & Enforcement Division at the time that it is
  discovered. The submittal shall detail the corrective
  action taken and shall include the data showing the
  exceedance as well as the time of occurrence. (basis:
Cumulative Increase, Regulation 2-5)

6. The temperature limit in Part 3 shall not apply during
  an "Allowable Temperature Excursion", provided that the
  temperature controller setpoint complies with the
  temperature limit. An Allowable Temperature Excursion is
  one of the following:

 a. A temperature excursion not exceeding 20 degrees F;
   or

 b. A temperature excursion for a period or periods
   which when combined are less than or equal to 15
   minutes in any hour; or

 c. A temperature excursion for a period or periods
   which when combined are more than 15 minutes in any
   hour, provided that all three of the following

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
143



**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

PERMIT EXPIRATION DATE
NOV 1, 2022

Plant# 208
                    *** PERMIT CONDITIONS ***
====================================================================

          criteria are met.
     i.   the excursion does not exceed 50 degrees F;
     ii.  the duration of the excursion does not exceed
24 hours; and
     iii. the total number of such excursions does not
          exceed 12 per calendar year (or any consecutive 12
          month period).
. Two or more excursions greater than 15 minutes in duration
occurring during the same 24 hour period shall be counted as
one excursion toward the 12 excursion limit. (basis:
Regulation 2-1-403)
7.   For each Allowable Temperature Excursion that exceeds 20
     degrees F and 15 minutes in duration, the Permit Holder
     shall keep sufficient records to demonstrate that they
     meet the qualifying criteria described above. Records
     shall be retained for a minimum of five (or two years)
     years from the date of entry, and shall be made
     available to the District upon request. Records shall
     include at least the following information:
     a.   Temperature controller setpoint;
     b.   Starting date and time, and duration of each
          Allowable Temperature Excursion;
     c.   Measured temperature during each Allowable
          Temperature Excursion;
     d.   Number of Allowable Temperature Excursions per
          month, and total number for the current calendar
          year; and
     e.   All strip charts or other temperature records.
     (basis: Regulation 2-1-403)
8.   The owner/operator shall not use more than 1,332,980
     therms combined during any consecutive twelve-month
     period in A-15 and A-16 regenerative thermal oxidizers.
     The A-15 and A-16 regenerative thermal oxidizers should
     be in operating mode not exceeding 8 hours per day, with
     the remaining hours in standby mode. (basis: Cumulative
     Increase)
9.   The owner/operator shall abate emissions from A-15 and A
     16 Regenerative Thermal Oxidizers with A-17 and A-18
     Packed Bed Scrubbers during all periods of operation.
     Exhaust gas flow rate to each Packed Bed Scrubber shall
     not exceed 90,000 acfm, and liquid flow rate shall be at
     least 720 gallons per minute. (basis: Cumulative
     Increase, BACT/TBACT)

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
144

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**

NOV 1, 2022

Plant# 208

```
               *** PERMIT CONDITIONS ***
===============================================================
```

10. The owner/operator shall not emit more than following
    from A-15 and A-16 Regenerative Thermal Oxidizers at
    stacks P-17 and P-18:

| | NOx (lb/MMscf) | CO lb/MMscf) |
|---|---|---|
| A-15 | 50 | 84 |
| A-16 | 50 | 84 |

.(basis: Cumulative Increase, Source Test Method 13A and
Method 6)

11. The owner/operator shall not emit more than the
    following toxic air contaminants from the exhaust of A-
    17 and A-18 Packed Bed Scrubbers, combined, unless the
    owner/operator complies with all of the procedures and
    limits in Parts 11a-d:

    a.  Within 60 days of receiving source test results
        demonstrating that total emissions from stack P-17
        and P-18 combined exceed any one of the limits in
        this part, the owner/operator shall submit a permit
        application to the Air District to request revisions
        in the TAC emission limits below. The permit
        application shall include all information required
        to conduct an updated health risk assessment for the
        Shredder, Thermal Oxidizers, and Acid Gas Scrubbers,
        including new proposed emission limits for fugitive
        emissions from the shredder building and for each
        stack for the full list of potential TACs for these
        devices, as identified in Part 13, that also
        demonstrate compliance with the source test results.

    b.  The health risk assessment for this project shall
        demonstrate that total health risks resulting from
        the proposed limits on shredder building fugitive
        emissions, P-17 emissions, and P-18 emissions do not
        exceed the lower of (a) a cancer risk limit of 3.0
        in a million for this project or (b) the applicable
        project cancer risk limit identified in Regulation
        2, Rule 5. The health risk value shall be evaluated
        at the Maximally Exposed Individual Resident (MEIR)
        and Maximally Exposed Individual Worker (MEIW), but
        not the Point of Maximum Impact (PMI). In addition,
        the health risk assessment for this project shall
        demonstrate compliance with any other applicable
        limits or requirements of Regulation 2, Rule 5.

    c.  The health risk assessment shall be conducted in
        accordance with the Regulation 2-5 procedures in

375 Beale Street, Suite 600 San Francisco, CA 94105 · (415) 771.6000 · WWW.BAAQMD.GOV

EXHIBIT C
145



**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***
=============================================================

        effect at the time the HRA is conducted.

d.  If the health risk assessment for the revised TAC emissions limits for the shredder and its associated abatement equipment find that health risks exceed any of the limits described in Part 11b, the owner/operator shall submit a compliance plan to reduced TAC emissions, change operational parameters, or make other improvements such that the health risk assessment meets the requirements of Part 11b. This compliance plan shall be submitted to the District within 60 days of notification by the District that such a plan is required. Pollutant _ Total Stack Emissions (P-17 + P-18)

lb/hr
| Pollutant | lb/hr |
|---|---|
| Arsenic | 8.2E-6 |
| Benzene | 1.8E-2 |
| Butadiene, 1,3- | 4.5E-4 |
| Cadmium | 5.0E-4 |
| Chromium, Hexavalent | 7.8E-5 |
| Ethyl Benzene | 3.7E-2 |
| Lead | 3.2E-3 |
| Nickel | 1.5E-3 |
| PCBs | 2.6E-4 |
| Toluene | 1.5E-1 |

.(basis: Regulation 2-5)

12. Not later than 60 days from the startup of A-15 and/or A-16 and annually thereafter, the owner/operator shall conduct District approved source tests to determine initial compliance with the limits in parts 2 and 10. The owner/operator shall submit the source test results to the District staff no later than 60 days after the source test. (basis: Cumulative Increase, Regulation 2-5)

13. Not later than 60 days from the startup of A-15 and/or A-16 and every five years thereafter, the owner/operator shall conduct District approved source tests to determine compliance with the limits in part 11. In addition to the compounds identified in Part 11, this source test shall include, as a minimum, the full list of potential TACs for the Shredder, Thermal Oxidizers, and Acid Gas Scrubbers identified below. The owner/operator shall submit the source test results to the District staff no later than 60 days after the source test. (basis: Cumulative Increase,

375 Beale Street, Suite 600 San Francisco, CA 94105 · (415) 771.6000 · WWW.BAAQMD.GOV

EXHIBIT C
146



**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***
=============================================================

Regulation 2-5)
Potential TACs
Acetaldehyde
Arsenic
Benzene
Beryllium
Butadiene, 1,3-
Cadmium
Chromium, Hexavalent
Copper
Ethyl Benzene
Formaldehyde
Hexane
Isopropyl Alcohol
Lead
Manganese
Methanol
Methyl Chloroform
Methyl Ethyl Ketone
Methylene Chloride
Mercury
Naphthalene
Nickel
Polychlorinated Dibenzo-p-Dioxins (PCDDs), Polychlorinated
Dibenzo Furans (PCDFs), and Dioxin-like PCBs*
Perchloroethylene
PCBs
Propylene
PAHs (as benzo(a)pyrene)
Selenium
Styrene
Toluene
Vanadium
Xylenes (mixed)
o-Xylene
Cumene
Hexachloroethane (PCA)
Methyl Isobutyl Ketone (MiBK)
Trimethylpentane, 2,2,4-
Acrylonitrile
1,1 Dichloroethene
Carbon Disulfide
1,4-Dioxane
1,4-Dichlorobenzene

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
147

09/30/21                           A0208                      Page   17

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**                    **PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.      **PERMIT EXPIRATION DATE**

                                                                     NOV 1, 2022

Plant# 208

                    *** PERMIT CONDITIONS ***
=================================================================

Hydrogen Fluoride
Hydrogen Chloride

This is a large group of compounds with different toxic
equivalency factors (TEF) values as listed in Table 2-5-1.

14. The owner/operator shall comply with all applicable
    testing requirements as specified in Volume V of the
    District's Manual of Procedures. The owner/operator
    shall notify the District's Source Test Section, in
    writing, of the source test protocols and projected test
    dates at least 7 days prior to testing. (basis:
Cumulative Increase, Regulation 2-5)
·15. In order to demonstrate compliance with the above parts
    of this permit condition, the owner/operator shall
    maintain the following monthly records in a District
    approved log for at least 24 months from the date of
    entry. Log entries shall be retained on site and made
    available to District staff upon request:
    a.  Monthly quantity of Natural Gas Consumed in A-15 and
        A-16 combined.
    b.  Monthly quantities shall be totaled for each
        consecutive twelve month period.
    c.  All source test records required per Parts 12 and
        13. (basis: Cumulative Increase)


COND# 27410 applies to S# 6

    This permit condition shall become effective upon the
    installation and start-up of the Regenerative Thermal
    Oxidizers (A-15 and A-16) and the Packed Bed Scrubbers (A-17
    and A-18).

    S-6 Shredder and S-7 Infeed Conveyor; abated by A-6 Water
    Sprays, A-11 Venturi Scrubber, A-12 Venturi Scrubber, A-15
    Regenerative Thermal Oxidizer, A-16, Regenerative Thermal
    Oxidizer, A-17 Packed Bed Scrubber, and A-18 Packed Bed
    Scrubber. (Revision 1: A #14194, 6/16/06; Revision 2: A
    #16721, 4/9/09; Revision 3: A #27762, 11/10/16; Revision 4:
    A #27762, 11/20/2020, A #30009, enter issue date)

    1.  The owner/operator shall not exceed the scrap-in
        throughput limit of 720,000 tons in any calendar year at

375 Beale Street, Suite 600 San Francisco, CA 94105 · (415) 771.6000 · WWW.BAAQMD.GOV

EXHIBIT C
148

09/30/21                          A0208                       Page  18



**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

\*\*\* PERMIT CONDITIONS \*\*\*
================================================================

 this facility. (Basis: Regulations 2-1-301 - baseline
 2005 production level of 431,471 tons/year - and 2-5-302
 and Cumulative Increase for the incremental throughput)

2. The owner/operator shall enclose the shredder, S-6, and
 shall vent the captured shredder emissions to the
 Venturi Scrubbers, A-11 and A-12, followed by
 Regenerative Thermal Oxidizers, A-15 and A-16, followed
 by Packed Bed Scrubbers, A-17 and A-18, during all times
 that S-6 is operating. The owner/operator shall minimize
 fugitive emissions from the shredder enclosure during
 shredder operation by (a) designing the enclosure such
 that the total surface area of all openings in the
 enclosure does not exceed 5% of the total surface area
 of the enclosure walls, floor, and ceiling; (b) using
 curtain walls or strip curtains on the inlet feed
 conveyor opening; and c ensuring that the ventilation
 fan is operating within its design range. The
 owner/operator shall demonstrate that the ventilation
 fan is operating within its design range by maintaining
 the amperage greater than 480 amperes during shredder
 operation. The owner/operator shall operate each Venturi
 Scrubber in accordance with manufacture specifications.
 The owner/operator shall demonstrate this by maintaining
 a minimum water flow rate of 300 gallons per minute
 (gpm) to each venturi scrubber and an effective pressure
 differential operating range 15-22 inches of $H_2O$ across
 each venturi scrubber. (Basis: TBACT)

3. Total emissions from the S-6 Auto Shredder shall not
 exceed any of the emission limits listed below:
 a. Maximum Permitted Emission Rates:

| | P-17 and P-18 Pounds/Hour Per Stack | P-17 and P-18 Tons/Year Per Stack |
|---|---|---|
| PM10 (total filterable + condensable) | 3.11 | 3.30 |
| POC (calculated as methane) | 3.11 | 1.95 |

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
149

09/30/21                            A0208                          Page   19

---

**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**                        **PERMIT TO OPERATE**

---

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***
==============================================================

    b.   Total particulate emissions from stacks P-17 and P-18 shall not exceed a grain loading of 0.0047 grains/dscf in each stack as determined in accordance with Regulation 6-1-602.1.

    c.   Organic emissions from stacks P-17 and P-18 shall not exceed 10 ppmv (dry basis) of total carbon in each stack as determined in accordance with Regulation 8-2-601.

    d.   The owner/operator shall demonstrate compliance with the Part 3a stack emission limits as described in Part 4.

(Basis: Cumulative Increase, BACT, TBACT, and Regulations 2-5-302 and 8-2-301)

4.   Source Testing Requirements for Part 3:

    a.   The owner/operator shall conduct quarterly monitoring for the total carbon concentration in stacks P-17 and P-18, using authorized procedures and methods, to demonstrate compliance with Parts 3a, 3c and Regulation 8-2-301. This quarterly monitoring shall continue until an organic abatement system is operating and continued compliance with Regulation 8-2-301 has been demonstrated.

    b.   On an annual basis, unless noted otherwise, the owner/operator shall conduct a District approved source test at stacks P-17 and P-18, while the S-6 Auto Shredder is operating at or near the maximum operating rate, to demonstrate compliance with the stack emission limits in Parts 3a-c. The owner/operator shall record the shredder processing rate, the water application rates for the infeed conveyor and the shredder, the water flow rates and the pressure differential operating ranges at each venturi scrubber, and the ventilation fan amperage during the source test. The source test shall determine the hourly emission rate and the average emission factor (pounds of pollutant per ton of material processed by the shredder) for the following compounds:

-total carbon (calculated as methane and as defined in Regulation 8-2-202) shall be determined by Air District approved methods, such as EPA Methods 25A and 18,

-total POC (calculated as methane), where total POC =

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
150



BAY AREA AIR QUALITY
MANAGEMENT DISTRICT

**PERMIT**
TO OPERATE

This document does not permit the holder to violate any BAAQMD regulation or any other law.      **PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***
==============================================================

    total carbon (excluding methane only) - total NPOC.
Total NPOC (calculated as methane) shall be determined
by Air District approved methods, such as EPA Method 18
and EPA Method TO-15 or other similar GC/MS methods.
Total NPOC is the sum of all NPOCs (other than methane)
identified in Regulation 2-1-207, expressed as methane.
-total particulate emissions shall be determined using
EPA Method 5/202. All measured total particulate
emissions shall be assumed to be PM10 for comparison to
the limits in Part 3a.
-Full speciation of organic TACs shall be determined by Air
District approved methods, such as EPA Method TO-15 or other
similar GC/MS methods.
-PCBs shall be determined by Air District approved methods,
such as CARB Method 428. (This test shall be conducted
within 90 days of Permit to Operate issuance and once every
four years thereafter.)
-PAHs and naphthalene shall be determined by Air District
approved methods, such as CARB Method 429. (This test shall
be conducted within 90 days of Permit to Operate issuance
and once every four years thereafter.)
-Full set of metal TACs (including arsenic (As), beryllium
(Be), cadmium (Cd), chromium (Cr) which includes total
chromium and hexavalent chromium (Cr VI), copper (Cu), lead
(Pb), manganese (Mn), mercury (Hg), nickel (Ni), selenium
(Se), and zinc (Zn)), shall be determined using Air District
approved procedures for each compound, including CARB Method
425 for hexavalent chromium. (This test shall be conducted
within 90 days of Permit to Operate issuance and once every
four years thereafter.)
-Dioxin and furans shall be determined by Air District
approved methods, such as EPA Method 23/23A.
-Annual emissions for each stack shall be calculated based
on the most recent 12-month shredder feedstock throughput
rate and the pounds/ton emission factors determined by the
most recent source test for total POC and total particulate
emissions. Annual stack emission rates shall be compared to
the Part 3a limits.
The annual source test shall also determine the outlet grain
loading and the concentration of total carbon in stacks P-17
and P-18 to demonstrate compliance with Parts 3b and 3c
using Air District approved methods.
    c.   The owner/operator shall submit a source test
        protocol and notification of the scheduled source

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
151

 **BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**

NOV 1, 2022

Plant# 208

### *** PERMIT CONDITIONS ***
========================================================

        test date to the Air District's Source Test Section Manager and to the Permit Engineer at least 30 days prior to the scheduled test date.

   d.  The owner/operator shall notify the Source Test Section Manager of any changes to the scheduled test date as soon as possible.

   e.  The owner/operator shall submit a copy of the source test report to the Source Test Section Manager and the Permit Engineer within 60 days of the test date. (Basis: Cumulative Increase, TBACT and Regulations 2

   5-302 and 8-2-301)

5.   The owner/operator shall apply water sprays (A-6) at the shredder, S-6, and infeed conveyor, S-7, at sufficient rates to ensure that non-metallic material exiting the sources is moist to the touch at all times of operation. (Basis: Cumulative Increase, TBACT; and Regulation 2-5-302)

6.   The owner/operator shall operate the Recycling Center in such a manner that particulate emissions into the atmosphere from any operation/equipment for a period or periods aggregating more than three minutes in any hour shall not cause a visible emission which is as dark or darker than No. 0.5 on the Ringelmann Chart, or of such opacity as to obscure an observer's view to an equivalent or greater degree or result in fallout on adjacent property in such quantities as to cause public nuisance per District Regulation 1-301. (Basis: Regulations 1-301 and 6-1-301)

7.   The owner/operator shall use water spray to minimize fugitive dust emissions from material/scrap handling and storage to comply with Part 6. The owner/operator shall operate the facility at all times in accordance with its approved Emissions Minimization Plan (EMP). (Basis: Regulations 1-301, 6-1-301, and 6-4-301)

8.   The owner/operator shall not exceed a total of 26 ship calls and 63,875 truck calls per calendar year to haul in/out scrap/materials at the facility. (Basis: health risk assessment for CEQA review)

375 Beale Street, Suite 600 San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV

EXHIBIT C
152



**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**PERMIT TO OPERATE**

This document does not permit the holder to violate any BAAQMD regulation or any other law.

**PERMIT EXPIRATION DATE**
NOV 1, 2022

Plant# 208

*** PERMIT CONDITIONS ***

===============================================================

9.   In order to demonstrate compliance with Part 1 and 8,
     the owner/operator shall keep records of monthly and
     yearly throughput of shredder feedstock materials, ship
     calls and truck calls in a District approved log.
     Shredder feedstock shall be totaled for each consecutive
     rolling 12-month period. The log shall be maintained for
     a period of at least 5 years from the date of data entry
     and shall be made available to the District staff for
     inspection upon request. (Basis:
Regulations 2-1-301 and 2-5-302, Cumulative Increase, CEQA)


~~~~~~~~~~~~~~~~~~~~~~~~~~ END OF CONDITIONS ~~~~~~~~~~~~~~~~~~~~~~~~~~

```
Bay Area Air Quality          ** SOURCE EMISSIONS **           PLANT #  208
Management  District                                          Sep 30, 2021
------------------------------------------------------------------------------
                                              Annual Average lbs/day
S#     Source Description                 PART   ORG   NOx   SO2    CO
--     ------ -----------                 ----   ---   ---   ---    --

6      Shredder w/ water injection, electric, 225   20.8   880   -    -    -
7      Infeed Conveyor (electric)                    11    46    -    -    -
10     Cement Silo                                    -     -    -    -    -
11     Joint Products Plants w/ enclosure (2 Trom     -     -    -    -    -
12     Drum Magnet Line W/ enclosure                 .5     -    -    -    -
13     JPP from Wet Seperation Unit downstream        -     -    -    -    -
16     Emergency Standby Diesel Generator Set         -     -    -    -    -
                                              ----- ----- ----- ----- -----
       T O T A L S                            32.3  926
```

**  PLANT TOTALS FOR EACH EMITTED TOXIC POLLUTANT  **

```
       Pollutant Name                        Emissions lbs/day
       --------- ----                        --------- -------

       Benzene                                      3.59
       Ethylene dichloride                           .09
       Hexane                                      11.19
       Isopropyl alcohol                           1.10
       Methyl ethyl ketone (MEK)                   2.40
       Methyl alcohol                              2.55
       Perchloroethylene                            .60
       Styrene                                     1.29
       Toluene                                    31.12
       Xylene                                     40.98
       Ethylbenzene                                8.31
       Acrylonitrile                                .05
       Vinylidene chloride                          .12
       Methylene chloride                          2.57
       1,3-butadiene                                .11
       Polychlorinated biphenyl (PCB)               .08
       Propylene                                   3.11
       1,1,1-Trichloroethane                        .31
       Copper (all) pollutant                       .05
       Lead (all) pollutant                         .02
       Manganese                                    .03
       Nickel pollutant                             .01
```

EXHIBIT C
154

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | |
|---|---|
| VENABLE LLP<br>William M. Sloan (SBN 203583)<br>Tyler J. Welti (SBN 231697) | **To keep other people from seeing what you entered on your form, please press the Clear This Form button at the end of the form when finished.** |

TELEPHONE NO: 415.653.3750    FAX NO: 415.653.3755
ATTORNEY FOR *(Name):* Athletics Investment Group, LLC

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Falllon Street
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: René C. Davidson Courthouse

**ELECTRONICALLY FILED**
Superior Court of California
County of Alameda
05/06/2022
Chad Finke, Executive Officer / Clerk of the Court
By: **X. Bowie** Deputy

CASE NAME:
Athletics Investment Group, LLC v. BAAQMD, et al.

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|---|
| ☑ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter  ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | **22CV010930** |
| | | | JUDGE: |
| | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation**<br>**(Cal. Rules of Court, rules 3.400–3.403)** |
|---|---|---|
| ☐ Auto (22) | ☐ Breach of contract/warranty (06) | ☐ Antitrust/Trade regulation (03) |
| ☐ Uninsured motorist (46) | ☐ Rule 3.740 collections (09) | ☐ Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property** | ☐ Other collections (09) | ☐ Mass tort (40) |
| **Damage/Wrongful Death) Tort** | ☐ Insurance coverage (18) | ☐ Securities litigation (28) |
| ☐ Asbestos (04) | ☐ Other contract (37) | ☐ Environmental/Toxic tort (30) |
| ☐ Product liability (24) | **Real Property** | ☐ Insurance coverage claims arising from the |
| ☐ Medical malpractice (45) | ☐ Eminent domain/Inverse | above listed provisionally complex case |
| ☐ Other PI/PD/WD (23) | condemnation (14) | types (41) |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | **Enforcement of Judgment** |
| ☐ Business tort/unfair business practice (07) | ☐ Other real property (26) | ☐ Enforcement of judgment (20) |
| ☐ Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| ☐ Defamation (13) | ☐ Commercial (31) | ☐ RICO (27) |
| ☐ Fraud (16) | ☐ Residential (32) | ☐ Other complaint *(not specified above)* (42) |
| ☐ Intellectual property (19) | ☐ Drugs (38) | **Miscellaneous Civil Petition** |
| ☐ Professional negligence (25) | **Judicial Review** | ☐ Partnership and corporate governance (21) |
| ☐ Other non-PI/PD/WD tort (35) | ☐ Asset forfeiture (05) | ☐ Other petition *(not specified above)* (43) |
| **Employment** | ☐ Petition re: arbitration award (11) | |
| ☐ Wrongful termination (36) | ☑ Writ of mandate (02) | |
| ☐ Other employment (15) | ☐ Other judicial review (39) | |

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties    d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel    e. ☐ Coordination with related actions pending in one or more courts
       issues that will be time-consuming to resolve        in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence    f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☐ monetary  b. ☑ nonmonetary; declaratory or injunctive relief  c. ☐ punitive
4. Number of causes of action *(specify):* Two
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 05/02/2022
William Sloan
_____        ► *(signature)* William M. Sloan
(TYPE OR PRINT NAME)        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov* |
|---|---|---|

American LegalNet, Inc.
www.FormsWorkflow.com

EXHIBIT C
155

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
    or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-
    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

| Print This Form | For your protection and privacy, please press the Clear This Form button after you have printed the form. | Clear This Form |

F. ADDENDUM TO CIVIL CASE COVER SHEET

*Unified Rules of the Superi... rt of California, County of Alameda*

| Short Title: | Case Number: |
|---|---|
| Athletics Investment Group, LLC v. Bay Area Air Quality Management District | |

## CIVIL CASE COVER SHEET ADDENDUM

### THIS FORM IS REQUIRED IN ALL NEW UNLIMITED CIVIL CASE FILINGS IN THE
### SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

[X] Oakland, Rene C. Davidson Alameda County Courthouse  (446)

[ ] Hayward Hall of Justice  (447)

[ ] Pleasanton, Gale-Schenone Hall of Justice  (448)

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) | | |
|---|---|---|---|---|
| Auto Tort | Auto tort (22) | [ ] | 34 | Auto tort (G) |
| | | Is this an uninsured motorist case?  [ ] yes  [ ] no | | |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] | 75 | Asbestos (D) |
| | Product liability (24) | [ ] | 89 | Product liability (not asbestos or toxic tort/environmental) (G) |
| | Medical malpractice (45) | [ ] | 97 | Medical malpractice (G) |
| | Other PI/PD/WD tort (23) | [ ] | 33 | Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ ] | 79 | Bus tort / unfair bus. practice (G) |
| | Civil rights (08) | [ ] | 80 | Civil rights (G) |
| | Defamation (13) | [ ] | 84 | Defamation (G) |
| | Fraud (16) | [ ] | 24 | Fraud (G) |
| | Intellectual property (19) | [ ] | 87 | Intellectual property (G) |
| | Professional negligence (25) | [ ] | 59 | Professional negligence - non-medical (G) |
| | Other non-PI/PD/WD tort (35) | [ ] | 03 | Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [ ] | 38 | Wrongful termination (G) |
| | Other employment (15) | [ ] | 85 | Other employment (G) |
| | | [ ] | 53 | Labor comm award confirmation |
| | | [ ] | 54 | Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [ ] | 04 | Breach contract / Wrnty (G) |
| | Collections (09) | [ ] | 81 | Collections (G) |
| | Insurance coverage (18) | [ ] | 86 | Ins. coverage - non-complex (G) |
| | Other contract (37) | [ ] | 98 | Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] | 18 | Eminent domain / Inv Cdm (G) |
| | Wrongful eviction (33) | [ ] | 17 | Wrongful eviction (G) |
| | Other real property (26) | [ ] | 36 | Other real property (G) |
| Unlawful Detainer | Commercial (31) | [ ] | 94 | Unlawful Detainer - commercial   **Is the deft. in possession** |
| | Residential (32) | [ ] | 47 | Unlawful Detainer - residential   **of the property?** |
| | Drugs (38) | [ ] | 21 | Unlawful detainer - drugs   **[ ] Yes   [ ] No** |
| Judicial Review | Asset forfeiture (05) | [ ] | 41 | Asset forfeiture |
| | Petition re: arbitration award (11) | [ ] | 62 | Pet. re: arbitration award |
| | Writ of Mandate (02) | [X] | 49 | Writ of mandate |
| | | Is this a CEQA action (Publ.Res.Code section 21000 et seq)  [ ] Yes  [X] No | | |
| | Other judicial review (39) | [ ] | 64 | Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [ ] | 77 | Antitrust / Trade regulation |
| | Construction defect (10) | [ ] | 82 | Construction defect |
| | Claims involving mass tort (40) | [ ] | 78 | Claims involving mass tort |
| | Securities litigation (28) | [ ] | 91 | Securities litigation |
| | Toxic tort / Environmental (30) | [ ] | 93 | Toxic tort / Environmental |
| | Ins covrg from cmplx case type (41) | [ ] | 95 | Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] | 19 | Enforcement of judgment |
| | | [ ] | 08 | Confession of judgment |
| Misc Complaint | RICO (27) | [ ] | 90 | RICO (G) |
| | Partnership / Corp. governance (21) | [ ] | 88 | Partnership / Corp. governance (G) |
| | Other complaint (42) | [ ] | 68 | All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] | 06 | Change of name |
| | | [ ] | 69 | Other petition |

202-19 (5/1/00)

A-13

EXHIBIT C
157

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**
**Branch Name:** Rene C. Davidson Courthouse
**Mailing Address:** 1225 Fallon Street
**City, State and Zip Code:** Oakland CA 94612

| | |
|---|---|
| **SHORT TITLE:** THE ATHLETICS INVESTMENT GROUP, LLC, vs THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT, AND, et al. | **CASE NUMBER:** 22CV010930 |
| **NOTICE OF CONFIRMATION OF ELECTRONIC FILING** | |

The Electronic Filing described by the below summary data was reviewed and accepted by the Superior Court of California, County of ALAMEDA. In order to process the filing, the fee shown was assessed.

**Electronic Filing Summary Data**

Electronically Submitted By:  jti efsp
Reference Number: EF-e39f55f5a49f
Submission Number: 22AA00058510
Court Received Date: 05/06/2022
Court Received Time: 1:27 pm
Case Number: 22CV010930
Case Title: THE ATHLETICS INVESTMENT GROUP, LLC, vs THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT, AND, et al.
Location: Rene C. Davidson Courthouse
Case Type: Civil Unlimited
Case Category: Writ - Administrative Mandamus
Jurisdictional Amount: Over $25,000
Notice Generated Date: 05/06/2022
Notice Generated Time: 1:43 pm

| **Documents Electronically Filed/Received** | **Status** |
|---|---|
| Petition for Writ of Mandate | Accepted |
| Civil Case Cover Sheet | Accepted |
| Summons | Accepted |

**Comments**
Submitter's Comments: Can our document to be stamped with the original date of submission (05/02/2022) as

the court did take some time to look over our documents before we received a notice of rejection.   Also (SCHNITZER STEEL INDUSTRIES, INC.,)  is Real Party in Interest,

Clerk's Comments:

**Electronic Filing Service Provider Information**
Service Provider: jti efsp
Contact: jti efsp
Phone:

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
05/16/2022 at 03:14:36 PM
By: Shabra Iyamu, Deputy Clerk

VENABLE LLP
William M. Sloan (SBN 203583)
wmsloan@venable.com
Tyler G. Welti (SBN 231697)
tgwelti@venable.com
101 California Street, Suite 3800
San Francisco, CA 94111
Telephone: 415 653 3750
Facsimile: 415 653 3755

KEKER, VAN NEST & PETERS LLP
R. James Slaughter (SBN 192813)
rslaughter@keker.com
Eric H. MacMichael (SBN 231697)
emacmichael@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Petitioner
*The Athletics Investment Group, LLC*

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

THE ATHLETICS INVESTMENT GROUP, LLC,

Petitioner,

v.

THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT,

Respondent,

SCHNITZER STEEL INDUSTRIES, INC.,

Real Party in Interest.

Case No. 22CV010930

MOTION FOR PEREMPTORY CHALLENGE UNDER CODE OF CIVIL PROCEDURE SECTION 170.6; DECLARATION OF WILLIAM M. SLOAN IN SUPPORT THEREOF

**(Code Civ. Proc. § 170.6)**

ASSIGNED FOR ALL PURPOSES
Hon. Frank Roesch
Department 17

Action Filed: May 6, 2022

1    Pursuant to Code of Civil Procedure section 170.6, Petitioner the Athletics Investment

2 Group LLC moves this Court for a peremptory disqualification of the Honorable Frank Roesch,

3 Alameda County Superior Court Judge, who has been assigned to the above-captioned case for all

4 purposes. This motion is based on the Declaration of William M. Sloan, attached as Exhibit A. In

5 accordance with C.C.P. section 170.6, Athletics Investment Group LLC requests the Honorable

6 Frank Roesch be disqualified from hearings or being assigned to any matters related to this

7 action, and that the matter be re-assigned to another judge for all purposes. This is the first and

8 only such motion made by Athletics Investment Group LLC.

9

10    Dated: May 16, 2022                                    VENABLE LLP

11

12                                              By: _____
                                                      WILLIAM M. SLOAN
13                                                    TYLER G. WELTI

14                                                    KEKER, VAN NEST & PETERS LLP

15

16                                              By: _____
                                                      R. JAMES SLAUGHTER
17                                                    ERIC H. MACMICHAEL

18                                                    *Attorneys for Petitioner*
19                                                    THE ATHLETICS INVESTMENT
                                                      GROUP, LLC

20

21

22

23

24

25

26

27

28

                                            2

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

1

## DECLARATION OF WILLIAM M. SLOAN

2   I, William M. Sloan, declare:

3   1.   I am a member of the State Bar of California. I am a Partner at the firm of Venable

4   LLP, attorney of record for Petitioner Athletics Investment Group LLC ("Petitioner") in this

5   action. The matters set forth in this declaration are within my personal knowledge and if called

6   upon to testify as to these matters, I could and would so testify.

7   2.   I believe that Judge Roesch is prejudiced against the Petitioner and/or the interests

8   of Petitioner and/or counsel for the Petitioner to such an extent that Petitioner cannot have a fair

9   and impartial hearing and/or trial before Judge Roesch.

10   3.   On May 9, 2022, I reviewed the Register of Actions for this case on the Alameda

11   County Superior Court website, which indicated that on May 6, 2022, this matter was assigned to

12   Judge Roesch in Department 17. From that entry on the Register of Actions and past practice, and

13   given the nature of this matter as a writ proceeding, I interpreted that entry as assigning this

14   matter for all purposes, leading to the submission of this peremptory challenge within 15 days in

15   accordance with Code of Civil Procedure 170.6(a)(2). No trial date has been set.

16   I declare under penalty of perjury, under the laws of the State of California, that the

17   foregoing is true and correct.

18   Executed on this day of May 16, 2022, at San Francisco, California

19

20   By: William M. Sloan
     William M. Sloan

21

22

23

24

25

26

27

28

3

CASE NO. 22CV010930
PEREMPTORY CHALLENGE UNDER C.C.P. 170.6



## Service of Process Transmittal Summary

**TO:**  Rhonda Sandstrom, Legal Assistant
Schnitzer Steel Industries
299 SW CLAY ST STE 350
PORTLAND, OR 97201-5819

**RE:**  **Process Served in California**

**FOR:**  Schnitzer Steel Industries, Inc.  (Domestic State: OR)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | THE ATHLETICS INVESTMENT GROUP, LLC vs. THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT |
| **DOCUMENT(S) SERVED:** | MOTION, DECLARATION |
| **COURT/AGENCY:** | Alameda County - Superior Court, CA<br>Case # 22CV010930 |
| **NATURE OF ACTION:** | Environmental Litigation - MOTION FOR PEREMPTORY CHALLENGE UNDER CODE OF CIVIL PROCEDURE SECTION 170.6 |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 05/18/2022 at 01:48 |
| **JURISDICTION SERVED:** | California |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S)/SENDER(S):** | William M. Sloan<br>Venable LLP<br>101 California St, Suite 3800<br>San Francisco, CA 94111<br>415-653-3570 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 05/19/2022, Expected Purge Date: 05/24/2022<br><br>Image SOP<br><br>Email Notification,  Rhonda Sandstrom  rsandstrom@schn.com<br><br>Email Notification,  Peter Saba  psaba@schn.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>330 N BRAND BLVD<br>STE 700<br>GLENDALE, CA 91203<br>866-331-2303<br>CentralTeam1@wolterskluwer.com |



**CT Corporation**
**Service of Process Notification**
05/18/2022
CT Log Number 541604262

**DOCKET HISTORY:**

| DOCUMENT(S) SERVED | DATE/METHOD OF SERVICE | TO | LOG NUMBER |
|---|---|---|---|
| Summons, Verified Petition, Attachment(s), Cover Sheet, Addendum, Notice | By Process Server on 05/09/2022 at 09:36 | Rhonda Sandstrom, Legal Assistant<br>Schnitzer Steel Industries | 541540235 |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

EXHIBIT D
164



# PROCESS SERVER DELIVERY DETAILS

**Date:**                          Wed, May 18, 2022
**Server Name:**                   Douglas Forrest

| Entity Served | SCHNITZER STEEL INDUSTRIES, INC. |
|---|---|
| Case Number | 22cv010930 |
| Jurisdiction | CA |

| Inserts | | |
|---|---|---|
|  |  |  |



CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Venable LLP<br>William M. Sloan (SBN 203583)<br>Tyler G. Welti (SBN 231697)<br><br>TELEPHONE NO.: 415.653.3750   FAX NO. *(Optional):* 415.653.3755<br>E-MAIL ADDRESS *(Optional):* wmsloan@venable.com<br>ATTORNEY FOR *(Name):* Athletics Investment Group, LLC | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Alameda<br>05/17/2022 at 04:24:57 PM<br>By: Gina Fu, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Rene C. Davidson Courthouse

| | |
|---|---|
| PLAINTIFF/PETITIONER: The Athletics Investment Group LLC | CASE NUMBER:<br>22CV010930 |
| DEFENDANT/RESPONDENT: The Bay Area Air Quality Management District et al. | JUDICIAL OFFICER:<br>Hon. Frank Roesch |
| **NOTICE OF RELATED CASE** | DEPT.:<br>17 |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1.  a.  Title: The Athletics Investment Group LLC v. California Department of Toxic Substances Control
    b.  Case number: RG20069917
    c.  Court: [✓] same as above
            [ ] other state or federal court *(name and address):*
    d.  Department: 302
    e.  Case type: [ ] limited civil [✓] unlimited civil [ ] probate [ ] family law [ ] other *(specify):*
    f.  Filing date: August 5, 2020
    g.  Has this case been designated or determined as "complex?" [ ] Yes [✓] No
    h.  Relationship of this case to the case referenced above *(check all that apply):*
            [✓] involves the same parties and is based on the same or similar claims.
            [✓] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
            [✓] involves claims against, title to, possession of, or damages to the same property.
            [✓] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
                [✓] Additional explanation is attached in attachment 1h
    i.  Status of case:
            [✓] pending
            [ ] dismissed [ ] with [ ] without prejudice
            [ ] disposed of by judgment

2.  a.  Title:
    b.  Case number:
    c.  Court: [ ] same as above
            [ ] other state or federal court *(name and address):*
    d.  Department:

Page 1 of 4

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300<br>www.courtinfo.ca.gov |

CM-015

| PLAINTIFF/PETITIONER: The Athletics Investment Group LLC | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: The Bay Area Air Quality Management District et al. | 22CV010930 |

2. *(continued)*

   e. Case type: ☐ limited civil  ☐ unlimited civil  ☐ probate  ☐ family law  ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?"  ☐ Yes  ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

   ☐ involves the same parties and is based on the same or similar claims.

   ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

   ☐ involves claims against, title to, possession of, or damages to the same property.

   ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

   ☐ Additional explanation is attached in attachment 2h

   i. Status of case:

   ☐ pending

   ☐ dismissed  ☐ with  ☐ without prejudice

   ☐ disposed of by judgment

3. a. Title:

   b. Case number:

   c. Court: ☐ same as above

   ☐ other state or federal court *(name and address):*

   d. Department:

   e. Case type: ☐ limited civil  ☐ unlimited civil  ☐ probate  ☐ family law  ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?"  ☐ Yes  ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

   ☐ involves the same parties and is based on the same or similar claims.

   ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

   ☐ involves claims against, title to, possession of, or damages to the same property.

   ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

   ☐ Additional explanation is attached in attachment 3h

   i. Status of case:

   ☐ pending

   ☐ dismissed  ☐ with  ☐ without prejudice

   ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: 05/17/2022

William M. Sloan

(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ _William M Sloan_ (SIGNATURE OF PARTY OR ATTORNEY)

EXHIBIT E

167

CM-015

| PLAINTIFF/PETITIONER:   The Athletics Investment Group LLC | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: The Bay Area Air Quality Management District et al. | 22CV010930 |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*
   a. ☐ deposited the sealed envelope with the United States Postal Service.
   b. ☐ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:
   a. on *(date):*
   b. from *(city and state):*

4. The envelope was addressed and mailed as follows:
   a. Name of person served:

      Street address:
      City:
      State and zip code:

   b. Name of person served:

      Street address:
      City:
      State and zip code:

   c. Name of person served:

      Street address:
      City:
      State and zip code:

   d. Name of person served:

      Street address:
      City:
      State and zip code:

☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____          ▶          _____
(TYPE OR PRINT NAME OF DECLARANT)                                    (SIGNATURE OF DECLARANT)

CM-015 [Rev. July 1, 2007]                    **NOTICE OF RELATED CASE**                    Page 3 of 4

EXHIBIT E
168

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| The Athletics Invesment Group, LLC v. the BAAQMD | 22CV010930 |

**ATTACHMENT** *(Number):* 1h

*(This Attachment may be used with any Judicial Council form.)*

Petitioner seeks to relate this case (the "BAAQMD case") to Athletics Investment Group LLC v. the Department of Toxic Substances Control (the "DTSC case").

The DTSC case is a petition for a writ of mandate requiring the California Department of Toxic Substances Control ("DTSC") to regulate the metal shredding facility in West Oakland owned by Schnitzer Steel Industries, Inc. ("Schnitzer Steel") pursuant to the requirements of the Hazardous Waste Control Law. On April 16, 2021, the Court issued a judgment and peremptory writ of mandate commanding DTSC to: 1) Rescind Schnitzer Steel's conditional nonhazardous waste classification (f letter); and 2) Regulate Schnitzer Steel's metal shredder waste pursuant to the requirements of the HWCL. Schnitzer Steel filed a notice of appeal of the writ with the First Appellate District, which is pending. This Court continues to exercise jurisdiction over this case, including by entering an Order Enforcing the Writ on April 18, 2022.

The DTSC case and BAAQMD case are related cases pursuant to Rule 3.300(a) because they: 1) involve the same parties and are based on the same or similar claims; 2) arise from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact; 3) involve claims against, title to, possession of, or damages to the same property; and 4) are likely for other reasons to require substantial duplication of judicial resources if heard by different judges. Specifically:

1) The Athletics Investment Group, LLC is the Petitioner in both cases. Similarly, Schnitzer Steel is named as a real party in interest in both cases.

2) Both cases arise from Schnitzer Steel's metal shredding operations in West Oakland, emissions of hazardous material, and claims that the relevant government agency has failed to fulfil its mandatory duty to regulate Schnitzer Steel's operations. Schnitzer Steel's emission of Light Fibrous Material     an amalgam of hazardous substances dispersed by wind from Schnitzer's facility     is at issue in both cases, for instance.

3) Both cases relate to Schnitzer Steel's West Oakland metal shredding facility, and involve claims that Schnitzer Steel's activities at that property have resulted in the emission of hazardous materials.

4) The cases will require substantial duplication of judicial resources if heard by different judges due to the highly technical and complex factual background. The Judge in the DTSC case is familiar with this background, having reviewed all declarations, memoranda, and the numerous documentary exhibits filed in the DTSC case. Much of this material will be relevant to the BAAQMD case, such that it would unnecessarily duplicate judicial resources to require a new judge to review the same material.

---

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page __4__ of __4__

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT
to Judicial Council Form**

*www.courtinfo.ca.gov*

EXHIBIT E



## Service of Process Transmittal Summary

**TO:**  Rhonda Sandstrom, Legal Assistant
Schnitzer Steel Industries
299 SW CLAY ST STE 350
PORTLAND, OR 97201-5819

**RE:**  **Process Served in California**

**FOR:**  Schnitzer Steel Industries, Inc.  (Domestic State: OR)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | THE ATHLETICS INVESTMENT GROUP, LLC vs. THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT |
| **DOCUMENT(S) SERVED:** | Notice, Proof, Attachment(s) |
| **COURT/AGENCY:** | Alameda County - Superior Court, CA<br>Case # 22CV010930 |
| **NATURE OF ACTION:** | Environmental Litigation - Notice of related case. Petitioner seeks to relate this case (the "BAAQMD case") to Athletics Investment Group LLC v. the Department of Toxic Substances Control (the "DTSC case"). |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 05/19/2022 at 01:34 |
| **JURISDICTION SERVED:** | California |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S)/SENDER(S):** | William M. Sloan<br>Venable LLP<br>101 California St, Suite 3800<br>San Francisco, CA 94111<br>415-653-3570 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 05/19/2022, Expected Purge Date: 05/24/2022<br><br>Image SOP<br><br>Email Notification,  Rhonda Sandstrom  rsandstrom@schn.com<br><br>Email Notification,  Peter Saba  psaba@schn.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>330 N BRAND BLVD<br>STE 700<br>GLENDALE, CA 91203<br>866-331-2303<br>CentralTeam1@wolterskluwer.com |

Page 1 of  2



**CT Corporation**
**Service of Process Notification**
05/19/2022
CT Log Number 541605814

**DOCKET HISTORY:**

| DOCUMENT(S) SERVED | DATE/METHOD OF SERVICE | TO | LOG NUMBER |
|---|---|---|---|
| MOTION, DECLARATION | By Process Server on 05/18/2022 at 01:48 | Rhonda Sandstrom, Legal Assistant Schnitzer Steel Industries | 541604262 |
| Summons, Verified Petition, Attachment(s), Cover Sheet, Addendum, Notice | By Process Server on 05/09/2022 at 09:36 | Rhonda Sandstrom, Legal Assistant Schnitzer Steel Industries | 541540235 |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

Page 2 of  2



# PROCESS SERVER DELIVERY DETAILS

**Date:** Thu, May 19, 2022
**Server Name:** Douglas Forrest

| Entity Served | SCHNITZER STEEL INDUSTRIES, INC. |
|---|---|
| Case Number | 22cv010930 |
| Jurisdiction | CA |

| Inserts |
|---|
|  |



# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
Rene C. Davidson Courthouse

| | |
|---|---|
| THE ATHLETICS INVESTMENT GROUP, LLC,<br>  Plaintiff/Petitioner(s)<br>vs.<br>THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT, and et al<br>  Defendant/Respondent(s) | No.     22CV010930<br><br>Date:    05/18/2022<br>Time:    3:46 PM<br>Dept:    23<br>Judge:   Brad Seligman<br><br><br>ORDER re: Court Order |

The Court reviews the Peremptory Challenge filed by THE ATHLETICS INVESTMENT GROUP, LLC, (Petitioner) on 05/16/2022 pursuant to Code of Civil Procedure section 170.6 and finds that it was timely filed, in proper format, and is accepted.

Good cause appearing and on order of the Court, the above matter is reassigned to Judge Michael Markman in Department 14 at the Rene C. Davidson Courthouse for all further proceedings.

The Court orders counsel to obtain a copy of this order from the eCourt portal.

Dated: 05/18/2022

Brad Seligman / Judge

EXHIBIT F
173

<table>
<tr><td colspan="2">

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ALAMEDA

</td><td>Reserved for Clerk's File Stamp</td></tr>
</table>

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF ALAMEDA** | Reserved for Clerk's File Stamp |
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br><br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>05/18/2022<br>Chad Finke Executive Officer / Clerk of the Court<br>By: _____ Deputy<br>J. Castaneda |
| PLAINTIFF(S):<br>THE ATHLETICS INVESTMENT GROUP, LLC, | |
| THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT, and et al | |
| **NOTICE OF CASE REASSIGNMENT** | CASE NUMBER:<br>22CV010930 |

**EFFECTIVE**   05/18/2022

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to Rule 3.734 of the California Rules of Court and Title 3 Chapter 2 of the Local Rules of the Superior Court of California, County of Alameda, this action is hereby assigned by the Presiding Judge for all purposes to:

| | |
|---|---|
| ASSIGNED JUDGE: | Michael Markman |
| DEPARTMENT: | 14 |
| LOCATION: | Rene C. Davidson Courthouse |
| | Administration Building, 1221 Oak Street, Oakland, CA 94612 |
| PHONE NUMBER: | (510) 267-6930 |
| FAX NUMBER: | |
| EMAIL ADDRESS: | Dept14@alameda.courts.ca.gov |

Under direct calendaring, this case is assigned to a single judge for all purposes including trial.

Please note: In this case, any challenge pursuant to Code of Civil Procedures section 170.6 must be exercised within the time period by law. (See Code of Civ. Proc. §§ 170.6, subd. (a.)(2) and 101.3)

NOTICE OF NONAVAILABILITY OF COURT REPORTERS: Effective June 4, 2012, the court will not provide a court reporter for civil law and motion hearings, any other hearing or trial in civil departments, or any afternoon hearing in Department 201 (probate). Parties may arrange and pay for the attendance of a certified shorthand reporter. In limited jurisdiction cases, parties may request electronic recording. Amended Local Rule 3.95 states: "Except as otherwise required by law, in general civil case and probate departments, the services of an official court reporter are not normally available. For civil trials, each party must serve and file a statement before the trial date indicating whether the party requests the presence of an official court reporter."

GENERAL PROCEDURES

Following assignment of a civil case to a specific department, all pleadings, papers, forms, documents and writings can be submitted for filing at either Civil Clerk's Office, located at the Rene C. Davidson Courthouse, Room 109, 1225 Fallon Street, Oakland, California, 94612, and the Hayward Hall of Justice, 24405 Amador Street, Hayward, California, 94544 and through Civil e-filing. Information regarding Civil e-filing can be found on the courts website. All documents, with the exception of the original summons and the original civil complaint, shall have clearly typed on the face page of each document, under the case number, the following:

### NOTICE OF CASE REASSIGNMENT

**EXHIBIT G**

174

**ASSIGNED FOR ALL PURPOSES TO**
JUDGE Michael Markman
DEPARTMENT 14

All parties are expected to know and comply with the Local Rules of this Court, which are available on the court's website at http://www.alameda.courts.ca.gov/Pages.aspx/Local-Rules(1) and with the California Rules of Court, which are available at www.courtinfo.ca.gov.

Parties must meet and confer to discuss the effective use of mediation or other alternative dispute processed (ADR) prior to the Initial Case Management Conference.  The court encourages parties to file a "Stipulation to Attend ADR and Delay Initial Case Management Conference for 90 Days."   The court's website contains this form and other ADR information.  If the parties do not stipulate to attend ADR, the parties must be prepared to discuss referral to ADR at the Initial Case Management Conference.

COURT RESERVATIONS

The use of the Court Reservation System (CRS) is now mandated in many civil courtrooms within the Alameda County Superior Court. Instead of calling or emailing the courtroom to make a reservation, parties with a case assigned to a courtroom using CRS are directed to utilize CRS to make and manage their own reservations, within parameters set by the courtrooms. CRS is available 24 hours a day, seven days a week and reservations can be made from a computer or smart phone. Please note, you are prohibited from reserving more than one hearing date for the same motion.

Prior to scheduling any motion on CRS, including any Applications for Orders for Appearance and Examination, or continuing any motion, please review the online information (if any) for the courtroom in which you are reserving. There may be specific and important conditions associated with certain motions and proceedings. Information is available on the court's eCourt Public Portal at www.eportal.alameda.courts.ca.gov.

Chad Finke, Executive Officer / Clerk of the Court

By

J. Castaneda, Deputy Clerk

**NOTICE OF CASE REASSIGNMENT**
EXHIBIT G
175

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ALAMEDA

Reserved for Clerk's File Stamp

COURTHOUSE ADDRESS:
Rene C. Davidson Courthouse
1225 Fallon Street, Oakland, CA 94612

**FILED**
Superior Court of California
County of Alameda

05/18/2022

Chad Finke, Executive Officer / Clerk of the Court
By: _____ Deputy
J. Castaneda

PLAINTIFF/PETITIONER:
THE ATHLETICS INVESTMENT GROUP, LLC,

DEFENDANT/RESPONDENT:
THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT, and et al

## CERTIFICATE OF MAILING

CASE NUMBER:
22CV010930

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Reassignment upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Oakland, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

William Milligan Sloan
Venable LLP
101 California St
Ste 3800
San Francisco, CA 94111

Chad Finke, Executive Officer / Clerk of the Court

Dated: 05/18/2022                    By:

T Castaneda, Deputy Clerk

EXHIBIT G
**CERTIFICATE OF MAILING**
176

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ALAMEDA

Reserved for Clerk's File Stamp

COURTHOUSE ADDRESS:
Rene C. Davidson Courthouse
1225 Fallon Street, Oakland, CA 94612

PLAINTIFF/PETITIONER:
THE ATHLETICS INVESTMENT GROUP, LLC,

DEFENDANT/RESPONDENT:
THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT, and et al

**FILED**
Superior Court of California
County of Alameda

05/19/2022

Chad Finke  Executive Officer / Clerk of the Court

By: _____ Deputy
    J. Castaneda

## CERTIFICATE OF MAILING

CASE NUMBER:
22CV010930

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the  upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Oakland, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

William Milligan Sloan
Venable LLP
101 California St
Ste 3800
San Francisco, CA 94111

Chad Finke, Executive Officer / Clerk of the Court

Dated: 05/19/2022                    By:

J. Castaneda, Deputy Clerk

PILLSBURY WINTHROP SHAW PITTMAN LLP
RONALD E. VAN BUSKIRK (SBN 64683)
Email: ronald.vanbuskirk@pillsburylaw.com
MARGARET ROSEGAY (SBN 96963)
Email: margaret.rosegay@pillsburylaw.com
STACEY C. WRIGHT (SBN 233414)
Email: stacey.wright@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone: (415) 983-1000
Facsimile: (415) 983-1200

Attorneys for *Real Party in Interest*
*Schnitzer Steel Industries, Inc.*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF ALAMEDA**

| | |
|---|---|
| THE ATHLETICS INVESTMENT GROUP, LLC, <br><br> Petitioner, <br><br> v. <br><br> THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT, and ALEXANDER CROCKETT, in his official capacity as Interim Executive Officer of the BAAQMD, <br><br> Respondents, <br><br> ——————————————— <br><br> SCHNITZER STEEL INDUSTRIES, INC., <br><br> Real Party in Interest. | Case No. 22CV010930 <br><br> *Assigned for All Purposes to* <br> *Hon. Michael Markman, Dept. 14* <br><br> **NOTICE OF CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL'S AND MEREDITH WILLIAMS, IN HER OFFICIAL CAPACITY AS DIRECTOR'S OPPOSITION TO PETITIONER'S NOTICE OF RELATED CASE** <br><br> Trial Date:  None Set <br> Action Filed: May 6, 2022 |

1     **TO THE COURT, ALL PARTIES AND ATTORNEYS OF RECORD,** please take

2 notice that Real Party in Interest, Schnitzer Steel Industries, Inc. ("Schnitzer"), submits the attached

3 Opposition of California Department of Toxic Substances Control and Meredith Williams, in her

4 official capacity as Director (collectively, "DTSC"), to the Notice of Related Case filed by Petitioner

5 Athletics Investment Group, LLC, seeking to relate the instant case to the unrelated matter of *The*

6 *Athletics Investment Group, LLC v. California Department of Toxic Substances Control, et al.*, Case

7 No. RG2006991.

8

9 Dated:  May 24, 2022

10                                PILLSBURY WINTHROP SHAW PITTMAN LLP

                                  RONALD E. VAN BUSKIRK

11                                MARGARET ROSEGAY

                               STACEY C. WRIGHT

12                                Four Embarcadero Center, 22nd Floor

                               San Francisco, CA 94111-5998

13

14                                By: _____

15                                     Attorneys for Real Party in Interest SCHNITZER

16                                STEEL INDUSTRIES, INC.

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF OPPOSITION TO NOTICE OF RELATED CASE

1   ROB BONTA
    Attorney General of California
2   DENNIS L. BECK, JR., SBN 179492
    Supervising Deputy Attorney General
3   ELIZABETH B. RUMSEY, SBN 257908
    Deputy Attorney General
4     1300 I Street, Suite 125
      Sacramento, CA  95814
5     Telephone:  (916) 210-7801
      Fax:  (916) 322-2368
6     E-mail:  Dennis.Beck@doj.ca.gov
    *Attorneys for Respondents California Department of*   *Exempt from filing fee under*
7   *Toxic Substances Control and Meredith Williams, in*   *Government Code section 6103*
    *her official capacity as Director*

8

9                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                            COUNTY OF ALAMEDA

11

12
    THE ATHLETICS INVESTMENT GROUP        Case No. RG20069917
13  LLC,
                                          **RESPONDENTS' OPPOSITION TO**
14                        Petitioner,     **PETITIONER'S NOTICE OF RELATED**
                                          **CASE**
15         v.
                                          Dept.:   302
16                                        Judge:  The Hon. Paul D. Herbert
    **CALIFORNIA DEPARTMENT OF TOXIC**
17  **SUBSTANCES CONTROL, a public agency**
    **of the State of California; MEREDITH**  Action Filed:  August 5, 2020
18  **WILLIAMS, in her official capacity as the**
    **Director of the California Department of**
19  **Toxic Substances Control,**

20                        Respondents,

21

22  **SCHNITZER STEEL INDUSTRIES, INC.,**

23                        Real Party in Interest.

24

25

26

27

28

                                          1

1

## INTRODUCTION

2      Pursuant to Rule 3.300, subdivision (g), of the California Rules of Court, Respondents, the

3   California Department of Toxic Substances Control and Meredith Williams, in her capacity as

4   Director (collectively, "DTSC"), hereby oppose the Notice of Related Case filed by Petitioner,

5   The Athletics Investment Group LLC ("Petitioner"). On May 19, 2022, Petitioner filed a Notice

6   of Related Case requesting that the Court relate the above-captioned case ("DTSC Case") with a

7   newly-filed case captioned *The Athletics Investment Group LLC v. The Bay Area Air Quality*

8   *Management District, et al.*, Alameda County Superior Court Case No. 22CV010930 ("Air

9   District Case"). Petitioner asserts in its Notice of Related Case that *all four* of the criteria set forth

10  in Rule 3.330(a) of the California Rules of Court ("CRC") for relating cases justify the relating of

11  the DTSC Case and the Air District Case. None of those criteria are satisfied here.

12      First, the two cases do not involve the same parties, as the Respondents are DTSC in one

13  case and the Bay Area Air Quality Management District and its Interim Executive Director

14  (collectively, "Air District") in the other. Further, the claims are different. In the DTSC Case,

15  Petitioner makes claims under the Hazardous Waste Control Law (Health & Saf. Code, § 25100,

16  et seq.) ("HWCL"). The Air District Case involves claims under the federal and state Clean Air

17  Acts, the Health and Safety Code (but not the HWCL), and the Air District's own regulations.

18      Second, the two cases present different questions of law and fact. The questions involved in

19  the DTSC Case concern the interpretation of Health and Safety Code section 25150.82 and

20  DTSC's regulatory obligations under that law. The Air District Case involves a Permit to Operate

21  issued by the Air District to Real Party in Interest, Schnitzer Steel Industries, Inc. ("Schnitzer")

22  and the Air District's application of air emissions laws.

23      Third, there are no claims against, title to, possession of, or damages to property.

24      Fourth, there will be no duplication of judicial resources (substantial or otherwise) if the

25  cases are heard by different judges, as the Air District Case has just begun while the DTSC Case

26  is in the post-judgment phase and already is in the Court of Appeal on multiple appeals.

27  Moreover, judicial resources previously expended in the DTSC Case lack any significant overlap

28  with Petitioner's claims in the Air District Case.

2

Therefore, the two cases meet *none* of the CRC Rule 3.300(a) criteria for relating cases. Petitioner's Notice of Related case is nothing more than a blatant attempt to judge-shop, which constitutes "other good cause" under CRC Rule 3.300(g) for why the cases should not be related. DTSC requests that the Court not relate the DTSC Case and the Air District Case.

## FACTUAL BACKGROUND

### I.   THE DTSC CASE

On August 5, 2020, Petitioner filed a Verified Petition for Writ of Mandate in this Court, naming DTSC as Respondents and Schnitzer as a Real Party in Interest ("DTSC Petition"). Petitioner asked the Court for a peremptory writ of mandate commanding DTSC to rescind Schnitzer's conditional nonhazardous waste classification (or "f letter") regarding the transportation and disposal of chemically treated metal shredder residue produced at Schnitzer's Oakland facility ("Facility") and to require Schnitzer to operate the Facility in compliance with the HWCL. (DTSC Pet., Prayer for Relief, ¶ A.)

On April 16, 2021, the Court, The Honorable Paul D. Herbert presiding, issued a peremptory writ of mandate ("Writ"), which commanded DTSC, within 30 days from the date the Writ was served on DTSC, to:

> 1.  Rescind Real Party in Interest Schnitzer Steel Industries, Inc.'s ("Schnitzer") conditional nonhazardous waste classification ("f" letter), which was issued pursuant to subdivision (f) of section 66260.20 of Title 22 of the California Code of Regulations; and

> 2.  Regulate Schnitzer's metal shredder waste pursuant to the requirements of the Hazardous Waste Control Law. (Health & Saf. Code, § 25100 et seq.)

(DTSC Case, Writ, at p. 1.)

On April 21, 2021, Schnitzer appealed the Court's issuance of the Writ (see DTSC Case, Notification of Filing of Notice of Appeal, dated Apr. 27, 2021) and that appeal remains pending with oral argument scheduled for August 24, 2022. (Court of Appeal, First Appellate District, Division Three ("Court of Appeal"), Case No. A162524.)[1]

---

[1] There is a companion appellate case, also pending in the Court of Appeal, Case No. A163291, regarding Schnitzer's appeal of the Court's issuance of an Order Granting Petitioner's

3

1    On December 14, 2021, DTSC filed a return to the Writ, explaining how DTSC had

2    complied with the requirements of the Writ and updating the Court on other, relevant regulatory

3    and litigation matters. On January 14, 2022, Petitioner filed a Motion to Enforce the Writ, asking

4    the Court to exclude the Facility from regulations lawfully adopted by DTSC and approved by the

5    Office of Administrative Law; those regulations apply to the offsite transportation and disposal of

6    chemically treated metal shredder residue from metal shredding facilities across California

7    ("Disposal Regulation"). The Court granted that motion and issued an order prohibiting DTSC

8    from applying the Disposal Regulation to the Facility. (DTSC Case, Order Granting Pet.'s Mot. to

9    Enforce, p. 13, dated Apr. 18, 2022.)

10    On May 17, 2022, both DTSC and Schnitzer appealed the Court's Order Granting

11    Petitioner's Motion to Enforce, which remains pending. (Court of Appeal, Case No. A165217.)

12    **II.    THE AIR DISTRICT CASE**

13    On May 6, 2022, Petitioner filed a Verified Petition for Writ of Mandate and Complaint for

14    Declaratory Relief in this Court against the Air District, naming Schnitzer as a Real Party in

15    Interest ("Air District Petition"). In the Air District Case, Petitioner asks the Court for:

16    
17        1. A writ of mandate requiring Respondent to revoke
    Schnitzer' s PTO [Permit to Operate] for the Facility and not issue a
    new permit until all applicable requirements are met, as alleged
18        above;

19        2. A declaratory judgment under Code Civ. Proc. § 1060,
    declaring that Respondent violated its duties under the federal
20        Clean Air Act, California Health and Safety Code, and its [Air
    District] regulations, for the reasons alleged above, and that [the Air
21        District] is required to revoke Schnitzer's PTO and deny a new
    permit until the applicable requirements are met;
22    

23    (Air Dist. Pet., Prayer for Relief, ¶¶ 1 and 2.)

24    In the Air District Case, Petitioner claims that they "bring this lawsuit to compel [the Air

25    District] to perform its duties under state air quality law with respect to regulating the Schnitzer

26    Facility" and that the Air District "must deny Schnitzer's permit to operate because Schnitzer is in

27    _____

28    Motion to Lift Stay on Appeal, issued on August 10, 2021, lifting the automatic stay of the Writ
pending Schnitzer's appeal.

4

violation of emission limitations, [Air District] Rules, and applicable federal and California air quality laws." (Air Dist. Pet., ¶ 9.)

After filing the Air District Petition, Petitioner quickly filed a peremptory disqualification under Code of Civil Procedure section 170.6 against The Honorable Frank Roesch.[2] (Air Dist. Case, Mot. for Peremptory Challenge, dated May 16, 2022.) On May 18, 2022, the Court issued a Minute Order accepting the disqualification and reassigning the Air District Case to The Honorable Michael Markman. (Air. Dist. Case, Minute Order, dated May 18, 2022.)

## ARGUMENT

A pending civil case may be related to another pending civil case if the cases:

> (1) Involve the same parties and are based on the same or similar claims;
>
> (2) Arise from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact;
>
> (3) Involve claims against, title to, possession of, or damages to the same property; or
>
> (4) Are likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

(Cal. Rules of Court, Rule 3.300(a).)

The purpose of relating cases is to "promote efficiency, to avoid duplicative effort, to combat judge-shopping, and to minimize the prospect of conflicting results." (*Harris v. Rojas* (2021) 66 Cal.App.5th 817, 820.)

Relating the DTSC Case and the Air District Case would not promote efficiency or avoid duplication of effort. The two cases are in completely different phases of litigation, as the substantive issues in the DTSC Case have been decided by the trial court and are on appeal and the Air District Case has barely begun. The two cases involve two separate regulatory agencies, which implement and enforce different statutory and regulatory schemes. Because of this, there is no risk of conflicting results. Instead of "combat[ing] judge-shopping", the Petitioner's attempt to

---

[2] Petitioner also filed a peremptory disqualification against Judge Roesch at the beginning of the DTSC case. (DTSC Case, Mot. for Peremptory Challenge, Aug. 28, 2021.)

5

1   relate the two cases is an obvious attempt to engage in the kind of judge-shopping the California

2   Court of Appeal recently criticized and the law seeks to discourage. For these reasons, the two

3   cases should not be related.

4   **I.     THE DTSC CASE AND THE AIR DISTRICT CASE INVOLVE DIFFERENT PARTIES AND ARE BASED ON DIFFERENT CLAIMS**

5

6          The DTSC Case and the Air District Case do not involve the same parties, as the

7   Respondents in each are different: DTSC in the former and the Air District in the latter. It is not

8   enough that the Petitioner and the Real Party in Interest are the same in both cases. The

9   importance of  the same-parties criteria is to avoid a situation in which two judges issue rulings in

10  two different cases involving the same parties, raising the "prospect of conflicting results" (see

11  *Harris v. Rojas*, *supra*, 66 Cal.App.5th at p. 820) and obligations being imposed on those parties.

12  Here, the rulings in the two cases are directed at two separate governmental entities with

13  responsibility for distinct regulatory requirements that are independent of each other under the

14  circumstances presented by these cases. For that reason, there is no risk of "conflicting results"

15  and obligations being imposed on the two sets of Respondents.

16         Further, the two cases are based on dissimilar claims. In the DTSC Case, Petitioner brought

17  suit to compel DTSC to rescind Schnitzer's so-called "f letter" issued pursuant to Title 22 of the

18  California Code of Regulations and to regulate the Facility pursuant to the HWCL. (DTSC Pet.,

19  ¶¶ 94-101.) In the Air District Case, Petitioner brings suit to compel the Air District to perform

20  duties under certain air quality laws, not the HWCL, and to deny Schnitzer a Permit to Operate

21  issued by the Air District, not DTSC. (Air Dist. Pet., ¶ 9.)

22         Because the parties and claims made in the DTSC Case and the Air District Case are

23  different, the two cases should not be related.

24  **II.    THE DTSC CASE AND THE AIR DISTRICT CASE INVOLVE DIFFERENT QUESTIONS OF LAW AND FACT**

25

26         The DTSC Case and the Air District Case are also dissimilar because they involve different

27  questions of law and fact.

28

1      In the DTSC Case, the statutory structure involved is the HWCL, which is found in Chapter

2    6.5 of Division 20 of the Health and Safety Code, and its implementing regulations in Title 22 of

3    the California Code of Regulations. (DTSC Case, Order Granting Writ of Mandate, pp. 2-8, dated

4    Apr. 16, 2021.) The Air District Case involves those Health and Safety Code sections dealing

5    with air resources (found in Division 26 of the Health and Safety Code), the Air District's own

6    regulations, and its air permitting authority. (Air Dist. Pet., ¶¶ 16-26.)

7      Further, the factual determinations in each case are different. In the DTSC Case, the Court

8    found that the "dispute is solely one of statutory interpretation and that no factual issues need be

9    determined in the trial court." (DTSC Case, Order Granting Writ of Mandate, p. 1, lines 18-19,

10   dated Apr. 16, 2021.) In the Air District Case, the relevant factual determinations include the

11   nature and amount of air pollutants emitted from the Facility (Air Dist. Pet., ¶¶ 33-41 and 56-58)

12   and the Air District's permitting history of the Facility. (*Id.*, ¶¶ 42-55 and 59-69.)

13     Thus, there is no overlap in the legal and factual determinations in the two cases, and no

14   basis for relating the two cases.

### III.  NEITHER CASE INVOLVES CLAIMS AGAINST, TITLE TO, POSSESSION OF, OR DAMAGES TO THE SAME PROPERTY

17      Neither the DTSC Case nor the Air District Case involves claims relating to property, as

18   that term is understood in CRC Rule 3.300(a)(3). While both cases concern operations at the same

19   Facility, there is no dispute that Schnitzer owns the property occupied by the Facility. (DTSC

20   Pet., ¶ 12 and Air Dist. Pet., ¶ 15.) Petitioner makes no claim against, title to, or possession of that

21   property.

22      Petitioner claims to maintain business operations near the Facility, and Petitioner wants to

23   build a new ballpark close to the Facility. (DTSC Pet., ¶ 6 and Air Dist. Pet., ¶ 9.) However,

24   Petitioner does not make a claim in either the DTSC Case or the Air District Case of actual

25   damage to that property. This prong of CRC Rule 3.300(a) provides no reason to relate the two

26   cases.

27

28

**IV.   THERE WILL BE NO DUPLICATION OF JUDICIAL RESOURCES IF THE CASES ARE HEARD BY SEPARATE JUDGES**

As previously noted, the Writ has been issued in the DTSC Case. The Writ, an order lifting the automatic stay on appeal, and a recent enforcement order are now all before the Court of Appeal. (Court of Appeal, Case Nos. A16252, A163291, and A165217.) The only matter that remains to be determined by the trial court in the DTSC Case is Petitioner's motion for an award of fees and costs, with a hearing on that motion scheduled for August 15, 2022. Even if there is further substantive litigation in the DTSC Case—for example, on a subsequent motion to enforce or clarify the Writ— this would not create a duplication of judicial resources because of the distinct factual and legal issues at play in each of the two cases.

The Air District Petition was just recently filed on May 2, 2022. As discussed in Sections I and II, above, the Air District Case involves claims, law, and facts different and apart from those involved in the DTSC Case. Therefore, the work done by the Court in the DTSC Case is of no meaningful use in the Air District Case, and no duplication of judicial resources will occur if a different judge hears the Air District Case than the judge that presided over the DTSC Case. This is yet another reason why there is no basis for relating the two cases.

**V.   THE NOTICE OF RELATED CASE IS AN ATTEMPT BY PETITIONER TO JUDGE-SHOP, WHICH IS GOOD CAUSE NOT TO RELATE THE CASES**

As noted above, one of the purposes of relating cases is to "combat judge-shopping." (*Harris v. Rojas*, *supra*, 66 Cal.App.5th at p. 820.) In both the DTSC Case and the Air District Case, Petitioner disqualified Judge Roesch at the outset of the case. The Air District Case is now before Judge Markman. Yet Petitioner still seeks to direct the Air District Case to a judicial officer of it choosing; considering that the DTSC Case and the Air District Case meet *none* of the criteria for relating cases set forth in CRC Rule 3.300(a), there appears to be no other reason. Judge-shopping is antithetical to the related case rules (see *Rojas*, *supra*, at p. 820) and should be discouraged. Thus, there is "other good cause" under CRC Rule 3.300(g) for not relating these two cases.

**CONCLUSION**

As explained above, the DTSC Case and the Air District Case do not meet any of the four criteria set forth in CRC Rule 3.300(a) for relating of cases. The cases are on completely different timelines, involving different parties, claims, law, and facts. There is no basis for relating the two cases. Petitioner's Notice of Related Case is purely an exercise in judge-shopping, which is "other good cause" under CRC Rule 3.300(g) as to why the cases should not be related. Therefore, DTSC respectfully requests that the Court not relate the DTSC Case and the Air District Case.

Dated:  May 24, 2022                                    Respectfully submitted,

                                                       ROB BONTA
                                                       Attorney General of California


                                                       DENNIS L. BECK, JR.
                                                       Supervising Deputy Attorney General
                                                       *Attorneys for Respondents California*
                                                       *Department of Toxic Substances Control*
                                                       *and Meredith Williams, in her official*
                                                       *capacity as Director*

9

EXHIBIT H
188

## <u>DECLARATION OF SERVICE BY ELECTRONIC MAIL</u>

Case Name:   ***The Athletics Investment Group LLC v. California Department of Toxic Substances Control, et al.,***

No.:   **Alameda County Superior Court Case No. RG20069917**

I declare:

I am employed in the Office of the Attorney General and a member of the California State Bar.  I am 18 years of age or older and not a party to this matter.

On <u>May 24, 2022</u>, I served the attached **RESPONDENTS' OPPOSITION TO PETITIONER'S NOTICE OF RELATED CASE** by transmitting a true copy via electronic mail, addressed as follows:

R. James Slaughter
Eric H. Macmichael
Keker, Van Nest & Peters LLP
**E-mail Address**: rslaughter@keker.com
**E-mail Address**: emacmichael@keker.com
*Attorneys for Plaintiffs*

William M. Sloan
Tyler G. Welti
Venable LLP
**E-mail Address**: wmsloan@venable.com
**E-mail Address**: tgwelti@venable.com
*Attorneys for Plaintiffs*

Ronald E. Van Buskirk
Margaret Rosegay
Pillsbury Winthrop Shaw Pittman LLP
**E-mail Address**:
ronald.vanbuskirk@pillsburylaw.com
**E-mail Address**:
margaret.rosegay@pillsburylaw.com
*Attorneys for Real Party in Interest*

Jaclyn H. Prange, SBN 270929
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
Telephone: (415) 875-6100
**E-mail Address**: jprange@nrdc.org
*Attorneys for Amici Curiae*

M.Benjamin Eichenberg, SBN 270893
San Francisco Baykeeper
1736 Franklin Street, Suite 800
Oakland, CA 94612
Telephone: 510-735-9700 x105
**E-mail Address**: ben@baykeeper.org
*Attorneys for Amici Curiae*

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on May 24, 2022, at Sacramento, California.

| Dennis L. Beck, Jr. | |
|---|---|
| Declarant | Signature |

**PROOF OF SERVICE**

I am employed in the City and County of San Francisco, State of California, in the office of a member of the bar of this court, at whose direction the service was made.  I am over the age of eighteen (18) years and not a party to or interested in the within-entitled action.  I am an employee of **PILLSBURY WINTHROP SHAW PITTMAN LLP**, and my business address is Four Embarcadero Center, 22nd Floor, San Francisco, California 94111.

On May 24, 2022, I served the following documents:

**NOTICE OF CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL'S AND MEREDITH WILLIAMS, IN HER OFFICIAL CAPACITY AS DIRECTOR'S OPPOSITION TO PETITIONER'S NOTICE OF RELATED CASE**

on the parties listed below:

| | |
|---|---|
| Rob Bonta, Attorney General of California | *Attorneys for Defendants* |
| Edward H. Ochoa, Senior Assistant Attorney General | *California Department of Toxic* |
| Dennis L. Beck, Jr., Deputy Attorney General | *Substances Control and Meredith* |
|    Dennis.Beck@doj.ca.gov | *Williams in her official capacity as* |
| Elizabeth B. Rumsey, Deputy Attorney General | *Director* |
|    liz.rumsey@doj.ca.gov | |
| 1300 I Street, Suite 125 | |
| P.O. Box 944255 | |
| Sacramento, CA  94244-2550 | |
| | |
| KEKER, VAN NEST & PETERS LLP | *Attorneys for Petitioner* |
| R. JAMES SLAUGHTER | *The Athletics Investment* |
|    rslaughter@keker.com | *Group LLC* |
| ERIC H. MACMICHAEL | |
|    emacmichael@keker.com | |
| 633 Battery Street | |
| San Francisco, CA  94111-1809 | |
| | |
| VENABLE LLP | *Attorneys for Petitioner* |
| WILLIAM M. SLOAN | *The Athletics Investment* |
|    wmsloan@venable.com | *Group LLC* |
| TYLER G. WELTI | |
|    tgwelti@venable.com | |
| 101 California Street, Suite 3800 | |
| San Francisco, CA  94111 | |

| | | |
|---|---|---|
| 1 | Jaclyn H. Prange | *Attorneys for Amici Curiae* |
| | Natural Resources Defense Council | *Communities for a Better* |
| 2 | 111 Sutter Street, 21st Floor | *Environment, Center on Race, Poverty* |
| 3 | San Francisco, CA 94104 | *& the Environment, San Francisco* |
| | Telephone: (415) 875-6100 | *Baykeeper, and Natural Resources* |
| 4 | Email: jprange@nrdc.org | *Defense Council* |

5   Lauren P. Phillips
    Natural Resources Defense Council
6   40 West 20th Street, 11th Floor
    New York, NY 10011
7   Telephone: (212) 727-4415
    Fax: (415) 795-4799
8   Email: lphillips@nrdc.org

9   M. Benjamin Eichenberg
    San Francisco Baykeeper
10  1736 Franklin Street, Suite 800
    Oakland, CA 94612
11  Telephone: 510-735-9700 x105
12  Email: ben@baykeeper.org

13

14       The documents were served via **E-MAIL.**  My electronic service address is

15  tina.bishop@pillsburylaw.com.  I electronically served the documents listed above on the parties

16  listed above by transmitting the documents in adobe PDF format.

17       I declare under the penalty under the laws of the State of California that the foregoing is true

18  and correct.

19       Executed on May 24, 2022, at San Francisco, California.

20

21                                          *Tina Bishop*
                                        _____
22                                          Tina Bishop

23

24

25

26

27

28

PILLSBURY WINTHROP SHAW PITTMAN LLP
RONALD E. VAN BUSKIRK (SBN 64683)
ronald.vanbuskirk@pillsburylaw.com
MARGARET ROSEGAY (SBN 96963)
margaret.rosegay@pillsburylaw.com
STACEY C. WRIGHT (SBN 233414_
stacey.wright@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone:    415-983-1000
Facsimile:    415-983-1200

Attorneys for Real Party in Interest
SCHNITZER STEEL INDUSTRIES, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| THE ATHLETICS INVESTMENT GROUP LLC,<br><br>                Petitioner,<br><br>vs.<br><br>CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL, a public agency of the State of California; MEREDITH WILLIAMS, in her official capacity as the Director of the California Department of Toxic Substances Control,<br><br>                Respondents.<br><br>SCHNITZER STEEL INDUSTRIES, INC.,<br><br>                Real Party in Interest. | Case No. RG20069917<br><br>**REAL PARTY IN INTEREST SCHNITZER STEEL INDUSTRIES, INC.'S NOTICE OF OPPOSITION TO PETITIONER'S NOTICE OF RELATED CASE**<br><br>Action Filed:  August 5, 2020 |

1    TO THE COURT, ALL PARTIES AND ATTORNEYS OF RECORD, please take notice

2 that Real Party in Interest, Schnitzer Steel Industries, Inc. ("Schnitzer"), submits the attached

3 response in opposition to the Notice of Related Case filed by Petitioner Athletics Investment Group,

4 LLC seeking to relate the instant case to the entirely unrelated recently filed new matter of *The*

5 *Athletics Investment Group, LLC v. Bay Area Air Quality Management District, et al.*, Case No.

6 22CV010930.  As explained in the attached opposition, the request to relate these cases is without

7 merit and should be denied.

8             Respectfully submitted,

9 Dated:  May 24, 2022      PILLSBURY WINTHROP SHAW PITTMAN LLP

              RONALD E. VAN BUSKIRK

10            MARGARET ROSEGAY

              STACEY C. WRIGHT

11            Four Embarcadero Center, 22nd Floor

12            San Francisco, CA 94111-5998

13

14            By: _____

15             Attorneys for Real Party in Interest SCHNITZER

              STEEL INDUSTRIES, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

PILLSBURY WINTHROP SHAW PITTMAN LLP
RONALD E. VAN BUSKIRK (SBN 64683)
Email: ronald.vanbuskirk@pillsburylaw.com
MARGARET ROSEGAY (SBN 96963)
Email: margaret.rosegay@pillsburylaw.com
STACEY C. WRIGHT (SBN 233414)
Email: stacey.wright@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone: (415) 983-1000
Facsimile: (415) 983-1200

Attorneys for *Real Party in Interest*
*Schnitzer Steel Industries, Inc.*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF ALAMEDA**

| | |
|---|---|
| THE ATHLETICS INVESTMENT GROUP, LLC,<br><br>            Petitioner,<br><br>      v.<br><br>THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT, and ALEXANDER CROCKETT, in his official capacity as Interim Executive Officer of the BAAQMD,<br><br>            Respondents,<br><br>―――――――――――<br><br>SCHNITZER STEEL INDUSTRIES, INC.,<br><br>            Real Party in Interest. | Case No. 22CV010930<br><br>*Assigned for All Purposes to*<br>*Hon. Michael Markman, Dept. 14*<br><br>**REAL PARTY IN INTEREST'S RESPONSE IN OPPOSITION TO NOTICE OF RELATED CASE [CRC 3.300]**<br><br>Trial Date:  None Set<br>Action Filed: May 6, 2022 |

Petitioner, Athletics Investment Group, LLC ("Petitioner"), has filed a Notice of Related Case[1] seeking to relate the instant air permitting case to an entirely different case[2] pending in

---

[1] *See* Notice of Related Case, filed May 17, 2022, and served May 19, 2022 ("Notice" or "Not.").

[2] *See Athletics Investment Group, LLC v. California Department of Toxic Substances Control*, Case No. RG20069917.  The Verified Petition for Writ of Mandate in that case, filed August 5, 2020, is attached hereto as Exhibit A.  The case is currently on appeal.

Department 302 of this Court only for post-judgment matters (the "DTSC case").  The request to relate these cases is without merit and should be denied.

The instant case has just been filed.  The petition alleges that the Bay Area Air Quality Management District ("BAAQMD") violated mandatory duties under the Clean Air Act and BAAQMD regulations relating to air emissions and permitting for Real Party in Interest, Schnitzer Steel Industries, Inc.'s ("Schnitzer") metal shredding and recycling facility (the "Facility") in Oakland (the "Air District Permitting Case").  Schnitzer denies that the claims against the BAAQMD, going back to 2006 and through the present, have any merit.  As one would expect, and the petition herein shows, the claims in the Air District Permitting Case involve unique and complex issues regarding control of air emissions from the Facility and BAAQMD's air permitting activities under a unique and complex regulatory scheme.

These events, and the applicable air quality statutes and regulations, have nothing to do with the DTSC case which involves only a single narrow question of statutory interpretation under the Hazardous Waste Control Law (the "HWCL"[3], to wit, whether the Department of Toxic Substances Control ("DTSC") was mandated by the Legislature in 2014, in Senate Bill 1249, to rescind certain approvals (conditional non-hazardous waste classifications) granted in the 1980's ("f letters")[4] allowing the disposal of chemically-treated metal shredder waste (generated at the very end of the metals recycling process) ("CTMSW") for use as beneficial daily cover at municipal landfills, rather than requiring the CTMSW to be disposed of in hazardous waste landfills.  *See* Exh. A, ¶¶ 4, 14, 28, 95.  The DTSC case thus involves an entirely different statutory scheme than the challenges to BAAQMD's air permitting actions at issue herein.

---

[3] *See* Health and Safety Code § 25100, et seq.

[4] These conditional non-hazardous waste classifications were documented in so-called "f letters" (so-named because they were issued under 22 Cal. Code Regs. § 66260.200(f)) to multiple metal shredding and recycling facilities throughout the State, and represented a safe and beneficial practice that has been ongoing for decades.  Even though Petitioner's case involved a question of statewide applicability and interpretation of a state statute, Petitioner challenged only the "f letters" issued in 1988-1989 to Schnitzer's facility in Oakland.

-2-

OBJECTION TO NOTICE OF RELATED CASE

EXHIBIT I
195

1    Basically, the cases involve a different set of laws, a different government agency, a different set

2    of agency duties, and an entirely distinct set of facts to be considered under those different duties.

3         Under California Rule of Court ("CRC") 3.300(g), this Court should deny the request to

4    relate these cases.  Because the cases involve different parties and different claims, and require

5    determination of entirely different questions of law and fact, there will be no duplication of judicial

6    resources in maintaining the current case assignment in Department 14.  In addition, good cause

7    exists not to transfer the case to Department 302 (a settlement unit).  *See* CRC 3.300(a).

8    **I.    The Cases Involve New and Different Parties and are Based on Different**

9         **Claims (CRC 3.300(a)(1)).**

10        Petitioner argues that the cases should be related because it is the same petitioner and

11   Schnitzer is named as a real party in interest in both cases.  Not., Attach. 1h.  This is plainly

12   insufficient to support finding the cases related within the meaning of CRC 3.300(a)(1).  It ignores

13   the essence of the cases, which involve completely distinct public agencies/respondents, entirely

14   different claims, and different bodies of substantive law at the heart of each case.  As stated in the

15   Notice, the DTSC Case involves a peremptory writ of mandate concerning only the regulation and

16   disposal of CTMSW under the HWCL.  Not., Attach. 1h.  In contrast, the Air District Permitting

17   Case challenges Schnitzer's "permit to operate" the Facility issued by BAAQMD, allegedly in

18   violation of the federal Clean Air Act, related provisions of the California Health and Safety Code,

19   and BAAQMD regulations.  *See* Petition, Prayer for Relief.  The cases could hardly be more

20   different and may not be properly related under CRC 3.300(a)(1).

21   **II.   The Cases Involve Different Questions of Law and Fact (CRC 3.300(a)(2)).**

22        The cases do not present overlapping questions of law or fact.  As stated above, the DTSC

23   Case involves a single question of statutory interpretation of a specific section of the HWCL

24   concerning the regulation and disposal of CTMSW.  The Air District Permitting Case does not

25   involve that provision (or any provision of the HWCL); but instead involves only questions of law

26   and fact related to BAAQMD's permitting decisions and alleged violations of the Clean Air Act,

27   BAAQMD rules, and BAAQMD's permit conditions.  *See, e.g.*, Petition, ¶¶ 5, 7, 9 (the basic claim

28

-3-

OBJECTION TO NOTICE OF RELATED CASE

EXHIBIT I

196

1   is that "BAAQMD must deny Schnitzer's permit to operate because Schnitzer is in violation of

2   emission limitations, BAAQMD Rules, and applicable federal and California air quality laws.").[5]

3   ### III.   The Cases Do Not  Involve Property Claims (CRC 3.300(a)(3)).

4            Petitioner argues that both cases "relate to" Schnitzer's metal shredding facility and involve

5   claims concerning Schnitzer's "activities at the property" and resulting emissions. Not., Attach.

6   1h.  However, that is not the standard under CRC 3.300(a)(3).  Neither case presents claims

7   against, title to, possession of, or damages to the same property, and the cases are not related under

8   that provision.

9   ### IV.   The Cases Will Not Require Duplication of Judicial Resources if Heard by

10           Different Judges (Cal. Rule of Court 3.300(a)(4)).

11           The DTSC Case has nothing to do with BAAQMD decisions or alleged violations of

12  permit requirements or federal and state air quality laws implemented by BAAQMD.  By the same

13  token, the Air District Permitting Case has nothing to do with regulation and disposal of CTMSW,

14  which falls within the jurisdiction of DTSC.  The issues of statutory interpretation and relevant

15  legislative history involved in the DTSC Case bring nothing to bear upon the issues involved in the

16  instant Air District Permitting Case, and there would be no saving of judicial resources if the case

17  were to be re-assigned to Department 302 as Petitioner proposes.  CRC 3.300(a)(4).[6]

18

19

20

21  [5] Petitioner argues that one topic, so-called "Light Fibrous Material" or "LFM," is "at issue in both
22      cases."  Not., Attach. 1h.  Nothing to do with LFM is at the center of either case.  Petitioner
        makes only a passing reference concerning LFM in the Air District Permitting Case (Pet., ¶ 36),
23      and LFM is clearly not at the nexus of the claimed air law permitting violations.  The DTSC Case
        concerns CTMSW, not LFM from upstream operations.  Petitioner cannot manufacture a claimed
24      overlap here that could even begin to overcome the manifest differences in the cases.

25  [6] Petitioner also argues that there is overlap in "background" materials and that "highly technical
        and complex factual background" materials were provided to Judge Herbert (now in Dept. 302)
26      in the DTSC case.  Not., Attach. 1h.  Apart from the legislative history materials, irrelevant to the
        Air District Permitting Case, these documents were submitted in connection with Petitioner's
27      motion to lift the automatic stay, now pending appeal, and concerned issues surrounding the
        regulation and disposal of CTMSW.  This "background" has little or nothing to do with the
28      BAAQMD or air permitting requirements for the Facility from 2006 to the present.

-4-

OBJECTION TO NOTICE OF RELATED CASE

EXHIBIT I
197

V.  **Other Good Cause Exists Not to Transfer the Instant Case (Cal. Rule of Court 3.300(g)).**

In addition, "other good cause" exists for the Court to decline the transfer of the case to another department (Dept. 302) that is a designated settlement unit.[7]  *See* Cal. Rules of Court 3.300(g).  As noted, the continued presence of the DTSC Case there is only for post-judgment matters.

VI.  **Conclusion.**

For the reasons given, the request to relate the DTSC case and the instant case should be denied.

Dated:  May 24, 2022

PILLSBURY WINTHROP SHAW PITTMAN LLP
RONALD E. VAN BUSKIRK
MARGARET ROSEGAY
STACEY C. WRIGHT
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998

By: _____

Attorneys for Real Party in Interest SCHNITZER STEEL INDUSTRIES, INC.

---

[7] Court divisions at the Alameda – George E. McDonald Hall of Justice (Departments 301-303) consist of a records management unit and a settlement unit, but not a general civil division. https://www.alameda.courts.ca.gov/general-information/locations-contact-info#Alameda%E2%80%94-348; extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.alameda.courts.ca.gov/sites/default/files/alameda/default/2022-05/2022%20Judicial%20Directory%20and%20Assignments_eff%2020220516_tcw.pdf.

-5-

OBJECTION TO NOTICE OF RELATED CASE

EXHIBIT I
198

# EXHIBIT A

EXHIBIT I
199

**FILED BY FAX**
ALAMEDA COUNTY

August 05, 2020

CLERK OF
THE SUPERIOR COURT
By Joanne Downie, Deputy

CASE NUMBER:

**RG20069917**

1  KEKER, VAN NEST & PETERS LLP
   R. JAMES SLAUGHTER - # 192813
2  rslaughter@keker.com
   ERIC H. MACMICHAEL - # 231697
3  emacmichael@keker.com
   633 Battery Street
4  San Francisco, CA 94111-1809
   Telephone:   415 391 5400
5  Facsimile:   415 397 7188

6  VENABLE LLP
   WILLIAM M. SLOAN - # 203583
7  wmsloan@venable.com
   TYLER G. WELTI - # 257993
8  tgwelti@venable.com
   101 California Street, Suite 3800
9  San Francisco, CA 94111
   Telephone:   (415) 653-3750
10 Facsimile:   (415) 653-3755

11 *Attorneys for Petitioner*

12 THE ATHLETICS INVESTMENT GROUP LLC

13                 **SUPERIOR COURT OF CALIFORNIA**

14                 **FOR THE COUNTY OF ALAMEDA**

15

16 THE ATHLETICS INVESTMENT GROUP LLC,     Case No.

17            Petitioner,

18               v.                         **VERIFIED PETITION FOR WRIT OF MANDATE**

19 CALIFORNIA DEPARTMENT OF TOXIC
   SUBSTANCES CONTROL, a public agency of  (Code Civ. Proc. § 1085)
20 the State of California; MEREDITH WILLIAMS,
   in her official capacity as the Director of the
21 California Department of Toxic Substances
   Control,
22
            Respondents.
23

24 SCHNITZER STEEL INDUSTRIES, INC.,

25            Real Party in Interest

26

27

28

EXHIBIT I
200

1                                    **INTRODUCTION**

2          1.      Real Party in Interest Schnitzer Steel Industries, Inc. ("Schnitzer") unlawfully

3    pollutes West Oakland, where it maintains a metal-shredding operation ("the Facility") that

4    shreds automobiles, among other things.  Under the law, Respondent California Department of

5    Toxic Substances Control ("DTSC") is required to regulate Schnitzer in compliance with

6    California's Hazardous Waste Law ("HWCL").  Indeed, DTSC has found that Schnitzer's

7    hazardous waste management practices pose significant public health risks to the surrounding

8    community.  Yet, for decades, DTSC has failed to apply the HWCL to Schnitzer's Facility, a

9    failure which has severely harmed the health of the West Oakland community.

10         2.      Beginning in the 1980s, DTSC has issued variances allowing a few businesses,

11   including Schnitzer, in a single industry, the metal-shredding industry, to operate without

12   complying with the HWCL, California's primary statute protecting humans and the environment

13   from toxins and other hazardous wastes, even though the HWCL would otherwise apply.  On

14   numerous occasions over the last 20 years, DTSC has found that hazardous waste generated by

15   metal-shredding operations, including Schnitzer's Facility, poses significant public health risks

16   and it has come close to ordering metal shredders to comply with the HWCL, only to retreat at the

17   last minute due to intensive lobbying efforts from Schnitzer and other shredders.

18         3.      The Legislature finally took matters into its own hands in 2014, after a series of

19   fires at metal shredders emitted toxic smoke that forced local residents to repeatedly seek refuge

20   indoors.  That year, the Legislature enacted and the Governor signed a bill requiring DTSC to

21   apply the HWCL to Schnitzer and the few remaining facilities that shred automobiles and have an

22   over twenty-year-old variance from the HWCL, known as an "f letter."  A principal component of

23   the bill, SB 1249, was a specific legislative directive that DTSC rescind any operative "f letters."

24   The Legislature was crystal clear that it intended to revoke once and for all the "f letters": "It is

25   the intent of the Legislature that the conditional nonhazardous waste classifications, as

26   documented through the historical 'f letters,' be revoked and that metal shredding facilities be

27   thoroughly evaluated and regulated to ensure adequate protection of the human health and the

28   environment." (*See* SB 1249 (2013–2014 Reg. Sess.) § 1(f).)

                                            1
                                                   VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
201

1   4.  SB 1249 gave DTSC over three years to implement the bill's requirements,

2 imposing a January 1, 2018 deadline. But the deadline that the Legislature set came and went,

3 and DTSC failed to revoke the variance that the Legislature had specifically commanded it to

4 revoke. While it did not rescind the "f letters," DTSC did issue a "draft evaluation" that yet again

5 found that metal shredders' hazardous waste management activities "pose substantial risks to

6 nearby communities." Yet, to this day, metal shredders in California, including Schnitzer,

7 continue to operate out of compliance with the HWCL—because DTSC allows them to do so.

8 This result directly contravenes the plain wording and intent of SB 1249, and must be remedied

9 through this action.

10   5.  West Oakland bears the brunt of DTSC's inaction. Schnitzer's Facility is within

11 the West Oakland environmental justice community, a low-income community of color with a

12 long history of suffering environmental pollution. Schnitzer is located closer to nearly every class

13 of sensitive receptor, including hospitals, schools, and daycare centers, than any other metal

14 shredder in California; indeed, the Facility is less than a mile away from schools, hospitals, senior

15 living centers, parks, and approximately 23,000 residents. The Facility adjoins the Oakland Inner

16 Harbor of the San Francisco Bay, which is impaired by multiple pollutants. In this sensitive

17 location, Schnitzer shreds more material and generates more hazardous waste than any other

18 metal shredding facility in the State. DTSC's failure to obey the Legislature has let down the

19 West Oakland community, its residents, students, and the thousands of people who access its

20 services and businesses. As if to punctuate the ongoing harm caused by DTSC's violation of the

21 law, just weeks ago, a large fire at Schnitzer's Facility sent dark plumes of toxic smoke into the

22 skies above Oakland and Alameda.[1]

23   6.  Petitioner the Athletics Investment Group LLC ("the Athletics") maintains its

24 business operations near the Facility and is in the process of seeking approvals to build a ballpark

25 for Major League Baseball games and other events in close proximity to the Facility. The

26 Athletics are proudly rooted in Oakland and look forward to deepening their involvement in West

27

28 [1] KTVU Fox 2, *Crews responding to blaze at Schnitzer Steel in Oakland* (June 17, 2020),
https://www.ktvu.com/news/crews-responding-to-blaze-at-schnitzer-steel-in-oakland.

2

1 Oakland for years to come.  The Athletics bring this lawsuit to compel DTSC to perform its

2 duties under state law and to protect the West Oakland community by—as required by statute—

3 rescinding the outdated and unlawful "f letter" that Schnitzer is using to evade compliance with

4 the HWCL.  A writ is urgently needed to reduce the ongoing "substantial risks to nearby

5 communities" and the environment that DTSC itself has repeatedly found the "f letters" to be

6 causing.

<div align="center"><strong><u>JURISDICTION AND VENUE</u></strong></div>

7    7. This Court has jurisdiction over this petition for a writ of mandate pursuant to

8 

9 section 1085 of the California Code of Civil Procedure and Article VI, Section 10 of the

10 California Constitution.

11    8. Venue is proper in this Court pursuant to section 401 of the Code of Civil

12 Procedure because this is an action against the State or a department, officer, or other agency

13 thereof, which may be commenced in any county in which the California Attorney General has an

14 office.  The California Attorney General has an office in this county.  Venue is also proper under

15 section 395 because the relevant operations of Real Party in Interest Schnitzer Steel Industries,

16 Inc. occur in Alameda County.

<div align="center"><strong><u>PARTIES</u></strong></div>

18    9. Petitioner Athletics Investment Group LLC is a limited liability corporation

19 organized under the laws of the State of California and having a principal place of business at 55

20 Harrison Street, Oakland, California 94607.  It owns the Major League Baseball franchise known

21 as the Oakland Athletics.

22    10. Respondent California Department of Toxic Substances Control is a California

23 state public agency, organized and existing under and pursuant to California Health & Safety

24 Code section 58000, *et seq*.

25    11. Respondent Dr. Meredith Williams is the Director of Respondent California

26 Department of Toxic Substances Control.  She is sued in her official capacity only.

27

28

<div align="center">3</div>

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
203

1    12.    Real Party in Interest Schnitzer Steel Industries, Inc., is a corporation organized
2    under the laws of the state of Oregon.  It operates a metal shredding facility located at 1101
3    Embarcadero West, Oakland, California, 94607.

### FACTUAL ALLEGATIONS

**A.    Background information**

6    13.    Schnitzer's Facility is the largest metal-shredding facility in California.  Its
7    operations consist of shredding junk automobiles, appliances, and other metal-containing
8    materials in a "mega-shredder," and removing ferrous (iron-containing) and non-ferrous metals.
9    Each year, the process yields hundreds of thousands of tons of materials, including harvested
10   metals that can be resold.  But the process also generates waste, classifications of which include
11   aggregate (a combination of metal shredder residue and non-ferrous metals), untreated metal
12   shredder residue, and treated metal shredder residue.[2]

13   14.    Long ago, DTSC determined that contaminants in Schnitzer's aggregate, untreated
14   metal shredder residue, and treated metal shredder residue exceed toxicity thresholds for
15   hazardous waste under California law.  Yet Schnitzer does not manage or dispose of these
16   materials as hazardous waste.  For example, Schnitzer stores aggregate and metal shredder
17   residue in towering stockpiles outside and uncovered, where contaminants can leach into the soil
18   and groundwater, blow offsite, and, as has occurred on numerous occasions (including just weeks
19   ago), catch fire.  Furthermore, Schnitzer trucks approximately 200,000 tons per year of "treated"
20   metal shredder residue—which DTSC has found continues to exceed California hazardous waste
21   toxicity thresholds despite treatment—through surrounding neighborhoods to landfills that are not
22   equipped for hazardous waste disposal.  Once there, the toxic shredder residue is spread as a top
23   layer over nonhazardous garbage as "alternative daily cover."

24

25

26   [2] DTSC has defined "metal shredder wastes" to include all of this material:  "A collective
     reference to all wastes being managed at metal shredding facilities that emanate from the metal
27   shredding process, including metal shredder aggregate, metal shredder residue, and Chemically
     Treated Metal Shredder Residue (CTMSR)."  (DTSC, Evaluation and Analysis of Metal
28   Shredding Facilities and Metal Shredder Wastes (Jan. 2018) ("2018 DTSC Evaluation"), p. 4.).

4

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
204

1    15.   DTSC allows Schnitzer to operate without complying with the HWCL, which

2    numerous other industries and businesses comply with every day. Since the mid-1980s, DTSC

3    has exempted Schnitzer and five other existing metal shredders in California from having to

4    handle and dispose of aggregate and metal shredder residue as hazardous waste. DTSC granted

5    this exemption through a conditional nonhazardous waste classification called an "f letter" and

6    DTSC's Official Policy and Procedure Number 88-6 (OPP 88-6).

7    16.   In 2001, a DTSC legal memo recognized that the variance it has granted Schnitzer

8    is "outdated and legally incorrect."[3]

9    17.   In 2002, DTSC issued a report recommending rescission of the "f letters" and OPP

10   88-6.[4] However, the agency did not act to rescind these policies and regulate metal shredders

11   pursuant to the HWCL.

12   18.   In 2008, DTSC's then-Director notified Schnitzer that rescission of the "f letters"

13   and OPP 88-6 was required to "ensure the safety of public health and the environment from

14   harmful exposures to toxins."[5] After intense industry lobbying, however, DTSC again did not

15   act.[6]

16   19.   DTSC's various failures to regulate the metal-shredding industry led to the

17   Legislature enacting SB 1249, also known as the Metal Shredding Facilities Law ("MSFL"),

18   Health & Safety Code §§ 25150.82-25150.86. The MSFL required DTSC to take one of two

19   actions before January 1, 2018: (1) develop and apply alternative management standards to the

20

21   [3] Senior Staff Counsel Nancy J. Long, Memorandum to DTSC Senior Environmental Scientist
     Peter Wood (Oct. 9, 2001) p. 17, https://assets.documentcloud.org/documents/2777064/2001-
22   Ruling.pdf. Exacerbating the problem, Schnitzer does not appear to have met the conditions of
     the "f letter" and OPP 88-6.
23
     [4] DTSC's Draft Report on California's Auto Shredder Waste Initiative.
24
     [5] DTSC Director Maureen F. Gorsen, letter to Schnitzer Steel Industries, Inc. Executive Vice
25   President, Gary Schnitzer, Sept. 29, 2008, p. 1, https://dtsc.ca.gov/wp-
     content/uploads/sites/31/2018/05/Schnitzer-1.pdf.
26
     [6] "[A]n intense lobbying campaign" by the metal shredding industry" followed DTSC's move to
27   rescind Schnitzer and other metal shredders' "f letters." (C. Richard, *Is California's Toxic Waste
     Regulator Letting Oversight Slide?*, KQED News (April 24, 2017), https://www.kqed.org/news/
28   11359491/is-californias-toxic-waste-regulator-letting-enforcement-slide.)

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
205

1   metal shredding facilities or (2) apply the HWCL to the facilities and rescind the "f letters."

2   (Health & Saf. Code § 25150.82(j)(1) ["The disposal of treated metal shredder waste shall be

3   regulated pursuant to this chapter and the regulations adopted pursuant to this chapter, *unless*

4   alternative management standards are adopted by the department pursuant to this section."]; *id.* at

5   subd. (k)(1) ["The department shall complete . . . regulatory action before January 1, 2018."]; *see*

6   *also* SB 1249 (2013–2014 Reg. Sess.) § 1(f) ["It is the intent of the Legislature that the

7   conditional nonhazardous waste classifications, as documented through the historical 'f letters,'

8   be revoked and that metal shredding facilities be thoroughly evaluated and regulated to ensure

9   adequate protection of the human health and the environment."].) Before proposing any

10  alternative management standards, the MSFL required DTSC to thoroughly evaluate shredding

11  facilities to determine the threats they pose to the surrounding communities. (Health & Saf. Code

12  § 25150.82(c)(1), (d).) Based on this evaluation, the MSFL authorized DTSC to adopt alternative

13  management standards by the January 1, 2018 deadline only if DTSC could demonstrate

14  compliance with one of the four conditions listed in Health & Safety Code sections

15  25150.82(e)(1) through 25150.82(e)(4). These conditions required DTSC to find that any

16  alternative standards would protect human health and the environment at least as well as any

17  requirements of the HWCL they would replace. (*Id.*)

18      20.     In 2015, DTSC's Deputy Director sent Schnitzer a letter explaining that the "onsite

19  activities and management of wastes and materials" at metal shredding facilities "raised serious

20  concerns" and were "alarming."[7] Again, however, DTSC did not act, notwithstanding the

21  legislative command of SB 1249.

22      21.     Continuing its longstanding pattern of inaction despite recognizing substantial

23  risks to human health and the environment, DTSC failed to act by SB 1249's January 1, 2018

24  deadline. DTSC neither adopted alternative management standards nor began to apply the

25  Hazardous Waste Control Law to metal shredders, as the MSFL required. Rather, DTSC issued a

26  _____

27  [7] DTSC Deputy Director Elise Rothschild, letter to Schnitzer Steel Industries Senior Vice
    President and General Counsel and Secretary, Richard Josephson, April 13, 2015, p. 2.

28

6

1   "draft evaluation," which yet again found that metal shredders' hazardous waste management

2   activities "pose substantial risks to nearby communities."[8] In that document, DTSC also

3   concluded that, based on the agency's findings, the MSFL did not authorize alternative

4   management standards because they would not be as protective of human health and the

5   environment as would be application of the HWCL's requirements. Accordingly, having not

6   issued alternative management standards by January 1, 2018, and having further found that

7   alternative standards were insufficiently protective to be authorized, the MSFL left DTSC no

8   other option but to rescind its outdated policies and apply the HWCL to metal shredders. (Health

9   & Saf. Code § 25150.82(j)(1).) Yet, over two-and-a-half years later, DTSC still has not acted.

10  The "f letters" remain in place, and Schnitzer continues to flaunt the HWCL even though DTSC

11  has repeatedly found that Schnitzer's practices place surroundings communities and the

12  environment at substantial risk.

13          22.     As further described below, DTSC's failure to follow SB 1249's mandates harms

14  the West Oakland community, where "sensitive receptors" such as hospitals, schools, daycare

15  centers, and residences exist in close proximity to Schnitzer's Facility.

16          **B.     Schnitzer's metal-shredding operations in West Oakland**

17          23.     Schnitzer Steel is a large, profitable company that can afford to implement best

18  management practices necessary for protecting public health and the environment. Schnitzer is a

19  multinational company with operations that include both acquiring, processing, and selling scrap

20  metals, and manufacturing and selling finished steel products.[9] Over the last three years,

21  Schnitzer has generated an average of over $2 billion in total revenue and $85 million in net

22  income, with cashflow from operations averaging approximately $135 million.

23          24.     Schnitzer's Facility is a 26.5-acre complex bordering the Oakland Inner Harbor

24  and located at 1101 Embarcadero West in West Oakland, a largely African-American, low-

25  income community with a long history of suffering environmental pollution. The Facility is

26

27  [8] 2018 DTSC Evaluation at p. 43.

28  [9] Schnitzer Steel Industries, Inc. operates the Facility under the name Schnitzer Steel Products
    Company.

7

1    located within a mile of approximately 40 "sensitive receptors," including numerous schools,

2    daycare centers, hospitals, senior living centers, parks, and several residential neighborhoods.

3    Approximately 23,000 fulltime residents live within a mile of the Facility. Thousands more are

4    present during the day in this area, which includes parts of downtown Oakland, busy commercial

5    districts in Alameda, and all of Jack London Square, including its harbor and ferry terminals.



18      25.     Schnitzer's metal-shredding Facility in Oakland receives and stockpiles junked

19    products containing metal, such as vehicles, appliances, construction and demolition materials,

20    and manufacturing waste. Junk vehicles and other metal-containing "feedstock" regularly contain

21    hazardous materials, including gasoline, oil, antifreeze, lead-acid batteries, vehicle air bags,

22    compressed gas cylinders (e.g., propane tanks, compressed gas tanks, and fire extinguishers),

23    refrigerants in air conditioning or heat transfer systems, capacitors containing polychlorinated

24    biphenyls (PCBs), light ballasts, transformers, and items containing elemental mercury (e.g., tilt-

25    switches or thermostats). California law requires metal shredders to remove hazardous materials

26    from feedstock before feeding the scrap metal through the shredder, a process known as "de-

27    pollution." (Cal. Pub. Res. Code § 42175.)

28

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
208

1    26.    Schnitzer loads stockpiled feedstock into a 9,000-horsepower machine called the

2    "mega shredder," which reduces the feedstock to small pieces. From there, magnets remove

3    ferrous metals from the shredded feedstock. The remaining material, called "metal shredder

4    aggregate"—which DTSC has determined "is a hazardous waste"—is dropped off a conveyor belt

5    and stored in large stockpiles. (DTSC, Proposed Concepts for Environmental Protection and

6    Authorization of Hazardous Waste Operations at Metal Shredding Facilities (March 2019) p. 3.)

7    This aggregate typically contains non-ferrous metal and a mixture of material frequently called

8    "metal shredder residue," which consists of metals, plastics, rubber, glass, foam, fabrics, carpet,

9    wood, residual automobile fluids, road dirt, and/or other debris.

10    27.    Schnitzer eventually moves stockpiled aggregate from there to the Facility's "joint

11    product plant," where non-ferrous metals such as aluminum, copper, lead, and zinc are removed.

12    The remaining metal shredder residue is stockpiled, eventually "treated" (sprayed with a sodium

13    or potassium silicate solution and an alkaline activator such as cement), and then again stockpiled

14    outside of the joint products plant.

15    28.    Schnitzer loads the treated metal shredder residue into trucks and transports it

16    through Oakland and other areas to the Altamont Landfill & Resource Recovery Management

17    Facility and Republic Service's Vasco Road landfill. "Typically, 20 loads per day are transported

18    offsite to the landfill." (2018 DTSC Evaluation at p. 26.) These are Class III municipal

19    *nonhazardous* waste landfills—they cannot accept hazardous waste, but, as explained in further

20    detail below, they accept Schnitzer's waste pursuant to the variance that DTSC has failed to

21    revoke. Once there, the treated metal shredder residue is again stockpiled and eventually

22    disposed of on top of normal garbage as "alternative daily cover."

23    29.    Schnitzer transports harvested metals from the facility by ship, rail, and truck.

24    C.    **DTSC has found that Schnitzer's metal shredder aggregate, metal shredder residue, and other materials are hazardous wastes.**

25

26    30.    Long ago, DTSC determined that contaminants in Schnitzer's aggregate, untreated

27    metal shredder residue, and treated metal shredder residue exceed toxicity thresholds for

28

9

1    hazardous waste under California law. According to DTSC, Schnitzer processes more scrap

2    metal, produces more aggregate, and generates and disposes more metal shredder residue than

3    any other metal shredding facility in California. (*Id.* at p. 71.) In 2015, Schnitzer reported that it

4    continually stockpiles between 70,000 and 80,000 tons of sorted scrap metal outdoors. (*Id.* at p.

5    26.) In addition, typically there are 300 to 500 tons of aggregate and up to 350 tons of treated

6    metal shredder residue at the Facility at any given time. (*Id.*) Schnitzer also regularly transports

7    approximately 20 loads of treated metal shredder residue per day to landfills, with each load

8    weighing between 20 and 25 tons. (*Id.*)

9        31.    DTSC has found that Schnitzer's aggregate, treated metal shredder residue, and

10    untreated metal shredder residue exceed toxicity thresholds for several harmful contaminants, and

11    that they constitute hazardous waste under California law.

12        32.    For instance, DTSC determined through extensive testing that the "aggregate"

13    resulting from shredding scrap metal exceeds hazardous waste thresholds under California law.

14    Aggregate has been found to contain levels of lead, copper, zinc, and, at least historically,

15    cadmium and PCBs, that exceed their respective "Soluble Threshold Limit Concentrations" and

16    "Total Threshold Limit Concentrations."[10] This means that the aggregate qualifies as hazardous

17    waste under California law due to the toxicity levels of these harmful contaminants.[11]

18        33.    DTSC has also determined that the metal shredder residue left after non-ferrous

19    metals have been separated from the aggregate contains lead, cadmium, copper, zinc, and PCBs at

20    levels above California's hazardous waste thresholds. (*See, e.g.*, DTSC, Draft Report,

21    California's Automobile Shredder Waste Initiative (Nov. 2002).)

22        34.    Additionally, DTSC has determined that metal shredder residue still exceeds

23    toxicity thresholds for hazardous waste under California law even after treatment, including due

24    _____

[10] Soluble Threshold Limit Concentrations and Total Threshold Limit Concentrations are
25    regulatory levels above which a waste is considered hazardous under California law because of its
toxicity. (DTSC, Glossary of Environmental Terms, https://dtsc.ca.gov/glossary-of-
26    environmental-terms/.)

27    [11] DTSC has recognized that "metal shredder aggregate is a hazardous waste." (DTSC, Proposed
Concepts for Environmental Protection and Authorization of Hazardous Waste Operations at
28    Metal Shredding Facilities (March 2019), p. 3.)

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
210

to high concentrations of lead and zinc. Thus, according to DTSC, treated metal shredder residue "continues to exhibit hazardous characteristics after treatment, and is a hazardous waste." (2018 DTSC Evaluation, p. 4.)

35. The materials generated by Schnitzer are no exception. For example, as shown in the table below, in 2015, DTSC found that samples of aggregate, untreated metal shredder residue, and treated metal shredder residue collected from the Facility exceeded toxicity thresholds for hazardous waste under California law.

TABLE 1: HAZARDOUS WASTE CHARACTERISTICS OF THE FACILITY'S METAL SHREDDER AGGREGATE AND RESIDUE [a]

| Contaminant | Total Contaminant Concentration (mg/kg)[b] | | | | Soluble Contaminant Concentration (mg/L)[b] | | | |
|---|---|---|---|---|---|---|---|---|
| | Aggregate | Residue | | | Aggregate | Residue | | |
| | TTLC Untreated | TTLC Untreated | TTLC Treated | TTLC Limit | STLC Untreated | STLC Untreated | STLC Treated | STLC Limit |
| Cadmium | <125 [c] | <125 | <50 | 100 | <2 | <2 | <1 | 1 |
| Copper | 7,980 [d] ~3 x limit | 2,140 [e] | 17,200 ~7 x limit | 2,500 | <2 | <2 | <1 | 25 |
| Lead | 1,570 ~1.5 x limit | 1,970 ~2 x limit | 910 | 1,000 | <2 | 10.9 [e] ~2 x limit | 22.5 ~4.5 x limit | 5 |
| Zinc | 17,000 ~3.5 x limit | 19,900 ~4 x limit | 12,100 ~2.5 x limit | 5,000 | 1,520 ~6 x limit | 1,780 ~7 x limit | 1,100 ~4.5 x limit | 250 |
| Polychlorinated Biphenyls ("PCBs") | 20 | 15 | 10 | 50 | - [f] | - | - | 5 |

Notes:
(a) Based on samples obtained by DTSC at Schnitzer Steel Industries, Inc.'s Oakland facility in March 2015.
(b) Under California law, hazardous wastes include wastes that exhibit characteristics of toxicity. A waste is defined to be a hazardous waste if it contains contaminants at total concentrations measured in milligrams per kilogram ("mg/kg") that are greater than Total Threshold Limit Concentration ("TTLC") values or soluble contaminants in the extractant of the Waste Extraction Test at concentrations measured in milligrams per liter ("mg/L") that are greater than Soluble Threshold Limit Concentration ("STLC") values. (22 CCR § 66261.24(a)(2).)
(c) Less than symbol ("<") indicates contaminant was not measured above the analytical method reporting limit shown.
(d) Red boldface type indicates that the average contaminant concentration is greater than California's threshold value and residue displays the characteristics of hazardous waste.
(e) This figure for the 2015 sample was low compared to average concentrations of samples reported by DTSC in 1989, 2002, and 2018. For metal shredding facilities in California, DTSC has found TTLC average concentrations of copper for untreated shredder residue as high as 14,431 mg/kg (DTSC, Public Workshop on Proposed Rulemaking, Conditional Exclusion for Chemically Treated Metal Shredder at slide 16 (June 26, 2018)) and STLC average concentrations of lead for untreated shredder residue as high as 210 mg/L (DTSC, Treatment Levels for Auto Shredder Waste at App. C (June 1989)).
(f) Dash ("-") denotes no concentration or value available.

36. Exposures to these chemicals can cause a range of health problems. For instance, exposure to high doses of copper can cause liver and kidney damage and even death. (2018 DTSC Evaluation, p. 72.) Exposure to high levels of lead can cause anemia, weakness, and kidney and brain damage, and can probably cause cancer. (*Id.*) Exposure to zinc can cause stomach cramps, anemia, and changes in cholesterol levels. (*Id.* at p. 73.)

11

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
211

1    **D.    Schnitzer does not manage aggregate, metal shredder residue, or other**
2         **materials that exceed hazardous waste thresholds as hazardous wastes.**

3        37.     While DTSC has found that aggregate, untreated metal shredder residue, and

4    treated metal shredder residue all exceed toxicity thresholds for hazardous waste under California

5    law, DTSC does not require Schnitzer to manage these materials as hazardous waste.

6        38.     For example, Schnitzer stores metal shredder aggregate and metal shredder residue

7    outside and uncovered in large stockpiles that are often several stories high and, in some cases, on

8    bare ground. (2018 DTSC Evaluation, p. 50.) Stored in this manner, the materials are susceptible

9    to leaching into the soil and groundwater and being blown offsite. (*Id.*)



Uncontained pile of untreated aggregate at Schnitzer Facility. *Source:* Photo taken by Paul Baranich, DTSC Senior Environmental Scientist, during March 17 and 18, 2015 investigation of the Facility.

21       39.     As noted, Schnitzer also loads treated metal shredder residue, which DTSC has

22   found continues to exceed hazardous waste toxicity thresholds despite "treatment," into trucks

23   and transports it to area landfills that are not equipped for hazardous waste disposal, where it is

24   used as "alternative daily cover."

25

26

27

28

―――――――――
12
VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
212

E.  **Schnitzer's hazardous waste management practices raise substantial public health and environmental risks.**

1.  **Schnitzer's hazardous waste practices have contaminated soil and groundwater.**

40.    Soil and groundwater tested throughout the Facility have been found to exceed San Francisco Bay Regional Water Quality Control Board (SF RWQCB) Environmental Screening Levels (ESLs) for several metals, including arsenic, copper, lead, and zinc.[12] (Terraphase Engineering, Revised Groundwater Investigation and Monitoring Well Installation Report, Schnitzer Steel Facility (July 14, 2017) Table 4; Terraphase Engineering, Draft Multi-Media Investigation Report, Schnitzer Steel Facility (2016).)

41.    For example, in 2015, DTSC collected soil samples from numerous locations at the Facility, including on bare ground where scrap metal was stored or processed; piles of material collected from the bare ground and from paved surfaces (swept material); and areas adjacent to and under the joint products plant. The testing showed that these samples exceeded regulatory thresholds for chromium, lead, nickel, zinc, and copper.  (2018 DTSC Evaluation, pp. 61-62.) One of the samples exceeded the federal limit for lead, indicating that the waste was also subject to federal regulation as hazardous waste.  (*Id.* at p. 61.)

42.    Schnitzer's consultant also has reported that groundwater at the Facility's boundary with the Oakland Inner Harbor has exceeded several toxicity screening levels, including the groundwater saltwater Ecotox ESLs for numerous metals (copper, lead, arsenic, and nickel) and petroleum hydrocarbons (diesel), and the seafood ingestion human health ESL for thallium.[13] (Terraphase Engineering, Revised Groundwater Investigation and Monitoring Well Installation Report, Schnitzer Steel Facility (July 14, 2017) Table 4.)

_____

[12] "ESLs" provide conservative screening levels for chemicals found at sites with contaminated soil and groundwater.  They are intended to help expedite the identification and evaluation of potential environmental concerns at contaminated sites.  For a site where chemical concentrations are greater than the ESLs, the site may pose a chemical threat and require investigation or evaluation to better asses the threat.

[13] Ecotox thresholds are media-specific contaminant concentrations above which there is sufficient concern regarding adverse ecological effects to warrant further site investigation.

13

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
213

1            **2.    Hazardous materials from the Facility, including light fibrous**
                **material, migrate off-site onto neighboring properties.**
2

3      43.     Schnitzer's shredding, stockpiling, processing, and treatment of aggregate and

4 metal shredder residue also cause hazardous materials to be blown offsite. The storage of

5 aggregate and metal shredder residue in enormous stockpiles outdoors is particularly problematic.

6 As DTSC has explained, "[t]he greatest chemical hazards these waste constituents pose is when

7 they or the waste they are within are not contained or otherwise controlled, and they are allowed

8 to be released into the environment. This can result in contamination of the metal shredding

9 facilities and potentially the areas near the metal shredding facilities . . . ." (2018 DTSC

10 Evaluation, p. 78.)

11      44.     Indeed, multiple agencies have found that Schnitzer's operations have caused a

12 large amount of "light fibrous material" (LFM) to be deposited across a broad swath of West

13 Oakland.[14] DTSC has determined that LFM frequently exceeds toxicity thresholds for hazardous

14 waste under California law due to high concentrations of lead, copper, and zinc. (Community

15 Meeting Regarding Schnitzer Steel, pp. 71-74; *see also* DTSC, Proposed Operational

16 Considerations for Hazardous Waste Operations at Metal Shredding Facilities (Feb. 2019) p. 3.)

17 Indeed, laboratory tests confirmed that samples of LFM taken from properties near Schnitzer met

18 the standard for hazardous waste classification due to the presence of lead, zinc, copper, and other

19 toxic metals. (Community Meeting Regarding Schnitzer Steel, p. 16.)

20

21

22

23

24

25

26 [14] (Alameda County District Attorney's Office, California Attorney General's Office, Department
of Toxic Substances Control, Community Meeting concerning Schnitzer Steel Industries, Inc.
27 (Nov. 20, 2014) ("Community Meeting Regarding Schnitzer Steel"); SF RWQCB, Cleanup and
Abatement Order No. R2-2012-0083 ("2012 CAO") p. 3; *see also* Terraphase Engineering Report
28 on Light Fibrous Material Removal for Schnitzer Steel (March 17, 2015).)



*Source:* Community Meeting Regarding Schnitzer Steel, p. 16.



LFM that migrated offsite from the Facility onto a neighboring property. *Source:* Community Meeting Regarding Schnitzer Steel, p. 47.

45.    The offsite migration of these materials can "result in contamination of the metal shredding facilities and potentially the areas near the metal shredding facilities, and may result in both the public and other biological organisms coming into contact with or being exposed to these

15

1    hazardous constituents, and *potentially suffering negative health impacts and harm.*" (2018

2    DTSC Evaluation, p. 78, emphasis added.)

3              **3.    Schnitzer's hazardous waste management practices have degraded the**
4                     **San Francisco Bay and Oakland Inner Harbor.**

5        46.    Schnitzer's failure to comply with hazardous waste management practices—a

6    failure that DTSC allows by keeping the "f letters" in place—also harms the San Francisco Bay.

7    The SF RWQCB recently acknowledged that the "discharge of unacceptable contaminated

8    groundwater [from the Facility] to the San Francisco Bay has been occurring and documented

9    since 2013." (SF RWQCB California Water Code § 13267 Order to Schnitzer Steel Industries,

10    Inc. (April 16, 2019), p. 2.) The agency concluded that these discharges are still "degrading the

11    water quality of San Francisco Bay and adversely affecting the Bay's beneficial uses." (*Id.*)

12        47.    The SF RWQCB has also found evidence that airborne fugitive dust from the

13    Facility is deposited directly into the Oakland Inner Harbor:

14        • "Airborne dust [is] also discharged into estuary waters, as evidence[d] by
             accumulation of dust on side railing and adjacent fence." (SF RWQCB, Inspection
15           Report for Schnitzer Steel Products Co. (March 29, 2012) ("March 2012 Inspection
             Report"), row NS-7.)
16        • "Excessive dust and sediment is discharged from area into estuary waters via wind and
             stormwater . . ." (*Id.* at row NS-8.)
17        • "Once airborne, the dust travels across the site and into off-site areas." (*Id.* at row NS-
18           11.)

19        48.    Airborne LFM, fugitive dust, and other debris blowing from the Facility also

20    deposit contaminants in the Inner Harbor and Bay:

21        • "Dust and sediment is discharged in stormwater to the [B]ay via conduits under the
             sidewalk which connect the site interior to the [B]ay." (March 2012 Inspection
22           Report, row NS-6.)
          • "Process sediment was . . . on the riprap and bridge foundation, on the sides of the
23           bridge railing, on lower bridge supports, and on pipes running the length of the bridge
             . . . where it probably will be directly discharged." (SF RWQCB, Cleanup and
24           Abatement Order No. R2-2013-1001 (Jan. 2, 2013), p. 3.)

25        49.    Schnitzer's spreading of contaminated fugitive dust, LFM, and other material into

26    the Oakland Inner Harbor is particularly concerning because the Oakland Inner Harbor is already

27

28

                                    16

                            EXHIBIT I
                               216

1    impaired by multiple pollutants frequently found in materials generated by metal shredding

2    facilities, including mercury, copper, lead, zinc, and PCBs.[15]

3              **4.    Schnitzer's hazardous waste management practices have led to
                      numerous fires.**
4

5         50.    Schnitzer's hazardous waste management practices have also led to numerous fires

6    raising public health concerns.

7         51.    For example, on April 8, 2009, a fire broke out in a stockpile and the smoke

8    created air quality concerns for local neighborhoods. (D. Sanchez, ABC News, *Fire Breaks Out*

9    *at Steel Plant in Oakland* (Apr. 8, 2009), http://abc7news.com/archive/6751956/; *see also* 2018

10   DTSC Evaluation, p. 61.)

11        52.    On September 29, 2011, a stockpile caught on fire, emitting a dark plume of

12   smoke that was visible for miles. (*See* A. Woodall, East Bay Times, *Oakland Firefighters*

13   *Extinguish Scrap Metal Blaze* (Sept. 29, 2011), http://www.eastbaytimes.com/2011/09/29/

14   oakland-firefighters-extinguish-scrap-metal-blaze/; 2018 DTSC Evaluation, p. 61.)

15        53.    On June 2, 2018, a fire occurred that was visible throughout the Bay Area,

16   emitting what a Bay Area Air Quality Management District (BAAQMD) official called a "toxic

17   brew" and prompting widespread concern about public health impacts and ongoing agency

18   investigations. (L. Anthony, ABC Channel 7 News, *West Oakland fire is recycling plant's fifth in*

19   *eight years*, (June 4, 2018), http://abc7news.com/oakland-fire-is-recycling-plants-fifth-in-eight-

20   years/3561037/; *see also* A. Hassan, NBC Bay Area, *Air Quality Concern in Oakland Following*

21   *Recycling Plant Fire* (June 2, 2018), https://www.nbcbayarea.com/news/local/Recycling-Pile-on-

22   Fire-in-Oakland-484396781.html.)

23

24

25   [15] (*See* State Water Resources Control Board, Region 2 Section 303(d) list from the "Final
     California 2010 Integrated Report (Clean Water Act Section 303(d) List/305(b) Report) –
26   Statewide, https://www.waterboards.ca.gov/water_issues/programs/tmdl/2010state_ir_reports/
     00009.shtml#18094 (listing these pollutants for the Oakland Inner Harbor); UC Davis DELTA
27   Group Study, Deposition of Coarse Toxic Particles in Wilmington, CA for DTSC: Summer 2008
     and Spring 2009 (May 6, 2011), p. 42 (listing these pollutants for metal shredders).)
28

---

                                        17

1



Plume of smoke at Schnitzer Steel Facility during June 2, 2018 fire. *Source:* CBS News, *Fire erupts at scrap yard in Oakland, California, that's had trouble in the past* (June 2, 2018), https://www.cbsnews .com/news/oakland-california-scrap-yard-fire-schnitzer-steel-blaze-today-live-updates-2018-06-02/.

54.     DTSC has observed that such "plumes of dense smoke [are] consistent with the burning of plastics and other synthetic materials that comprise the majority of the metal shredder wastes," and explained that "[t]he chemical constituents in this smoke can harm those who come in contact with it by, for example, exacerbating existing respiratory problems." (2018 DTSC Evaluation, p. 79.)

55.     In fact, the Facility had at least four fires in 2018 alone. (*See* Oakland Fire Department Incident Report No. 2018-0008289 (Jan. 31, 2018); Oakland Fire Department Incident Report No. 2018-0018039 (March 10, 2018); Oakland Fire Department Incident Report No. 2018-0018338 (March 11, 2018); Oakland Fire Department Incident Report No. 2018-0039820 (June 2, 2018).)

56.     Most recently, a fire broke out at the Facility on June 17, 2020. The blaze sent large plumes of black smoke over West Oakland, Alameda, and the Bay. (KTVU, *Crews responding to blaze at Schnitzer Steel in Oakland*, https://www.ktvu.com/news/crews-responding-to-blaze-at-schnitzer-steel-in-oakland (June 17, 2020).)

1    **F.    Schnitzer's location raises additional public health risk**

2    57.    In addition to the size of its operations, Schnitzer's location differentiates the risk

3 it poses to nearby communities from other metal shredders. The Facility is located within a half

4 mile of sensitive receptors. Many more sensitive receptors are located within a mile of the

5 Facility, including numerous schools, daycare centers, hospitals, senior living centers, parks, and

6 residential neighborhoods. Approximately 23,000 fulltime residents live within a mile of the

7 Facility.

8    58.    The Oakland Unified School District has found that five schools in West Oakland

9 near the Facility show the highest "environmental stress indicators" based on exposure to poor air

10 quality, among other risks. (Oakland Unified School Strict, *School Environment: Environmental*

11 *Stress Factors 2016*, https://dashboards.ousd.org/views/SRA1718_3SCHOOLS_ENVIRONM

12 ENT_0/SchoolEnvironment?iframeSizedToWindow=true&:embed=y&:showAppBanner

13 =false&:display_count=no&:showVizHome=no.) Prescott School, an elementary school near the

14 Facility, has the *highest score possible* (145 out of 145) for environmental stress factors. (*Id.*)

15 Martin Luther King Jr. Elementary School is located less than a mile from the Facility and is

16 shown to be "highly stressed," with a score of 112. (*Id.*) In 2014, DTSC found that Schnitzer had

17 caused hazardous LFM to be deposited at Martin Luther King Jr. Elementary School. DTSC's

18 testing showed that the LFM samples exceeded California hazardous waste toxicity threshold for

19 lead. (Community Meeting Regarding Schnitzer Steel, p. 74; DTSC, Harbison Summary of Test

20 Results (Oct. 29, 2014)).

21    59.    The Facility is also surrounded by neighborhoods that have a high proportion of

22 socioeconomically disadvantaged populations. Approximately 27.1% percent of residents living

23 in ZIP code 94607, where the Facility sits and which encompasses most of West Oakland, live

24 below the federal poverty level. This is almost three times greater than Alameda County's overall

25 10.6% poverty rate.[16]

26

27 [16] U.S. Census Bureau, American Communities Survey, 2018 ACS 5-Year Estimates Subject
Tables, tbl. S1701, https://data.census.gov/cedsci/table?q=United%20States&g=

28 0100000US&tid=ACSDP1Y2018.DP05.

1       60.    The community surrounding the Facility is also already burdened by much higher

2   pollution levels than other areas in Oakland and California. (Alameda County Pub. Health Dept.,

3   East and West Oakland Health Data Existing Cumulative Health Impacts (Sept. 3, 2015)

4   ("ACPHD Report"), p. 7.) The Alameda County Public Health Department has found that "[l]ow

5   income neighborhoods and communities of color [in Alameda County] are unjustly burdened by a

6   disproportionate number of hazardous facilities that pollute the air, ground water and soil with

7   toxic contaminants." (*Id.* at p. 7.) In fact, "the density of industrial chemical and fuel release

8   sites in very high poverty neighborhoods [in Alameda County] is 4 times higher than in affluent

9   neighborhoods." (*Id.*) The California Environmental Protection Agency's Communities

10   Environmental Health Screening Tool shows that the majority of the West Oakland community is

11   in the 81-90 percentile of census tracts in the state that are "disproportionately burdened by, and

12   vulnerable to, multiple sources of pollution."[17]

13       61.    As to health impacts, the rate of asthma emergency-department visits in West

14   Oakland neighborhoods surrounding the Facility is almost double Alameda County's rate.

15   (ACPHD Report at p. 9.) Stroke and congestive heart failure-related hospitalization rates are also

16   much higher in West Oakland, as well as stroke and heart disease mortality rates. (*Id.* at p. 9;

17   Alameda County Pub. Health Dept., Community Assessment, Planning, and Evaluation Unit,

18   *Map Set 2016* (Nov. 2016), pp. 17, 21.) Death rates in West Oakland are 1.3 times the rate for

19   Oakland and 1.5 times the rate for Alameda County overall. (ACPHD Report, p. 13.) In fact, an

20   African American child born in West Oakland has a life expectancy that is 12.4 years shorter than

21   a white child living in the more affluent Oakland Hills. (*Id.* at p. 18.)

22       62.    Schnitzer's proximity to these sensitive receptors in the vulnerable West Oakland

23   community is particularly concerning because DTSC has "found that the hazardous waste

24   management activities" of metal shredding facilities, including Schnitzer's Facility, "*pose*

25   *substantial risks* to nearby communities." (2018 DTSC Evaluation, p. 112, emphasis added.)

26

27

28   [17] *See* California Office of Environmental Health Hazard Assessment, CalEnviroScreen 3.0 (June 2018 update), https://oehha.ca.gov/calenviroscreen/report/calenviroscreen-30.

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
220

1    G.    **DTSC's regulation of metal shredders**

2        63.    Enacted in 1972, the HWCL directs DTSC to regulate the handling, processing,

3    and disposal of hazardous and extremely hazardous waste to protect the public, livestock, and

4    wildlife from hazards to health and safety. Under the HWCL, facilities that treat, store, handle,

5    and/or dispose of hazardous waste are required to obtain a permit from DTSC. A hazardous

6    waste facility permit identifies specific requirements for a facility to ensure its safe operation.

7    The HWCL also implements federal tracking requirements for the handling and transportation of

8    hazardous waste from generation to ultimate disposition.

9        64.    In 1984, DTSC first found that metal shredder residue was California hazardous

10    waste due to the presence of cadmium, copper, lead, PCBs, and zinc at levels above the state's

11    regulatory thresholds, as well as PCBs at concentrations "that, on some occasions, exceeded

12    either the federal or the California regulatory thresholds, or both."[18] (SB 1249 § 1(b); *see also*

13    DTSC, Draft Report, California's Automobile Shredder Waste Initiative (Nov. 2002) p. 11.)

14    These findings subjected metal shredder residue to statutory and regulatory requirements for

15    California hazardous waste management, including permitting, treatment, transportation, and

16    disposal requirements.

17        65.    In accordance with these findings, on March 9, 1984, DTSC directed metal

18    shredding facilities to manage metal shredder residue in accordance with hazardous waste

19    regulations.

20        66.    In 1986, however, DTSC examined whether treating metal shredder residue with

21    silicate and cement to reduce the solubility of metals could permit its classification as

22    nonhazardous waste. (2018 DTSC Evaluation, p. 14.)

23        67.    Between 1986 and 1992, DTSC "issued conditional nonhazardous waste

24    classifications . . . to seven shredder facilities in California that treated their metal shredder waste

25    to stabilize the metals in the waste and reduce their solubility."[19] (SB 1249 § 1(c).) These

26    _____

27    [18] DTSC is also used to refer to the agency's predecessor, the Toxic Substances Control Division
of the former State Department of Health Service.

28    [19] Six of the seven facilities currently remain.

21

1    conditional nonhazardous waste classifications are referred to as "f letters" because DTSC issued

2    them pursuant to subdivision (f) of Section 66260.200 of Title 22 of the California Code of

3    Regulations. Once a metal shredder received an "f letter," DTSC no longer regulated the treated

4    waste as hazardous. The practical result was that metal shredder residue from these facilities

5    could then be treated, stored, transported, and disposed of as non-hazardous waste, even though

6    the shredder residue continues to exceed toxicity thresholds for hazardous waste after

7    "treatment." For example, Schnitzer is not required to containerize the hazardous treated

8    shredder residue, and is allowed to dispose of the material in Class III municipal landfills—

9    landfills *not* approved to accept hazardous waste.

10        68.    In addition to issuing "f letters," in 1988, DTSC issued its related OPP 88-6 to

11   address the management of metal shredder waste. (*See* DHS Official Policy and Procedure No.

12   88-6 Auto Shredder Waste Policy and Procedure (1988).) Under OPP 88-6, if the chemical

13   stabilization were to take place while the metal shredder aggregate was still undergoing

14   separation processes, DTSC's policy was to consider the treatment to be "in-line" and not require

15   a hazardous waste facility permit.[20]

16        69.    As the Legislature explained in passing SB 1249, "[i]n early 2001, DTSC began an

17   initiative to evaluate the adequacy of the metal shredder waste policy and compliance with the

18   conditional nonhazardous waste classifications, which included new sampling and analysis." (SB

19   1249 § 1(d).)

20        70.    A DTSC legal memorandum issued on October 9, 2001, concluded that DTSC's

21   policies on metal shredder waste, including OPP 88-6 and the "f letters," were "outdated and

22   legally incorrect." (DTSC Senior Staff Counsel Nancy J. Long, memorandum to DTSC Senior

23   Environmental Scientist Peter Wood, Oct. 9, 2001, p. 17.) The memorandum explains:

24        DTSC's policy on [metal shredder waste] is outdated and legally incorrect. The
25        crushed automobile or junked appliance arriving at the resource recovery facility
          (shredder) is a "waste" as set forth in the relevant case law. This waste becomes a
26        hazardous waste as a result of the shredding process. The treatment of any

27   ─────────────────────────
[20] "In-line" treatment means "any treatment to a material in an industrial process before that
28   material is exhausted or otherwise rendered a waste." (*See* OPP 88-6 (Nov. 21, 1988), p. 3.)

1   hazardous waste, including [metal shredder waste], requires a permit or other grant
2   of authorization.

(*Id.*) Yet DTSC left its policies in place.

71.   In 2002, DTSC released a draft report summarizing its on-site surveys and review of metal shredder facilities operating in California, including DTSC's sampling of treated and untreated metal shredder residue. The report demonstrated that both treated and untreated metal shredder residue exceeded state regulatory thresholds for lead, zinc, and cadmium. (*See* DTSC, Draft Report, California's Automobile Shredder Waste Initiative (Nov. 2002) pp. 7, 17–19.) Some of the samples also exceeded the federal regulatory thresholds for soluble lead and cadmium. (*Id.* at pp. 7, 10, 21.) Based on the results of the sampling investigation, DTSC recommended:

a) Rescinding OPP 88-6;

b) Requiring "facilities that wish to continue treating their shredder waste on-site to obtain the appropriate authorization within a specified period of time;" and

c) Rescinding "all previously issued nonhazardous waste classifications for treated shredder waste," *i.e.*, the "f letters."

(*Id.* at pp. 8, 25.) However, DTSC shelved the report and did not act on its recommendations.

72.   In 2008, again based on the results of sampling, the then-Director of DTSC notified Schnitzer and other metal shredding facilities that DTSC intended to rescind the "f letters" and OPP 88-6:

Despite many discussions with industry regarding alternative management and treatment of the waste, it is clear that the conditions contained in the DTSC's previous authorization letters and in DTSC's Policy and Procedure 88-6 have not been sufficient to reduce the waste to a non-hazardous solid waste. Therefore, those letters and policy need to be repealed, and the wastes need to be managed as hazardous waste to ensure the safety of public health and the environment from harmful exposures of toxins.

(DTSC Director Maureen F. Gorsen, letter to Schnitzer Steel Industries, Inc. Executive Vice President, Gary Schnitzer, Sept. 29, 2008, p. 1, https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/05/Schnitzer-1.pdf.)

23

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
223

1       73.      However, after industry lobbying, DTSC again did not rescind the "f letters" or

2   OPP 88-6.

3       74.      DTSC was not the only agency to raise concern about metal shredders' hazardous

4   waste management practices. In 2009, the California Integrated Waste Management Board (now

5   CalRecycle) issued the "Alternative Daily Cover White Paper." The paper explained that:

6         Staff with [DTSC] have indicated that [metal shredder waste] *treatment is not
7         effective, the material should be considered hazardous, and [metal shredder waste]
         should be required to be disposed in Class I landfills.*[21] DTSC staff also indicate
         that [metal shredder waste] feedstocks are variable and have changed in the last 20
8         years (more electronic components, white goods, chlorinated plastics) . . . .
         Automobile Recycling Fluff in Ohio is considered unsuitable for [alternative daily
9         cover] due to concerns regarding fire hazards, wind-driven scattering dispersal
         outside the working face by landfill equipment, and the potential for contamination
10        by asbestos, PCBs, and mercury (from switches).

11   (California Integrated Waste Management Board, Alternative Daily Cover White Paper

12   (Oct. 2009) p. 22, emphasis added.)

13       75.      Despite conceding that the treatment of metal shredder residue was ineffective,

14   and recognizing that other states have concluded that treated metal shredder residue was

15   unsuitable for use as alternative daily cover, DTSC again took no action to rescind the "f letters."

16      **H.**     **The Legislature enacts Senate Bill 1249, mandating that DTSC rescind the "f
         letters."**

17

18       76.      Frustrated with DTSC's pattern of inaction and concerned with the dangers posed

19   by the metal shredding industry, in 2014, the California Legislature stepped in by passing SB

20   1249. The law required DTSC to act by January 1, 2018, by either developing alternative

21   management standards or applying the HWCL to metal shredders.

22       77.      The Senate Committee on Environmental Quality explained that legislation was

23   required because "DTSC has failed to revoke the nonhazardous waste classifications for treated

24   shredder waste granted decades ago to the metal shredding industry despite a 2001 legal opinion

25   by DTSC attorneys, which called the exemption 'outdated and legally incorrect,' and warnings

26   from the department's scientists that this waste could become hazardous during the shredding

27   [21] A Class I landfill is a landfill that is authorized to accept hazardous waste. In contrast, a Class
28   II landfill is not authorized to accept hazardous waste, and a Class III landfill is a municipal
    landfill that is not authorized to accept hazardous waste.

1    process." (Sen. Comm. on Environmental Quality, April 29, 2014 Analysis of SB 1249 (2013–

2    2014 Reg. Sess.) pp. 3-4.) The Bill's author, Senator Jerry Hill, explained that SB 1249 was also

3    prompted by several fires that had occurred at metal shredding facilities, including at least one

4    within his district. (*Id.* at p. 3.) He explained that the Counties of San Mateo, Alameda, and

5    Santa Clara issued health advisories because of the smoke from these fires, and school districts

6    were forced to keep students inside because of poor air quality. (*Id.*) He concluded that "these

7    incidents provide clear evidence that this industry is not currently adequately regulated." (*Id.*)

8        78.    SB 1249 became effective on January 1, 2015, enacting the MSFL, Health &

9    Safety Code sections 25150.82 through 25150.86.

10       79.    A central provision of the MSFL requires that "[t]he disposal of treated metal

11   shredder waste shall be regulated pursuant to this chapter [the HWCL] and the regulations

12   adopted pursuant to this chapter, unless alternative management standards are adopted by the

13   department pursuant to this section." (Health & Saf. Code § 25150.82(j)(1).) The MSFL makes

14   clear that DTSC's authority to adopt alternative management "shall remain in effect only until

15   January 1, 2018," absent subsequent legislative action amending that deadline. (*Id.* at

16   § 25150.82(l).) Accordingly, absent regulatory action by that deadline, "[t]he disposal of treated

17   metal shredder waste shall be regulated pursuant to [the HWCL]," requiring DTSC to rescind the

18   "f letters." (*Id.* § 25150.82(j)(1); *see also* SB 1249 § 1(f) ["It is the intent of the Legislature that

19   the conditional nonhazardous waste classifications, as documented through the historical 'f

20   letters,' be revoked and that metal shredding facilities be thoroughly evaluated and regulated to

21   ensure adequate protection of the human health and the environment"].)

22       80.    The MSFL also imposes procedural and substantive requirements on DTSC's

23   ability to adopt alternative management standards. Specifically, to adopt such standards instead

24   of applying the HWCL, DTSC must first evaluate the hazardous waste management activities at

25   metal shredding facilities to determine the hazards and risks that are posed to the surrounding

26   communities. (*Id.* § 25150.82(c)(1), (d).) Based on this evaluation, the MSFL authorizes DTSC

27

28

<hr />

25

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
225

1  to adopt alternative management standards only if it can satisfy one of the four demonstrations

2  required by Health & Safety Code sections 25150.82(e)(1) through 25150.82(e)(4).[22]

3      81.    DTSC neither adopted alternative management standards nor began to apply the

4  HWCL to metal shredders by the January 1, 2018 deadline. Rather, DTSC issued a "draft

5  evaluation" of metal shredders, which yet again found that their hazardous waste management

6  activities "pose substantial risks to nearby communities." (2018 DTSC Evaluation, p. 112.)  In

7  that document, DTSC also concluded that, based on the agency's findings, the MSFL did not

8  authorize alternative management standards because it could not satisfy any of the four

9  demonstrations required by Health & Safety Code sections 25150.82(e)(1) through

10  25150.82(e)(4). (*Id.* at pp. 98-100.)  DTSC found that none of these requirements were met

11  because "the risks and hazards posed by the hazardous waste management activities conducted at

12  metal shredding facilities require the protections that can only be provided by the existing

13  hazardous waste management requirements." (*Id.* at p. 113.)  Specifically, alternative

14  management standards would not be as protective of human health and the environment as

15  detailed, facility-specific requirements imposed through the HWCL's permitting process, which

16  "consider[s] the variability between facilities' operations, treatment equipment, pollution control

17  equipment and practices, and environmental setting and proximity to nearby sensitive land uses,

18

19

20

---

21  [22] Pursuant to Health & Safety Code sections 25150.82(e), DTSC evaluated whether (1) the
22  requirements of existing hazardous waste control law, including the requirement to obtain a
    permit to conduct hazardous waste treatment and storage activities, are significant or important in
23  preventing or mitigating potential hazards to human health or safety and the environment, or in
    ensuring compliance with other hazardous waste requirements; (2) the requirements imposed and
24  enforced by other public agencies are equivalent to, or as effective as, the existing hazardous
    waste control law; (3) conditions or limitations could be developed that would provide protection
25  of human health and safety and the environment equivalent to the requirement, or requirements,
    of existing hazardous waste control law; and (4) conditions or limitations could be imposed that
26  would accomplish the same regulatory purpose as the requirement, or requirements, of existing
    hazardous waste control law, but at less cost or with greater administrative efficiency, and while
27  preventing potential risks to human health or safety or to the environment.

28

---

26

EXHIBIT I
226

1   such as residences, schools, day care centers, and hospitals."[23]  (*Id.* at p. 94.)  Despite these

2   findings, DTSC did not act to rescind Schnitzer's "f letter" or to apply the HWCL to the Facility.

3   82.   Instead, DTSC explained its view that it would be more appropriate and effective

4   to establish a conditional exclusion for metal shredder residue and regulate other hazardous waste

5   management practices by metal shredders pursuant to regulations that DTSC might develop in the

6   future.  This position is fundamentally at odds with SB 1249's clear command that DTSC either

7   regulate metal shredders under the HWCL or pursuant to alternative regulations promulgated

8   consistent with SB 1249's requirements.  (Health & Safety Code § 25150.82(j)(1).)  DTSC has

9   stayed its unlawful course; it has since embarked on a rulemaking process to create new

10  hazardous waste management standards for metal shredders.  But even if this alternative path

11  qualified as compliance with SB 1249—which it does not—DTSC still has failed, over two and a

12  half years later, to act.  In clear violation of the law, DTSC is still not regulating Schnitzer

13  pursuant to the HWCL.  Rather, Schnitzer's "f letter" remains in place, as do the onsite hazardous

14  waste management practices they purport to authorize, which DTSC has repeatedly found place

15  surroundings communities and the environment at "substantial risk."

16        I.      **DTSC has not complied with the Metal Shredding Facilities Law**

17        83.   As summarized above, the MSFL authorized DTSC to adopt alternative

18  management standards by January 1, 2018.  (Health & Saf. Code § 25150.82(l).)  Absent

19  adoption of alternative management standards by that deadline, the MSFL imposed a non-

20  discretionary duty on DTSC to regulate metal shredders pursuant to the HWCL and rescind the "f

21  letters."  (Health & Saf. Code § 25150.82(j)(1); *id.* at subd. (k).)  Because DTSC did not adopt

22  alternative management standards by the January 1, 2018 deadline, it must rescind Schnitzer

23  Steel's "f letter" and regulate Schnitzer pursuant to the HWCL.

24

25

26  [23] Such requirements imposed through hazardous waste permits include but are not limited to the
    use of containment buildings, pavement, and liners, as well as other preparedness and prevention
27  measures "to minimize the possibility of a fire, explosion, or any unplanned sudden or non-
    sudden release of metal shredder waste or metal shredder waste constituents to air, soil, or surface
28  water."  (2018 DTSC Evaluation, pp. 89-91, 94-95.)

VERIFIED PETITION FOR WRIT OF MANDATE
EXHIBIT I
227

84.     This conclusion is supported by the MSFL's statutory statement of purpose, plain

language, and legislative history, as well as by DTSC's own previous interpretations of the law,

as further detailed below.

85.     In its findings and declarations at SB 1249's outset, the Legislature made clear that

DTSC must rescind the "f letters:"

> It is the intent of the Legislature that the conditional nonhazardous waste
> classifications, as documented through the historical 'f letters,' *be revoked* and that
> metal shredding facilities be thoroughly evaluated and regulated to ensure adequate
> protection of the human health and the environment.

(SB 1249 § 1(f), emphasis added.)

86.     This intent is carried forward in the plain language of the MSFL's substantive

provisions. For example, Health and Safety Code section 25150.82(j)(1) provides that "[t]he

disposal of treated metal shredder waste *shall* be regulated pursuant to this chapter and the

regulations adopted pursuant to this chapter, *unless* alternative management standards are adopted

by the department pursuant to this section." (Health & Saf. Code § 25150.82(j)(1), emphasis

added.)

87.     The legislative history also makes clear that DTSC had a non-discretionary duty to

apply the HWCL to Schnitzer and rescind the "f letters," unless the agency adopted alternative

management standards by January 1, 2018. For example, the legislative counsel's digest states:

> The bill would require the disposal of treated metal shredder waste to be regulated
> pursuant to the hazardous waste control laws, unless the department adopts those
> alternative management standards, and would authorize treated metal shredder
> waste to be used at a specified type of disposal unit as alternative daily cover or for
> beneficial reuse or placed in that specified type of disposal unit, if the alternative
> management standards result in the treated metal shredder waste being classified as
> nonhazardous waste.

(SB 1249, Legislative Counsel's Digest at § 1.) SB 1249's Bill Analysis similarly explains:

> SB 1249 *rescinds all previously issued nonhazardous waste classifications* for
> treated shredder waste for facilities that deal with vehicle shredder waste and
> requires DTSC to analyze, classify and develop regulations to ensure that storage,
> treatment, transport and disposal are done in a manner that protects public health
> and the environment, as appropriate. The author believes that this legislation will
> provide for better DTSC oversight of the industry to prevent contamination,

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
228

1      explosions or other risks to California communities.

2  (Sen. Comm. on Environmental Quality, April 29, 2014 Analysis of SB 1249 (2013–2014 Reg.

3  Sess.) p. 7, emphasis added.)

4      88.    In fact, even DTSC itself interpreted (at least initially) SB 1249 as requiring it to

5  act. For example, DTSC has stated:

6      SB 1249 requires DTSC to evaluate the risks and threats posed by metal shredders
7      and the management of metal shredder waste, and to *either* develop alternative
       management standards that govern metal shredding activities, *or* rescind its 1987
8      era decisions under which metal shredders have operated without hazardous waste
       permits and managed their waste as nonhazardous waste.
9

10  (DTSC, State of California Budget Change Proposal Regarding Implementation of SB 1249

11  (Nov. 6, 2015).)

12      89.    In its Project Summary on SB 1249 Implementation, DTSC's Independent Review

13  Panel (IRP)[24] interpreted the statute similarly and confirmed that the status quo was unacceptable:

14      SB 1249 authorizes DTSC to *either* develop alternative management standards for
       metal shredding facilities *or* rescind any prior decisions and require the facilities and
15      its waste to be subject to full hazardous waste management requirements.

16  (DTSC Independent Review Panel, Project Summary, SB 1249 Implementation (Jan. 28, 2016) p.

17  1, emphasis added; *see also id.* at p. 2 ["As expressed in the bill, it was the intent of the Legislature

18  that the non-hazardous waste classification, as documented through the 'f letters,' *be revoked* and

19  that metal shredding facilities be regulated to ensure adequate protection of the human health and

20  environment."], emphasis added.)

21      90.    Indeed, the IRP stated that DTSC had intended to follow the Legislature's intent to

22  rescind the "f letters":

23      By January 1, 2018, DTSC intends to revoke the historic "f letters" and either
       replace them with alternative management standards or require the industry to be
24      regulated under existing hazardous waste control law. Ultimately, at the conclusion
       of the DTSC's implementation of SB 1249, all metal shredding facilities will be
25      consistently regulated under uniform statewide standards that ensure adequate
26      protection of human health and the environment.

27  [24] Senate Bill 83 established within DTSC a three-member IRP to review the Department and
28  make recommendations to improve its programs. (*See* Sen. Bill No. 83 (2015–2016 Reg. Sess.)
    § 15.)

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I

229

1   (DTSC Independent Review Panel, Project Summary, SB 1249 Implementation (Jan. 28,

2   2016) p. 8.)

3       91.    Moreover, other agencies have expressed their understanding that the "f letters"

4   have already been rescinded, as SB 1249 required of DTSC. (Email from Arleen Feng, Alameda

5   Countywide Clean Water Program, to Lucile Paquette, Jon Konnan, and Reig Bogert (May 23,

6   2017) ["The process and timeline are driven by SB 1249, which led to DTSC's rescinding the 'F-

7   letters' that allowed 7 CA shredding facilities to classify their treated Metal Shredder Waste as

8   non-hazardous waste, pending re-evaluation and revising regulations."].)

9       92.    However, DTSC reversed course and never acted to rescind the "f letters" and

10  apply the HWCL, as the MSFL requires. To date, DTSC has not rescinded the "f letters," and it

11  has not begun regulating metal shredders under the HWCL. Rather, the hazardous waste

12  management practices that DTSC has found "pose substantial risks to nearby communities" and

13  the environment continue today. (2018 DTSC Evaluation, p. 112.)

14      93.    As explained above, the public health and environmental concerns raised by these

15  hazardous waste management practices are particularly alarming in West Oakland, where

16  Schnitzer operates the largest metal shredding facility in California in an environmental justice

17  community with many nearby sensitive receptors. Indeed, DTSC recognized as much in its

18  Budget Change Proposal to the California Legislature to fund implementation of SB 1249:

19          This proposal will allow DTSC to perform the responsibilities specified in the bill
            in the amount of time required by the bill. *Even more importantly*, this proposal will
20          allow DTSC to reduce risks and hazards faced by California's most vulnerable and
            impacted communities in the vicinity of these types of facilities.
21

22  (DTSC, State of California Budget Change Proposal Regarding Implementation of SB 1249 (Jan.

23  2, 2015), emphasis added.)

24                          **FIRST CAUSE OF ACTION**

25                      **(For Writ of Mandate Under C.C.P. § 1085)**

26      94.    Petitioner hereby incorporates all preceding paragraphs as if fully set forth herein.

27

28

                                    30
                            VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
230

95.     DTSC has a clear, mandatory duty under the Metal Shredding Facilities Law (Health and Safety Code §§ 25150.82–25150.86), as enacted by Senate Bill 1249, to rescind Schnitzer's "f letter" and regulate its Oakland metal shredding facility pursuant to the California Hazardous Waste Control Law.

96.     DTSC has unlawfully failed and/or refused to perform this duty and, unless this Court mandates it to do so, will continue to fail and refuse to perform the duties imposed on it by California law.

97.     Petitioner has no available administrative remedies.  Petitioner has no plain, speedy, and adequate remedy in the ordinary course of law, other than the relief sought herein.

98.     Petitioner is beneficially interested in issuance of a peremptory writ because it presently maintains business operations in close proximity to Schnitzer and additionally because Petitioner is seeking to construct its ballpark in close proximity to Schnitzer.  Petitioner, along with its employees and patrons, is entitled to the protection of the environmental laws that the Legislature has enacted to protect individuals within close proximity to hazardous waste. Petitioner is further beneficially interested in issuance of a peremptory writ of mandate so that hazardous wastes can be safely managed to ensure adequate protection of human health in surrounding communities and of the environment, including the Oakland community.

99.     The writ of mandate sought by Petitioner will result in the enforcement of an important right affecting the public interest, and will confer a significant benefit on the general public, especially the West Oakland environmental justice community, as it will require compliance with California laws that were enacted to protect human health and the environment.

100.    DTSC's failure and/or refusal to rescind Schnitzer's "f letter" and apply the Hazardous Waste Control Law to the Facility violates mandatory duties imposed on DTSC and/or constitutes action that is contrary to law, an abuse of discretion, and/or arbitrary and capricious.

101.    Therefore, pursuant to Code of Civil Procedure section 1085, a Writ of Mandate should issue directing DTSC (i) to rescind Schnitzer's "f letter" and (ii) to require Schnitzer to operate the Facility in compliance with the HWCL.

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
231

1          **PRAYER FOR RELIEF**

2     Petitioner hereby prays for relief as follows:

3     A.     A peremptory writ of mandate or other order commanding the DTSC to rescind

4            Schnitzer's conditional nonhazardous waste classification ("f letter") and to

5            require Schnitzer to operate the Facility in compliance with the HWCL;

6     B.     Costs of suit;

7     C.     Attorneys' fees as allowed by law, including under Code of Civil Procedure

8            Section 1021.5;

9     D.     Such other and further relief as the Court deems just and proper.

10

11    Dated: August 5, 2020                         **KEKER, VAN NEST & PETERS LLP**

12                                           By: _____

13                                               R. JAMES SLAUGHTER
                                                 ERIC H. MACMICHAEL
14

15

16    Dated: August 5, 2020                         **VENABLE LLP**

17                                           By: _____

18                                               WILLIAM M. SLOAN
                                                 TYLER WELTI
19

20                                               *Attorneys for Petitioner*
                                                 THE ATHLETICS INVESTMENT
21                                               GROUP LLC

22

23

24

25

26

27

28

                                      32
                                                   VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
232

## VERIFICATION

I, David Kaval, declare:

I have been authorized to make this verification on behalf of Petitioner THE ATHLETICS INVESTMENT GROUP LLC.

I have read the foregoing VERIFIED PETITION FOR WRIT OF MANDATE and know the contents thereof. I verify that the factual allegations set forth therein are true or are allegations that on information and belief I believe to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California on this 4th day of August, 2020.


_____
DAVID KAVAL

VERIFIED PETITION FOR WRIT OF MANDATE

EXHIBIT I
233

1

## PROOF OF SERVICE

2    I am employed in the City and County of San Francisco, State of California, in the office of

3  a member of the bar of this court, at whose direction the service was made.  I am over the age of

4  eighteen (18) years and not a party to or interested in the within-entitled action.  I am an employee

5  of **PILLSBURY WINTHROP SHAW PITTMAN LLP**, and my business address is Four Embarcadero

6  Center, 22nd Floor, San Francisco, California 94111.

7    On May 24, 2022, I served the following documents:

8    **REAL PARTY IN INTEREST SCHNITZER STEEL INDUSTRIES, INC.'S**
   **NOTICE OF OPPOSITION TO PETITIONER'S NOTICE OF RELATED CASE**

9

10  on the parties listed below:

11

12  Rob Bonta, Attorney General of California                *Attorneys for Defendants*
    Edward H. Ochoa, Senior Assistant Attorney General      *California Department of Toxic*

13  Dennis L. Beck, Jr., Deputy Attorney General             *Substances Control and Meredith*
        Dennis.Beck@doj.ca.gov                               *Williams in her official capacity as*

14  Elizabeth B. Rumsey, Deputy Attorney General             *Director*
        liz.rumsey@doj.ca.gov

15  1300 I Street, Suite 125
    P.O. Box 944255

16  Sacramento, CA  94244-2550

17  KEKER, VAN NEST & PETERS LLP                             *Attorneys for Petitioner*

18  R. JAMES SLAUGHTER                                       *The Athletics Investment*
        rslaughter@keker.com                                 *Group LLC*

19  ERIC H. MACMICHAEL
        emacmichael@keker.com

20  633 Battery Street
    San Francisco, CA  94111-1809

21

22  VENABLE LLP                                              *Attorneys for Petitioner*
    WILLIAM M. SLOAN                                         *The Athletics Investment*

23      wmsloan@venable.com                                  *Group LLC*
    TYLER G. WELTI

24      tgwelti@venable.com
    101 California Street, Suite 3800

25  San Francisco, CA  94111

26

27

28

1    Jaclyn H. Prange                        *Attorneys for Amici Curiae*
       Natural Resources Defense Council            *Communities for a Better*

2    111 Sutter Street, 21st Floor                 *Environment, Center on Race, Poverty*
       San Francisco, CA 94104                  *& the Environment, San Francisco*

3    Telephone: (415) 875-6100                *Baykeeper, and Natural Resources*
       Email: jprange@nrdc.org                 *Defense Council*

4

5    Lauren P. Phillips
       Natural Resources Defense Council

6    40 West 20th Street, 11th Floor
       New York, NY 10011

7    Telephone: (212) 727-4415
       Fax: (415) 795-4799

8    Email: lphillips@nrdc.org

9    M. Benjamin Eichenberg
       San Francisco Baykeeper

10   1736 Franklin Street, Suite 800
       Oakland, CA 94612

11   Telephone: 510-735-9700 x105

12   Email: ben@baykeeper.org

13

14        The documents were served via **E-MAIL.** My electronic service address is

15   tina.bishop@pillsburylaw.com. I electronically served the documents listed above on the parties

16   listed above by transmitting the documents in adobe PDF format.

17        I declare under the penalty under the laws of the State of California that the foregoing is true

18   and correct.

19        Executed on May 24, 2022, at San Francisco, California.

20

21                                      *Tina Bishop*

22                                      Tina Bishop

23

24

25

26

27

28

1  ALEXANDER G. CROCKETT (SBN 193910)
   District Counsel
2  acrockett@baaqmd.gov
   ADAN A. SCHWARTZ (SBN 151815)
3  Senior Assistant Counsel
   aschwartz@baaqmd.gov
4  MARCIA L. RAYMOND (SBN 215655)
   Assistant Counsel
5  mraymond@baaqmd.gov
   BAY AREA AIR QUALITY MANAGEMENT DISTRICT
6  375 Beale Street, Suite 600
   San Francisco, CA  94105
7  Telephone: (415) 749-4920
   Facsimile:  (415) 749-5103
8
   Counsel for Respondents the
9  BAY AREA AIR QUALITY MANAGEMENT DISTRICT and
   ALEXANDER CROCKETT
10

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**05/24/2022 at 05:20:51 PM**
By: Cheryl Clark, Deputy Clerk

California Public Entity
Fee Exempt (Gov't Code § 6103)

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                        **COUNTY OF ALAMEDA**

13  THE ATHLETICS INVESTMENT GROUP,      )  CASE NO. 22CV01 0930
    LLC,                                 )
14                                       )  **BAY AREA AIR QUALITY MANAGEMENT**
                Petitioner,              )  **DISTRICT'S RESPONSE OPPOSING**
15                                       )  **PETITIONER'S NOTICE OF RELATED CASE**
        vs.                              )
16                                       )  *[Assigned for All Purposes to*
    THE BAY AREA AIR QUALITY             )  *Hon. Michael Markman, Dept. 14]*
17  MANAGEMENT DISTRICT, and ALEXANDER  )
    CROCKETT, in his official capacity as Interim )  Action filed: May 6, 2022
18  Executive Officer of BAAQMD,         )  Trial Date: None Set
                                         )
19              Respondents,             )
                                         )
20  ─────────────────────────────────── )
                                         )
21  SCHNITZER STEEL INDUSTRIES, INC.,    )
                                         )
22          Real Party in Interest.      )
    ─────────────────────────────────── )
23

24         Pursuant to Rule 3.300(g) of the California Rules of Court, Respondents the BAY AREA AIR

25  QUALITY MANAGEMENT DISTRICT and ALEXANDER CROCKETT (collectively, the "Air

26  District") hereby respond to and oppose the Notice of Related Case ("Notice") filed by the Petitioner the

27  Athletics Investment Group, LLC ("Petitioner") on May 17, 2022.

28         The Notice seeks to relate this case (the "Air District case") with an unrelated case involving the

─────────────────────────────────────────
                        1
    RESPONDENTS' RESPONSE AND OBJECTION TO PETITIONER'S NOTICE OF RELATED CASE

Department of Toxics Substances Control (the "DTSC case"), *The Athletics Investment Group, LLC v. California Department of Toxic Substances Control*, Alameda County Superior Court Case No. RG20069917. Both cases were filed by the same Petitioner, but beyond that they bear no more than a superficial resemblance. They both allege that a governmental agency (the Air District and DTSC, respectively) failed to properly regulate the activities of a neighbor of Petitioner's proposed development site, but that single common generality does not give rise to any substantial overlap in the two cases. To the contrary, the cases involve two completely separate regulatory agencies, two completely separate bodies of regulatory law, and two completely separate administrative records. There will be no commonality in the substance of the two cases with respect to any of the determinative factual or legal issues, and thus no judicial savings by having both cases assigned to the same judge. The Air District opposes Petitioner's request to relate these two cases because they are not "related" as defined in California Rule of Court ("CRC") Rule 3.300(a), and because there is good cause not to transfer the Air District case to Department 302 where the DTSC case is assigned.

## I.     The Cases Involve Different Parties And Different Claims

The two cases do not satisfy the standard set forth in CRC Rule 3.300(a)(1) applicable to cases involving (i) the same parties and (ii) the same or similar claims. Both of these elements must apply in order to come within this subsection of the definition. But neither is present here.

First, the cases do not involve the same parties. Although the Petitioner is the same in both cases, the Respondents are entirely separate regulatory agencies administering different statutes and implementing different regulatory programs. The Respondents in the two cases share nothing at all in common, beyond the fact that the Real Party in Interest happens to be subject to the regulatory jurisdiction of both agencies.

Second, the cases are not based on the same or similar claims. The DTSC case claims that DTSC improperly issued a conditional nonhazardous waste classification under the Hazardous Waste Control Law and DTSC regulations, whereas the Air District case claims that the Air District should have refused to renew its air permit under the applicable air pollution control laws and Air District regulations. Those claims are very different because the agencies' respective statutory and regulatory programs are very different. The statutes and regulations that govern this case are entirely different from

2

those that govern the DTSC case, and the factual and procedural history of Air District's actions in this case is entirely different from the factual and procedural history of the DTSC's actions in the DTSC case.

## II.      The Cases Involve Different Regulatory Actions and Different Questions of Fact and Law

The two cases do not satisfy the standard set forth in CRC Rule 3.300(a)(2) applicable to cases arising from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact. The "transactions, incidents and events" at issue in these two writ petition cases are those contained in the respective administrative records, which are and will be wholly separate and independent. To the extent there are factual issues in the cases, these will be determined by reference to the documents contained in those administrative records, which will be very different documents from the two separate agencies and will have no overlap or commonality. Similarly, the issues of law will involve the Hazardous Waste Control Law and DTSC regulations on the one hand, and the relevant air pollution control laws and Air District regulations on the other, which are completely separate – and highly complex – systems of regulatory law entirely unto themselves.

## III.     Neither Of The Cases Involves Any Property, Let Alone The Same Property

The two cases do not satisfy the standard set forth in CRC Rule 3.300(a)(3) applicable to cases involving claims against, title to, possession of, or damages to the same property. Neither of these cases involves any claim against any property, title to any property, possession of any property, or damages to any property. The Notice does not even allege that either case involves any property at all. The most that Petitioner can argue is that the activities it claims should have been regulated differently took place on a piece of property – although even that argument is misplaced, as the legal claims asserted do not go to the underlying activity on that property, but to the regulatory actions by the respective agencies to implement their respective programs. This is not enough to come within the language of Rule 3.300(a)(3) regarding claims involving property.

## IV.     There Will Be No Duplication Of Resources If Heard By Different Judges

The two cases do not satisfy the standard set forth in CRC Rule 3.300(a)(4) applicable to cases that will likely require substantial duplication of judicial resources if heard by different judges. As the

two cases involve entirely different regulatory systems and administrative records that do not overlap, there will be no judicial savings by having a single judge hear both cases. A judge in the DTSC case who has familiarized themself with DTSC's administrative record regarding the real party in interest's handing of its solid wastes and the complex regulatory system governing those activities under the Hazardous Waste Control Law will know virtually nothing about the Air District's administrative record regarding the facility's emissions of air pollutants and the complex regulatory system governing those emissions under the air pollution control laws involved in the Air District case – and vice versa. After having evaluated one case, that judge would have to start essentially from square one to understand the law and the record and the regulatory system in the other case. There will therefore be no duplication of resources by leaving the two cases assigned to different judges.

**V.      Good Cause Exists Not To Assign The Air District Case To Dept. 302, Where The DTSC Case Is Assigned**

Finally, pursuant to CRC Rule 3.300(g), good cause exists not to transfer the Air District case to Department 302 where the DTSC case is assigned. The Air District is informed and believes that Department 302 is a designated settlement unit, and that the DTSC case is assigned there only for resolution of certain post-judgment issues such as attorneys' fees requests and writ enforcement claims. Judicial economy would not be served by giving the Air District case that same assignment, as the Air District case is just beginning and will need to be fully litigated from scratch as an entirely new case.

For all of the foregoing reasons, the Air District respectfully submits that the Court should decline to order the two cases related or assigned to the same judge or department.


Dated:  May 24, 2022                              Respectfully submitted,


                                                  ALEXANDER G. CROCKETT
                                                  DISTRICT COUNSEL
                                                  BAY AREA AIR QUALITY
                                                  MANAGEMENT DISTRICT

                                                   /s/ Marcia L. Raymond
                                                  By: Marcia L. Raymond (SBN 215655)
                                                       Assistant Counsel

RESPONDENTS' RESPONSE AND OBJECTION TO PETITIONER'S NOTICE OF RELATED CASE

EXHIBIT J
239

**PROOF OF SERVICE**

I, Magnolia Vinluan-Chan, certify and declare as follows:

I am over the age of 18 years, and not a party to this action.  My business address is 375 Beale Street, Suite 600, San Francisco, CA  94105.  On May 24, 2022, I served the foregoing documents, described as:

- **BAY AREA AIR QUALITY MANAGEMENT DISTRICT'S RESPONSE OPPOSING PETITIONER'S NOTICE OF RELATED CASE**

☒ **BY UNITED STATES MAIL.**  I enclosed the documents in a sealed envelope or package addressed to the persons at the address(es) listed below and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the Bay Area Air Quality Management District's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the U.S. Postal Services, in a sealed envelope with postage fully prepaid.

William M. Sloan
Tyler G. Welti
Venable LLP
101 California Street, Suite 3800
San Francisco, CA 94111
Tel:  (415) 653-3750
Fax:  (415) 653-3755
Email:  wmsloan@venable.com,
tgwelti@venable.com
*Attorneys for Petitioner*

R. James Slaughter
Erich N. MacMichael
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Tel:  (415) 391-5400
Fax:  (415) 397-7188
Email:  rslaughter@keker.com,
emacmichael@keker.com
*Attorneys for Petitioner*

Ronald E. Van Buskirk
Margaret Rosegay
Stacey C. Wright
Eric Moorman
Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Tel:  (415) 983-1496
Fax:  (415) 983-1200
Mobile:  (415) 867-9209
Email:  ronald.vanbuskirk@pillsburylaw.com,
margaret.rosegay@pillsburylaw.com,
stacey.wright@pillsburylaw.com,
eric.moorman@pillsburylaw.com
*Attorneys for Schnitzer Steel*

Rob Bonta, Attorney General of CA
Edward H. Ochoa, Sr. Assistant
Attorney General
Dennis L. Beck, Jr., Deputy Attorney
General
Elizabeth B. Rumsey, Deputy Attorney
General
State of California Dept. of Justice
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA  94244-2550
Email:  Dennis.Beck@doj.ca.gov,
liz.rumsey@doj.ca.gov

*Attorneys for Defendants  California
Department of Toxic Substances Control
and Meredith Williams in her official
capacity as Director*

PROOF OF SERVICE

Case No. 22CV01 0930

| | |
|---|---|
| Jaclyn H. Prange | M. Benjamin Eichenberg |
| Natural Resources Defense Council | San Francisco Baykeeper |
| 111 Sutter Street, 21st Floor | 1736 Franklin Street, Suite 800 |
| San Francisco, CA 94104 | Oakland, CA 94612 |
| Tel: (415) 875-6100 | Tel: 510-735-9700 x105 |
| Email: jprange@nrdc.org | Email: ben@baykeeper.org |
| *Attorneys for Amici Curiae Communities for a* | *Attorneys for Amici Curiae* |
| *Better Environment, Center on Race, Poverty* | *Communities for a Better Environment,* |
| *& the Environment, San Francisco* | *Center on Race, Poverty & the* |
| *Baykeeper, and Natural Resources Defense* | *Environment, San Francisco Baykeeper,* |
| *Council* | *and Natural Resources Defense Council* |

I declare under penalty of perjury under the laws of the State of California that the foregoing

is true and correct. Executed on May 24, 2022, at Richmond, California.

_____

Magnolia Vinluan-Chan